LABOR & NON LABOR - Prior Months

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X10-5 | 500611 | E3 | 1022494772 | | 20050930 | 8200507002 | $ 427.20 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560600 | E3 | | LABOR | 20050930 | | $ 279.31 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X13-5 | 610100 | E3 | | LABOR | 20050930 | | $ 3,500.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X37-5 | 610100 | E3 | | LABOR | 20050930 | | $ 237,156.57 | 0510304UT503 | (b)(4) |
| GC02H8-A5A024X37-5 | 610100 | E3 | | LABOR | 20050930 | | $ 88,177.09 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X13-5 | 610100 | E3 | | LABOR | 20050930 | | $ 1,050.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X37-5 | 610100 | E3 | | LABOR | 20050930 | | $ 30,158.67 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X37-5 | 610100 | E3 | | LABOR | 20050930 | | $ 63,406.14 | 0510304UT503 | (b)(4) |
| GC02H8-A5A021X37-5 | 610100 | E3 | | LABOR | 20050930 | | $ 32,879.31 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610101 | E3 | 1022494773 | | 20050930 | 8200506875 | $ 2.44 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610101 | E3 | 1022494774 | | 20050930 | 8200506875 | $ 150.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610109 | E3 | 1022494775 | | 20050930 | 8200506875 | $ 45.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610123 | E3 | 1022494776 | | 20050930 | 8200506875 | $ 1,411.75 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610123 | E3 | 1022494777 | | 20050930 | 8200506875 | $ 6.84 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494778 | | 20050930 | 8200507047 | $ 82,671.02 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494779 | | 20050930 | 8200507047 | $ 76,706.35 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494780 | | 20050930 | 8200507047 | $ 14,220.33 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494781 | | 20050930 | 8200506875 | $ 1,868.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494782 | | 20050930 | 8200506875 | $ 190.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | E3 | 1022494783 | | 20050930 | 8200506875 | $ 970.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610147 | E3 | 1022494984 | | 20050930 | 8200506869 | $ 1,904.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 610155 | E3 | 1022494985 | | 20050930 | 8200506875 | $ 1,120.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X13-5 | 610300 | E3 | | LABOR | 20050930 | | $ 22,042.50 | 0510304UT503 | (b)(4) |
| GC02H8-A5A024X13-5 | 610300 | E3 | | LABOR | 20050930 | | $ 560.50 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 620104 | E3 | 1022494986 | | 20050930 | 8200507002 | $ 35.24 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X37-5 | 550430 | KN | 1022492299 | ULTIMATE SOLUTIONS CO | 20050930 | 1900259408 | $ 525.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1022492301 | ULTIMATE SOLUTIONS CO | 20050930 | 1900259410 | $ 110.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1022492332 | THE JORDANIAN ESTABLISHMENT FO | 20050930 | 1900259437 | $ 300.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1022492299 | ULTIMATE SOLUTIONS CO | 20050930 | 1900259408 | $ 25.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1022492332 | THE JORDANIAN ESTABLISHMENT FO | 20050930 | 1900259437 | $ 150.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560605 | KN | 1021077051 | AL AMANA SECURITY | 20050915 | 1900250321 | $ 3,360.53 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021077069 | NASER M AL BADDAH & PARTNER | 20050915 | 1900250339 | $ 7,708.12 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021077072 | NASER M AL BADDAH & PARTNER | 20050915 | 1900250342 | $ 7,708.12 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021078547 | WHITE SKY COMPANY TRADING & CO | 20050915 | 1900251477 | $ 59.73 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X05-5 | 560605 | KN | 1021078361 | AL ESRAA OFFICE | 20050916 | 1900251162 | $ 2,116.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A040X09-5 | 560605 | KN | 1021080238 | BADER AL MULLA & BROS CO WLL | 20050917 | 1900251746 | $ 558.41 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X01-5 | 560605 | KN | 1021080989 | MUBARAK INT | 20050918 | 1900252406 | $ 67,350.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560605 | KN | 1021080994 | MUBARAK INT | 20050918 | 1900252416 | $ 59,350.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X41-5 | 560605 | KN | 1021081311 | AL BADRAN GENERAL TRADING | 20050918 | 1900253220 | $ 5,500.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560605 | KN | 1021081106 | AL AMANA SECURITY | 20050919 | 1900252625 | $ 2,424.74 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X23-5 | 560605 | KN | 1021081119 | ATEF AL MANASEER BUREAU | 20050919 | 1900252636 | $ 7,500.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1021081121 | AL BADRAN GENERAL TRADING | 20050919 | 1900252638 | $ 40,400.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021081744 | AL RAWAN GENERAL TRADING | 20050920 | 1900252681 | $ 640.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X23-5 | 560605 | KN | 1021081749 | SAIF AL KHAWALID CO | 20050920 | 1900252686 | $ 77,525.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1021081941 | SAHIL AL FAO CO | 20050920 | 1900252699 | $ 10,860.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X05-5 | 560605 | KN | 1021083091 | AL TAHREER LAUNDRY | 20050920 | 1900253607 | $ 5,007.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X23-5 | 560605 | KN | 1021083389 | SAIF AL KHAWALID CO | 20050920 | 1900253824 | $ 7,500.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021137780 | TAMIMI GLOBAL CO LTD TAFGA | 20050921 | 1900254600 | $ 39,750.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021137799 | ARABIAN MOTORS GROUP | 20050921 | 1900254403 | $ 83.53 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1021138229 | AL BASRAH CO. | 20050921 | 1900254083 | $ 13,500.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1021138229 | AL BASRAH CO. | 20050921 | 1900254083 | $ 450.00 | 0510304UT503 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

## LABOR & NON LABOR - Prior Months

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X15-5 | 560605 | KN | 1021138987 | EQUIPMENT CO WLL | 20050921 | 1900254384 | $ | 12,261.05 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021139264 | WORLD OF SWIMMING POOLS | 20050922 | 1900255470 | $ | 6,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A024X02-5 | 560605 | KN | 1021139599 | AL MANAR CO | 20050924 | 1900255498 | $ | 800.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KN | 1021139834 | AL SABAH COMPANY | 20050926 | 1900254512 | $ | 57,142.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KN | 1021139834 | AL SABAH COMPANY | 20050926 | 1900254512 | $ | 160,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KN | 1021139834 | AL SABAH COMPANY | 20050926 | 1900254512 | $ | 622,736.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KN | 1021139834 | AL SABAH COMPANY | 20050926 | 1900254512 | $ | 40,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X06-5 | 560605 | KN | 1021140157 | RENAISSANCE SERVICES SAOG | 20050926 | 1900255826 | $ | 1,004,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021140206 | MAC INTERNATIONAL | 20050926 | 1900256203 | $ | 5,661.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021140207 | MAC INTERNATIONAL FZE | 20050926 | 1900256204 | $ | 3,760.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021140208 | MAC INTERNATIONAL FZE | 20050926 | 1900256205 | $ | 87.60 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1021140209 | MAC INTERNATIONAL FZE | 20050926 | 1900256206 | $ | 922.04 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1021140345 | SIGMA INTERNATIONAL CONST LLC | 20050926 | 1900255914 | $ | 30,118.40 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X01-5 | 560605 | KN | 1021140984 | PEERAJ GENERAL TRADING CO LLC | 20050927 | 1900255952 | $ | 155,274.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560605 | KN | 1021141060 | MERSIN HILTON | 20050927 | 1900256829 | $ | 1,792.08 | 0510304UT503 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1021141158 | AL GHASAQ COMPANY | 20050927 | 1900257011 | $ | 45,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486025 | MILLENIUM AIRPORT HOTEL | 20050927 | 1900256195 | $ | 61.50 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486296 | MAC INTERNATIONAL FZE | 20050928 | 1900257126 | $ | 5,247.74 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486297 | MAC INTERNATIONAL FZE | 20050928 | 1900257127 | $ | 4,786.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486299 | MAC INTERNATIONAL FZE | 20050928 | 1900257129 | $ | 4,641.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486300 | MAC INTERNATIONAL FZE | 20050928 | 1900257130 | $ | 2,325.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486561 | BADER AL MULLA & BROS CO WLL | 20050928 | 1900257191 | $ | 384.36 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486563 | BADER AL MULLA & BROS CO WLL | 20050928 | 1900257193 | $ | 5,070.05 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486564 | BADER AL MULLA & BROS CO WLL | 20050928 | 1900257194 | $ | 356.27 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486566 | BADER AL MULLA & BROS CO WLL | 20050928 | 1900257196 | $ | 586.31 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486573 | ARABIAN MOTORS GROUP | 20050928 | 1900257803 | $ | 760.51 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486575 | ARABIAN MOTORS GROUP | 20050928 | 1900257805 | $ | 137.03 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486576 | ARABIAN MOTORS GROUP | 20050928 | 1900257806 | $ | 918.09 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486578 | ARABIAN MOTORS GROUP | 20050928 | 1900257808 | $ | 398.10 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486580 | ARABIAN MOTORS GROUP | 20050928 | 1900257810 | $ | 414.76 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486581 | ARABIAN MOTORS GROUP | 20050928 | 1900257811 | $ | 2,196.62 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486582 | ARABIAN MOTORS GROUP | 20050928 | 1900257812 | $ | 101.27 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486787 | ARABIAN MOTORS GROUP | 20050928 | 1900257817 | $ | 413.65 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486789 | ARABIAN MOTORS GROUP | 20050928 | 1900257819 | $ | 1,061.75 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486790 | ARABIAN MOTORS GROUP | 20050928 | 1900257820 | $ | 235.72 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486791 | ARABIAN MOTORS GROUP | 20050928 | 1900257821 | $ | 774.01 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486793 | ARABIAN MOTORS GROUP | 20050928 | 1900257823 | $ | 818.91 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486794 | ARABIAN MOTORS GROUP | 20050928 | 1900257824 | $ | 366.21 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486797 | ARABIAN MOTORS GROUP | 20050928 | 1900257827 | $ | 2,307.40 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486798 | ARABIAN MOTORS GROUP | 20050928 | 1900257828 | $ | 81.27 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486799 | ARABIAN MOTORS GROUP | 20050928 | 1900257829 | $ | 155.86 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022486800 | ARABIAN MOTORS GROUP | 20050928 | 1900257830 | $ | 1,406.58 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X01-5 | 560605 | KN | 1022487070 | PEERAJ GENERAL TRADING CO LLC | 20050928 | 1900257674 | $ | 155,274.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487492 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257689 | $ | 1,479.29 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487496 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257691 | $ | 2,575.86 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487499 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257693 | $ | 205.89 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487501 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257694 | $ | 1,370.28 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487503 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257696 | $ | 1,478.37 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487506 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257697 | $ | 633.76 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487508 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257699 | $ | 876.07 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487510 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257700 | $ | 522.42 | 0510304UT503 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Prior Months

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487512 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257701 | $ | 1,259.94 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487513 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257702 | $ | 71.94 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487514 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257703 | $ | 505.98 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487572 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257719 | $ | 1,693.67 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487573 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257720 | $ | 633.76 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487574 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257721 | $ | 274.06 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487575 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257722 | $ | 887.26 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487576 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257723 | $ | 947.21 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487577 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257724 | $ | 3,597.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487579 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257726 | $ | 2,303.70 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1022487580 | MOHAMED NASER AL SAYER & SONS | 20050929 | 1900257727 | $ | 123.33 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X06-5 | 560605 | KN | 1022487812 | RENAISSANCE SERVICES SAOG | 20050929 | 1900257757 | $ | 1,004,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X37-5 | 620104 | KN | 1022492299 | ULTIMATE SOLUTIONS CO | 20050930 | 1900259408 | $ | 84.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X09-5 | 500612 | KO | 1022491355 | AL NADAEER SHOP FOR FURNITURE | 20050901 | 1700050260 | $ | (63.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550410 | KO | 1022491350 | AL SADEQ OFFICE | 20050901 | 1700050255 | $ | (8.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550410 | KO | 1022491353 | AL MUJTABA SHOP | 20050901 | 1700050258 | $ | (160.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550450 | KO | 1022491352 | AWANEAS | 20050901 | 1700050257 | $ | (50.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X02-5 | 560600 | KO | 1022491354 | IRAQI AMERICAN MEDIA INC. | 20050901 | 1700050259 | $ | (261,533.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KO | 1021140009 | AL SABAH COMPANY | 20050901 | 1700050239 | $ | (57,142.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KO | 1021140009 | AL SABAH COMPANY | 20050901 | 1700050239 | $ | (150,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KO | 1021140009 | AL SABAH COMPANY | 20050901 | 1700050239 | $ | (930,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | KO | 1021140009 | AL SABAH COMPANY | 20050901 | 1700050239 | $ | (40,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X01-5 | 560605 | KO | 1022485763 | PEERAJ GENERAL TRADING CO LLC | 20050928 | 1700049836 | $ | (155,274.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 500600 | SA | 1022492162 | | 20050930 | 100160544 | $ | (72,764.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550430 | SA | 1022492162 | | 20050930 | 100160544 | $ | 321,300.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550430 | SA | 1022492162 | | 20050930 | 100160544 | $ | 254,900.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550430 | SA | 1022492162 | | 20050930 | 100160544 | $ | 271,840.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X42-5 | 550430 | SA | 1022492162 | | 20050930 | 100160544 | $ | 170,600.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | SA | 1022492162 | | 20050930 | 100160544 | $ | (321,300.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | SA | 1022492162 | | 20050930 | 100160544 | $ | (254,900.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | SA | 1022492162 | | 20050930 | 100160544 | $ | (271,840.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X42-5 | 550451 | SA | 1022492162 | | 20050930 | 100160544 | $ | (170,600.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A040X02-5 | 550610 | SA | 1022492162 | | 20050930 | 100160544 | $ | 14,746.18 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X10-5 | 560600 | SA | 1022492162 | | 20050930 | 100160544 | $ | 72,764.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X16-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | 3,910.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | (150,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | (930,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | (40,000.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X02-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | (57,142.00) | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X42-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | 57,142.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X42-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | 150,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X42-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | 930,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A030X42-5 | 560605 | SA | 1022490876 | | 20050929 | 100160517 | $ | 40,000.00 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X11-5 | 600100 | SA | 1022492162 | | 20050930 | 100160544 | $ | (11,992.58) | 0510304UT503 | (b)(4) |
| GC02H8-A5A024X08-5 | 600100 | SA | 1022494731 | | 20050930 | 100160531 | $ | 667.67 | 0510304UT503 | (b)(4) |
| GC02H8-A5A024X08-5 | 600100 | SA | 1022494731 | | 20050930 | 100160531 | $ | 2,622.33 | 0510304UT503 | (b)(4) |
| GC02H8-A5A010X11-5 | 600108 | SA | 1022492162 | | 20050930 | 100160544 | $ | 11,992.58 | 0510304UT503 | (b)(4) |
| | | | | | | | $ | 2,831,823.55 | | |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.







LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X37-5 | 500605 | KN | 1026684324 | AEMAN STATIONARY | 20060501 | 1900379625 | 150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X41-5 | 500605 | KN | 1026684324 | AEMAN STATIONARY | 20060501 | 1900379625 | 40.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500611 | KN | 1026684324 | AEMAN STATIONARY | 20060501 | 1900379625 | 45.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026685104 | CAPROCK COMMUNICATIONS | 20060501 | 1900379983 | 37,134.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026684990 | CAPROCK COMMUNICATIONS | 20060501 | 1900379869 | 28,063.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026684991 | CAPROCK COMMUNICATIONS | 20060501 | 1900379870 | 25,823.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026685002 | CAPROCK COMMUNICATIONS | 20060501 | 1900379881 | 94,389.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026685003 | CAPROCK COMMUNICATIONS | 20060501 | 1900379882 | 99,384.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 550200 | KN | 1026685024 | CAPROCK COMMUNICATIONS | 20060501 | 1900379903 | 33,586.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026685032 | CAPROCK COMMUNICATIONS | 20060501 | 1900379911 | 31,836.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 550200 | KN | 1026685044 | CAPROCK COMMUNICATIONS | 20060501 | 1900379923 | 16,669.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 550200 | KN | 1026685048 | CAPROCK COMMUNICATIONS | 20060501 | 1900379927 | 29,416.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 550200 | KN | 1026685073 | CAPROCK COMMUNICATIONS | 20060501 | 1900379952 | 15,392.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685838 | PANALPINA INC | 20060501 | 1900380683 | 290.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026685839 | PANALPINA INC | 20060501 | 1900380684 | 167.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026685839 | PANALPINA INC | 20060501 | 1900380684 | 96.18 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X12-5 | 550520 | KN | 1026685839 | PANALPINA INC | 20060501 | 1900380684 | 891.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685839 | PANALPINA INC | 20060501 | 1900380684 | 579.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685149 | PANALPINA INC | 20060501 | 1900380228 | 89.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685150 | PANALPINA INC | 20060501 | 1900380229 | 261.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026685145 | PANALPINA INC | 20060501 | 1900380224 | 35.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685146 | PANALPINA INC | 20060501 | 1900380225 | 895.61 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026685149 | PANALPINA INC | 20060501 | 1900380228 | 27.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026685149 | PANALPINA INC | 20060501 | 1900380228 | 21.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685107 | EAGLE GLOBAL LOGISTICS | 20060501 | 1900379986 | 37.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685108 | EAGLE GLOBAL LOGISTICS | 20060501 | 1900379987 | 1,061.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026685108 | EAGLE GLOBAL LOGISTICS | 20060501 | 1900379987 | 384.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685140 | WYNDHAM GREENSPOINT | 20060501 | 1900380219 | 1,368.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685140 | WYNDHAM GREENSPOINT | 20060501 | 1900380219 | 547.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685141 | WYNDHAM GREENSPOINT | 20060501 | 1900380220 | 1,825.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685142 | WYNDHAM GREENSPOINT | 20060501 | 1900380221 | 1,368.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685142 | WYNDHAM GREENSPOINT | 20060501 | 1900380221 | 365.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685143 | WYNDHAM GREENSPOINT | 20060501 | 1900380222 | 1,003.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685143 | WYNDHAM GREENSPOINT | 20060501 | 1900380222 | 1,688.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685144 | WYNDHAM GREENSPOINT | 20060501 | 1900380223 | 7,498.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685144 | WYNDHAM GREENSPOINT | 20060501 | 1900380223 | 1,609.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685129 | WYNDHAM GREENSPOINT | 20060501 | 1900380208 | 296.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685129 | WYNDHAM GREENSPOINT | 20060501 | 1900380208 | 1,068.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685130 | WYNDHAM GREENSPOINT | 20060501 | 1900380209 | 1,290.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685130 | WYNDHAM GREENSPOINT | 20060501 | 1900380209 | 378.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685131 | WYNDHAM GREENSPOINT | 20060501 | 1900380210 | 1,914.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685131 | WYNDHAM GREENSPOINT | 20060501 | 1900380210 | 194.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685132 | WYNDHAM GREENSPOINT | 20060501 | 1900380211 | 832.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026685132 | WYNDHAM GREENSPOINT | 20060501 | 1900380211 | 326.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026685139 | WYNDHAM GREENSPOINT | 20060501 | 1900380218 | 2,281.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 590110 | KN | 1026684984 | WYNDHAM GREENSPOINT | 20060501 | 1900379864 | 1,006.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 590110 | KN | 1026684981 | WYNDHAM GREENSPOINT | 20060501 | 1900379861 | 603.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 500200 | KN | 1026685544 | 4C TECHNOLOGIES GENERAL TRADIN | 20060502 | 1900380485 | 821.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 500603 | KN | 1026686393 | GROVES INDUSTRIAL SUPPLY | 20060502 | 1900380802 | 3,445.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550410 | KN | 1026685642 | ARABIAN AUTO AGENCY CO LTD | 20060502 | 1900380604 | 11.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550430 | KN | 1026686393 | GROVES INDUSTRIAL SUPPLY | 20060502 | 1900380802 | 26,500.00 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A030X02-5 | 550451 | KN | 1026686391 | WESTERN INT DISTRIBUTING CO | 20060502 | 1900380800 | 1,612.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 550451 | KN | 1026686391 | WESTERN INT DISTRIBUTING CO | 20060502 | 1900380800 | 6,335.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026685642 | ARABIAN AUTO AGENCY CO LTD | 20060502 | 1900380604 | 237.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026686391 | WESTERN INT DISTRIBUTING CO | 20060502 | 1900380800 | 80.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026685642 | ARABIAN AUTO AGENCY CO LTD | 20060502 | 1900380604 | 55.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560610 | KN | 1026684963 | MARRIOTT EXECUTIVE APARTMENTS | 20060502 | 1900379693 | 764.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560614 | KN | 1026684965 | TOWERS ROTANA HOTEL | 20060502 | 1900379695 | 24.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560614 | KN | 1026684966 | TOWERS ROTANA HOTEL | 20060502 | 1900379696 | 35.29 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560614 | KN | 1026684967 | TOWERS ROTANA HOTEL | 20060502 | 1900379697 | 50.39 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560614 | KN | 1026684963 | MARRIOTT EXECUTIVE APARTMENTS | 20060502 | 1900379693 | 29.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 560200 | KN | 1026685871 | JEANNERET & ASSOCIATES INC | 20060502 | 1900380705 | 14.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 560200 | KN | 1026685871 | JEANNERET & ASSOCIATES INC | 20060502 | 1900380705 | 56.75 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1026685878 | BADER AL MULLA & BROS CO WLL | 20060502 | 1900380712 | 672.79 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590110 | KN | 1026686430 | WYNDHAM GREENSPOINT | 20060502 | 1900380836 | 2,686.43 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026686430 | WYNDHAM GREENSPOINT | 20060502 | 1900380836 | 4,477.59 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026685775 | | 20060502 | 1500224690 | (546.76) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026685775 | | 20060502 | 1500224690 | 614.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026685775 | | 20060502 | 1500224690 | (546.76) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026685775 | | 20060502 | 1500224690 | 614.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026685773 | | 20060502 | 1500224688 | 428.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | SA | 1026685382 | | 20060502 | 100215454 | 1,323.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 500200 | KN | 1026687017 | AL MUKHTASS SPECIALIST CO. | 20060503 | 1900380751 | 260,000.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 500605 | KN | 1026687687 | NEWMAN SUPPLY CORP | 20060503 | 1900381615 | 1,324.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X08-5 | 500605 | KN | 1026687269 | LAB SAFETY SUPPLY | 20060503 | 1900380997 | 148.11 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687326 | AL TAYER MOTORS LLC | 20060503 | 1900381085 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687327 | AL TAYER MOTORS LLC | 20060503 | 1900381086 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687329 | AL TAYER MOTORS LLC | 20060503 | 1900381088 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687298 | AL TAYER MOTORS LLC | 20060503 | 1900381059 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687300 | AL TAYER MOTORS LLC | 20060503 | 1900381060 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687302 | AL TAYER MOTORS LLC | 20060503 | 1900381062 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687303 | AL TAYER MOTORS LLC | 20060503 | 1900381063 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687306 | AL TAYER MOTORS LLC | 20060503 | 1900381066 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687308 | AL TAYER MOTORS LLC | 20060503 | 1900381068 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687312 | AL TAYER MOTORS LLC | 20060503 | 1900381071 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687314 | AL TAYER MOTORS LLC | 20060503 | 1900381073 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687316 | AL TAYER MOTORS LLC | 20060503 | 1900381075 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687319 | AL TAYER MOTORS LLC | 20060503 | 1900381078 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687321 | AL TAYER MOTORS LLC | 20060503 | 1900381080 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687322 | AL TAYER MOTORS LLC | 20060503 | 1900381081 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687323 | AL TAYER MOTORS LLC | 20060503 | 1900381082 | 35.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687293 | AL TAYER MOTORS LLC | 20060503 | 1900381053 | 35.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687294 | AL TAYER MOTORS LLC | 20060503 | 1900381054 | 43.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550400 | KN | 1026687296 | AL TAYER MOTORS LLC | 20060503 | 1900381057 | 43.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 550451 | KN | 1026687278 | NEWMAN SUPPLY CORP | 20060503 | 1900381806 | 600.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687696 | PANALPINA INC | 20060503 | 1900381824 | 335.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687700 | PANALPINA INC | 20060503 | 1900381828 | 3,638.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687702 | PANALPINA INC | 20060503 | 1900381830 | 3,962.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026687705 | PANALPINA INC | 20060503 | 1900381833 | 234.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687707 | PANALPINA INC | 20060503 | 1900381835 | 139.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687709 | PANALPINA INC | 20060503 | 1900381837 | 1,292.15 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687710 | PANALPINA INC | 20060503 | 1900381838 | 5,102.56 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687715 | EAGLE GLOBAL LOGISTICS | 20060503 | 1900381843 | 2,141.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687687 | NEWMAN SUPPLY CORP | 20060503 | 1900381815 | 40.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687693 | PANALPINA INC | 20060503 | 1900381821 | 483.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026687694 | PANALPINA INC | 20060503 | 1900381822 | 71.24 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026687694 | PANALPINA INC | 20060503 | 1900381822 | 39.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026687269 | LAB SAFETY SUPPLY | 20060503 | 1900380997 | 9.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026687278 | NEWMAN SUPPLY CORP | 20060503 | 1900381806 | 65.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 560601 | KN | 1026685881 | THE TRANSP & WAREHOUSING CO | 20060503 | 1900380715 | 6,931.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 560605 | KN | 1026687441 | ASFA INT'L CONSTRUCTION INDUST | 20060503 | 1900381461 | 6,825.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 560605 | KN | 1026687016 | ANNABAA CO | 20060503 | 1900380750 | 65,579.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 560605 | KN | 1026685879 | BADER AL MULLA & BROS CO WLL | 20060503 | 1900380713 | 1,247.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026688116 | SHARJAH ROTANA HOTEL DUBA | 20060503 | 1900381274 | 1,145.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026688116 | SHARJAH ROTANA HOTEL DUBA | 20060503 | 1900381274 | 4,078.17 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026687625 | | 20060503 | 1500225194 | 774.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026687385 | | 20060503 | 1500224555 | 480.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590108 | KZ | 1026687436 | | 20060503 | 1500224560 | 13.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026687436 | | 20060503 | 1500224560 | 13.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590108 | KZ | 1026687150 | | 20060503 | 1500224543 | 972.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026687150 | | 20060503 | 1500224543 | 1,119.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026687179 | | 20060503 | 1500224551 | 69.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 500200 | KN | 1026743248 | AL BARAKA STORE | 20060504 | 1900381873 | 2,043.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 500603 | KN | 1026688168 | EQUIPMENT CO WLL | 20060504 | 1900381337 | 226.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500605 | KN | 1026751467 | SARA SHOPS | 20060504 | 1900382038 | 512.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 500605 | KN | 1026751491 | RAFEEK AL JARBAWI | 20060504 | 1900382041 | 18,500.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 500611 | KN | 1026753997 | NFPA (NATIONAL FIRE PROTECTION | 20060504 | 1900381967 | 1,559.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 500612 | KN | 1026743673 | SHIRENE CO | 20060504 | 1900382026 | 1,950.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550412 | KN | 1026743677 | SHIRENE CO | 20060504 | 1900382030 | 370.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550412 | KN | 1026743677 | SHIRENE CO | 20060504 | 1900382030 | 1,540.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550430 | KN | 1026753999 | PROTECTION DEVICES INC | 20060504 | 1900381968 | 122,000.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 550430 | KN | 1026743249 | ORANGE COMPANY | 20060504 | 1900381874 | 1,150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026753987 | INTERNATIONAL TRUCKS OF HOUSTO | 20060504 | 1900381962 | 71.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743480 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381690 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743481 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381691 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743474 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381684 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743475 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381685 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743476 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381686 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743476 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381686 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026743479 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381689 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026688117 | SHARJAH ROTANA HOTEL DUBA | 20060504 | 1900381275 | 105.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026753997 | NFPA (NATIONAL FIRE PROTECTION | 20060504 | 1900381967 | 31.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026753985 | EAGLE GLOBAL LOGISTICS | 20060504 | 1900381954 | 254.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026753985 | EAGLE GLOBAL LOGISTICS | 20060504 | 1900381954 | 16.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026753976 | EAGLE GLOBAL LOGISTICS | 20060504 | 1900381957 | 875.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026743673 | SHIRENE CO | 20060504 | 1900382026 | 100.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743473 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381683 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743465 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381675 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743469 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381679 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743470 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381680 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743471 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381681 | 16.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026743472 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381682 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550610 | KN | 1026688117 | SHARJAH ROTANA HOTEL DUBA | 20060504 | 1900381275 | 499.20 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X10-5 | 550614 | KN | 1026668117 | SHARJAH ROTANA HOTEL DUBA | 20060504 | 1900381275 | 39.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 560600 | KN | 1026751485 | PRIME PROJECTS INTERNATIONAL | 20060504 | 1900382037 | 22,964.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 560600 | KN | 1026743674 | PRIME PROJECTS INTERNATIONAL | 20060504 | 1900382027 | 8,718.84 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 560600 | KN | 1026743676 | PRIME PROJECTS INTERNATIONAL | 20060504 | 1900382031 | 27,199.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560600 | KN | 1026743683 | PRIME PROJECTS INTERNATIONAL | 20060504 | 1900382035 | 9,375.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A080X02-5 | 560600 | KN | 1026743264 | DEHDARI GENERAL TRADING CONT E | 20060504 | 1900381875 | 101,811.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 560601 | KN | 1026743680 | PRIME PROJECTS INTERNATIONAL | 20060504 | 1900382032 | 35,650.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 560603 | KN | 1026751484 | ROSE LAUNDRY | 20060504 | 1900382036 | 9,772.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 560605 | KN | 1026751489 | ROSE LAUNDRY | 20060504 | 1900382040 | 9,618.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 560605 | KN | 1026743682 | ROSE LAUNDRY | 20060504 | 1900382034 | 7,100.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KN | 1026753932 | ACTION MOTORS & LIMOUSINES | 20060504 | 1900381945 | 95.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 590108 | KN | 1026753932 | ACTION MOTORS & LIMOUSINES | 20060504 | 1900381945 | 13.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KN | 1026753952 | DSSN3801NE 5257 | 20060504 | 1900381951 | 292.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751396 | CHELSEA HOTEL | 20060504 | 1900381697 | 456.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751397 | CHELSEA HOTEL | 20060504 | 1900381698 | 483.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751398 | CHELSEA HOTEL | 20060504 | 1900381699 | 729.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751399 | CHELSEA HOTEL | 20060504 | 1900381700 | 591.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751400 | CHELSEA HOTEL | 20060504 | 1900381701 | 636.59 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751401 | CHELSEA HOTEL | 20060504 | 1900381702 | 393.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751402 | CHELSEA HOTEL | 20060504 | 1900381703 | 362.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751403 | CHELSEA HOTEL | 20060504 | 1900381704 | 281.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751404 | CHELSEA HOTEL | 20060504 | 1900381705 | 366.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751405 | CHELSEA HOTEL | 20060504 | 1900381706 | 419.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026748834 | CHELSEA HOTEL | 20060504 | 1900381695 | 648.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026751395 | CHELSEA HOTEL | 20060504 | 1900381696 | 666.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743480 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381690 | 873.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743481 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381691 | 1,465.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743520 | CHELSEA HOTEL | 20060504 | 1900381490 | 418.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743521 | CHELSEA HOTEL | 20060504 | 1900381491 | 828.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743473 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381683 | 632.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743474 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381684 | 615.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743475 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381685 | 1,033.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743476 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381686 | 712.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743478 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381688 | 726.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743479 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381689 | 407.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743465 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381675 | 1,314.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743469 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381679 | 1,308.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743470 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381680 | 469.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743471 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381681 | 1,187.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026743472 | MILLENIUM AIRPORT HOTEL | 20060504 | 1900381682 | 1,015.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026742581 | CHELSEA HOTEL | 20060504 | 1900381489 | 426.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026741552 | CHELSEA HOTEL | 20060504 | 1900381488 | 281.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026739354 | CHELSEA HOTEL | 20060504 | 1900381487 | 954.43 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026738171 | CHELSEA HOTEL | 20060504 | 1900381486 | 671.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026737833 | CHELSEA HOTEL | 20060504 | 1900381485 | 589.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026736814 | CHELSEA HOTEL | 20060504 | 1900381484 | 614.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026735244 | CHELSEA HOTEL | 20060504 | 1900381483 | 161.11 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026734733 | CHELSEA HOTEL | 20060504 | 1900381482 | 228.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026733697 | CHELSEA HOTEL | 20060504 | 1900381481 | 347.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 500605 | KN | 1026758395 | USMI BAGHDAD PETTY CASH | 20060505 | 1900382254 | 200.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560302 | KN | 1026758436 | VINSON & ELKINS LLP | 20060505 | 1900382276 | 102.58 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A021X06-5 | 610168 | ZD | LABOR | | 20060505 | | 29.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610168 | ZD | LABOR | | 20060505 | | 100.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610168 | ZD | LABOR | | 20060505 | | 210.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610168 | ZD | LABOR | | 20060505 | | 40.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610168 | ZD | LABOR | | 20060505 | | 117.05 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610168 | ZD | LABOR | | 20060505 | | 100.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610168 | ZD | LABOR | | 20060505 | | 75.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610168 | ZD | LABOR | | 20060505 | | 115.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610168 | ZD | LABOR | | 20060505 | | 85.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610168 | ZD | LABOR | | 20060505 | | 464.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610168 | ZD | LABOR | | 20060505 | | 121.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610168 | ZD | LABOR | | 20060505 | | 37.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610168 | ZD | LABOR | | 20060505 | | 167.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610168 | ZD | LABOR | | 20060505 | | 11.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610168 | ZD | LABOR | | 20060505 | | 222.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610168 | ZD | LABOR | | 20060505 | | 114.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610168 | ZD | LABOR | | 20060505 | | 27.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610168 | ZD | LABOR | | 20060505 | | 95.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610168 | ZD | LABOR | | 20060505 | | 174.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610168 | ZD | LABOR | | 20060505 | | 75.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610169 | ZD | LABOR | | 20060505 | | 75,643.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610169 | ZD | LABOR | | 20060505 | | 46,159.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610169 | ZD | LABOR | | 20060505 | | 17,671.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610169 | ZD | LABOR | | 20060505 | | 20,681.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610169 | ZD | LABOR | | 20060505 | | 5,973.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610169 | ZD | LABOR | | 20060505 | | 663.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610169 | ZD | LABOR | | 20060505 | | 997.97 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610169 | ZD | LABOR | | 20060505 | | 806.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610169 | ZD | LABOR | | 20060505 | | 25,664.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610169 | ZD | LABOR | | 20060505 | | 2,506.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610169 | ZD | LABOR | | 20060505 | | 10,119.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610169 | ZD | LABOR | | 20060505 | | 10,924.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610169 | ZD | LABOR | | 20060505 | | 4,062.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610169 | ZD | LABOR | | 20060505 | | 1,197.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610169 | ZD | LABOR | | 20060505 | | 7,520.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610169 | ZD | LABOR | | 20060505 | | 4,178.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610169 | ZD | LABOR | | 20060505 | | 6,042.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610169 | ZD | LABOR | | 20060505 | | 4,787.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610169 | ZD | LABOR | | 20060505 | | 1,298.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610169 | ZD | LABOR | | 20060505 | | 3,964.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610169 | ZD | LABOR | | 20060505 | | 4,456.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610169 | ZD | LABOR | | 20060505 | | 2,994.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610169 | ZD | LABOR | | 20060505 | | 1,350.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610169 | ZD | LABOR | | 20060505 | | 4,512.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610169 | ZD | LABOR | | 20060505 | | 1,939.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 610169 | ZD | LABOR | | 20060505 | | 360.62 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A060X26-5 | 610169 | ZD | LABOR | | 20060505 | | 2,962.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610169 | ZD | LABOR | | 20060505 | | 95.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA: | 610169 | ZD | LABOR | | 20060505 | | 500.17 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610169 | ZD | LABOR | | 20060505 | | 2,472.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610169 | ZD | LABOR | | 20060505 | | 787.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610169 | ZD | LABOR | | 20060505 | | 972.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610169 | ZD | LABOR | | 20060505 | | 1,397.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610169 | ZD | LABOR | | 20060505 | | 3,412.18 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610169 | ZD | LABOR | | 20060505 | | 576.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610169 | ZD | LABOR | | 20060505 | | 576.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610169 | ZD | LABOR | | 20060505 | | 5,578.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610169 | ZD | LABOR | | 20060505 | | 298.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X08-5 | 610169 | ZD | LABOR | | 20060505 | | 1,320.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610169 | ZD | LABOR | | 20060505 | | 650.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610169 | ZD | LABOR | | 20060505 | | 988.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X08-5 | 610169 | ZD | LABOR | | 20060505 | | 935.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610169 | ZD | LABOR | | 20060505 | | 772.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610169 | ZD | LABOR | | 20060505 | | 1,600.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610169 | ZD | LABOR | | 20060505 | | 1,182.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610169 | ZD | LABOR | | 20060505 | | 2,678.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 610169 | ZD | LABOR | | 20060505 | | 149.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610169 | ZD | LABOR | | 20060505 | | 501.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610169 | ZD | LABOR | | 20060505 | | 1,019.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610169 | ZD | LABOR | | 20060505 | | 201.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610169 | ZD | LABOR | | 20060505 | | 585.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610169 | ZD | LABOR | | 20060505 | | 501.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610169 | ZD | LABOR | | 20060505 | | 375.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610169 | ZD | LABOR | | 20060505 | | 572.89 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610169 | ZD | LABOR | | 20060505 | | 426.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610169 | ZD | LABOR | | 20060505 | | 2,232.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610169 | ZD | LABOR | | 20060505 | | 609.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610169 | ZD | LABOR | | 20060505 | | 187.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610169 | ZD | LABOR | | 20060505 | | 595.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610169 | ZD | LABOR | | 20060505 | | 34.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610169 | ZD | LABOR | | 20060505 | | 1,112.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610169 | ZD | LABOR | | 20060505 | | 388.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610169 | ZD | LABOR | | 20060505 | | 478.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610169 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610169 | ZD | LABOR | | 20060505 | | 872.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610169 | ZD | LABOR | | 20060505 | | 375.00 | 0605304UT124 | (b)(4) |
| GC02H6-A5A010X02-5 | 610180 | ZD | LABOR | | 20060505 | | 174.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610180 | ZD | LABOR | | 20060505 | | 272.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610180 | ZD | LABOR | | 20060505 | | 952.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610181 | ZD | LABOR | | 20060505 | | 5,233.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610181 | ZD | LABOR | | 20060505 | | 2,207.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610181 | ZD | LABOR | | 20060505 | | 351.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610181 | ZD | LABOR | | 20060505 | | 702.98 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X42-5 | 610181 | ZD | LABOR | | 20060505 | | 449.17 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610181 | ZD | LABOR | | 20060505 | | 24.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610181 | ZD | LABOR | | 20060505 | | 349.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610181 | ZD | LABOR | | 20060505 | | 448.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610181 | ZD | LABOR | | 20060505 | | 2,036.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610181 | ZD | LABOR | | 20060505 | | 63.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610181 | ZD | LABOR | | 20060505 | | 183.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610181 | ZD | LABOR | | 20060505 | | 341.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610181 | ZD | LABOR | | 20060505 | | 158.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610181 | ZD | LABOR | | 20060505 | | 107.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610181 | ZD | LABOR | | 20060505 | | 144.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610181 | ZD | LABOR | | 20060505 | | 378.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610181 | ZD | LABOR | | 20060505 | | 170.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610181 | ZD | LABOR | | 20060505 | | 188.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610181 | ZD | LABOR | | 20060505 | | 290.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610181 | ZD | LABOR | | 20060505 | | 162.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610181 | ZD | LABOR | | 20060505 | | 268.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610181 | ZD | LABOR | | 20060505 | | 132.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610183 | ZD | LABOR | | 20060505 | | 145,672.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610183 | ZD | LABOR | | 20060505 | | 5,243.73 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X13-5 | 610183 | ZD | LABOR | | 20060505 | | 3,440.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610183 | ZD | LABOR | | 20060505 | | 11,793.15 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 610183 | ZD | LABOR | | 20060505 | | 3,839.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610191 | ZD | LABOR | | 20060505 | | 887.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610191 | ZD | LABOR | | 20060505 | | 14,231.39 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610191 | ZD | LABOR | | 20060505 | | 16,781.78 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610191 | ZD | LABOR | | 20060505 | | 1,775.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610191 | ZD | LABOR | | 20060505 | | 2,809.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610191 | ZD | LABOR | | 20060505 | | 3,701.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610191 | ZD | LABOR | | 20060505 | | 1,712.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610191 | ZD | LABOR | | 20060505 | | 1,212.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610191 | ZD | LABOR | | 20060505 | | 105.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610191 | ZD | LABOR | | 20060505 | | 103.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610191 | ZD | LABOR | | 20060505 | | 404.66 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610191 | ZD | LABOR | | 20060505 | | 7,387.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610191 | ZD | LABOR | | 20060505 | | 23.43 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X18-5 | 610191 | ZD | LABOR | | 20060505 | | 609.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610191 | ZD | LABOR | | 20060505 | | 1,943.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610191 | ZD | LABOR | | 20060505 | | 840.84 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610191 | ZD | LABOR | | 20060505 | | 416.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610191 | ZD | LABOR | | 20060505 | | 1,352.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610191 | ZD | LABOR | | 20060505 | | 740.05 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610191 | ZD | LABOR | | 20060505 | | 34.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610191 | ZD | LABOR | | 20060505 | | 1,491.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610191 | ZD | LABOR | | 20060505 | | 659.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610191 | ZD | LABOR | | 20060505 | | 0.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610191 | ZD | LABOR | | 20060505 | | 103.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610191 | ZD | LABOR | | 20060505 | | 1,174.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610191 | ZD | LABOR | | 20060505 | | 1,161.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610191 | ZD | LABOR | | 20060505 | | 392.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610191 | ZD | LABOR | | 20060505 | | 295.98 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

## LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X07-5 | 610191 | ZD | LABOR | | 20060505 | | 887.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610191 | ZD | LABOR | | 20060505 | | 893.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610191 | ZD | LABOR | | 20060505 | | 40.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 610191 | ZD | LABOR | | 20060505 | | 60.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610191 | ZD | LABOR | | 20060505 | | 350.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610191 | ZD | LABOR | | 20060505 | | 58.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA: | 610191 | ZD | LABOR | | 20060505 | | 80.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610191 | ZD | LABOR | | 20060505 | | 1.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610191 | ZD | LABOR | | 20060505 | | 466.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610191 | ZD | LABOR | | 20060505 | | 99.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610191 | ZD | LABOR | | 20060505 | | 102.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610191 | ZD | LABOR | | 20060505 | | 418.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610191 | ZD | LABOR | | 20060505 | | 1,538.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610191 | ZD | LABOR | | 20060505 | | 56.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610191 | ZD | LABOR | | 20060505 | | 32.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610191 | ZD | LABOR | | 20060505 | | 620.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610191 | ZD | LABOR | | 20060505 | | 904.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 610191 | ZD | LABOR | | 20060505 | | 34.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610191 | ZD | LABOR | | 20060505 | | 268.24 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 810191 | ZD | LABOR | | 20060505 | | 13.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610191 | ZD | LABOR | | 20060505 | | 104.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610191 | ZD | LABOR | | 20060505 | | 76.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X06-5 | 610191 | ZD | LABOR | | 20060505 | | 241.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610191 | ZD | LABOR | | 20060505 | | 185.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610191 | ZD | LABOR | | 20060505 | | 5.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610191 | ZD | LABOR | | 20060505 | | 424.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610191 | ZD | LABOR | | 20060505 | | 201.53 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610191 | ZD | LABOR | | 20060505 | | 51.66 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610191 | ZD | LABOR | | 20060505 | | 34.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 810191 | ZD | LABOR | | 20060505 | | 157.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 610191 | ZD | LABOR | | 20060505 | | 17.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610191 | ZD | LABOR | | 20060505 | | 51.59 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610191 | ZD | LABOR | | 20060505 | | 137.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610191 | ZD | LABOR | | 20060505 | | 82.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610191 | ZD | LABOR | | 20060505 | | 104.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610191 | ZD | LABOR | | 20060505 | | 47.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610191 | ZD | LABOR | | 20060505 | | 77.11 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610191 | ZD | LABOR | | 20060505 | | 67.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610191 | ZD | LABOR | | 20060505 | | 77.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610191 | ZD | LABOR | | 20060505 | | 66.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610191 | ZD | LABOR | | 20060505 | | 108.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610191 | ZD | LABOR | | 20060505 | | 17.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610191 | ZD | LABOR | | 20060505 | | 120.29 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610191 | ZD | LABOR | | 20060505 | | 4.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610191 | ZD | LABOR | | 20060505 | | 528.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 810191 | ZD | LABOR | | 20060505 | | 192.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610191 | ZD | LABOR | | 20060505 | | 32.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610191 | ZD | LABOR | | 20060505 | | 34.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610191 | ZD | LABOR | | 20060505 | | 102.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610191 | ZD | LABOR | | 20060505 | | 34.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610192 | ZD | LABOR | | 20060505 | | 77.58 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X10-5 | 610192 | ZD | LABOR | | 20060505 | | 3,144.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610192 | ZD | LABOR | | 20060505 | | 5,036.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610192 | ZD | LABOR | | 20060505 | | 723.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610192 | ZD | LABOR | | 20060505 | | 1,502.15 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610192 | ZD | LABOR | | 20060505 | | 1,365.39 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610192 | ZD | LABOR | | 20060505 | | 408.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610192 | ZD | LABOR | | 20060505 | | 187.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610192 | ZD | LABOR | | 20060505 | | 50.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610192 | ZD | LABOR | | 20060505 | | 40.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610192 | ZD | LABOR | | 20060505 | | 69.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610192 | ZD | LABOR | | 20060505 | | 1,711.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610192 | ZD | LABOR | | 20060505 | | 2.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610192 | ZD | LABOR | | 20060505 | | 177.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610192 | ZD | LABOR | | 20060505 | | 676.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610192 | ZD | LABOR | | 20060505 | | 261.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610192 | ZD | LABOR | | 20060505 | | 76.97 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610192 | ZD | LABOR | | 20060505 | | 508.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610192 | ZD | LABOR | | 20060505 | | 277.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610192 | ZD | LABOR | | 20060505 | | 23.66 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610192 | ZD | LABOR | | 20060505 | | 408.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610192 | ZD | LABOR | | 20060505 | | 317.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610192 | ZD | LABOR | | 20060505 | | 0.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610192 | ZD | LABOR | | 20060505 | | 87.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610192 | ZD | LABOR | | 20060505 | | 258.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610192 | ZD | LABOR | | 20060505 | | 297.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610192 | ZD | LABOR | | 20060505 | | 250.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610192 | ZD | LABOR | | 20060505 | | 90.53 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610192 | ZD | LABOR | | 20060505 | | 284.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610192 | ZD | LABOR | | 20060505 | | 27.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610192 | ZD | LABOR | | 20060505 | | 133.26 | 0605304UT124 | (b)(4) |
| GC02H6-A5A021X15-5 | 610192 | ZD | LABOR | | 20060505 | | 25.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610192 | ZD | LABOR | | 20060505 | | 263.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610192 | ZD | LABOR | | 20060505 | | 9.11 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA) | 610192 | ZD | LABOR | | 20060505 | | 34.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610192 | ZD | LABOR | | 20060505 | | 0.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610192 | ZD | LABOR | | 20060505 | | 159.79 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610192 | ZD | LABOR | | 20060505 | | 51.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610192 | ZD | LABOR | | 20060505 | | 59.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610192 | ZD | LABOR | | 20060505 | | 96.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610192 | ZD | LABOR | | 20060505 | | 231.89 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610192 | ZD | LABOR | | 20060505 | | 36.78 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610192 | ZD | LABOR | | 20060505 | | 36.78 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610192 | ZD | LABOR | | 20060505 | | 362.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610192 | ZD | LABOR | | 20060505 | | 162.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 610192 | ZD | LABOR | | 20060505 | | 20.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610192 | ZD | LABOR | | 20060505 | | 85.24 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610192 | ZD | LABOR | | 20060505 | | 1.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610192 | ZD | LABOR | | 20060505 | | 46.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610192 | ZD | LABOR | | 20060505 | | 57.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X06-5 | 610192 | ZD | LABOR | | 20060505 | | 69.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610192 | ZD | LABOR | | 20060505 | | 45.98 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A060X09-5 | 610192 | ZD | LABOR | | 20060505 | | 0.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610192 | ZD | LABOR | | 20060505 | | 107.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610192 | ZD | LABOR | | 20060505 | | 79.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610192 | ZD | LABOR | | 20060505 | | 33.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610192 | ZD | LABOR | | 20060505 | | 23.66 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 610192 | ZD | LABOR | | 20060505 | | 10.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610192 | ZD | LABOR | | 20060505 | | 64.17 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610192 | ZD | LABOR | | 20060505 | | 12.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610192 | ZD | LABOR | | 20060505 | | 35.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610192 | ZD | LABOR | | 20060505 | | 33.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610192 | ZD | LABOR | | 20060505 | | 25.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610192 | ZD | LABOR | | 20060505 | | 27.15 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610192 | ZD | LABOR | | 20060505 | | 6.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610192 | ZD | LABOR | | 20060505 | | 34.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610192 | ZD | LABOR | | 20060505 | | 24.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610192 | ZD | LABOR | | 20060505 | | 28.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610192 | ZD | LABOR | | 20060505 | | 36.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610192 | ZD | LABOR | | 20060505 | | 12.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610192 | ZD | LABOR | | 20060505 | | 59.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610192 | ZD | LABOR | | 20060505 | | 4.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610192 | ZD | LABOR | | 20060505 | | 73.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610192 | ZD | LABOR | | 20060505 | | 59.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610192 | ZD | LABOR | | 20060505 | | 26.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610192 | ZD | LABOR | | 20060505 | | 23.66 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610192 | ZD | LABOR | | 20060505 | | 60.81 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610192 | ZD | LABOR | | 20060505 | | 25.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (535,361.81) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (833,857.14) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (2,441.54) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (82,768.01) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (109,049.93) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (12,752.96) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (245,824.04) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (20,686.08) | 0605304UT124 | (b)(4) |
| GC02H8-A5A080X16-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (29,046.13) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (41,277.17) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (226,873.85) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (118,031.61) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (51,956.94) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (68,398.41) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (45,888.26) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (318,897.78) | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (9,703.32) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (13,958.24) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (5,522.16) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (4,585.20) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (40,959.08) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (47,369.90) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (8,327.56) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (43,566.07) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 938351 | HR PLUS | LABOR | | 20060505 | | (83,195.09) | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A080X02-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (49,703.60) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (18,641.36) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (9,662.78) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (6,707.08) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (32,412.16) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (7,537.56) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (785.98) | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (11,859.49) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (23,588.77) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (12,008.24) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (44,198.07) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (43,172.74) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (1,038.08) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (30,694.00) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (69,075.22) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (9,410.10) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (7,545.51) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (13,015.80) | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (1,675.21) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,347.28) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (5,859.84) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (3,882.48) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (10,510.52) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (9,985.10) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (2,064.68) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (14,812.60) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (12,191.07) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (14,286.04) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,126.08) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (13,388.74) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (5,848.84) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (28,161.22) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X06-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (11,436.43) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (8,443.68) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (6,348.72) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,228.00) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (6,348.72) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (3,279.36) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (312.32) | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (5,522.16) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (1,639.68) | 0605304UT124 | (b)(4) |
| GC02H6-A5A021X05-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (3,882.48) | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,769.52) | 0605304UT124 | (b)(4) |
| GC02H6-A5A060X04-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (6,678.79) | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (3,882.48) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA) | 938351 | HR PLUS | | LABOR | 20060505 | | (5,723.23) | 0605304UT124 | (b)(4) |
| GC02H6-A5A030X23-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (3,882.48) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,726.93) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 938351 | HR PLUS | | LABOR | 20060505 | | (4,021.14) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 550411 | KN | 1026761725 | JAEESR COMPANY FOR GEN TRADING | 20060506 | 1900382604 | 4,300.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 500600 | KN | 1026761667 | AL SAMA'AH SHOPS | 20060507 | 1900381584 | 300.00 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X41-5 | 500811 | KN | 1026761878 | OFFICE OUTLET | 20060507 | 1900381595 | 135.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 500811 | KN | 1026761885 | OFFICE OUTLET | 20060507 | 1900382802 | 12.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 550610 | KN | 1026761356 | CHELSEA HOTEL | 20060507 | 1900382454 | 340.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 550614 | KN | 1026761356 | CHELSEA HOTEL | 20060507 | 1900382454 | 21.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761352 | CHELSEA HOTEL | 20060507 | 1900382450 | 159.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761353 | CHELSEA HOTEL | 20060507 | 1900382451 | 78.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761354 | CHELSEA HOTEL | 20060507 | 1900382452 | 138.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761355 | CHELSEA HOTEL | 20060507 | 1900382453 | 111.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761350 | CHELSEA HOTEL | 20060507 | 1900382448 | 186.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026761351 | CHELSEA HOTEL | 20060507 | 1900382449 | 136.75 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 938351 | HR PLUS | | LABOR | 20060507 | | 4,839.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 938351 | HR PLUS | | LABOR | 20060507 | | 2,524.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 938351 | HR PLUS | | LABOR | 20060507 | | (1,714.63) | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 938351 | HR PLUS | | LABOR | 20060507 | | (220.15) | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500200 | KN | 1026762377 | SAEH AL SAHRA GENERAL TRANSP | 20060508 | 1900383263 | 6,365.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500200 | KN | 1026762341 | MAKEE MUSLEM HANSH | 20060508 | 1900383234 | 280.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 500200 | KN | 1026762346 | BAHAA ABDUL-RAHEEM ABDUL KHALI | 20060508 | 1900383237 | 7,455.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500200 | KN | 1026762313 | JAWHART AL IRAQ | 20060508 | 1900383212 | 106,240.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500200 | KN | 1026762320 | M.G. MOHAMMED GHANY EWAD | 20060508 | 1900383218 | 5,640.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500200 | KN | 1026762275 | JAWHART AL IRAQ | 20060508 | 1900383183 | 555.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500200 | KN | 1026762047 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383070 | 3,958.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500200 | KN | 1026762044 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383067 | 6,113.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500201 | KN | 1026762044 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383067 | 1,572.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500600 | KN | 1026762336 | AL HUDA CO | 20060508 | 1900383230 | 754.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500600 | KN | 1026762344 | MAKEE MUSLEM HANSH | 20060508 | 1900383236 | 767.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500600 | KN | 1026762354 | OMAR FAISEL NAWAF ABDALAH | 20060508 | 1900383243 | 14,624.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 500600 | KN | 1026762358 | WISAM AL ANI | 20060508 | 1900383246 | 12,321.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 500600 | KN | 1026762359 | WISAM AL ANI | 20060508 | 1900383247 | 4,107.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500600 | KN | 1026762277 | AURORA STAR GENERAL TRADING | 20060508 | 1900383185 | 38,968.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 500600 | KN | 1026762290 | FOOD CHOICE CO | 20060508 | 1900383196 | 800.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500600 | KN | 1026762215 | LAITH ZAIDAN KHALF | 20060508 | 1900383133 | 42,045.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 500600 | KN | 1026762228 | WISAM AL ANI | 20060508 | 1900383146 | 4,107.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 500600 | KN | 1026762232 | WISAM AL ANI | 20060508 | 1900383150 | 22,975.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500602 | KN | 1026762309 | JAWHART AL IRAQ | 20060508 | 1900383209 | 3,600.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500603 | KN | 1026762841 | GROVES INDUSTRIAL SUPPLY | 20060508 | 1900382861 | 188.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 500603 | KN | 1026762219 | AL RAWAFID BUREAU | 20060508 | 1900383137 | 3,750.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500603 | KN | 1026762225 | AL ZAQURAH COMPUTERS TRADING L | 20060508 | 1900383143 | 6,270.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 500605 | KN | 1026762379 | AL SARMED | 20060508 | 1900383265 | 595.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500605 | KN | 1026762338 | ALAMJAD CO | 20060508 | 1900383232 | 865.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 500605 | KN | 1026762341 | MAKEE MUSLEM HANSH | 20060508 | 1900383234 | 25.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 500605 | KN | 1026762294 | GOLDEN AXIS | 20060508 | 1900383198 | 500.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 500611 | KN | 1026762348 | BAHAA ABDUL-RAHEEM ABDUL KHALI | 20060508 | 1900383239 | 100.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 500611 | KN | 1026762324 | MAITHAM BUREAU | 20060508 | 1900383221 | 5,299.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 500612 | KN | 1026762374 | AL RAWAFID BUREAU | 20060508 | 1900383260 | 1,200.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 500612 | KN | 1026762375 | AL RAWAFID BUREAU | 20060508 | 1900383261 | 15,050.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026762297 | I COMPORT | 20060508 | 1900383200 | 19,508.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550410 | KN | 1026762282 | ROSTOM NAZAREAT SANKRIM | 20060508 | 1900383190 | 6,480.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 550410 | KN | 1026762089 | UNATRAC INTERNATIONAL | 20060508 | 1900383091 | 13,498.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 550411 | KN | 1026762363 | JAEESR COMPANY FOR GEN TRADING | 20060508 | 1900383251 | 82,455.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 550411 | KN | 1026762369 | JAEESR COMPANY FOR GEN TRADING | 20060508 | 1900383255 | 560.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 550411 | KN | 1026762372 | AL MONIM COMPANY | 20060508 | 1900383258 | 17,664.00 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X23-5 | 550411 | KN | 1026762216 | AL KHATAB COMPANY | 20060508 | 1900383134 | 95,265.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 550411 | KN | 1026762218 | AL MONIM COMPANY | 20060508 | 1900383136 | 26,848.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 550412 | KN | 1026762271 | MAKI MUHAUISH COMPANY | 20060508 | 1900383180 | 4,080.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550430 | KN | 1026762379 | AL SARMED | 20060508 | 1900383265 | 1,305.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 550451 | KN | 1026762835 | WESTERN INT DISTRIBUTING CO | 20060508 | 1900382955 | 13.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026762620 | BIN DASMAL AUTO SPARE PARTS CO | 20060508 | 1900382625 | 475.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026762281 | ROSTOM NAZAREAT SANKRIM | 20060508 | 1900383189 | 2,160.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026762283 | ROSTOM NAZAREAT SANKRIM | 20060508 | 1900383191 | 50.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026762286 | ROSTOM NAZAREAT SANKRIM | 20060506 | 1900383194 | 4,150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 550451 | KN | 1026761274 | AHLEIA ELECTRICAL CO WLL | 20060506 | 1900381798 | 6,750.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762045 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383068 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762086 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382146 | 90.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762097 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382151 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 550507 | KN | 1026762097 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382151 | 256.59 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762017 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383042 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762023 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383048 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762028 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383053 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762032 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383056 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762041 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383065 | 10.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026761995 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383020 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026761999 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383024 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762002 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383027 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762004 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383029 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762011 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383036 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026762014 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383039 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026754576 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382141 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550507 | KN | 1026754578 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382142 | 16.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026762225 | AL ZAQURAH COMPUTERS TRADING L | 20060508 | 1900383143 | 320.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026761976 | PANALPINA INC | 20060508 | 1900382898 | 1,930.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026761969 | PANALPINA INC | 20060508 | 1900382889 | 1,041.37 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026761969 | PANALPINA INC | 20060508 | 1900382889 | 540.78 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X12-5 | 550520 | KN | 1026761969 | PANALPINA INC | 20060508 | 1900382889 | 520.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550614 | KN | 1026762087 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382147 | 63.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 560200 | KN | 1026762807 | JEANNERET & ASSOCIATES INC | 20060508 | 1900382927 | 68.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 560200 | KN | 1026762807 | JEANNERET & ASSOCIATES INC | 20060508 | 1900382927 | 17.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X14-5 | 560600 | KN | 1026762333 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383228 | 647.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560600 | KN | 1026762315 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383213 | 903.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560600 | KN | 1026762327 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383224 | 159.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560600 | KN | 1026762328 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383225 | 830.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560600 | KN | 1026762330 | PRIME PROJECTS INTERNATIONAL | 20060508 | 1900383227 | 17,392.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 560601 | KN | 1026762238 | UBAIDY & PARTNERS | 20060508 | 1900383154 | 1,860.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 560601 | KN | 1026762266 | UBAIDY & PARTNERS | 20060508 | 1900383177 | 1,860.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 560601 | KN | 1026762268 | UBAIDY & PARTNERS | 20060508 | 1900383176 | 1,680.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 560601 | KN | 1026762234 | NARAM SEEN GENERAL TRADING CO | 20060508 | 1900383152 | 7,400.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560602 | KN | 1026762309 | JAWHART AL IRAQ | 20060508 | 1900383209 | 280.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 560602 | KN | 1026762309 | JAWHART AL IRAQ | 20060508 | 1900383209 | 699.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 560605 | KN | 1026762380 | IRAQI AMERICAN MEDIA INC. | 20060508 | 1900383266 | 30,000.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1026762351 | AL FAREZ WAMED COMPANY | 20060508 | 1900383241 | 153,427.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 560605 | KN | 1026762304 | BOEING SATELITE SYSTEM INTERNA | 20060508 | 1900383205 | 50,422.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1026762279 | AURORA STAR GENERAL TRADING | 20060508 | 1900383187 | 4,500.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1026762220 | SHAMILA CO LTD | 20060508 | 1900383138 | 1,300.00 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X02-5 | 560605 | KN | 1026762221 | SHAMILA CO LTD | 20060508 | 1900383139 | 980.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X17-5 | 560605 | KN | 1026762223 | AL WARKAA CO | 20060508 | 1900383141 | 40,520.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026762084 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382144 | 627.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026762085 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382145 | 984.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590107 | KN | 1026754582 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382143 | 442.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762045 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383066 | 555.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762092 | CHELSEA HOTEL | 20060508 | 1900382150 | 265.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762014 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383039 | 645.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762017 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383042 | 1,164.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762023 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383048 | 1,516.11 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762028 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383053 | 1,407.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762032 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383056 | 499.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762041 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383065 | 485.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026761995 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383020 | 1,033.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026761999 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383024 | 317.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762002 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383027 | 338.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762004 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383029 | 530.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026762011 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900383036 | 397.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026754576 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382141 | 659.57 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | KN | 1026754578 | MILLENIUM AIRPORT HOTEL | 20060508 | 1900382142 | 861.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762623 | ALPHA TOURS | 20060508 | 1900382626 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762396 | ALPHA TOURS | 20060508 | 1900383405 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 938351 | HR PLUS | | LABOR | 20060508 | | 1,411.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 500605 | KN | 1026767047 | NEWMAN SUPPLY CORP | 20060509 | 1900384079 | 816.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 500811 | KN | 1026762732 | OFFICE OUTLET | 20060509 | 1900382498 | 335.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 550200 | KN | 1026766856 | CAPROCK COMMUNICATIONS | 20060509 | 1900383788 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026766866 | CAPROCK COMMUNICATIONS | 20060509 | 1900383798 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 550200 | KN | 1026766879 | CAPROCK COMMUNICATIONS | 20060509 | 1900384011 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 550200 | KN | 1026766999 | CAPROCK COMMUNICATIONS | 20060509 | 1900384031 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026767023 | CAPROCK COMMUNICATIONS | 20060509 | 1900384055 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026766821 | CAPROCK COMMUNICATIONS | 20060509 | 1900383753 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026766822 | CAPROCK COMMUNICATIONS | 20060509 | 1900383754 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 550200 | KN | 1026766827 | CAPROCK COMMUNICATIONS | 20060509 | 1900383759 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026766834 | CAPROCK COMMUNICATIONS | 20060509 | 1900383766 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 550200 | KN | 1026766835 | CAPROCK COMMUNICATIONS | 20060509 | 1900383767 | 57.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550402 | KN | 1026766254 | WESTERN AUTO | 20060509 | 1900382579 | 54.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550402 | KN | 1026766257 | WESTERN AUTO | 20060509 | 1900382580 | 54.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550402 | KN | 1026766261 | WESTERN AUTO | 20060509 | 1900382583 | 54.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550410 | KN | 1026762767 | CUMMINS MIDDLE EAST FZE | 20060509 | 1900382525 | 1,246.84 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550410 | KN | 1026762769 | CUMMINS MIDDLE EAST FZE | 20060509 | 1900382526 | 535.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550430 | KN | 1026762776 | CUMMINS MIDDLE EAST FZE | 20060509 | 1900382532 | 77,985.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550430 | KN | 1026762774 | CUMMINS MIDDLE EAST FZE | 20060509 | 1900382530 | 131,773.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550451 | KN | 1026762774 | CUMMINS MIDDLE EAST FZE | 20060509 | 1900382530 | 8,833.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026767030 | EAGLE GLOBAL LOGISTICS | 20060509 | 1900384062 | 640.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026767047 | NEWMAN SUPPLY CORP | 20060509 | 1900384079 | 150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026762986 | DHL INTERNATIONAL TRANSPORTATI | 20060509 | 1900383621 | 14.33 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 560605 | KN | 1026763054 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383672 | 37,654.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 560605 | KN | 1026763055 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383673 | 37,654.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 560605 | KN | 1026763058 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383674 | 37,654.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 560605 | KN | 1026763060 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383675 | 37,654.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 560605 | KN | 1026763061 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383676 | 37,654.44 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X06-5 | 560605 | KN | 1026763063 | NAJLAA INTERNATIONAL CATERING | 20060509 | 1900383677 | 37,654.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 560605 | KN | 1026762579 | TAMIMI GLOBAL CO LTD TAFGA | 20060509 | 1900383319 | 213,079.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 570500 | KN | 1026766811 | SECURITY SOLUTIONS & TRAINING | 20060509 | 1900383744 | 180.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 570500 | KN | 1026766812 | SECURITY SOLUTIONS & TRAINING | 20060509 | 1900383745 | 52.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 570500 | KN | 1026766812 | SECURITY SOLUTIONS & TRAINING | 20060509 | 1900383745 | 211.97 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762640 | ALPHA TOURS | 20060509 | 1900382645 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762644 | ALPHA TOURS | 20060509 | 1900382649 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762658 | ALPHA TOURS | 20060509 | 1900382663 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762660 | ALPHA TOURS | 20060509 | 1900382665 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026762672 | ALPHA TOURS | 20060509 | 1900382677 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800802 | KN | 1026766807 | KROLL BACKGROUND AMERICA INC | 20060509 | 1900383740 | 5.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026762764 | | 20060509 | 1500225333 | 1,287.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026762772 | | 20060509 | 1500225335 | 1,083.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 500603 | KN | 1026768147 | NEWMAN SUPPLY CORP | 20060510 | 1900384727 | 2,158.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 500605 | KN | 1026768285 | NEWMAN SUPPLY CORP | 20060510 | 1900384765 | 989.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 550200 | KN | 1026767319 | TARZEEN CO | 20060510 | 1900384251 | 2,500.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560400 | KN | 1026768093 | AL TAYER MOTORS LLC | 20060510 | 1900384703 | 13.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560400 | KN | 1026768094 | AL TAYER MOTORS LLC | 20060510 | 1900384704 | 19.39 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560400 | KN | 1026768097 | AL TAYER MOTORS LLC | 20060510 | 1900384705 | 34.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026768181 | NEWMAN SUPPLY CORP | 20060510 | 1900384761 | 161.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 550506 | KN | 1026768086 | CROWNE PLAZA | 20060510 | 1900384700 | 772.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026768147 | NEWMAN SUPPLY CORP | 20060510 | 1900384727 | 80.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026768181 | NEWMAN SUPPLY CORP | 20060510 | 1900384761 | 35.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026768285 | NEWMAN SUPPLY CORP | 20060510 | 1900384765 | 50.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 560200 | KN | 1026768296 | JEANNERET & ASSOCIATES INC | 20060510 | 1900384776 | 1.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 560200 | KN | 1026768296 | JEANNERET & ASSOCIATES INC | 20060510 | 1900384776 | 4.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 560200 | KN | 1026768296 | JEANNERET & ASSOCIATES INC | 20060510 | 1900384776 | 37.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 560200 | KN | 1026768296 | JEANNERET & ASSOCIATES INC | 20060510 | 1900384776 | 1.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 560600 | KN | 1026767664 | GULF INTERNATIONAL CONTRACTING | 20060510 | 1900384826 | 3,578.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 560600 | KN | 1026767682 | MARAFIE KUWAITIA COMMERCIAL CO | 20060510 | 1900384844 | 6,671.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 560601 | KN | 1026767321 | SAIFADDIN HUSSAIN ALI | 20060510 | 1900384253 | 9,200.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 560605 | KN | 1026767626 | AL AMANA SECURITY | 20060510 | 1900384588 | 3,423.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X07-5 | 560605 | KN | 1026767318 | TARZEEN CO | 20060510 | 1900384250 | 12,500.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X07-5 | 560605 | KN | 1026767320 | TARZEEN CO | 20060510 | 1900384252 | 9,600.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X07-5 | 560605 | KN | 1026767320 | TARZEEN CO | 20060510 | 1900384252 | 1,000.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X01-5 | 560605 | KN | 1026767322 | 77 CONSTRUCTION CONT & TRDG C | 20060510 | 1900384254 | 5,260.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KN | 1026767334 | SKYLINK AIR & LOGISTIC SUPPORT | 20060510 | 1900384266 | 45,571.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767569 | ALPHA TOURS | 20060510 | 1900384532 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767579 | ALPHA TOURS | 20060510 | 1900384542 | 73.97 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 800500 | KN | 1026767634 | ALPHA TOURS | 20060510 | 1900384596 | 82.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 800500 | KN | 1026767694 | ALPHA TOURS | 20060510 | 1900384617 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767741 | ALPHA TOURS | 20060510 | 1900384662 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767744 | ALPHA TOURS | 20060510 | 1900384665 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767752 | ALPHA TOURS | 20060510 | 1900384674 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767762 | ALPHA TOURS | 20060510 | 1900384685 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767233 | ALPHA TOURS | 20060510 | 1900383596 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767415 | ALPHA TOURS | 20060510 | 1900384140 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767417 | ALPHA TOURS | 20060510 | 1900384141 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 800500 | KN | 1026767447 | ALPHA TOURS | 20060510 | 1900384171 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767506 | ALPHA TOURS | 20060510 | 1900384469 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767536 | ALPHA TOURS | 20060510 | 1900384499 | 46.58 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767134 | ALPHA TOURS | 20060510 | 1900383500 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767148 | ALPHA TOURS | 20060510 | 1900383514 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767149 | ALPHA TOURS | 20060510 | 1900383515 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767150 | ALPHA TOURS | 20060510 | 1900383516 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026767206 | ALPHA TOURS | 20060510 | 1900383570 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800500 | KN | 1026766778 | ALPHA TOURS | 20060510 | 1900384210 | 46.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 800902 | KN | 1026768297 | MEMORIAL RADIOLOGY ASSOCIATES | 20060510 | 1900384777 | 21.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800902 | KN | 1026768297 | MEMORIAL RADIOLOGY ASSOCIATES | 20060510 | 1900384777 | 72.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 800700 | KR | 1026767725 | BROWNBUILDERS FEDERAL CREDIT U | 20060510 | 1900384647 | 112.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 500603 | KN | 1026770800 | GROVES INDUSTRIAL SUPPLY | 20060511 | 1900375395 | 437.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 500604 | KN | 1026770800 | GROVES INDUSTRIAL SUPPLY | 20060511 | 1900375395 | 28.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 500605 | KN | 1026770800 | GROVES INDUSTRIAL SUPPLY | 20060511 | 1900375395 | 3,274.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 500605 | KN | 1026768722 | EXCALIBUR VENTURES LIMITED | 20060511 | 1900385245 | 7,407.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550410 | KN | 1026768774 | UNATRAC INTERNATIONAL | 20060511 | 1900385297 | 43,010.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 550430 | KN | 1026768774 | UNATRAC INTERNATIONAL | 20060511 | 1900385297 | 22,569.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 550430 | KN | 1026770804 | SARA INTERNATIONAL INC | 20060511 | 1900375399 | 5,897.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550430 | KN | 1026768427 | 4C TECHNOLOGIES GENERAL TRADIN | 20060511 | 1900384951 | 13,226.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 550430 | KN | 1026768740 | GRUNDFOS | 20060511 | 1900385263 | 17,453.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 550451 | KN | 1026768780 | ULTIMATE SOLUTIONS CO | 20060511 | 1900385303 | 568.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 550451 | KN | 1026768736 | LABOCK TECHNOLOGIES INC | 20060511 | 1900385259 | 2,034.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 550451 | KN | 1026768740 | GRUNDFOS | 20060511 | 1900385263 | 15,718.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X12-5 | 550520 | KN | 1026768780 | ULTIMATE SOLUTIONS CO | 20060511 | 1900385303 | 125.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026770804 | SARA INTERNATIONAL INC | 20060511 | 1900375399 | 458.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026768427 | 4C TECHNOLOGIES GENERAL TRADIN | 20060511 | 1900384951 | 285.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026768722 | EXCALIBUR VENTURES LIMITED | 20060511 | 1900385245 | 1,834.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | KN | 1026768736 | LABOCK TECHNOLOGIES INC | 20060511 | 1900385259 | 650.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | KN | 1026768819 | HAL COMPANY | 20060511 | 1900385062 | 105,150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 800900 | KN | 1026770800 | GROVES INDUSTRIAL SUPPLY | 20060511 | 1900375395 | 59.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026768043 | | 20060511 | 1500225797 | 1,345.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | KZ | 1026768042 | | 20060511 | 1500225796 | 1,330.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 938351 | HR PLUS | | LABOR | 20060512 | | 1,688.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 938351 | HR PLUS | | LABOR | 20060512 | | 1,464.00 | 0605304UT124 | (b)(4) |
| | | | | | | | $ 3,605,032.73 | | |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A030X09-5 | 580600 | KN | 1026751479 | FIRAS DIAB ABID | 20060505 | 1900381731 | 138.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 580600 | KN | 1026751480 | HAIDER FALAH JABBAR | 20060505 | 1900381732 | 138.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610100 | ZD | | LABOR | 20060505 | | 378.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610100 | ZD | | LABOR | 20060505 | | 759.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610100 | ZD | | LABOR | 20060505 | | 376.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610100 | ZD | | LABOR | 20060505 | | 110.27 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610100 | ZD | | LABOR | 20060505 | | 158.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610100 | ZD | | LABOR | 20060505 | | 209.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610100 | ZD | | LABOR | 20060505 | | 49.97 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610100 | ZD | | LABOR | 20060505 | | 22.53 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610100 | ZD | | LABOR | 20060505 | | 8.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610100 | ZD | | LABOR | 20060505 | | 6.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610100 | ZD | | LABOR | 20060505 | | 6.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610100 | ZD | | LABOR | 20060505 | | 243.84 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610100 | ZD | | LABOR | 20060505 | | 32.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610100 | ZD | | LABOR | 20060505 | | 96.90 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610100 | ZD | | LABOR | 20060505 | | 40.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610100 | ZD | | LABOR | 20060505 | | 9.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610100 | ZD | | LABOR | 20060505 | | 82.59 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610100 | ZD | | LABOR | 20060505 | | 38.05 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610100 | ZD | | LABOR | 20060505 | | 52.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610100 | ZD | | LABOR | 20060505 | | 41.43 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610100 | ZD | | LABOR | 20060505 | | 8.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610100 | ZD | | LABOR | 20060505 | | 49.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610100 | ZD | | LABOR | 20060505 | | 31.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610100 | ZD | | LABOR | 20060505 | | 22.61 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610100 | ZD | | LABOR | 20060505 | | 10.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610100 | ZD | | LABOR | 20060505 | | 14.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610100 | ZD | | LABOR | 20060505 | | 43.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610100 | ZD | | LABOR | 20060505 | | 3.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610100 | ZD | | LABOR | 20060505 | | 14.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 610100 | ZD | | LABOR | 20060505 | | 3.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X13-5 | 610100 | ZD | | LABOR | 20060505 | | 14.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610100 | ZD | | LABOR | 20060505 | | 26.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610100 | ZD | | LABOR | 20060505 | | 0.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA | 610100 | ZD | | LABOR | 20060505 | | 5.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610100 | ZD | | LABOR | 20060505 | | 23.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610100 | ZD | | LABOR | 20060505 | | 8.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610100 | ZD | | LABOR | 20060505 | | 5.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610100 | ZD | | LABOR | 20060505 | | 27.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610100 | ZD | | LABOR | 20060505 | | 11.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610100 | ZD | | LABOR | 20060505 | | 21.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610100 | ZD | | LABOR | 20060505 | | 4.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610100 | ZD | | LABOR | 20060505 | | 47.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610100 | ZD | | LABOR | 20060505 | | 19.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610100 | ZD | | LABOR | 20060505 | | 12.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610100 | ZD | | LABOR | 20060505 | | 5.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610100 | ZD | | LABOR | 20060505 | | 5.86 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A060X06-5 | 610100 | ZD | | LABOR | 20060505 | | 13.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610100 | ZD | | LABOR | 20060505 | | 16.05 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610100 | ZD | | LABOR | 20060505 | | 15.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610100 | ZD | | LABOR | 20060505 | | 10.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 610100 | ZD | | LABOR | 20060505 | | 1.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610100 | ZD | | LABOR | 20060505 | | 4.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610100 | ZD | | LABOR | 20060505 | | 7.48 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610100 | ZD | | LABOR | 20060505 | | 4.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610100 | ZD | | LABOR | 20060505 | | 4.95 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610100 | ZD | | LABOR | 20060505 | | 4.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610100 | ZD | | LABOR | 20060505 | | 3.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610100 | ZD | | LABOR | 20060505 | | 4.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610100 | ZD | | LABOR | 20060505 | | 2.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610100 | ZD | | LABOR | 20060505 | | 2.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610100 | ZD | | LABOR | 20060505 | | 9.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610100 | ZD | | LABOR | 20060505 | | 1.44 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610100 | ZD | | LABOR | 20060505 | | 6.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610100 | ZD | | LABOR | 20060505 | | 0.19 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610100 | ZD | | LABOR | 20060505 | | 8.45 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610100 | ZD | | LABOR | 20060505 | | 4.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 610100 | ZD | | LABOR | 20060505 | | 7.18 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610100 | ZD | | LABOR | 20060505 | | 2.73 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610100 | ZD | | LABOR | 20060505 | | 2.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610100 | ZD | | LABOR | 20060505 | | 5.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610100 | ZD | | LABOR | 20060505 | | 2.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610115 | ZD | | LABOR | 20060505 | | 65.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610115 | ZD | | LABOR | 20060505 | | 29,454.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610115 | ZD | | LABOR | 20060505 | | 5,335.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610115 | ZD | | LABOR | 20060505 | | 299.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610115 | ZD | | LABOR | 20060505 | | 1.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610115 | ZD | | LABOR | 20060505 | | 928.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610115 | ZD | | LABOR | 20060505 | | 4.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610115 | ZD | | LABOR | 20060505 | | 3,200.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610115 | ZD | | LABOR | 20060505 | | 2,558.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610115 | ZD | | LABOR | 20060505 | | 79.67 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610115 | ZD | | LABOR | 20060505 | | 14.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610115 | ZD | | LABOR | 20060505 | | 2,397.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610115 | ZD | | LABOR | 20060505 | | 563.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610115 | ZD | | LABOR | 20060505 | | 480.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610115 | ZD | | LABOR | 20060505 | | 283.39 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610115 | ZD | | LABOR | 20060505 | | 18.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610115 | ZD | | LABOR | 20060505 | | 286.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610115 | ZD | | LABOR | 20060505 | | 1,931.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610115 | ZD | | LABOR | 20060505 | | 649.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 610115 | ZD | | LABOR | 20060505 | | 537.29 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610115 | ZD | | LABOR | 20060505 | | 191.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610115 | ZD | | LABOR | 20060505 | | 1,004.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610165 | ZD | | LABOR | 20060505 | | 14,241.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610165 | ZD | | LABOR | 20060505 | | 394,250.03 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X02-5 | 610165 | ZD | LABOR | | 20060505 | | 629,969.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610165 | ZD | LABOR | | 20060505 | | 90,440.24 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610165 | ZD | LABOR | | 20060505 | | 187,659.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610165 | ZD | LABOR | | 20060505 | | 173,140.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610165 | ZD | LABOR | | 20060505 | | 51,091.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610165 | ZD | LABOR | | 20060505 | | 23,415.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610165 | ZD | LABOR | | 20060505 | | 5,098.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610165 | ZD | LABOR | | 20060505 | | 6,839.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610165 | ZD | LABOR | | 20060505 | | 6,355.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610165 | ZD | LABOR | | 20060505 | | 212,365.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610165 | ZD | LABOR | | 20060505 | | 461.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610165 | ZD | LABOR | | 20060505 | | 22,171.26 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610165 | ZD | LABOR | | 20060505 | | 83,843.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610165 | ZD | LABOR | | 20060505 | | 32,692.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610165 | ZD | LABOR | | 20060505 | | 9,626.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610165 | ZD | LABOR | | 20060505 | | 63,267.47 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610165 | ZD | LABOR | | 20060505 | | 34,639.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610165 | ZD | LABOR | | 20060505 | | 2,962.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610165 | ZD | LABOR | | 20060505 | | 233,371.24 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610165 | ZD | LABOR | | 20060505 | | 50,972.61 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610165 | ZD | LABOR | | 20060505 | | 39,656.25 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610165 | ZD | LABOR | | 20060505 | | 9.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610165 | ZD | LABOR | | 20060505 | | 10,903.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610165 | ZD | LABOR | | 20060505 | | 32,323.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610165 | ZD | LABOR | | 20060505 | | 37,254.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610165 | ZD | LABOR | | 20060505 | | 31,287.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610165 | ZD | LABOR | | 20060505 | | 8,705.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610165 | ZD | LABOR | | 20060505 | | 11,307.27 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610165 | ZD | LABOR | | 20060505 | | 35,630.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610165 | ZD | LABOR | | 20060505 | | 3,499.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610165 | ZD | LABOR | | 20060505 | | 16,639.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 610165 | ZD | LABOR | | 20060505 | | 3,227.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X13-5 | 610165 | ZD | LABOR | | 20060505 | | 9,783.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610165 | ZD | LABOR | | 20060505 | | 32,957.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610165 | ZD | LABOR | | 20060505 | | 1,146.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA: | 610165 | ZD | LABOR | | 20060505 | | 4,369.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610165 | ZD | LABOR | | 20060505 | | 32.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610165 | ZD | LABOR | | 20060505 | | 19,983.42 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610165 | ZD | LABOR | | 20060505 | | 6,445.38 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610165 | ZD | LABOR | | 20060505 | | 7,375.53 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610165 | ZD | LABOR | | 20060505 | | 15,360.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610165 | ZD | LABOR | | 20060505 | | 12,092.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610165 | ZD | LABOR | | 20060505 | | 28,950.64 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610165 | ZD | LABOR | | 20060505 | | 4,846.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610165 | ZD | LABOR | | 20060505 | | 4,846.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610165 | ZD | LABOR | | 20060505 | | 45,161.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610165 | ZD | LABOR | | 20060505 | | 20,362.87 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610165 | ZD | LABOR | | 20060505 | | 2,503.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610165 | ZD | LABOR | | 20060505 | | 10,654.75 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610165 | ZD | LABOR | | 20060505 | | 238.43 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610165 | ZD | LABOR | | 20060505 | | 5,759.32 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A060X07-5 | 610165 | ZD | | LABOR | 20060505 | | 7,162.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X08-5 | 610165 | ZD | | LABOR | 20060505 | | 6,730.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610165 | ZD | | LABOR | 20060505 | | 5,753.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610165 | ZD | | LABOR | 20060505 | | 98.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610165 | ZD | | LABOR | 20060505 | | 13,398.15 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610165 | ZD | | LABOR | 20060505 | | 780.23 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610165 | ZD | | LABOR | 20060505 | | 9,936.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610165 | ZD | | LABOR | 20060505 | | 2,982.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X08-5 | 610165 | ZD | | LABOR | 20060505 | | 1,251.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X08-5 | 610165 | ZD | | LABOR | 20060505 | | 4,214.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610165 | ZD | | LABOR | 20060505 | | 6,023.14 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610165 | ZD | | LABOR | 20060505 | | 1,576.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610165 | ZD | | LABOR | 20060505 | | 4,473.65 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610165 | ZD | | LABOR | 20060505 | | 4,214.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610165 | ZD | | LABOR | 20060505 | | 3,150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610165 | ZD | | LABOR | 20060505 | | 3,399.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X13-5 | 610165 | ZD | | LABOR | 20060505 | | 2,176.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610165 | ZD | | LABOR | 20060505 | | 4,312.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610165 | ZD | | LABOR | 20060505 | | 3,068.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610165 | ZD | | LABOR | 20060505 | | 3,607.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610165 | ZD | | LABOR | 20060505 | | 4,551.72 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610165 | ZD | | LABOR | 20060505 | | 1,612.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610165 | ZD | | LABOR | 20060505 | | 7,405.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610165 | ZD | | LABOR | 20060505 | | 800.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610165 | ZD | | LABOR | 20060505 | | 9,164.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610165 | ZD | | LABOR | 20060505 | | 7,481.55 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610165 | ZD | | LABOR | 20060505 | | 1,564.63 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X13-5 | 610165 | ZD | | LABOR | 20060505 | | 7,060.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610165 | ZD | | LABOR | 20060505 | | 3,316.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610165 | ZD | | LABOR | 20060505 | | 2,982.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610165 | ZD | | LABOR | 20060505 | | 7,621.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X16-5 | 610165 | ZD | | LABOR | 20060505 | | 3,150.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610167 | ZD | | LABOR | 20060505 | | 75,643.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610167 | ZD | | LABOR | 20060505 | | 45,891.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610167 | ZD | | LABOR | 20060505 | | 17,671.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610167 | ZD | | LABOR | 20060505 | | 5,973.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610167 | ZD | | LABOR | 20060505 | | 20,681.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610167 | ZD | | LABOR | 20060505 | | 663.13 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610167 | ZD | | LABOR | 20060505 | | 997.09 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610167 | ZD | | LABOR | 20060505 | | 808.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610167 | ZD | | LABOR | 20060505 | | 25,586.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610167 | ZD | | LABOR | 20060505 | | 2,469.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610167 | ZD | | LABOR | 20060505 | | 10,119.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610167 | ZD | | LABOR | 20060505 | | 10,924.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610167 | ZD | | LABOR | 20060505 | | 1,197.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610167 | ZD | | LABOR | 20060505 | | 4,082.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610167 | ZD | | LABOR | 20060505 | | 7,517.82 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610167 | ZD | | LABOR | 20060505 | | 4,176.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610167 | ZD | | LABOR | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610167 | ZD | | LABOR | 20060505 | | 6,042.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610167 | ZD | | LABOR | 20060505 | | 4,767.13 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X03-5 | 610167 | ZD | LABOR | | 20060505 | | 1,298.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610167 | ZD | LABOR | | 20060505 | | 4,430.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610167 | ZD | LABOR | | 20060505 | | 3,899.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610167 | ZD | LABOR | | 20060505 | | 2,994.02 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610167 | ZD | LABOR | | 20060505 | | 1,329.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610167 | ZD | LABOR | | 20060505 | | 4,512.18 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610167 | ZD | LABOR | | 20060505 | | 1,871.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X15-5 | 610167 | ZD | LABOR | | 20060505 | | 360.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610167 | ZD | LABOR | | 20060505 | | 2,916.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610167 | ZD | LABOR | | 20060505 | | 82.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA: | 610167 | ZD | LABOR | | 20060505 | | 471.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610167 | ZD | LABOR | | 20060505 | | 2,472.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610167 | ZD | LABOR | | 20060505 | | 767.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610167 | ZD | LABOR | | 20060505 | | 951.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610167 | ZD | LABOR | | 20060505 | | 1,398.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610167 | ZD | LABOR | | 20060505 | | 3,393.56 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610167 | ZD | LABOR | | 20060505 | | 576.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610167 | ZD | LABOR | | 20060505 | | 578.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610167 | ZD | LABOR | | 20060505 | | 5,578.70 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 610167 | ZD | LABOR | | 20060505 | | 298.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610167 | ZD | LABOR | | 20060505 | | 1,320.98 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610167 | ZD | LABOR | | 20060505 | | 650.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610167 | ZD | LABOR | | 20060505 | | 980.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X06-5 | 610167 | ZD | LABOR | | 20060505 | | 935.96 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610167 | ZD | LABOR | | 20060505 | | 770.01 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610167 | ZD | LABOR | | 20060505 | | 1,600.99 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610167 | ZD | LABOR | | 20060505 | | 1,182.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610167 | ZD | LABOR | | 20060505 | | 2,677.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610167 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X06-5 | 610167 | ZD | LABOR | | 20060505 | | 149.03 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X06-5 | 610167 | ZD | LABOR | | 20060505 | | 501.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X15-5 | 610167 | ZD | LABOR | | 20060505 | | 1,019.36 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X37-5 | 610167 | ZD | LABOR | | 20060505 | | 201.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X15-5 | 610167 | ZD | LABOR | | 20060505 | | 585.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X05-5 | 610167 | ZD | LABOR | | 20060505 | | 501.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X09-5 | 610167 | ZD | LABOR | | 20060505 | | 375.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X23-5 | 610167 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X37-5 | 610167 | ZD | LABOR | | 20060505 | | 568.86 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X05-5 | 610167 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X03-5 | 610167 | ZD | LABOR | | 20060505 | | 426.94 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X09-5 | 610167 | ZD | LABOR | | 20060505 | | 2,207.12 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X20-5 | 610167 | ZD | LABOR | | 20060505 | | 609.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X20-5 | 610167 | ZD | LABOR | | 20060505 | | 187.50 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X16-5 | 610167 | ZD | LABOR | | 20060505 | | 503.88 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X07-5 | 610167 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X48-5 | 610167 | ZD | LABOR | | 20060505 | | 34.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X42-5 | 610167 | ZD | LABOR | | 20060505 | | 1,112.34 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X09-5 | 610167 | ZD | LABOR | | 20060505 | | 342.71 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X37-5 | 610167 | ZD | LABOR | | 20060505 | | 478.85 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X16-5 | 610167 | ZD | LABOR | | 20060505 | | 352.74 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X23-5 | 610167 | ZD | LABOR | | 20060505 | | 872.00 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Current Month

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A024X16-5 | 610167 | ZD | LABOR | | 20060505 | | 375.00 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X13-5 | 610168 | ZD | LABOR | | 20060505 | | 212.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X02-5 | 610168 | ZD | LABOR | | 20060505 | | 15,534.04 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X10-5 | 610168 | ZD | LABOR | | 20060505 | | 9,720.41 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X26-5 | 610168 | ZD | LABOR | | 20060505 | | 3,630.51 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X16-5 | 610168 | ZD | LABOR | | 20060505 | | 4,170.80 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X42-5 | 610168 | ZD | LABOR | | 20060505 | | 1,244.07 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X04-5 | 610168 | ZD | LABOR | | 20060505 | | 141.08 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X10-5 | 610168 | ZD | LABOR | | 20060505 | | 223.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X04-5 | 610168 | ZD | LABOR | | 20060505 | | 161.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X09-5 | 610168 | ZD | LABOR | | 20060505 | | 5,262.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X16-5 | 610168 | ZD | LABOR | | 20060505 | | 523.52 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X15-5 | 610168 | ZD | LABOR | | 20060505 | | 2,060.21 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X06-5 | 610168 | ZD | LABOR | | 20060505 | | 2,184.79 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X02-5 | 610168 | ZD | LABOR | | 20060505 | | 818.27 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X02-5 | 610168 | ZD | LABOR | | 20060505 | | 239.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X05-5 | 610168 | ZD | LABOR | | 20060505 | | 1,555.35 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X18-5 | 610168 | ZD | LABOR | | 20060505 | | 854.68 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X04-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-5 | 610168 | ZD | LABOR | | 20060505 | | 1,208.78 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X23-5 | 610168 | ZD | LABOR | | 20060505 | | 1,003.49 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X03-5 | 610168 | ZD | LABOR | | 20060505 | | 259.62 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X10-5 | 610168 | ZD | LABOR | | 20060505 | | 818.69 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X02-5 | 610168 | ZD | LABOR | | 20060505 | | 896.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X26-5 | 610168 | ZD | LABOR | | 20060505 | | 598.77 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X15-5 | 610168 | ZD | LABOR | | 20060505 | | 280.31 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X07-5 | 610168 | ZD | LABOR | | 20060505 | | 902.30 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X08-5 | 610168 | ZD | LABOR | | 20060505 | | 408.28 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X16-5 | 610168 | ZD | LABOR | | 20060505 | | 72.10 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X26-5 | 610168 | ZD | LABOR | | 20060505 | | 626.91 | 0605304UT124 | (b)(4) |
| GC02H8-A5A040X10-5 | 610168 | ZD | LABOR | | 20060505 | | 27.58 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X37-MA) | 610168 | ZD | LABOR | | 20060505 | | 122.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X25-5 | 610168 | ZD | LABOR | | 20060505 | | 508.61 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X37-5 | 610168 | ZD | LABOR | | 20060505 | | 153.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X44-5 | 610168 | ZD | LABOR | | 20060505 | | 198.83 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X09-5 | 610168 | ZD | LABOR | | 20060505 | | 289.46 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X10-5 | 610168 | ZD | LABOR | | 20060505 | | 717.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X44-5 | 610168 | ZD | LABOR | | 20060505 | | 115.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X44-5 | 610168 | ZD | LABOR | | 20060505 | | 115.40 | 0605304UT124 | (b)(4) |
| GC02H8-A5A010X20-5 | 610168 | ZD | LABOR | | 20060505 | | 1,145.76 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X18-5 | 610168 | ZD | LABOR | | 20060505 | | 59.60 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X06-5 | 610168 | ZD | LABOR | | 20060505 | | 264.20 | 0605304UT124 | (b)(4) |
| GC02H8-A5A030X13-5 | 610168 | ZD | LABOR | | 20060505 | | 11.92 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X25-5 | 610168 | ZD | LABOR | | 20060505 | | 130.16 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X07-5 | 610168 | ZD | LABOR | | 20060505 | | 199.32 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X06-5 | 610168 | ZD | LABOR | | 20060505 | | 167.18 | 0605304UT124 | (b)(4) |
| GC02H8-A5A060X42-5 | 610168 | ZD | LABOR | | 20060505 | | 159.93 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X09-5 | 610168 | ZD | LABOR | | 20060505 | | 320.22 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X02-5 | 610168 | ZD | LABOR | | 20060505 | | 236.53 | 0605304UT124 | (b)(4) |
| GC02H8-A5A024X10-5 | 610168 | ZD | LABOR | | 20060505 | | 547.06 | 0605304UT124 | (b)(4) |
| GC02H8-A5A021X05-5 | 610168 | ZD | LABOR | | 20060505 | | 70.54 | 0605304UT124 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR -Current Month & Corrections for 2008

| DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Item Desc | Invoice | Item |
|---|---|---|---|---|---|---|---|---|
| ZD | 1030404031 | LABOR | 20080601 | T003160225 | (789.86) | TrueUP Actual - FI - Post CATS Document | 0806304UT607 | (b)(4) |
| ZD | 1030404031 | LABOR | 20080601 | T003160225 | (99.13) | TrueUP Actual - FI - Post CATS Document | 0806304UT607 | (b)(4) |
| ZD | 1030404031 | LABOR | 20080601 | T003160225 | (32.94) | TrueUP Actual - FI - Post CATS Document | 0806304UT607 | (b)(4) |
| ZD | 1030404031 | LABOR | 20080601 | T003160225 | (99.13) | TrueUP Actual - FI - Post CATS Document | 0806304UT607 | (b)(4) |
| ZD | 1030404031 | LABOR | 20080601 | T003160225 | (61.17) | TrueUP Actual - FI - Post CATS Document | 0806304UT607 | (b)(4) |
| KN | 1030337837 | UNATRAC LIMITED | 20080604 | 1900622773 | 82.24 | LC3-PV03289-REQ#IC13529-CATERPILLAR SPARE PRTS | 0806304UT607 | (b)(4) |
| KO | 1030337852 | UNATRAC LIMITED | 20080604 | 1700088605 | (1,994.40) | LC3-PV03289-REQ#IC13529-CREDIT NOTE | 0806304UT607 | (b)(4) |
| KN | 1030337837 | UNATRAC LIMITED | 20080604 | 1900622773 | 9,119.22 | LC3-PV03289-REQ#IC13529-CATERPILLAR SPARE PRTS | 0806304UT607 | (b)(4) |
| KN | 1030346374 | VINSON & ELKINS LLP | 20080605 | 1900622870 | 19,382.20 | Baker / 2006-DRP-000386 | 0806304UT607 | (b)(4) |
| ZD | | LABOR | 20080606 | | 3,798.76 | | 0806304UT607 | (b)(4) |
| ZD | | LABOR | 20080606 | | 329.31 | | 0806304UT607 | (b)(4) |
| ZD | | LABOR | 20080606 | | 101.42 | | 0806304UT607 | (b)(4) |
| ZD | | LABOR | 20080606 | | 329.31 | | 0806304UT607 | (b)(4) |
| ZD | | LABOR | 20080606 | | 174.25 | | 0806304UT607 | (b)(4) |
| HR PLUS | | LABOR | 20080606 | | (5,459.90) | | 0806304UT607 | (b)(4) |
| WE | 1030349239 | IPBD LIMITED | 20080607 | 5000319319 | 379.62 | 1 Level IV Admin Specialist WBS 48 | 0806304UT607 | (b)(4) |
| HR PLUS | | LABOR | 20080607 | | 1,341.60 | | 0806304UT607 | (b)(4) |
| WE | 1030362228 | NATIONAL CONTRACTING COMPANY L | 20080610 | 5000321955 | 2,712.44 | 2 Level IV Admin Specialists WBS 48 | 0806304UT607 | (b)(4) |
| HR PLUS | | LABOR | 20080614 | | 724.55 | | 0806304UT607 | (b)(4) |
| KN | 1030378761 | CUMMINS MIDDLE EAST FZE | 20080615 | 1900623717 | 294.40 | LC3-E000198-SWITCH | 0806304UT607 | (b)(4) |
| KN | 1030378766 | AL MONIM COMPANY | 20080615 | 1900623718 | 38,398.00 | LC3-E001017-DIESEL | 0806304UT607 | (b)(4) |
| KN | 1030378775 | AL MONIM COMPANY | 20080615 | 1900623720 | 4,350.00 | LC3-E001017-DEMURAGE FOR OVERNIGHT PARKING | 0806304UT607 | (b)(4) |
| KN | 1030378766 | AL MONIM COMPANY | 20080615 | 1900623718 | 5,250.00 | LC3-E001017-DIESEL | 0806304UT607 | (b)(4) |
| KN | 1030378775 | AL MONIM COMPANY | 20080615 | 1900623720 | 3,000.00 | LC3-E001017-DEMURAGE FOR OVERNIGHT PARKING | 0806304UT607 | (b)(4) |
| KN | 1030378761 | CUMMINS MIDDLE EAST FZE | 20080615 | 1900623717 | 18,984.49 | LC3-E000198-SWITCH | 0806304UT607 | (b)(4) |
| KN | 1030378782 | AL MONIM COMPANY | 20080616 | 1900623722 | 14,208.00 | LC3-E001017-DEMURAGE FOR OVERNIGHT PARKING | 0806304UT607 | (b)(4) |
| KO | 1030386752 | AZMAR TRADING ESTABLISHMENT | 20080617 | 1700088039 | (1,000.00) | 50 CASE COPIER,EP01872,REQ#INO3723 | 0806304UT607 | (b)(4) |
| KO | 1030386751 | AL KAMOUS FOR GENERAL TRADING | 20080617 | 1700088038 | (1,983.00) | HP CARTRIDGE Q2610A,E001586,REQ#ISO4848 | 0806304UT607 | (b)(4) |
| KO | 1030386749 | AL KAMOUS FOR GENERAL TRADING | 20080617 | 1700088037 | (990.00) | CHARGER BATTERY,E001574,REQ#IS04883 | 0806304UT607 | (b)(4) |
| KO | 1030386014 | AL HARAM LOGISTICS & | 20080617 | 1700088020 | (420.00) | E001262-REQ#IB04112-MARKERS | 0806304UT607 | (b)(4) |
| KO | 1030386745 | AL KAMOUS FOR GENERAL TRADING | 20080617 | 1700088035 | (70.00) | FILE CABINET 4 DRAWER,E00708,REQ#IS04652 | 0806304UT607 | (b)(4) |
| KO | 1030386757 | MOTOROLA INC | 20080617 | 1700088040 | (1,550.00) | LC3-CP33777-IC10508-SUBSCRIBER PROGRAMMING | 0806304UT607 | (b)(4) |
| KO | 1030386748 | AL KAMOUS FOR GENERAL TRADING | 20080617 | 1700088036 | (3,500.00) | SCANNER DIGITAL SCANNER,E001486,REQ#IS04860 | 0806304UT607 | (b)(4) |
| KO | 1030386017 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088021 | (10,268.26) | SHIPPING COSTS AS IN,CP34273,REQ#IS03741 | 0806304UT607 | (b)(4) |
| KO | 1030386017 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088021 | (12,529.43) | SHIPPING COSTS AS IN,CP34273,REQ#IS03741 | 0806304UT607 | (b)(4) |
| KO | 1030386019 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088022 | (1,404.42) | REPLACING ORIGINAL,CP35264-1,REQ#IB02613 | 0806304UT607 | (b)(4) |
| KO | 1030386017 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088021 | (10,268.26) | SHIPPING COSTS AS IN,CP34273,REQ#IS03741 | 0806304UT607 | (b)(4) |
| KO | 1030386017 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088021 | (10,268.26) | SHIPPING COSTS AS IN,CP34273,REQ#IS03741 | 0806304UT607 | (b)(4) |
| KO | 1030386029 | ARAB WATER TREATMENT CO | 20080617 | 1700088027 | (3,700.00) | PALACE POOL MAINT,SJ00296,REQ#IC17582 | 0806304UT607 | (b)(4) |
| KO | 1030386027 | ARAB WATER TREATMENT CO | 20080617 | 1700088026 | (3,700.00) | PALACE POOL MAIN,SJ00296,REQ#IC17582 | 0806304UT607 | (b)(4) |
| KO | 1030386025 | ARAB WATER TREATMENT CO | 20080617 | 1700088025 | (1,726.00) | PALACE POOL MAINT,ITF1,SJ00298,REQ#IC17582 | 0806304UT607 | (b)(4) |
| KO | 1030386019 | EXPLORATION LOGISTICS GROUP PL | 20080617 | 1700088022 | (4,207.72) | REPLACING ORIGINAL,CP35264-1,REQ#IB02613 | 0806304UT607 | (b)(4) |
| HR PLUS | | LABOR | 20080621 | | 240.94 | | 0806304UT607 | (b)(4) |
| I6 | 1030402768 | | 20080623 | 526898464 | 20.81 | CY2008-C0805HSOCPALLOC | 0806304UT607 | (b)(4) |
| IC | 1030402776 | | 20080623 | 526898466 | 45.89 | CY2008-C0805HSOCPALLOC | 0806304UT607 | (b)(4) |
| WE | 1030405489 | IPBD LIMITED | 20080624 | 5000333429 | 307.69 | 1 Level IV Admin Specialist WBS 48 | 0806304UT607 | (b)(4) |
| WE | 1030409100 | NATIONAL CONTRACTING COMPANY L | 20080625 | 5000334623 | 2,736.95 | 2 Level IV Admin Specialists WBS 48 | 0806304UT607 | (b)(4) |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR -Current Month & Corrections for 2008

| DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Item Desc | Invoice | Item |
|---|---|---|---|---|---|---|---|---|
| | | | | | $ 50,200.21 | | | |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

LABOR & NON LABOR - Prior Months 2005

| Object | Cost Elem | DT | Document | Vendor Name | PostDate | Ref Doc | Obj Amt | Invoice | Item |
|---|---|---|---|---|---|---|---|---|---|
| GC02H8-A5A010X02-5 | 500200 | YE | 1026878394 | | 20051231 | 100218241 | (4.61) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500600 | YE | 1026878394 | | 20051231 | 100218241 | (2.24) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500603 | YE | 1026878394 | | 20051231 | 100218241 | (0.51) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500604 | YE | 1026878394 | | 20051231 | 100218241 | (0.16) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500605 | YE | 1026878394 | | 20051231 | 100218241 | (1.19) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500611 | YE | 1026878394 | | 20051231 | 100218241 | (0.16) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500612 | YE | 1026878394 | | 20051231 | 100218241 | (0.96) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 500613 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550200 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550202 | YE | 1026878394 | | 20051231 | 100218241 | 0.01 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550400 | YE | 1026878394 | | 20051231 | 100218241 | (0.43) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550402 | YE | 1026878394 | | 20051231 | 100218241 | (0.02) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550410 | YE | 1026878394 | | 20051231 | 100218241 | (0.24) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550411 | YE | 1026878394 | | 20051231 | 100218241 | (5.27) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550413 | YE | 1026878394 | | 20051231 | 100218241 | (0.10) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550414 | YE | 1026878394 | | 20051231 | 100218241 | 0.01 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550430 | YE | 1026878394 | | 20051231 | 100218241 | (1.64) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550450 | YE | 1026878394 | | 20051231 | 100218241 | (0.02) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550451 | YE | 1026878394 | | 20051231 | 100218241 | (2.35) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550452 | YE | 1026878394 | | 20051231 | 100218241 | (0.15) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550507 | YE | 1026878394 | | 20051231 | 100218241 | (0.34) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X12-5 | 550520 | YE | 1026878394 | | 20051231 | 100218241 | (0.14) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 550610 | YE | 1026878394 | | 20051231 | 100218241 | (1.76) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 560302 | YE | 1026878394 | | 20051231 | 100218241 | (0.02) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 560600 | YE | 1026878394 | | 20051231 | 100218241 | 0.04 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 560601 | YE | 1026878394 | | 20051231 | 100218241 | (0.91) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 560605 | YE | 1026878394 | | 20051231 | 100218241 | (3.28) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X13-5 | 590108 | YE | 1026878394 | | 20051231 | 100218241 | 12.18 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X13-5 | 590109 | YE | 1026878394 | | 20051231 | 100218241 | (0.09) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X13-5 | 590110 | YE | 1026878394 | | 20051231 | 100218241 | 199.34 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X10-5 | 610139 | YE | 1026878394 | | 20051231 | 100218241 | (6.81) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 620103 | YE | 1026878394 | | 20051231 | 100218241 | (0.02) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 620104 | YE | 1026878394 | | 20051231 | 100218241 | 0.01 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 620106 | YE | 1026878394 | | 20051231 | 100218241 | 0.03 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 640105 | YE | 1026878394 | | 20051231 | 100218241 | 0.02 | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 640356 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X10-5 | 800300 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X10-5 | 800500 | YE | 1026878394 | | 20051231 | 100218241 | (0.30) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 800900 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X13-5 | 800902 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| GC02H8-A5A010X02-5 | 800960 | YE | 1026878394 | | 20051231 | 100218241 | (0.01) | 0606304UT119 | (b)(4) |
| | | | | | | | $ 178.79 | | |

NOTE: This page contains information which is subject to restrictions stated on the first page of the document.

# Exhibit U



Al Paree Wareed v. KBR Arbitration

| Co code | Document No | LC amnt | LCurr | GTP # | [illegible] | [illegible] | [illegible] | Text | [illegible] | Task Order | Voucher Num | Date | Public Voucher Num | Date Paid by USG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1003 | 1900224801 | [illegible] | USD | 1 | | | | Vehicle Maintenance Facility Construction | GC02H8-A5A010X02-5 | 100 | 20 | 31-Jul-05 | 050730-4UT846 | 8/19/2005 |
| 1003 | 1700040568 | 113,281.00 | USD | 1 | | | | Vehicle Maintenance Facility Construction | GC02H8-A5A010X02-5 | 100 | [illegible] | 15-Aug-05 | 0508304UT131 | 8/13/2005 |
| 1003 | 1900228544 | [illegible] | USD | 1 | 0.00 | 113,281.00 | | MAINTENCE FAILITY,ITF1,REQ#C11442,SJ00163 | GC02H8-A5A010X02-5 | 100 | 21 | 15-Aug-05 | 0508304UT131 | 9/15/2005 |
| 1003 | 1900263543 | [illegible] | USD | 2 | 0.00 | 136,000.00 | | CONSTRUCTION MATERIAL,ITF2,SJ00163,REQ#C11442 | GC02H8-A5A010X02-5 | 100 | 25 | 14-Oct-05 | 0510304UT803 | 11/10/2005 |
| 1003 | 1900338937 | [illegible] | USD | 3 | 0.00 | 67,973.00 | | payment for reaching 30% milestone | GC02H8-A5A010X02-5 | 100 | 36 | 23-Feb-06 | 0602304UT613 | 3/9/2006 |
| 1003 | 1900363241 | [illegible] | USD | 4 | 0.00 | 183,427.14 | | PARTIAL PAYMENT CONSTRU,ITF04,SJ00163,REQ#C11442 | GC02H8-A5A010X02-5 | 100 | 41 | 15-May-06 | 0605304UT124 | 6/8/2006 |
| 1003 | 1900398037 | [illegible] | USD | 5 | 0.00 | 183,427.14 | | VEHICLE MAINT FACILITY,ITF05,SJ00163,REQ#C16471 | GC02H8-A5A010X02-5 | 100 | 43 | 15-Jun-06 | 0606304UT525 | 6/28/2006 |
| 1003 | [illegible] | [illegible] | USD | 6 | 0.00 | 133,427.14 | | VEHICLE MAINTENCE FACILITY,SJ00163,REQ#C11442 | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900489600 | [illegible] | USD | 7 | 2,000.00 | 10,000.00 | | SJ00163 ITF#7, 20% retention of 10k invoice = 8K | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900489333 | [illegible] | USD | 8 | 2,000.00 | 10,000.00 | | PARTIAL CNSTRUCTION OF VEHICLE MAINENANCE FACILI | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900490540 | [illegible] | USD | 9 | 600.00 | 3,000.00 | | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900492859 | [illegible] | USD | 10 | 4,000.00 | 20,000.00 | | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900496012 | [illegible] | USD | 11 | 2,400.00 | 12,000.00 | 9,600.00 | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900496013 | [illegible] | USD | 12 | 600.00 | 3,000.00 | 2,400.00 | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900496014 | [illegible] | USD | 13 | 1,000.00 | 5,000.00 | 4,000.00 | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900498791 | [illegible] | USD | 14 | 2,000.00 | 10,000.00 | 8,000.00 | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900498780 | [illegible] | USD | 15 | 800.00 | 4,000.00 | 3,200.00 | PARTIAL CONSTRUCTION VEHICLE MAINENANCE FACILITY | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900502035 | [illegible] | USD | 16 | 3,200.00 | 16,000.00 | 12,800.00 | SJ00163 ITF#16, Complete Upper Deck Flooring | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900502037 | [illegible] | USD | 17 | 600.00 | 3,000.00 | 2,400.00 | SJ00163 ITF#17, Complete Exterior Doors | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 18 | 3,000.00 | 15,000.00 | 12,000.00 | SJ00163 ITF#18, Complete Windows | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 19 | 400.00 | 2,000.00 | 1,600.00 | SJ00163 ITF#19, Repair bad spots in plaster | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 20 | 246.00 | 1,200.00 | 960.00 | SJ00163, ITF#20, Complete suspended ceiling | GC02H8-A5A010X02-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 21 | 2,000.00 | 10,000.00 | 8,000.00 | Vehicle Maintenance Facility - Finish Wall gypsum | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900512288 | [illegible] | USD | 22 | 1,400.00 | 7,000.00 | 5,600.00 | SJ00163 ITF#23 Interior Doors | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900512289 | [illegible] | USD | 23 | 2,000.00 | 10,000.00 | 8,000.00 | SJ00163, ITF#23 Install HVAC in Annex Office | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900512290 | [illegible] | USD | 24 | 2,000.00 | 10,000.00 | 8,000.00 | SJ00163, ITF#24 Install HVAC in Main Office | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900518340 | [illegible] | USD | 25 | 2,000.00 | 10,000.00 | 8,000.00 | Vehicle Maintenance Facility - Install 4 r. doors | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900518342 | [illegible] | USD | 26 | 1,200.00 | 6,000.00 | 4,800.00 | Vehicle Maintenance Facility - Paint 2 buildings | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900518343 | [illegible] | USD | 27 | 400.00 | 2,000.00 | 1,600.00 | Vehicle Maintenance Facility - Install 2 compresso | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900521962 | [illegible] | USD | 28 | 400.00 | 2,000.00 | 1,600.00 | Install Chain Link Railing Maint. in Serv. ITF#28 | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900521961 | [illegible] | USD | 29 | 400.00 | 2,000.00 | 1,600.00 | Install 2 air Compressors Maint. in Serv. ITF#29 | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | 1900521960 | [illegible] | USD | 30 | 800.00 | 4,000.00 | 3,200.00 | Paint Vehicle Maint. in Serv ITF#30 | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 31 | 1,000.00 | 5,000.00 | 4,000.00 | Milestone Pmt - CO #14 - Pour Driveway Pad/Ramp | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/14/2006 |
| 1003 | [illegible] | [illegible] | USD | 32 | 800.00 | 4,000.00 | 3,200.00 | Milestone Pmt - CO#14 - Plumbing in main off bldg | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 33 | 400.00 | 2,000.00 | 1,600.00 | Milestone Pmt - CO#14 - Plumbing in arc bay area | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 34 | 400.00 | 2,000.00 | 1,600.00 | Milestone Pmt - CO#14 - Plumbing in Annex Off Bldg | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/12/2006 |
| 1003 | [illegible] | [illegible] | USD | 35 | 600.00 | 3,000.00 | 2,400.00 | Vehicle Maintenance Facility - Sealing the Joints | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 36 | 600.00 | 3,000.00 | 2,400.00 | Vehicle Maintenance Facility - Paint inside metal | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/10/2006 |
| 1003 | [illegible] | [illegible] | USD | 37 | 400.00 | 2,000.00 | 1,600.00 | Vehicle Maintenance Facility - Paint outside Metal | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 38 | 400.00 | 2,000.00 | 1,600.00 | Vehicle Maintenance Facility - Install Counters | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 39 | 400.00 | 2,000.00 | 1,600.00 | Vehicle Maintenance Facility - Instal Shelving | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 40 | 300.00 | 1,500.00 | 1,200.00 | Vehicle Maintenance Facility - Flashing & Trimming | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| 1003 | [illegible] | [illegible] | USD | 41 | 4,000.00 | 20,000.00 | 16,000.00 | Vehicle Maintenance Facility - Install Duct | GC02H8-A5A010X01-5 | 100 | 52 | 30-Jun-06 | 0606304UT605 | 7/15/2006 |
| | | [illegible] | USD | | 44,740.00 | [illegible] | | | | | | | | |

KBR 000001

J-015

# Exhibit V

# AL-FAREZ WAMED CO

E mail : wamed_jameel@yahoo.com
Thuraya: 88216-5115-9446
Mobile: 0790-191-3672

14-Feb -2006

**From : Al-Farez Wamed CO.**
**General Manger / Wamed I . J Al-Azzawi**

**To : KBR - Subcontract Administrator**
**Attn : Julie McEachern**

**Subject : Invoice No.3 SJ00163**
**Vehicle Maintenance Facility**

**We would like to submit our invoice, for the civil work done as a 30 percent milestone payment and like the following :**

**30% X 1,022,847.60 = 306,854.28 $**
**(( Subtract )) 249,281.00 $ ( invoice 1&2)**

**57,573.28 $**

**Best regards,**

**Al – Farez wamed Co**
**General manger**
Wamed I . J . Al - Azzawi

RECEIVED IN A&F
14 FEB 2006

**Page 539** COPY

I-032

# Mega Cash/ Petty Cash Ticket

Kellogg Brown & Root
USMI Baghdad - IRAQ

KBR

CC5023
2/21/2006

Please Disburse: USD $ 57,573.00

From: KBR - LOGCAP III

To: 6019449
AL FAREZ WAMED CO

Approval Signature — Date

Morales, Jackie — 21 Feb 06
Disbursed By 362438 — Date

WAMED I. J. AL-AZZAWI
Received By — Date 21-Feb-20[illegible]

Page 540

| PO Number | Description | Amount | INV# |
|---|---|---|---|
| SJ00163 | PAYMENT FOR REACHING 30% MILESTONE | $ 57,573.00 | 3 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TOTAL $ 57,573.00

DOCUMENT 1500216815

# Exhibit W

 

# SUBCONTRACT AGREEMENT CHANGE ORDER

| | | | | |
|---|---|---|---|---|
| $988,500.00 | ORIGINAL AMOUNT AND PREVIOUS CHANGE ORDER(S) | GENERAL CONTRACTOR KELLOGG BROWN & ROOT SERVICES INC. (KBR) | PAGE 1 OF 1 | DATE EFFECTIVE: 31-JUL-2005 |
| $5,940.00 | ADDITION BY THIS CHANGE ORDER | USMI - CENTRAL – HEADQUARTERS BLDG | CHANGE ORDER THREE (3) | REQ. NO. IC16308 |
| $0.00 | DEDUCTION BY THIS CHANGE ORDER | BAGHDAD, IRAQ | SUBCONTRACT NUMBER 02H8-US-SJ00163 | |
| $994,440.00 | AMENDED TOTAL | ORIGINAL _NOTIFICATION X CONFIRMATION | JOB NUMBER GC02H8 | COST CODE ASA010X02-5-560605 |

| | |
|---|---|
| SUBCONTRACTOR<br>AL-FAREZ WAMEED COMPANY<br>AL-YARMOOK AVENUE 610-21-9<br>BAGHDAD, IRAQ | THE TERMS AND CONDITIONS FORMING THE ORIGINAL SUBCONTRACT ARE MADE A PART OF THIS CHANGE ORDER EXCEPT TO THE EXTENT MODIFIED ON THE FACE HEREOF. |
| SIZE OF BUSINESS: FOREIGN | |

**Refer to Subcontract Agreement No. 02H8-US-SJ00163, for any amendments.**

DPAS RATING IS DO-C9- "This purchase order contains rated order quantities for national defense use, and you ae required to follow all the provisions of the Defense Priorities and Allocations System regulation (15CFR Part 700) only as it pertains to the rated quantities."

1.0 PURPOSE. The purpose of this change order is to (i) update the scope of work to include the removal of asbestos to the New Vehicle Maintenance Facility.

2.0 SUBLET WORK CHANGES. The attached scope of work has been changed to reflect the revised scope of work dated 25 July 2005 from Jimmie Hyde in engineering.

3.0 PRICE. The authorized obligation amount is increased $5,940.00 from $988,500.00 to $994,440.00

- Progress payment schedule is revised as stated below due to the additional asbestos work on the New Vehicle Maintenance Facility.
- $224,744.75 (25% contract value) at completion of 25% of work. Description of work to be completed will be (i) Site Preparation, (ii) Gravel filling Works and (iii) concrete completion. GENERAL CONTRACTOR will inspect and sign off on a KBR service confirmation form. Payment will be made Net 30 days upon approval by the GENERAL CONTRACTOR.
- $175,043.80 (20% contract value) at completion of 50% of work. Description of work to be completed is the set up of the structure and the completion of the roof. GENERAL CONTRACTOR will inspect and sign off on a KBR service confirmation form. Payment will be made Net 30 days upon approval by the GENERAL CONTRACTOR.
- $175,043.80 (20% contract value) at completion of 75% of work. Description of work to be completed will be the plumbing, electrical, HVAC system, interior walls and ceiling. GENERAL CONTRACTOR will inspect and sign off on a KBR service confirmation form. Payment will be made Net 30 days upon approval by the GENERAL CONTRACTOR.
- $306,326.65 at completion, approval and acceptance of work by the QA/QC Department. Payment will be made Net 30 days upon approval by the GENERAL CONTRACTOR.

4.0 PERIOD OF PERFORMANCE. The Subcontract Agreement completion date remains unchanged, 01 October 2005.

5.0 TERMS AND CONDITIONS. Except as herein amended all terms and conditions of this Subcontract shall remain unchanged and in full force and effect.

 

SUBCONTRACT NO. 02H8-[redacted]00163
CHANGE ORDER NO. 3

6.0 **EXECUTION.** This Change Order is only intended to clarify the Subcontract Agreement. Subcontractor's authorized representative shall sign where indicated where indicated, retain one copy, and return one copy for counter signature to Procurement – Subcontracts department.

| SUBCONTRACTOR (AL-FAREZ COMPANY) | GENERAL CONTRACTOR (KBR) |
| --- | --- |
| [signature] WAMED I. J. AL-AZZAWI | [signature] 7.31.05 |
| 31-July-05 | TYSON KISER Sr. Subcontracts Admin. Date |

# Exhibit X



KELLOGG BROWN & ROOT SERVICES INC.
ENGINEERING USM- IRAQ
POC.0790-192-2136

15 August 2005

**Vehicle Maintenance**

***Rev 4 Changes in Red italics***

**SCOPE OF WORK:**

**Division 1 General Requirements**

1.1.1 The intent of this Subcontract is to build a new Vehicle Maintenance facility in the approximate vicinity of the existing old building. Total square footage of both floors of this building equals 24,000 sqf (apr2230 m2).

1.1.2 This is a turnkey project and all material, labor and design to make a complete functional system shall be provided.

1.1.3 The work is taken together as a whole and any item required to interface or is implied by the separate items of work listed below shall be supplied by this contractor to make a complete and habitable product.

1.1.4 The work stipulated in the line items below shall apply all portions of the entire project unless specifically stated otherwise.

1.1.5 The Materials and Equipment provided shall be new, good quality of substantial construction and able to perform well in the Middle Eastern environment.

1.1.6 Work shall be done in a work man like manner using the best trade practice. All new work shall comply with the International Building Code (all trades).

1.1.7 Submit Plans, Shop Drawings, Cut sheets, "As-Built" Cut sheets, and operation manuals as appropriate.

1.1.8 Provide one year warrantee on all labor, material and equipment.

1.1.9 All work shall be complete in N/A days from NTP.

1.1.10 Subcontractor shall provide with his proposal a construction schedule with milestones in MS Project format.

1.1.11 Subcontractor will maintain a safe and clean site during all phases of construction.

1.1.12 Subcontractor will remove all trash accumulated at the site every day prior to the end of the work shift.

1.1.13 Subcontractor will place barricades around the work site during non-working hours to limit access to the site.

1.1.14 On completion, the facility shall be left broom clean. All trash and debris shall be removed off site to a legal disposal area.

1.1.15 Subcontractor shall warrant all equipment and workmanship to be free of defects under normal service and use for a period of one (1) year after acceptance of the work by GENERAL CONTRACTOR. If within this period, any of the equipment or workmanship proves defective, it shall be repaired or replaced by the Subcontractor at no additional cost to the GENERAL CONTRACTOR.

**Division 2 SITE WORK**

2.1 Provide a Hazardous Materials site survey and removal plan based on site conditions. Obtain the required permits and perform all Hazardous materials abatement within the guidelines of and under the supervision of KBR HSE Staff.

2.2 Demolish wall as shown on the attached plan.

2.3 Demolish partially two overhead existing structures as shown on the site visit.

 

## SUBCONTRACT AGREEMENT CHANGE ORDER

| | | | | |
|---|---|---|---|---|
| $994,440.00 | ORIGINAL AMOUNT AND PREVIOUS CHANGE ORDER(S) | GENERAL CONTRACTOR KELLOGG BROWN & ROOT SERVICES INC. (KBR) | PAGE 1 OF 1 | DATE EFFECTIVE: 15-AUG-2005 |
| $28,932.00 | ADDITION BY THIS CHANGE ORDER | USMI - CENTRAL - HEADQUARTERS BLDG | CHANGE ORDER FIVE (5) | REQ. NO. IC16471 |
| $0.00 | DEDUCTION BY THIS CHANGE ORDER | BAGHDAD, IRAQ | SUBCONTRACT NUMBER 02H8-US-SJ00163 | |
| $1,023,372.00 | AMENDED TOTAL | ORIGINAL _NOTIFICATION X CONFIRMATION | JOB NUMBER GC02H8 | COST CODE ASA010X02-S-560605 |

| | |
|---|---|
| SUBCONTRACTOR<br>AL-FAREZ WAMEED COMPANY<br>AL-YARMOOK AVENUE 610-21-9<br>BAGHDAD, IRAQ | THE TERMS AND CONDITIONS FORMING THE ORIGINAL SUBCONTRACT ARE MADE A PART OF THIS CHANGE ORDER EXCEPT TO THE EXTENT MODIFIED ON THE FACE HEREOF. |
| SIZE OF BUSINESS: FOREIGN | |

**Refer to Subcontract Agreement No. 02H8-US-SJ00163, for any amendments.**

DPAS RATING IS DO-C9- "This Subcontract Agreement contains rated order quantities for national defense use, and you ae required to follow all the provisions of the Defense Priorities and Allocations System regulation (15CFR Part 700) only as it pertains to the rated quantities."

1.0 PURPOSE. The purpose of this change order is (i) increase the total dollar amount of the Subcontract Agreement and update the scope of work.

2.0 SUBLET WORK CHANGES. Subcontractor to complete additional work to the New Vehicle Maintenance Facility as directed by the General Contractor, and in accordance with Exhibt A; Scope of Work.

3.0 PRICE. The authorized obligation is increased $28,932.00 from $994,440.00 to $1,023,372.00.

4.0 PERIOD OF PERFORMANCE. The Subcontract Agreement completion date remains unchanged 01 October 2005.

5.0 TERMS AND CONDITIONS. Except as herein amended all terms and conditions of this Subcontract shall remain unchanged and in full force and effect.

6.0 EXECUTION. This Change Order is only intended to clarify the Subcontract Agreement. Subcontractor's authorized representative shall sign where indicated where indicated, retain one copy, and return one copy for counter signature to Procurement – Subcontracts department

| SUBCONTRACTOR (AL-FAREZ WAMED) | GENERAL CONTRACTOR (KBR) | |
|---|---|---|
| NAMEER AL-AZWAI | [signature] | 8-16-05 |
| [signature] 8-16-05 | TYSON KISER<br>Sr. Subcontracts Admin. | Date |

# Exhibit C1



**KELLOGG BROWN AND ROOT SERVICES, INC.**

**PURCHASE ORDER/SUBCONTRACT SPECIAL CONDITIONS**

**FOR OVERSEAS SUBCONTRACTS**
**in support of**
**LOGISTICS CIVIL AUGMENTATION PROGRAM (LOGCAP) III**
**PRIME CONTRACT NO. DAAA09-02-D-0007**

These Subcontract/Purchase Order Special Conditions are to be read in conjunction with the Subcontract GENERAL CONDITIONS (04-25-06) and/or PURCHASE ORDER TERMS AND CONDITIONS (01-04) as appropriate; these Special Conditions are to be considered supplementary to the Subcontract GENERAL CONDITIONS (04-25-06) and/or PURCHASE ORDER TERMS AND CONDITIONS (01-04) except in those cases where there is conflict, in which case these Special Conditions take precedence. CONTRACT refers to KBRS' prime contract DAAA09-02-D-0007 with the U. S. Government (U.S. ARMY); Subcontract refers to this Subcontract between KBRS and Subcontractor.

**1.0 INCORPORATION OF FEDERAL ACQUISITION REGULATIONS**

| | | |
|---|---|---|
| 52.215-2 | AUDIT AND RECORDS NEGOTIATION<br>(IN PARA'S (a) THRU (e) CHANGE "CONTRACTOR" TO READ "SUBCONTRACTOR" | JUN 1999 |

1.1 The following Federal Acquisition Regulations (FAR) clauses are hereby incorporated by reference as if set out fully herein, except the word "KBRS" shall be substituted for the words "Contracting Officer" wherever they appear, and the term "Subcontractor " shall be substituted for the term "Contractor" wherever it appears for all clauses incorporated within paragraph 1.0.

| PARAGRAPH | TITLE | DATE |
|---|---|---|
| 52.202-1 | DEFINITIONS<br>ALTERNATE I | OCT 1995<br>APR 1984 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON CONTRACTOR SALES TO THE GOVERNMENT | JUL 1995 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | JUL 1995 |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY | JAN 1997 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | JAN 1997 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JUN 1997 |
| 52.204-2 | SECURITY REQUIREMENTS | AUG 1996 |
| 52.204-2 | SECURITY REQUIREMENTS, ALTERNATE II | APR 1984 |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | JUL 1995 |
| 52.211-5 | MATERIAL REQUIREMENTS | AUG 2000 |
| 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENT | SEP 1990 |
| 52.215-10 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | OCT 1997 |

KBR-FII-000381

**LOGCAP III**
**SUBCONTRACT SPECIAL CONDITIONS – OVERSEAS**

| PARAGRAPH | TITLE | DATE |
|---|---|---|
| 52.215-11 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA – MODIFICATIONS | OCT 1997 |
| 52.215-12 | CONTRACTOR COST OR PRICING DATA | OCT 1997 |
| 52.215-13 | CONTRACTOR COST OR PRICING DATA – MODIFICATIONS | OCT 1997 |
| 52.215-14 | INTEGRITY OF UNIT PRICES<br>ALTERNATE I | OCT 1997<br>OCT 1997 |
| 52.215-19 | NOTIFICATION OF OWNERSHIP CHANGES | OCT 1997 |
| 52.223-6 | DRUG-FREE WORKPLACE | JAN 1997 |
| 52.225-3 | BUY AMERICAN ACT – NORTH AMERICAN FREE TRADE AGREEMENT – ISRAELI TRADE ACT – BALANCE OF PAYMENTS PROGRAM | FEB 2000 |
| 52.225-5 | TRADE AGREEMENTS | APR 2000 |
| 52.225-10 | NOTICE OF BUY AMERICAN ACT - BALANCE OF PAYMENTS PROGRAM - CONSTRUCTION MATERIALS UNDER TRADE AGREEMENTS | FEB 2000 |
| 52.225-15 | SANCTIONED EUROPEAN UNION COUNTRY END PRODUCTS | FEB 2000 |
| 52.227-1 | AUTHORIZATION AND CONSENT | JUL 1995 |
| 52.228-3 | WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT) | APR 1984 |
| 52.228-4 | WORKER'S COMPENSATION AND WAR-HAZARD INSURANCE OVERSEAS | APR 1984 |
| 52.229-6 | TAXES –FOREIGN FIXED PRICE CONTRACTS | JAN 1991 |
| 52.232-17 | INTEREST | JUN 1996 |
| 52.236-5 | MATERIAL AND WORKMANSHIP | APR 1984 |
| 52.236-7 | PERMITS AND RESPONSIBILITIES | NOV 1991 |
| 52.236-19 | ORGANIZATION AND DIRECTION OF THE WORK | APR 1984 |
| 52.239-1 | PRIVACY OR SECURITY SAFEGUARDS | AUG 1996 |
| 52.244-5 | COMPETITION IN SUBCONTRACTING | DEC 1996 |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED PRICE CONTRACTS) | DEC 1989 |
| 52.246-2 | INSPECTION OF SUPPLIES – FIXED PRICE | AUG 1996 |
| 52.246-4 | IINSPECTION OF SERVICES – FIXED PRICE | AUG 1996 |
| 52.246-12 | INSPECTION OF CONSTRUCTION | AUG 1996 |
| 52.246-21 | WARRANT OF CONSTRUCTION | MAR 1994 |
| 52.246-29 | F.O.B. ORIGIN | NOV 1991 |
| 52.246-34 | F.O.B. DESTINATION | NOV 1991 |
| 52.247-14 | CONTRACTOR'S RESPONSIBILITY FOR RECEIPT OF SHIPMENT | APR 1984 |
| 52.247-15 | CONTRACTOR'S RESPONSIBILITY FOR LOADING AND UNLOADING | APR 1984 |
| 52.247-63 | PREFERENCE FOR U.S. FLAG AIR CARRIERS | JAN 1997 |

**1.2 INCORPORATION OF DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT CLAUSES:**

| PARAGRAPH | TITLE | DATE |
|---|---|---|
| 252.203-7001 | PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER DEFENSE-CONTRACT RELATED FELONIES | MAR 1999 |
| 252.204-7000 | DISCLOSURE OF INFORMATION | DEC 1991 |



LOGCAP III
SUBCONTRACT SPECIAL CONDITIONS – OVERSEAS

| PARAGRAPH | TITLE | DATE |
|---|---|---|
| 252.209-7000 | ACQUISITION FROM SUBCONTRATORS SUBJECT TO ON-SITE INSPECTION UNDER THE INTERMEDIATE RANGE NUCLEAR FORCES (INF) TREATY | NOV 1995 |
| 252.222-7002 | COMPLIANCE WITH LOCAL LABOR LAWS (OVERSEAS) | JUN 1997 |
| 252.222-7003 | PERMIT FROM ITALIAN INSPECTORATE OF LABOR | JUN 1997 |
| 252.222-7004 | COMPLIANCE WITH SPANISH SOCIAL SECURITY LAWS AND REGULATIONS | JUN 1997 |
| 252.223-7002 | SAFETY PRECAUTIONS FOR AMMUNITION AND EXPLOSIVES | MAY 1994 |
| 252.223-7003 | CHANGE IN PLACE OF PERFORMANCE - AMMUNITION AND EXPLOSIVES | DEC 1991 |
| 252.223-7004 | DRUG-FREE WORK FORCE | SEP 1988 |
| 252.223-7001 | HAZARD WARNING LABELS | DEC 1991 |
| 252.223-7006 | PROHIBITION ON STORAGE AND DISPOSAL OF TOXIC AND HAZARDOUS MATERIALS | APR 1993 |
| 252.225-7005 | IDENTIFICATION OF EXPENDITURES IN THE UNITED STATES | DEC 1991 |
| 252.225-7007 | BUY AMERICAN ACT - TRADE AGREEMENTS - BALANCE OF PAYMENTS PROGRAM | APR 2000 |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES | AUG 2000 |
| 252.225-7026 | REPORTING OF CONTRACT PERFORMANCE OUTSIDE THE UNITED STATES | JUN 2000 |
| 252.225-7030 | RESTRICTION ON ACQUISITION OF CARBON, ALLOY, AND ARMOR STEEL PLATE | OCT 1992 |
| 252.225-7032 | WAIVER OF UNITED KINGDOM LEVIES | OCT 1992 |
| 252.225-7043 | ANTITERRORISM/FORCE PROTECTION POLICY FOR DEFENSE CONTRACTORS OUTSIDE | JUN 1998 |
| 252.236-7005 | AIRFIELD SAFETY PRECAUTIONS | DEC 1991 |
| 252.247-4521 | UNITIZATION/PALLETIZATION | MAR 1988 |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA<br>ALTERNATE I | MAR 2000<br>MAR 2000 |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA—NONCOMMERCIAL ITEMS | NOV 1995 |
| 252.227-7014 | RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER | JUN 1995 |
| 252.227-7015 | TECHNICAL DATA—COMMERCIAL ITEMS | NOV 1995 |
| 252.227-7020 | RIGHTS IN SPECIAL WORKS | JUN 1995 |
| 252.228-7003 | CAPTURE AND DETENTION | DEC 1991 |
| 252.228-7006 | COMPLIANCE WITH SPANISH LAWS AND INSURANCE | JUN 1997 |
| 252.229-7002 | CUSTOMS EXEMPTIONS (GERMANY) | JUN 1997 |
| 252.229-7003 | TAX EXEMPTIONS (ITALY) (DFARS) | JUN 1997 |
| 252.229-7004 | STATUS OF KBRS AS A DIRECT CONTRACTOR (SPAIN) | MAR 1998 |
| 252.229-7005 | TAX EXEMPTIONS (SPAIN) | JUN 1997 |
| 252.229-7006 | VALUE ADDED TAX EXCLUSION (UNITED KINGDOM) | JUN 1997 |
| 252.229-7007 | VERIFICATION OF UNITED STATES RECEIPT OF GOODS | JUN 1997 |
| 252.229-7008 | RELIEF FROM IMPORT DUTY (UNITED KINGDOM) (JUN 1997) | JUN 1997 |
| 52.229-7009 | RELIEF FROM CUSTOMS DUTY AND VALUE ADDED TAX | JUN 1997 |

| PARAGRAPH | TITLE | DATE |
|---|---|---|
| | ON FUEL (PASSENGER VEHICLES)(UNITED KINGDOM) (JUN 1997) | |
| 252.229-7010 | RELIEF FROM CUSTOMS DUTY ON FUEL (UNITED KINGDOM) | JUN 1997 |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES DFARS | DEC 1991 |
| 252.232-7008 | ASSIGNMENT OF CLAIMS (OVERSEAS) DFARS | JUN 1997 |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |
| 252.233-7001 | CHOICE OF LAW (OVERSEAS) DFARS | JUN 1997 |
| 252.245-7001 | REPORTS OF GOVERNMENT PROPERTY DFARS | MAY 1994 |
| 252.246-7002 | WARRANTY OF CONSTRUCTION (JUN 1997) DFARS | JUN 1997 |

## 1.2 FAR CLAUSES INCORPORATED IN FULL TEXT

### 52.225-13–RESTRICTIONS ON CERTAIN FOREIGN PURCHASES. (MAR 2005)

(a) Except as authorized by the Office of Foreign Assets Control (OFAC) in the Department of the Treasury, the Contractor shall not acquire, for use in the performance of this contract, any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States.

(b) Except as authorized by OFAC, most transactions involving Cuba, Iran, Libya, and Sudan are prohibited, as are most imports from North Korea, into the United States or its outlying areas. Lists of entities and individuals subject to economic sanctions are included in OFAC's List of Specially Designated Nationals and Blocked Persons at http://www.epls.arnet.gov/News.html. More information about these restrictions, as well as updates, is available in the OFAC's regulations at 31 CFR Chapter V and/or on OFAC's website at http://www.treas.gov/ofac.

(c) The Contractor shall insert this clause, including this paragraph (c), in all subcontracts.

(End of clause)

### 52.244-6 SUBCONTRACTS FOR COMMERCIAL ITEMS (JUL 2004)

(a) *Definitions.* As used in this clause-

"Commercial item" has the meaning contained in Federal Acquisition Regulation 2.101, Definitions.

"Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or non-developmental items as components of items to be supplied under this contract.

(c) (1) The Contractor shall insert the following clauses in subcontracts for commercial items:

(i) 52.219-8, Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting




opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $500,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(ii) 52.222-26, Equal Opportunity (Apr 2002) (E.O. 11246).

(iii) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (Dec 2001) (38 U.S.C. 4212(a));

(iv) 52.222-36, Affirmative Action for Workers with Disabilities (June 1998) (29 U.S.C. 793).

(v) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Apr 2003) (46 U.S.C. Appendix 1241 and 10 U.S.C. 2631) (flow down required in accordance with paragraph (d) of FAR clause 52.247-64).

(2) While not required, the Contractor may flow down to subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

(End of clause)

**252.225-7040 Contractor Personnel Supporting a Force Deployed Outside the United States.**

As prescribed in 225.7402-4(a), use the following clause:

CONTRACTOR PERSONNEL SUPPORTING A FORCE DEPLOYED OUTSIDE THE UNITED STATES (JUN 2005)

(a) *Definitions.* As used in this clause—

"Combatant Commander" means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.

"Theater of operations" means an area defined by the combatant commander for the conduct or support of specified operations.

(b) *General.*

(1) This clause applies when contractor personnel deploy with or otherwise provide support in the theater of operations to U.S. military forces deployed outside the United States in—

(i) Contingency operations;

(ii) Humanitarian or peacekeeping operations; or

(iii) Other military operations or exercises designated by the Combatant Commander.



(2) Contract performance in support of U.S. military forces may require work in dangerous or austere conditions. The Contractor accepts the risks associated with required contract performance in such operations.

(3) Contractor personnel are not combatants and shall not undertake any role that would jeopardize their status. Contractor personnel shall not use force or otherwise directly participate in acts likely to cause actual harm to enemy armed forces.

(c) *Support.*

(1) The Combatant Commander will develop a security plan to provide protection, through military means, of Contractor personnel engaged in the theater of operations unless the terms of this contract place the responsibility with another party.

(2)(i) All Contractor personnel engaged in the theater of operations are authorized resuscitative care, stabilization, hospitalization at level III military treatment facilities, and assistance with patient movement in emergencies where loss of life, limb, or eyesight could occur. Hospitalization will be limited to stabilization and short-term medical treatment with an emphasis on return to duty or placement in the patient movement system.

(ii) When the Government provides medical treatment or transportation of Contractor personnel to a selected civilian facility, the Contractor shall ensure that the Government is reimbursed for any costs associated with such treatment or transportation.

(iii) Medical or dental care beyond this standard is not authorized unless specified elsewhere in this contract.

(3) Unless specified elsewhere in this contract, the Contractor is responsible for all other support required for its personnel engaged in the theater of operations under this contract.

(d) *Compliance with laws and regulations.* The Contractor shall comply with, and shall ensure that its personnel supporting a force deployed outside the United States as specified in paragraph (b)(1) of this clause are familiar with and comply with, all applicable—

(1) United States, host country, and third country national laws;

(2) Treaties and international agreements;

(3) United States regulations, directives, instructions, policies, and procedures; and

(4) Orders, directives, and instructions issued by the Combatant Commander relating to force protection, security, health, safety, or relations and interaction with local nationals.

(e) *Pre-deployment requirements.* The Contractor shall ensure that the following requirements are met prior to deploying personnel in support of U.S. military forces. Specific requirements for each category may be specified in the statement of work or elsewhere in the contract.

(1) All required security and background checks are complete and acceptable.

(2) All deploying personnel meet the minimum medical screening requirements and have received all required immunizations as specified in the contract. The Government will

provide, at no cost to the Contractor, any theater-specific immunizations and/or medications not available to the general public.

(3) Deploying personnel have all necessary passports, visas, and other documents required to enter and exit a theater of operations and have a Geneva Conventions identification card from the deployment center.

(4) Country and theater clearance is obtained for personnel. Clearance requirements are in DoD Directive 4500.54, Official Temporary Duty Abroad, and DoD 4500.54-G, DoD Foreign Clearance Guide. Contractor personnel are considered non-DoD personnel traveling under DoD sponsorship.

(f) *Processing and departure points*. Deployed contractor personnel shall—

(1) Process through the deployment center designated in the contract, or as otherwise directed by the Contracting Officer, prior to deploying. The deployment center will conduct deployment processing to ensure visibility and accountability of contractor personnel and to ensure that all deployment requirements are met;

(2) Use the point of departure and transportation mode directed by the Contracting Officer; and

(3) Process through a Joint Reception Center (JRC) upon arrival at the deployed location. The JRC will validate personnel accountability, ensure that specific theater of operations entrance requirements are met, and brief contractor personnel on theater-specific policies and procedures.

(g) *Personnel data list.*

(1) The Contractor shall establish and maintain with the designated Government official a current list of all contractor personnel that deploy with or otherwise provide support in the theater of operations to U.S. military forces as specified in paragraph (b)(1) of this clause. The Contracting Officer will inform the Contractor of the Government official designated to receive this data and the appropriate automated system(s) to use for this effort.

(2) The Contractor shall ensure that all employees on the list have a current DD Form 93, Record of Emergency Data Card, on file with both the Contractor and the designated Government official.

(h) *Contractor personnel.*

(1) The Contracting Officer may direct the Contractor, at its own expense, to remove and replace any contractor personnel who jeopardize or interfere with mission accomplishment or who fail to comply with or violate applicable requirements of this clause. Such action may be taken at the Government's discretion without prejudice to its rights under any other provision of this contract, including the Termination for Default clause.

(2) The Contractor shall have a plan on file showing how the Contractor would replace employees who are unavailable for deployment or who need to be replaced during deployment. The Contractor shall keep this plan current and shall provide a copy to the Contracting Officer upon request. The plan shall—

(i) Identify all personnel who are subject to military mobilization;

(ii) Detail how the position would be filled if the individual were mobilized; and

(iii) Identify all personnel who occupy a position that the Contracting Officer has designated as mission essential.

(i) *Military clothing and protective equipment.*

(1) Contractor personnel supporting a force deployed outside the United States as specified in paragraph (b)(1) of this clause are prohibited from wearing military clothing unless specifically authorized in writing by the Combatant Commander. If authorized to wear military clothing, contractor personnel must wear distinctive patches, arm bands, nametags, or headgear, in order to be distinguishable from military personnel, consistent with force protection measures and the Geneva Conventions.

(2) Contractor personnel may wear military-unique organizational clothing and individual equipment (OCIE) required for safety and security, such as ballistic, nuclear, biological, or chemical protective clothing.

(3) The deployment center, or the Combatant Commander, shall issue OCIE and shall provide training, if necessary, to ensure the safety and security of contractor personnel.

(4) The Contractor shall ensure that all issued OCIE is returned to the point of issue, unless otherwise directed by the Contracting Officer.

(j) *Weapons.*

(1) If the Contractor requests that its personnel performing in the theater of operations be authorized to carry weapons, the request shall be made through the Contracting Officer to the Combatant Commander. The Combatant Commander will determine whether to authorize in-theater contractor personnel to carry weapons and what weapons will be allowed.

(2) The Contractor shall ensure that its personnel who are authorized to carry weapons—

(i) Are adequately trained;

(ii) Are not barred from possession of a firearm by 18 U.S.C. 922; and

(iii) Adhere to all guidance and orders issued by the Combatant Commander regarding possession, use, safety, and accountability of weapons and ammunition.

(3) Upon redeployment or revocation by the Combatant Commander of the Contractor's authorization to issue firearms, the Contractor shall ensure that all Government-issued weapons and unexpended ammunition are returned as directed by the Contracting Officer.

(k) *Vehicle or equipment licenses.* Contractor personnel shall possess the required licenses to operate all vehicles or equipment necessary to perform the contract in the theater of operations.

(l) *Purchase of scarce goods and services.* If the Combatant Commander has established an organization for the theater of operations whose function is to determine that certain items are





scarce goods or services, the Contractor shall coordinate with that organization local purchases of goods and services designated as scarce, in accordance with instructions provided by the Contracting Officer.

(m) *Evacuation.*

(1) If the Combatant Commander orders a mandatory evacuation of some or all personnel, the Government will provide assistance, to the extent available, to United States and third country national contractor personnel.

(2) In the event of a non-mandatory evacuation order, unless authorized in writing by the Contracting Officer, the Contractor shall maintain personnel on location sufficient to meet obligations under this contract.

(n) *Next of kin notification and personnel recovery.*

(1) The Contractor shall be responsible for notification of the employee-designated next of kin in the event an employee dies, requires evacuation due to an injury, or is missing, captured, or abducted.

(2) In the case of missing, captured, or abducted contractor personnel, the Government will assist in personnel recovery actions in accordance with DoD Directive 2310.2, Personnel Recovery.

(o) *Mortuary affairs.* Mortuary affairs for contractor personnel who die while providing support in the theater of operations to U.S. military forces will be handled in accordance with DoD Directive 1300.22, Mortuary Affairs Policy.

(p) *Changes.* In addition to the changes otherwise authorized by the Changes clause of this contract, the Contracting Officer may, at any time, by written order identified as a change order, make changes in Government-furnished facilities, equipment, material, services, or site. Any change order issued in accordance with this paragraph (p) shall be subject to the provisions of the Changes clause of this contract.

(q) *Subcontracts.* The Contractor shall incorporate the substance of this clause, including this paragraph (q), in all subcontracts that require subcontractor personnel to be available to deploy with or otherwise provide support in the theater of operations to U.S. military forces deployed outside the United States in—

(1) Contingency operations;

(2) Humanitarian or peacekeeping operations; or

(3) Other military operations or exercises designated by the Combatant Commander.

(End of clause)

**2.0 ANTI-KICKBACK NOTICE**

Your attention is directed to the prohibitions contained within the Anti-Kickback Act of 1986 (FAR Clause 52.203-7), highlights of which are: Subcontractors and suppliers are prohibited from offering any money, fee, commission, credit, gift, gratuity, thing of value or compensation of any kind directly or indirectly to Kellogg Brown & Root Services employees for the purpose of improperly obtaining or



rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

**3.0 COMBATING TRAFFICKING IN PERSONS (FAR Clause 52.222-50 - APR 2006)**

(a) *Definitions*. As used in this clause—

"Coercion" means—

(1) Threats of serious harm to or physical restraint against any person;

(2) Any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(3) The abuse or threatened abuse of the legal process.

"Commercial sex act" means any sex act on account of which anything of value is given to or received by any person.

"Debt bondage" means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined.

"Employee" means an employee of a Subcontractor directly engaged in the performance of work under a Government contract or subcontract, including all direct cost employees and any other Subcontractor employee who has other than a minimal impact or involvement in contract performance.

"Individual" means a Subcontractor that has no more than one employee including the Subcontractor.

"Involuntary servitude" includes a condition of servitude induced by means of—

(1) Any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such conditions, that person or another person would suffer serious harm or physical restraint; or

(2) The abuse or threatened abuse of the legal process.

"Severe forms of trafficking in persons" means—

(1) Sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

(2) The recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

"Sex trafficking" means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

(b) *Policy*. The United States Government has adopted a zero tolerance policy regarding Contractors and Subcontractors and their respective employees that engage in or support severe forms of trafficking in persons, procurement of commercial sex acts, or use of forced labor. During the performance of this subcontract, the Subcontractor shall ensure that its employees do not violate this policy.

(c) *Subcontractor requirements.* The Subcontractor, if other than an individual, shall establish policies and procedures for ensuring that its employees do not engage in or support severe forms of trafficking in persons, procure commercial sex acts, or use forced labor in the performance of this contract. At a minimum, the Subcontractor shall—

(1) Publish a statement notifying its employees of the United States Government's zero tolerance policy described in paragraph (b) of this clause and specifying the actions that will be taken against employees for violations of this policy. Such actions may include, but are not limited to, removal from the contract, reduction in benefits, or termination of employment;

(2) Establish an awareness program to inform employees about—

(i) The Subcontractor's policy of ensuring that employees do not engage in severe forms of trafficking in persons, procure commercial sex acts, or use forced labor;

(ii) The actions that will be taken against employees for violation of such policy;

(iii) Regulations applying to conduct if performance of the contract is outside the U.S., including—

(A) All host country Government laws and regulation relating to severe forms of trafficking in persons, procurement of commercial sex acts, and use of forced labor; and

(B) All United States laws and regulations on severe forms of trafficking in persons, procurement of commercial sex acts, and use of forced labor which may apply to its employees' conduct in the host nation, including those laws for which jurisdiction is established by the Military Extraterritorial Jurisdiction Act of 2000 (18 U.S.C. 3261-3267), and 18 U.S.C. 3271, Trafficking in Persons Offenses Committed by Persons Employed by or Accompanying the Federal Government Outside the United States;

(3) Provide all employees directly engaged in performance of the subcontract with a copy of the statement required by paragraph (c)(1) of this clause and obtain written agreement from the employee that the employee shall abide by the terms of the statement; and

(4) Take appropriate action, up to and including termination, against employees or subcontractors that violate the policy in paragraph (b) of this clause.

(d) *Notification.* The Subcontractor shall inform the Contractor's Subcontract Administrator, in writing, immediately of—

(1) Any information it receives from any source (including host country law enforcement) that alleges a contract employee has engaged in conduct that violates this policy; and

(2) Any action taken against employees pursuant to this clause.

(e) *Remedies.* In addition to other remedies available to the Contractor, the Subcontractor's failure to comply with the requirements of paragraphs (c) or (d) of this clause may render the Subcontractor subject to—

(1) Required removal of a Subcontractor employee or employees from the performance of the contract;



(2) Required subcontractor termination;

(3) Suspension of subcontract payments;

(4) Loss of award fee, if authorized in the terms of the subcontract, for the performance period in which the Contractor determined Subcontractor non-compliance;

(5) Termination of the subcontract for default, in accordance with the termination clause of this subcontract; or

(6) Suspension or debarment.

(f) *Lower-tier Subcontracts*. In the event that lower-tier subcontracts are authorized by this subcontract, The Subcontractor shall include the substance of this clause, including this paragraph (f), in all subcontracts for the acquisition of services.

**4.0 WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT)**

*(This paragraph is applicable in the event that a Subcontractor is deployed overseas to perform work under this subcontract) FAR Clause* 52.228-3)

4.1 In the event that subcontract work is to be performed overseas, all Subcontractors are required to be covered by DBA insurance or security (a) the Defense Base Act (42 U.S.C. 1651, et seq.) (b) to continue to maintain it until performance is completed. The Subcontractor shall insert, in all subcontracts under this subcontract in which the Defense Base Act applies, a clause similar to this clause (including this sentence) imposing upon those subcontractors this requirement to comply with the Defense Base Act.

4.2 KBRS shall provide DBA insurance coverage to the Subcontractor under the KBRS DBA Insurance Program to insure the Subcontractor employees under DBA insurance at no additional cost to the Subcontractor; therefore Subcontract must not include any DBA premium costs in the price of this agreement.

4.3 The Subcontract shall be an individually named insured and will receive policy documentation upon enrollment.

4.4 The Subcontractor shall certify with submission of their proposal that its bid does not include any charges for DBA coverage. In addition, the Subcontractor shall provide the following information on the DBA Application Form:

- Subcontractor (Named Insured)
- Subcontract Term
- Subcontract Number
- Contact Name
- Physical Address
- Email Address
- Description of Operations
- Contract Value
- Estimated Payroll
- Number of Employees (US, Third County Nationals and Host Country Nationals)
- Prime Contract Number and Description



**LOGCAP III**
**SUBCONTRACT SPECIAL CONDITIONS – OVERSEAS**

**Note:** DBA coverage will not apply to subcontractors who are engaged exclusively in furnishing materials or supplies off of KBRS work site under a U.S. prime Contract; however--paragraph 4.0 does applies.

**5.0 STOP-WORK ORDER**

5.1 KBRS may, at any time, by written order to the Subcontractor, require the Subcontractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Subcontractor, and for any further period to which the parties may agree. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of 90 days after a stop-work order is delivered to the Subcontractor, or within any extension of that period to which the parties shall have agreed, KBRS shall either-

(1) Cancel the stop-work; or

(2) Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

5.2 If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Subcontractor shall resume work. KBRS shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing accordingly, if-

(1) The stop-work order results in an increase in the time required for, or in the Subcontractor's cost properly allocable to, the performance of any part of this contract; and

(2) The Subcontractor asserts a claim for the adjustment within 15 days after the end of the period of work stoppage; provided, that, if KBRS decides the facts justify the action, KBRS may receive and act upon the claim asserted at any time before final payment under this contract.

5.3 If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, KBRS shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

5.4 If a stop-work order is not canceled and the work covered by the order is terminated for default, KBRS shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

5.5 Notwithstanding the above, where the stop-work order is occasioned by the imposition of such stop-work order by the GOVERNMENT on KBRS, Subcontractor will be entitled to only such adjustment that is awarded to KBRS to the extent such adjustment relates to this Subcontract.

**6.0 DISPUTES**

6.1 Notwithstanding any other provision in this Subcontract, any decision of the Government's Contracting Officer pursuant to the contract between KBRS and the Department of the Army (Prime Contract) which binds KBRS shall bind both KBRS and Subcontractor to the extent that it relates to the Subcontract, provided (1) KBRS promptly notifies Subcontractor of the decision, and (2) if requested by the Subcontractor, KBRS appeals the decision in accordance with the Disputes clause of the Prime Contract and takes whatever further action is required under this clause.


6.2 Any decision on the appeal, or any other decision of the Government under the Prime Contract that is binding on KBRS and cannot be appealed under the Disputes clause of the Prime Contract, shall also bind KBRS and the Subcontractor to the extent that it relates to the Subcontract, provided KBRS promptly notifies Subcontractor of the decision and, if requested by the Subcontractor, brings suit or files a claim, as appropriate, against the Government. A final judgment in the suit shall be conclusive upon KBRS and Subcontractor.

6.3 If requested by KBRS, Subcontractor shall assume the burden of prosecuting for KBRS any appeal, suit, or claim initiated by KBRS at Subcontractor's request. Each party shall cooperate fully in assisting the other party in the proceedings. If any appeal, suit, or claim is prosecuted by KBRS under this clause, Subcontractor shall be permitted to participate fully in the prosecution for the purpose of protecting its interests.

6.4 Pending any decision, appeal, suit or claim pursuant to this clause, Subcontractor shall proceed diligently with performance of this Subcontract. All costs and expenses incurred by Subcontractor and KBRS in prosecuting any appeal, suit or claim initiated by KBRS at Subcontractor's request shall be paid by Subcontractor. The rights and obligations of KBRS and Subcontractor under this Subcontract shall survive completion of, and final payment under, this Subcontract.

**7.0 ALTERNATIVE DISPUTE RESOLUTION**

The following provision for Alternative Dispute Resolution shall be incorporated into the SUBCONTRACT AGREEMENT as follows:

In the event of any claim or dispute between the parties arising under or relating to this AGREEMENT or any WORK RELEASE hereunder, AS AN EXCLUSIVE SUBSTITUTE FOR INITIATING ANY ACTION IN LAW OR EQUITY IN ANY COURT OR OTHER JUDICIAL PROCESS, THE PARTIES AGREE THAT THE FOLLOWING DISPUTE RESOLUTION PROCEDURE SHALL BE COMPLIED WITH:

1. If any claim or dispute of any nature arises between the parties, both parties first shall exert all reasonable and necessary efforts, amicable and in good faith, to resolve such dispute promptly and with finality, by direct negotiation between each party. Any settlement agreement shall be placed in writing.

2. Should such efforts described in 1 above fail to settle such dispute, then the aggrieved party shall send to the other a notice in writing, and the receiving party shall have ten (10) working days to submit a written response. The notice and response shall include: (i) a statement of each party's position and a summary of facts supporting that position, with all pertinent supporting documentation, and (ii) the name and title of who will represent that party in negotiations.

3. Within thirty (30) working days after delivery of the written response, the representatives from each side shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to exert their best efforts to resolve the dispute with finality. All reasonable requests for information made by either party to the other shall be honored. Any settlement agreement shall be placed in writing.

4. Should negotiations between the representatives not be successful after thirty (30) days, the dispute shall then be submitted to binding arbitration administered by the American Arbitration Association

in Arlington, Virginia, USA in accordance with the applicable rules, regulations, and procedures of the American Arbitration Association.

5. The governing law of this contract shall be the law of Texas, USA excluding any conflict of law provisions which would lead to the application of a different body of law.

6. The arbitration panel shall be composed of three arbitrators; one arbitrator shall be appointed by each of the parties to the claim or dispute, and another independent arbitrator appointed by the two arbitrators chosen by the parties..

7. Each of the parties shall pay one-half of the costs and expenses of the American Arbitration Association in the administration of any dispute resolution proceeding, including but not limited to any mediation and arbitration. Each party shall bear all of its own expenses in the dispute resolution process.

8. The decision of a majority of the arbitrators shall be reduced to writing; final and binding without the right of appeal. Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the Party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be.

9. Unless otherwise directed by KBRS, Subcontractor shall continue to perform the WORK pending resolution of any claim or dispute under this Article.

10. Consequential, punitive or other similar damages shall not be allowed; provided, however, the award may include appropriate punitive damages where a Party has engaged in delaying and dilatory actions

## 8.0 CHANGES

8.1 KBRS may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the Subcontract, including changes:

(1) in the specifications (including drawings and designs);

(2) in the method or manner of performance of the work;

(3) in the Government-furnished facilities, equipment, materials, services, or site; or,

(4) directing acceleration in the performance of the work.

8.2 Any other written or oral order (which, as used in this paragraph 8.2 includes direction, instruction, interpretation, or determination) from KBRS that causes a change shall be treated as a change order under this clause; provided, that the Subcontractor gives KBRS written notices stating (1) the date, circumstances, and source of the order and (2) that the Subcontractor regards the order as a change order.

8.3 Except as provided in this clause, no order, statement, or conduct of KBRS shall be treated as change order under this clause or entitle the Subcontractor to an equitable adjustment.

8.4 If any change under this clause causes an increase or decrease in the Subcontractor's cost of, or time required for, the performance of any part of the work under this Subcontract, whether or not changed by any such order, KBRS shall make an equitable adjustment and modify the Subcontract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under

paragraph 8.2 of this clause shall be made for any costs incurred more than twenty (20) days before KBRS gives written notice as required under the Prime Contract to the Government. In the case of defective specifications for which KBRS is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Subcontractor in attempting to comply with the defective specifications.

8.5 The Subcontractor must assert its right to an equitable adjustment under this clause within fifteen (15) days after (1) receipt of a written change order under paragraph 8.1 of this clause, or (2) the furnishing of a written notice under paragraph 8.2 of this clause, by submitting to KBRS a written statement describing the general nature and amount of the proposal including a detailed cost breakdown. Included costs must conform to FAR, Part 31 (including the DOD FAR Supplement). As required by FAR supplement, no profit on General & Administrative Overhead may be included. The statement of proposal of adjustment may be included in the notice under paragraph 8.2 above.

8.6 Subcontractor shall not submit nor shall KBRS accept a proposal for an equitable adjustment if asserted after the fifteen (15) day period set forth in paragraph 8.5 above.

## 9.0 VALUE ENGINEERING

9.1 Subcontractor is encouraged to develop, prepare and submit value engineering change proposals (VECP'S) voluntarily. The Subcontractor shall share in any award on an equal basis with KBRS (to the extent that it involves this Subcontract) that KBRS receives from the Government for any instant contract savings under the prime contract.

9.2 All definitions associated with the VECP'S shall be as stated in FAR 52.248-1.

9.3 Subcontractor shall provide KBRS with any and all information required from Subcontractor to enable KBRS to submit VECP'S to the Government pursuant to the requirements of FAR 52.248-1.

9.4 If a VECP is accepted by the Government, the Subcontractor hereby grants the Government unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, the Government shall have the rights specified in the prime contract modification implementing the VECP and shall appropriately mark the data. (The terms "unlimited rights" and "limited rights" are defined in Part 27 of the FAR).

## 10.0 COMMENCEMENT, PROSECUTION AND COMPLETION OF WORK

The Subcontractor will be required to (a) commence work under this Subcontract on the required Start Date as stated in the Subcontract Terms, (b) prosecute the work diligently, and (c) complete the entire work ready for use (including completion of all punch-list items and clean-up) not later than the Completion Date as stated in the Subcontract Terms. However, any delays in giving notice to proceed, attributable to Subcontractor's failure to execute the subcontract and give the required performance and payment bonds (if any) will be deducted from the number of days allowed for completion in the Subcontract Terms.

## 11.0 PERFORMANCE EVALUATION OF SUBCONTRACTOR

11.1 Subcontractor's performance will be evaluated upon final acceptance of the work. However, interim evaluation may be prepared at any time during the subcontract performance when determined to be in either the best interest of KBRS or the Government.

11.2 KBRS will use whatever format for evaluation it chooses, including the SF1420. KBRS reserves the right to forward its evaluation to the Government if so requested by the Government's Contracting Officer.

### 12.0 CONTRACTUAL RELATIONSHIP

There is no privity of contract between the Subcontractor and the Government. All communication on this project (oral or written) shall be addressed to KBRS.

### 13.0 LOWER-TIER Subcontract CONDITIONS

Subcontractor shall include in its lower-tier subcontracts (including purchase orders) all Government Contracting clauses as detailed in Paragraph 1.0.

### 14.0 CONFLICTING REQUIREMENTS

Any conflict between the specifications, data sheets, drawings, referenced national standards, and codes shall be brought to KBRS' attention, and approved written clarification shall be obtained before proceeding.

### 15.0 EXPEDITING AND INSPECTION

KBRS reserves the right to expedite and/or inspect equipment, materials and services covered by any resultant Subcontract at any location, including lower-tier subcontracts. Access shall be given to representatives of KBRS and its client at all reasonable times under adequate notice to Subcontractor, so that Subcontractor may advise any involved lower-tier subcontractor. The Subcontractor shall ensure that all of the expediting and inspection clauses included in this Subcontract are made part of any lower-tier subcontract.

### 16.0 INVOICING

Invoices received that do not agree with the provisions of this Subcontract will be returned for correction. Invoices shall reference this Subcontract number and shall show shipping point, quantities shipped and description, as well as price. Subcontractor's failure to provide specified vendor data requirements will result in payment of invoices being delayed.

### 17.0 RELEASE OF INFORMATION

17.1 Subcontractor shall not draft, issue, release or participate in, directly or indirectly, any news release, interview with any form of media, public announcement, advertisement or public statement, either written or oral, concerning any aspect of this Subcontract Agreement or any attachment thereunder; KBRS' Prime Contract with the U.S. Government; or any work being performed under the Prime Contract or this Subcontract without first obtaining prior written approval of KBRS. Furthermore, Subcontractor is required to direct all media inquiries or requests for information to KBRS.

17.2 Subcontractor may submit written requests for approval to release information to KBRS. Such requests shall identify the specific information to be released, the medium to be used, and the purpose for the release. The Subcontractor shall submit its request to KBRS at least 45 days before the proposed date for release.

17.3 Any violation of this provision is considered a material breach of the subcontract.

LOGCAP III
SUBCONTRACT SPECIAL CONDITIONS – OVERSEAS

## 18.0 ORDER OF PRECEDENCE

In case of conflicts between various Subcontract documents, the following order of precedence shall be used to settle said conflicts:

Change Order (s) (latest one issued)
Subcontract Terms
Subcontract Special Conditions
Special Subcontract Requirements
Subcontract General Conditions/Purchase Order Terms and Conditions
Specifications (unless specifically stated otherwise elsewhere within the Subcontract documents)
Drawings:
  Schedules shown on drawings
  Details shown on drawings
  Individual drawing sheets

18 of 18

Logcap III – Special Conditions – Overseas
Rev. 005, Dated 07/27/2006

KBR-FH-000398

**REPRESENTATIONS, CERTIFICATIONS AND**

**OTHER STATEMENTS OF OFFERORS**

**FOR OVERSEAS SUBCONTRACTORS/SUPPLIERS**

**PRIME CONTRACT NUMBER: DAAA09-02-D-0007**

**1. 52.203-11 CERTIFICATION AND DISCLOSURE REGARDING PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (APR 1991) (OVER $100,000)**

(a) The definitions and prohibitions contained in the clause, at FAR 52.203-12, Limitation on Payments to Influence Certain Federal Transactions, included in this solicitation, are hereby incorporated by reference in paragraph (b) of this certification.

(b) The offeror, by signing its offer, hereby certifies to the best of his or her knowledge and belief that on or after December 23, 1989:

(1) No Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence, an officer or employee of any agency, a Member of Congress, an officer or an employee of a Member of Congress on his or her behalf in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement;

(2) If any funds other than Federal appropriated funds (including profit or fee received under a covered Federal transaction) have been paid, or will be paid, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress on his or her behalf in connection with this solicitation, the offeror shall complete and submit, with its offer, OMB standard Form-LLL, Disclosure of Lobbying Activities, to the Contracting Officer; and

(3) He or she will include the language of this certification in all subcontract awards at any tier and require that all recipients of subcontract awards in excess of $100,000 shall certify and disclosure accordingly.

(c) Submission of this certification and disclosure is a prerequisite for making or entering into this contract imposed by section 1352, title 31, United States Code. Any person who makes an expenditure prohibited under this provision or who fails to file or amend the disclosure form to be filed or amended by this provision, shall be subjected to a civil penalty of not less than $10,000, and not more than $100,000, for each such failure.

**2. 52.209-5 CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED DEBARMENT, AND OTHER RESPONSIBILITY MATTERS (APR 2001) (OVER $25,000)**

(a)(1) The Offeror certifies, to the best of its knowledge and belief, that:

(i) The Offeror and/or any of its Principals:

(A) ☐ are, ☑ are not presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal Agency.

(B) ☐ have, ☑ have not within a three year period preceding this offer, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or Local) contract or subcontract; violation of Federal or State antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; and

(C) ☐ are, ☑ are not presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subdivision (a)(1)(i)(B) of this provision; and

(ii) (A) The offeror, aside from the offenses enumerated in paragraphs (a)(1)(i)(A), (B) and (C) of this provision, has ☐ has not ☑ within the past three years, relative to tax, labor and employment, environmental, antitrust, or consumer protection laws--

(1) Been convicted of a Federal or state felony (or has any federal or state felony indictments currently pending against them); or
(2) Had a Federal court judgment in a civil case brought by the United States rendered against them; or
(3) Had an adverse decision by a Federal administrative law judge, board or commission indicating a willful violation of law.

(B) If the offeror responded affirmatively, the offeror shall provide additional information if requested by the Contractor; and

(iii) The Offeror ☐ has, ☑ has not within a three year period preceding this offer, hed one or more contracts terminated for default by any Federal Agency.

(2) "Principals," for the purposes of this certification, means officers; directors; owners; partners; and persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division or business segment, and similar positions).

**THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION AY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER SECTION 1001, TITLE 18, UNITED STATES CODE.**

(b) The Offeror shall provide immediate written notice to the Contractor if, at any time prior to subcontract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists will not necessarily result in withholding of an award under this solicitation. However, the certification will

be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contractor may render the Offeror nonresponsible.

(d) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph (a) of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

(e) The certification in paragraph (a) of this provision is a material representation of fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, in addition to other remedies available to the Contractor, the Contractor may terminate the contract resulting from this solicitation for default.

**3. 52.222-21 PROHIBITION OF SEGREGATED FACILITIES (FEB 1999)**

(a) "Segregated facilities," as used in this clause, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex, or national origin because of written or oral policies or employee custom. The term does not include separate or single-user rest rooms or necessary dressing or sleeping areas provided to assure privacy between the sexes.

(b) The Contractor agrees that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The Contractor agrees that a breach of this clause is a violation of the Equal Opportunity clause in this contract.

(c) The Contractor shall include this clause in every subcontract and purchase order that is subject to the Equal Opportunity clause of this contract.
(End of clause)

**4. 52.237-8 RESTRICTION ON SEVERANCE PAYMENTS TO FOREIGN NATIONALS (OCT 1995)**

(a) The Federal Acquisition Regulation (FAR), at 31.2056(g)(3), limits the cost allowability of severance payments to foreign nationals employed under a service contract performed outside the United States unless the head of the agency, or designee, grants a waiver pursuant to FAR 37.1131 before contract award.

(b) (b) In making the determination concerning the granting of a waiver, the head of the agency, or designee, will determine that-

(1) The application of the severance pay limitations to the contract would adversely affect the continuation of a program, project, or activity that provides significant support services for- (i) Members of the armed forces stationed or deployed outside the United States; or (ii) Employees of an executive agency posted outside the United States;

(2) The Contractor has taken (or has established plans to take) appropriate actions within its control to minimize the amount and number of incidents of the payment of severance pay to employees under the contract who are foreign nationals; and

(3) (3) The payment of severance pay is necessary in order to comply with a law that is generally applicable to a significant number of businesses in the country in which the foreign national receiving the payment performed services under the contract, or is necessary

**5. 252.209-7001 DISCLOSURE OF OWNERSHIP OR CONTROL BY THE GOVERNMENT OF A TERRORIST COUNTRY (MAR 1998) (Over $100,000)**

(a) Definitions.

As used in this provision—

(1) "Government of a terrorist country" includes the state and the government of a terrorist country, as well as any political subdivision, agency, or instrumentality thereof.

(2) "Terrorist country" means a country determined by the Secretary of State, under Section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(i)(A)), to be a country the government of which has repeatedly provided support for acts of international terrorism. As of the date of this provision, terrorist countries include: Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria.

(3) "Significant interest" means—

(i) Ownership of or beneficial interest in 5 percent or more of the firm's or subsidiary's securities. Beneficial interest includes holding 5 percent or more of any class of the firm's securities in "nominee shares," "street names," or some other method of holding securities that does not disclose the beneficial owner;

(ii) Holding a management position in the firm, such as a director or officer;
(iii) Ability to control or influence the election, appointment, or tenure of directors or officers in the firm;

(iv) Ownership of 10 percent or more of the assets of a firm such as equipment, buildings, real estate, or other tangible assets of the firm; or

(v) Holding 50 percent or more of the indebtedness of a firm.

(b) Prohibition on award. In accordance with 10 U.S.C. 2327, no contract may be awarded to a firm or a subsidiary of a firm if the government of a terrorist country has a significant interest in the firm or subsidiary or, in the case of a subsidiary, the firm that owns the subsidiary, unless a waiver is granted by the Secretary of Defense.

(c) Disclosure. If the government of a terrorist country has a significant interest in the Offeror or a subsidiary of the Offeror, the Offeror shall disclose such interest in an attachment to its offer. If the Offeror is a subsidiary, it shall also disclose any significant interest the government of a terrorist country has in any firm that owns or controls the subsidiary. The disclosure shall include—


(1) Identification of each government holding a significant interest; and

(2) A description of the significant interest held by each government.

**6. 252.209-7002 DISCLOSURE OF OWNERSHIP OR CONTROL BY A FOREIGN GOVERNMENT (SEP 1994)**

(a) Definitions. As used in this provision—

(1) "Effectively owned or controlled" means that a foreign government or any entity controlled by a foreign government has the power, either directly or indirectly, whether exercised or exercisable, to control the election, appointment, or tenure of the Offeror's officers or a majority of the Offeror's board of directors by any means, e.g., ownership, contract, or operation of law (or equivalent power for unincorporated organizations).

(2) "Entity controlled by a foreign government"—

(i) Means—

(A) Any domestic or foreign organization or corporation that is effectively owned or controlled by a foreign government; or

(B) Any individual acting on behalf of a foreign government.

(ii) Does not include an organization or corporation that is owned, but is not controlled, either directly or indirectly, by a foreign government if the ownership of that organization or corporation by that foreign government was effective before October 23, 1992.

(3) "Foreign government" includes the state and the government of any country (other than the United States and its possessions and trust territories) as well as any political subdivision, agency, or instrumentality thereof.

(4) "Proscribed information" means—

(i) Top Secret information;

(ii) Communications Security (COMSEC) information, except classified keys used to operate secure telephone units (STU IIIs);

(iii) Restricted Data as defined in the U.S. Atomic Energy Act of 1954, as amended;

(iv) Special Access Program (SAP) information; or

(v) Sensitive Compartmented Information (SCI).

(b) Prohibition on award. No contract under a national security program may be awarded to an entity controlled by a foreign government if that entity requires access to proscribed information to perform the contract, unless the Secretary of Defense or a designee has waived application of 10 U.S.C. 2536(a).

(c) Disclosure. The Offeror shall disclose any interest a foreign government has in the Offeror when that interest constitutes control by a foreign government as defined in this provision. If the Offeror is a subsidiary, it shall also disclose any reportable interest a foreign government has in any entity that owns or controls the subsidiary, including reportable interest concerning the Offeror's immediate parent, intermediate parents, and the ultimate parent. Use separate paper as needed, and provide the information in the following format:

Offeror's Point of Contact for Questions about Disclosure (Name and Phone Number with Country Code, City Code and Area Code, as applicable)

Name and Address of Offeror

| Name and Address of Entity Controlled by a Foreign Government | Description of Interest, Ownership Percentage, and Identification of Foreign Government |
|---|---|

6. 252.247-7022 REPRESENTATION OF EXTENT OF TRANSPORTATION BY SEA

(a) The Offeror shall indicate by checking the appropriate blank in paragraph (b) of this provision where transportation of supplies by sea is anticipated under the resulting subcontract.

(b) Representation: The Offeror represents that it –

☐ Does anticipate that supplies will be transported by sea in the performance of any subcontract resulting from this solicitation.

☑ Does not anticipate that supplies will be transported by sea in the performance of subcontract resulting from this solicitation.

**BY SIGNING BELOW, THE OFFEROR CERTIFIES THAT THE ABOVE REPRESENTATIONS AND CERTIFICATIONS ARE ACCURATE, CURRENT AND COMPLETE AND WILL NOTIFY THE CONTRACTOR OF ANY CHANGES TO THESE REPRESENTATIONS AND CERTIFICATIONS.**

______________________________
**COMPANY NAME**

AL-FAREZ WAMED Co.
**PRINTED NAME and TITLE OF AUTHORIZED COMPANY REPRESENTATIVE**

[signature]
**SIGNATURE**

15/9/2006
**DATE**



*Aon Risk Services*
1330 Post Oak Blvd
Houston, Texas 77056
Telephone: (832) 476 6000
US Fax: (800) 953-4542
International Fax: (847) 953 4178

## CONFIRMATION OF COVERAGE

Per your instructions and based on the information you provided, Aon Risk Services of Texas, Inc., 1330 Post Oak Blvd., Suite 900, Houston, Texas 77056 has effected insurance as follows:

**SUBCONTRACTOR**

INSURED: Al Farez Wamed Company

CONTACT AND ADDRESS: Wamed Al-Azzawi
Al-Yarmook Avenue
Baghdad, Iraq

CONTACT EMAIL ADDRESS: wamed_jameel@yahoo.com

CONTACT TELEPHONE: 790-191-3672

SUBCONTRACT NUMBER: 02H8-US-SJ00163

SUBCONTRACT CHANGE ORDER NUMBER: 13

DESCRIPTION OF CONTRACT: New vehicle maintenance facility.

COUNTRY OF PERFORMANCE: Iraq

CAMPSITE NAME/LOCATION: USMI Central, Baghdad

SUBCONTRACT TERM: 1 April 2005 to 23 September 2006

CONTRACT VALUE: $10,000.00

ESTIMATED PAYROLL: $10,000.00

| Type of Employee | Number of Employees | Estimated Payroll for Contract Term |
|---|---|---|
| US Nationals | 0 | $ 0.00 |
| Third Country Nationals | 0 | $ 0.00 |
| Host Country Nationals | 30 | $10,000.00 |
| TOTALS | 30 | $10,000.00 |

**COVERAGE**

Defense Base Act Coverage in accordance with the Longshore and Harbor Workers Compensation Act Amendments of 1984

COVERAGE TERM: 16 September 2006 to 23 September 2006

INSUROR: Insurance Company of the State of Pennsylvania

POLICY NO: 8348632-03161

PREMIUM: Premium paid by Kellogg Brown & Root Services, Inc. The insurance company reserves the right to audit any insured under this program.



*Aon Risk Services*
1330 Post Oak Blvd
Houston, Texas 77056
Telephone: (832) 476 6000
US Fax: (800) 953-4542
International Fax: (847) 953 4178

**PRIME CONTRACT**

| | |
|---|---|
| PRIME CONTRACTOR: | Kellogg Brown & Root Services, Inc. |
| CONTRACT NUMBER/DESCRIPTION: | LOGCAP III |
| TASK ORDER NO.: | 100 |
| SAP JOB CHARGE NO.: | GC02H8-A5A010X02-5 560605 |
| SUBCONTRACT ADMINISTRATOR: | Andrea Hajas |
| SUBCONTRACT MANAGER: | Julie McEachern |
| COMMENTS: | |

ATTESTED: AON RISK SERVICES OF TEXAS, INC.

DATE: 18 September 2006 BY: Bruce Jefferis



*Aon Risk Services*
1330 Post Oak Blvd
Houston, Texas 77056
Telephone: (832) 476 6000
US Fax: (800) 953-4542
International Fax: (847) 953 4178

**CONTRACT OF INSURANCE TO BE ISSUED:**

Insurance described herein has been effected, against which a Contract of Insurance will be issued and in the event of any inconsistency, the terms, conditions and provisions of the Contract of Insurance to be issued will prevail. This Confirmation of Coverage will be terminated as of its effective date by the issuance of the Contract of Insurance and the premium and charges shown herein shall be credited thereto.

**CANCELLATION:**

This Confirmation of Coverage may be cancelled by the Insured by surrender thereof to Underwriters and/or their representatives, or by mailing to Underwriters and/or their representatives, written notice stating when thereafter such cancellation shall be effective. This Confirmation of Coverage may also be cancelled by the Insurer(s) or by Aon Risk Services of Texas, Inc. on their behalf by mailing to the Insured at the address shown herein or last known address, written notice stating when, in accordance with the number of days notice for cancellation to be provided in the contract of insurance to be issued, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date stated in the notice shall become the termination date of this Confirmation of Coverage. Delivery of such written notice by the Insured, the Insurer(s) or Aon Risk Services of Texas, Inc. shall be equivalent to mailing. Cancellation shall be in accordance with the terms and conditions of the Contract of Insurance to be issued.

**INSURER'S HEREUNDER:**

It is expressly understood and agreed by the Insured by accepting this Confirmation of Coverage, that Aon Risk Services of Texas, Inc. is not an Insurer hereunder and that Aon Risk Services of Texas, Inc. shall not be in any way or to any extent liable for any loss or claim whatsoever, but that the Insurers hereunder are those individual Insurance Companies and/or Underwriters, whose names appear herein.

**Andrea Hajas**

**From:** angelia.worzel@halliburton.com
**Sent:** Monday, September 18, 2006 8:38 PM
**To:** wamed_jameel@yahoo.com; Andrea Hajas; kelly_braucht@ars.aon.com
**Subject:** Welcome to the KBR Subcontractor DBA Program

...48632-03161 Al Farez.pdf (3... LS202.xls (54 KB) EmployerWageStatement.doc (37 ... DBANoticetoEmployees.pdf (147 ... KBR SUB DBA Guide rev 7-28.doc...

WELCOME TO THE KBR SUBCONTRACTOR DBA INSURANCE PROGRAM

We are pleased to attach a Confirmation of Coverage evidencing your company's enrollment into the KBR Subcontractor DBA Program. You will also find a Posting Notice that should be signed and placed in an area where all personnel can view it.

Please take a few minutes to review the SUB DBA GUIDE to understand the benefits under Defense Base Act insurance. If you require the translation of this package in Arabic, please email Angelia Worzel at angelia.worzel@halliburton.com to request.

Evacuation services are provided as part of DBA coverage for all serious work related injuries. Please note that not all injuries require evacuation. In the event of injury, the injured employee and/or representative must provide your specific policy number in order for coverage to be confirmed.

In order to expedite the claim process in the event of an incident, we highly suggest that you maintain next of kin and beneficiary information for each employee working under this subcontract.

...S VERY IMPORTANT THAT ALL INCIDENTS BE IMMEDIATELY REPORTED TO A KBR SAFETY ...PERVISOR. ALL INCIDENTS MUST BE REPORTED UNDER THIS INSURANCE. THE ATTACHED FORMS SHOULD BE COMPLETED FOR EACH AND EVERY INCIDENT. PLEASE MAKE SURE THAT THE COMPLETED INFORMATION IS SUBMITTED IN A TIMELY MANNER.

If you have any specific questions or require assistance in filing a claim, please contact Angelia Worzel at (713) 753-3174 or via email at angelia.worzel@halliburton.com

 

**NOTICE TO EMPLOYEES**
Defense Base Act

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

Employer

Al Farez Warned Company

This employer is insured to provide compensation benefits (including medical and hospital care) to its employees, or monetary benefits to eligible survivors, in case of work-connected injury, occupational illness or death, in accordance with the provisions of the above law and [...]s of the Office of Workers' Compensation Programs.

# WHAT TO DO WHEN INJURED AT WORK

- NOTIFY YOUR EMPLOYER IMMEDIATELY. If possible, complete Form LS-201, Notice of Injury, available from your employer. You should give notice of injury to the following person(s):

  The Site H.S.E. Supervisor

- MEDICAL TREATMENT. Request authority (Form LS-1) from your employer for treatment by the physician you choose. You may not select a physician that is not authorized by the Office of Workers' Compensation Programs to provide medical care under the Act. Your employer has a list of physicians who are not authorized. In an emergency or if unable to contact your employer, go to the nearest hospital or physician, but be sure to let your employer know as soon as possible.

- DISABILITY. If you are disabled more than 3 days, contact your employer or the insurance company indicated below for payment of compensation, payable 14 days after your employer has knowledge of injury.

- IMPORTANT! The law requires you to give written notice of injury (Form LS.201) to your employer and to the Office of Workers' Compensation Programs within 30 days. Additional time may be allowed for certain hearing loss and occupational disease claims. The address of the Office of Workers' Compensation Programs District Office for this area is:

  U.S. Department of Labor
  PO Box 249
  New York, NY 10014-0249

| [...]surance Carrier for This Employer: | For Further Assistance and Information: |
|---|---|
| **Name**<br>The Insurance Company of the State of Pennsylvania<br>**Address**<br>8144 Walnut Hill Lane, Suite 1600<br>Dallas, Texas 75231<br>**Telephone**<br>(214) 932-2208 Foreign Claims Department | On request, the Office of Workers' Compensation Programs will explain benefits and proceedings under the above Act. In addition, the Office of Workers' Compensation Programs will inform employees receiving compensation about medical and vocational rehabilitation services, and will assist in obtaining such services. |
| **Policy Number**<br>8348632-03161 | **Expiration Date of Policy**<br>30 September 2006 |

Authorized Signature for the Employer — Date Signed

**This Notice must be posted and maintained in a conspicuous place in and about the place of business. (33 U.S.C. 934)**

**Important Notice**

Section 31(a)(1) of the Longshore Act, as extended to the Defense Base Act, 33 U.S.C. 931(a)(1), provides as follows: Any claimant or representative of a claimant who knowingly and willfully makes a false statement or representation for the purpose of obtaining a benefit or payment under this Act shall be guilty of a felony, and on conviction thereof shall be punished by a fine not to exceed $10,000, by imprisonment not to exceed five years, or by both.

Form LS-241 (DB)
(Rev. 7/86)

**Andrea Hajas**

**From:** Andrea Hajas
**Sent:** Saturday, September 16, 2006 8:28 AM
**To:** FHOUKBR - KBR Sub Defense Base Act; 'kbrdba@aon.com'
**Subject:** DBA | 02H8-US-SJ00163 CO 13

DBA | 02H8-US-SJ00163 CO 13

Please see attached.

Andrea Hajas
Sr. Subcontracts Administrator
KBR Government & Infrastructure
USMI Central | Baghdad
Ph: (1) 281 669 3347





*Aon Risk Services*
1330 Post Oak Blvd, Suite 900
Houston, Texas 77057
Telephone: (832) 476 6000
US Fax: (800) 953-4542
International Fax: (847) 953 4178

***** APPLICATION *****
**DEFENSE BASE ACT COVERAGE**

**KELLOGG BROWN & ROOT SERVICES, INC. (KBR)**
**SUBCONTRACTOR PROGRAM**

**NOTES:**

1. All spaces should be filled in by either the Subcontractor or the Subcontract Administrator before sending application.
2. All applications must be returned to Subcontract Administrator to be forwarded on to KBR's corporate office.
3. Subcontract Administrators: please send applications to

**FHOUKBR – KBR Sub Defense Base Act**
**kbrdba@aon.com**

**SUBCONTRACTOR**

| | |
|---|---|
| **INSURED/COMPANY NAME: (Exactly as indicated on contract)** | Al Fareez Wameed Company |
| **INSURED CONTACT PERSON:** | Wamed Jameel |
| **INSURED ADDRESS: (Including City, State, Zip & Country** | Baghdad, Iraq |
| **EMAIL ADDRESS: (list KBR SCA if Subcontractor does not have one)** | wameed_jameel@yahoo.com |
| **PHONE (If available):** | NA |

| | |
|---|---|
| **SUBCONTRACT NO: (As indicated on contract)** | 02H8-US-SJ00163 |
| **SUBCONTRACT CHANGE ORDER NO:** | Change Order No 13 |
| **STATEMENT OF WORK:** | New Vehicle Maintenance Facility |
| **FEDERAL SUPPLY CODE #:** | Y152 |
| **COUNTRY OF PERFORMANCE:** | Iraq |
| **CAMP SITE NAME/LOCATION:** | USMI CENTRAL, BAGHDAD |
| **SUBCONTRACT TERM: (Dates – Beginning & Ending)** | April 01, 2006 - September 15, 2006 |
| **CHANGE ORDER TERM: (Dates – Beginning & Ending)** | September 16, 2006 - September 23, 2006 |
| **APPROXIMATE NUMBER OF HOURS TO BE WORKED MONTHLY:** | 126 |
| **TOTAL CONTRACT VALUE:** | $ 1,022,847.60 |
| **CHANGE ORDER CONTRACT VALUE:** | $ 0.00 |
| **ESTIMATED MONTHLY PAYROLL:** | $ 25,000.00 |
| **ESTIMATED MONTHLY PAYROLL FOR CHANGE ORDER:** | $ 0.00 |



**PRIME CONTRACT**

| | |
|---|---|
| **PRIME CONTRACTOR:** | Kellogg Brown & Root Services, Inc. |
| **CONTRACT NUMBER/DESCRIPTION: (drop box)** | LOGCAP III |
| **TASK ORDER NO:** | TO 100 |
| **SAP JOB CHARGE NO:** | GC02H8-A5A010X02-5 560605 |
| **ADMINISTRATIVE CONTACT & EMAIL: (or person to whom coverage email should be sent)** | Andrea Hajas (andrea.hajas@halliburton.com) |
| **SUBCONTRACT ADMINISTRATOR & EMAIL:** | Andrea Hajas (andrea.hajas@halliburton.com) |
| **SUBCONTRACT MANAGER & EMAIL:** | Julie McEachem (julie.mceachem@halliburton.com) |

**EMPLOYEE CONCENTRATION**

| Nationality | Number of Employees | Estimated Payroll for Contract Term |
|---|---|---|
| United States (US) | 0 | $ 0.00 |
| Third Country Nationals (TCN) | 0 | $ 0.00 |
| Host Country Nationals (HCN) | 30 | $ 10,000.00 |
| TOTALS | 30 | $ 10,000.00 |

**EMPLOYEE WORK & HOUSING LOCATION**

| | | Number of Employees |
|---|---|---|
| Maximum # of employees at any one site | US | 0 |
| *Only information for largest site* | TCN | 0 |
| | HCN | 30 |

| | |
|---|---|
| Where are employees housed? – which camp, hotel, private residences, etc | NA |

| | | |
|---|---|---|
| Maximum # of employees housed together? | US | 0 |
| *Only information for largest location* | TCN | 0 |
| | HCN | 0 |

**DAILY EMPLOYEE COMMUTE**

| | |
|---|---|
| Type of conveyance? Car, bus, etc | CAR |
| Is security provided? (Check Answer) | YES ☐ or NO ☒ |

| | | |
|---|---|---|
| Maximum # of employees in any one vehicle? | US | 0 |
| | TCN | 0 |
| | HCN | 5 |

**IN/OUT OF COUNTRY ROTATION**

| | | |
|---|---|---|
| How do they travel? (Commercial, Charter Air, Ground, etc.) | NA | |
| How often do they rotate? | NA | |
| Maximum # of employees on any one flight? | US | 0 |
| | TCN | 0 |

**GENERAL INFORMATION**

| | |
|---|---|
| Will any of this work be subcontracted to others? (Check Answer) | YES ☐ or NO ☒ |
| *If yes, name of subcontractor* | |

*If yes, prior permission must be approved by KBR and evidence of DBA coverage must be provided for Risk Management approval.*

**Andrea Hajas**

**From:** Wayne Parris
**Sent:** Friday, September 15, 2006 3:36 PM
**To:** Andrea Hajas
**Subject:** RE: Construction projects | Extentions

9/15/06
1536

Sounds like a plan.

**From:** Andrea Hajas
**Sent:** Friday, September 15, 2006 3:31 PM
**To:** Wayne Parris; Karl Demming
**Cc:** Julie McEachern
**Subject:** RE: Construction projects | Extentions

Jim, due to the recent QA findings, I am suggesting to extend SJ00163 with 7 days allowing the subcontractor to come up with the schedule and plans on how he's planning on fixing the deficiencies.

This QA teport threw the previous plans out the window. Please confirm the 7 days extension.
Thanks,

Andrea Hajas
Sr. Subcontracts Administrator
KBR Government & Infrastructure
USMI Central | Baghdad
Ph: (1) 281 669 3347

-----Original Message-----
**From:** Andrea Hajas
**Sent:** Tuesday, September 12, 2006 8:36 AM
**To:** Wayne Parris
**Cc:** Julie McEachern
**Subject:** Construction projects | Extentions
**Importance:** High

Jim,

Based on the completed work and the remaining work to be done, I hereby recommend the following subcontracts to be extended:
If you agree from an Engineering / Construction stand point, please approve the proposed end dates;

02H8-US-SE00043 – Old Tamimi Man camp;
End date 9/15/06,
Proposed end date 11/15/06
Reason: 234 water heater to be replaced by Subcontractor. Heaters are being imported from Italy.

02H8-US-SJ00163 – Vehicle Maintenance
End date: 9/15/06
Proposed end date: 10/30/06

 KELLOGG BROWN & ROOT SERVICES INC.
UNITED STATES MISSION IRAQ • APO AE 09316
USMI CENTRAL / BAGHDAD, IRAQ

MEMORANDUM TO FILE
02H8-US-SJ00163
Change Order No 13

The Purpose of Change Order No 13 is to extend the period of performance by 7 days allowing Subcontractor to submit a plan, schedule to fix all deficiencies noted by QA department on September 14, 2005. All work is to be done at no cost to KBR.

Andrea Hajas (295149)
Sr. Subcontract Administrator

Date: 9/15/05

NOTE: This document contains information which may be withheld from the public because disclosure would cause a foreseeable harm to an interest protected by one or more Exemptions of the Freedom of Information Act, 5 USC Section 552. Furthermore, it is requested that any Government entity receiving this information act in accordance with DoD 5400.7-R, and consider this information as being for official use only (FOUO), and mark, handle and store this information so as to prevent unauthorized access.

**Andrea Hajas**

9/14/06 1750

**From:** Carl Brown
**Sent:** Thursday, September 14, 2006 5:50 PM
**To:** Benjamin Shepherd; Andrea Hajas; Karl Demming; Eddie Caso; Anita Bryant; Wayne Parris; Frank Powell; David Harvey; Charles Petko; Ronald Testa
**Cc:** Alex Wild; Hidajeta Mahmutovic; William B. Richards
**Subject:** NVM Special Evaluation inspection report ***ISSUES NOTED***
**Importance:** High

Please see attached report regarding the New Vehicle Maintenance Project

Carl Brown
Quality Manager USMI
KBR LOGCAP III ME/CA
USMI Central Baghdad, Iraq
APO AE 09316
Office: 281-669-3370
MCI: 914-822-0563
Iraqna: 790-191-7087
Carl.Brown2@halliburton.com

**Search Menu - Current Exclusions**
- Name
- Multiple Names
- DUNS
- Agency
- State/Country
- Action Dates
- Termination Dates
- Exact Name and SSN/TIN
- CT Code

**View Cause and Treatment Code Descriptions**
- Reciprocal Codes
- Procurement Codes
- Nonprocurement Codes

**Agency & Acronym Info**
- Agency Contacts
- Agency Descriptions
- State/Country Code Descriptions

**Related Links**
- Debar Maintenance
- Administration
- Upload Login

## Search Results for Parties Excluded

## by Partial Name : al fareez wameed company

## As of 14-Sep-2006

No records were found matching your search request.

**Resources**
- Public User's Manual
- FAQ

**Reports Menu**
- Lists Report
- Supplemental Report
- Agency Report
- Supplemental Agency Report
- State/Country Report
- Lists Data Report
- Supplemental Data Report
- Cause and Treatment Code

**Archive Menu - Past Exclusions**
- Name
- Multiple Names

**Contact Information**
- Email: support@epls.gov
- 1-866-GSA-EPLS Phone:1-866-472-3757
- Email: eplscomments@epls.gov

E·GOV

Bobby

ANDREA HAJAS 291149




# Exhibit D1



----- Forwarded Message -----
**From:** Mark Font <mfont@sdablaw.com>
**To:** Markham Ball <markhamball@gmail.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>
**Cc:** DK Hodges <dkhodges@sdablaw.com>; "Tom Simotas (simotasat@adr.org)" <simotasat@adr.org>; wamed jameel <wamed_jameel@yahoo.com>; Peggy Brenner <pbrenner@sdablaw.com>; Marc Folsom <Marc.Folsom@kbr.com>
**Sent:** Tuesday, July 28, 2015 12:39 PM
**Subject:** RE: Al Farez--final ruling on July 21 requests

Members of the Tribunal,

It appears that Mr. al Azzawi is accusing KBR of not producing the following documents:

- Attachment 2 (General Conditions 6/15/05) referenced in Change No. 11
- Attachment 7 (Illegal Drugs, Alcohol and Firearms Policy) referenced in Change Order No. 11
- Attachment 7 (Representations and Certifications rev.3 (08/13/06)) referenced in Change Order No. 13
- Attachment 3 (Subcontractor Special Overseas Conditions rev. 05 (07/27/06) referenced in Change Order No. 13

Once again, Mr. al Azzawi's accusations are completely false and nothing but an attempt to focus this Tribunal's attention away from the fact Al Farez has no evidence to support its claims.

Attachment 2 (General Conditions 6/15/05) referenced in Change No. 11 was produced by KBR on November 12, 2014, as part of KBR's Final Hearing Documents under Bates Nos. KBR-FH-000334 to KBR-FH-000363.

Attachment 7 (Illegal Drugs, Alcohol and Firearms Policy for Contractors WRC08122) referenced in Change Order No. 11 was produced by KBR on November 12, 2014, as part of KBR's Final Hearing Documents under Bates Nos. KBR-FH-000131 to KBR-FH-000133.

Attachment 7 (Representations and Certifications rev.3 (08/13/06)) referenced in Change Order No. 13 was produced by KBR on November 12, 2014, as part of KBR's Final Hearing Documents under Bates Nos. KBR-FH-000399 to KBR-FH-000404.

Attachment 3 (Subcontractor Special Overseas Conditions rev. 05 (07/27/06) referenced in Change Order No. 13 was produced by KBR on November 12, 2014, as part of KBR's Final Hearing Documents under Bates Nos. KBR-FH-000381 to KBR-FH-000398.

Copies of these documents are attached.

Please let me know if any additional response is requested.

Sincerely,
Mark Font

---

Mark A. Font | Senior Counsel
**SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP**
700 Milam Street, 10th Floor | Houston, Texas 77002
Direct: 713.221.2503 | Cell: 281.635.4830





Best Regard

Wameedh Al azzawi
General Manager
Al Farez-Wamed Co.



**From:** Markham Ball <markhamball@gmail.com>
**To:** DK Hodges <dkhodges@sdablaw.com>; "wamed_jameel@yahoo.com"
<wamed_jameel@yahoo.com>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font
<mfont@sdablaw.com>
**Cc:** Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>; "Tom Simotas
(simotasat@adr.org)" <simotasat@adr.org>
**Sent:** Friday, July 24, 2015 1:52 PM
**Subject:** Al Farez--final ruling on July 21 requests

Dear parties:

Claimant's email of July 21 asks the Tribunal to issue an order compelling claimant to
produce certain documents and to "recall" certain Government or KBR officials as
witnesses.

Respondent's email of the same date proffers a Supplemental Statement of Gregory
Jacobs, a Motion to Supplement the Documentary Evidence, and four new pieces of
documentary evidence (four invoices sent by KBR to the U.S. Government).

We issued a provisional order on July 23, and asked for the parties'
comments.  Claimant asks us to reconsider the provisional order, stating that it will take
a great deal of time for him to review the evidence proffered by Respondent in its July
23 filing.

The Tribunal intends that each of the parties will have a full and fair opportunity to put its
case before the Tribunal.  It also regards it essential to the ends of justice that the
hearing set to begin on August 3 proceed as scheduled under the procedures
established by the Tribunal's procedural rulings.

In response to the parties' requests, we make the following ruling:



Claimant's request for an order requiring the attendance of certain Government personnel as witnesses. The tribunal has no power to compel non-parties to attend. It has previously informed the Claimant of this. The request is not timely. It is refused.

Claimant's request for an order requiring the attendance of certain KBR personnel as witnesses. The lists of the witnesses that the parties wish to present have been established. See Procedural Orders No. 9 (October 8, 2014) and 10 (February 11, 2015). The request is untimely. Claimant does not offer any reason why the request for additional witnesses could not have been made at an earlier date. The request is denied. If the Claimant wishes to request Respondent to offer any of its employees as witnesses, he may do so. We request the Respondent to take reasonable steps to comply with any such request to the extent feasible.

Claimant's request for an order requiring the production of documents. Discovery of documents in this case was completed many months ago. Many if not all of the documents now requested were requested in the discovery phase of the case, and the Tribunal has ruled on those earlier requests. The lists of the documents that the parties wish to rely on have been established. See Procedural Orders No. 9 (October 8, 2014) and 10 (February 11, 2015). Claimant does not offer any reason why the request for additional documents could not have been made at an earlier date. The request is denied. If the Claimant wishes to request Respondent to produce additional documents, he may do so. We request the Respondent to take reasonable steps to comply with any such request to the extent feasible.

Respondent's proffer of a written statement by Gregory Jacobs. Respondent has already named Mr. Jacobs as a potential witness. When sworn as a witness, he may offer his statement as a part of his testimony. He will be subject then to cross-examination.

Respondent' s proffer of four invoices as documentary evidence. The submission was not timely. Respondent has submitted a statement explaining the circumstances responsible for the delay. Claimant says, however, that admission of the documents, and obliging him to review them before the commencement of the hearing, would put him under unreasonable and prejudicial time pressures. The request to admit these four documents is denied.

Respondent's proffer of an "Analysis" prepared by Mr. Jacobs. When sworn as a witness, Mr. Jacobs may offer his analysis as a part of his testimony. He will be subject then to cross-examination on that part of his testimony.

Respondent' proffer of Subcontrator Special Overseas Conditions-Rev.3. The Tribunal accepts that this is a part of the relevant contract, and that it was omitted from previous submissions inadvertently. It will be admitted.

The hearing will commence on August 3, as scheduled.



Main: 713.221.2500 | Facsimile: 713.228.3510
mfont@sdablaw.com | website: www.sdablaw.com

**From:** Markham Ball [mailto:markhamball@gmail.com]
**Sent:** Tuesday, July 28, 2015 8:59 AM
**To:** Peggy Brenner
**Cc:** DK Hodges; Mark Font; Robert Rubin; Tom Welby; Tom Simotas (simotasat@adr.org); wamed jameel
**Subject:** Re: Al Farez--final ruling on July 21 requests

To counsel for Respondent:

Please comment on Claimant's email of today's date. If you send Claimant the documents he is seeking, that will be a sufficient response.

Markham Ball
Tribunal chair

On Tue, Jul 28, 2015 at 6:44 AM, wamed jameel <wamed_jameel@yahoo.com> wrote:
Dear Mr. Ball

The Claimant never served with the Exhibit C attachment 3- subcontract special conditions Overseas Rev. 003(12/12/05) mentioned under 5 Terms And Condition , The Respondent did not attached Exhibit C signed together on change order 11 dated at Feb/13/2006.

If The Claimant alleged that Attachment 3 was omitted from previous submission inadvertently then the Respondent should prove the following :

1- Did Attachment 2 omitted too from Change order 11 on previous submission inadvertently too

2- Did attachment 7 omitted too from Change order 11 on previous submission inadvertently too.

3- Did the attachment 7 omitted too from Change order 13 on previous submission inadvertently too .

4- Did The Attachment 3 on change order 13 served( attached) to Change order 13 as KBR Alleged?

The Claimant request from the Tribunal to order the Respondent to submit the original copy of change order 11 and change order 13 with all the attachments ( original copy) under Terms and conditions of both change orders ( 11,13)as stated forgoing , so the Claimant will prove to the Tribunal thats all of these attachments never attached with change order 11 and change order 13 as KBR alleged.



Claimant proves and evidence that all KBR attachments submitted to Tribunal in the final hearing dated at Nov/12/2104 i under Change order 10 and change order 11 and change order 13 are a false documents , these documents never attached with change order 10 nor change order 11 nor change order 13 bilateral sign .

## Change order 11 attachments

The Evidence

Per KBR email to Tribunal dated at July /28/2015 which stated the following :

1- Attachment 2 ( General Conditions 6/15/05) referenced in change no.11 was produced by KBR on Nov/12/2014 ,as a part of KBR Final Hearing Documents under Bates No.KBR – FH-000334 to KBR –FH-000363.

Claimant Evidence and prove :

- KBR should produce the original copy of Change order no 10 and no 11 and no 13 with all the attachments (original copy) submitted to Tribunal ( Claimant letter requested to Tribunal dated at July/29/2015).

  It is the strong evidence the Claimant rely on it to prove that all the attachments of change orders submitted to Tribunal in the final hearing which

mentioned in KBR letter to Tribunal dated at July/28/2105  are a false attachments

- Per KBR documents under  Bates No: KBR –FH-000334 to KBR –FH-000363 , All these documents which KBR alleged it was attached with  change order 11 is a false documents , as all of these documents  are not punch in the top of each page( 2 black punch for each page) and on the left of each page ( 3 black punch for each page) .as  Change order 11 on Bates no : KBR-FH-000326  to KBR –FH-000328 are all have identical punch  with two black punch on the top and three black holes on the left ,which is a strong evidence that KBR submit a false documents to the Tribunal and to Claimant

- On KBR Bates No: KBR –FH-000364 which is Change order 12 , the  black punch is identical with change order 11 ( two black holes on the top  and 3 black holes in the left ).

- The type of punch ( 2  black punch  on the top and 3 black punch  on the left ) for Change order 11 (Bates no : KBR-FH-000326  to KBR –FH-000328 ) means that KBR documented the change orders for two preceding separate times (one before the claim and one after the claim) and in both cases the Attachment documents under  Bates No: KBR –FH-000334 to KBR –FH-000363) were never attached ( never punch)
   It is a strong evidence which prove that KBR submit a false documents to the Tribunal and to Claimant.

- KBR Manager , Vendor resolutions team / Mr .Harold Davis  who did the Vendor resolution Claim analysis report to Al Farez Claims for the second time dated at Oct /21/2010  page 170 to 179
Mr. Harold refers to Subcontract special conditions Clause 4.0 under Subcontractors Thirty one claims page 171 , in all Al Farez claim analysis
Also Mr. Harold refer to General conditions article 8.0
Mr Davis never referred  to any of the attachment of change order 11 ( general conditions 6/15/05 and never referred in his analysis to subcontractor  special Overseas Condition rev 03(12/12/05) and never referred in his analysis to the claimant 31 claims  to change order 13 ( subcontractor special Overseas Conditions rev  005( 07/27/06)
It  is an strong evidence which prove that KBR submit a false documents to the Tribunal and to Claimant.


- KBR Vendor analysis dated at May/01/2008 by Tom Hudson / KBR segment VRT and KBR David Breener / KBR legal counsel , (Page never referred in their analysis report  to any terms of the subcontract ( Page 135 to page 142 )never referred to subcontract general conditions Page-61 to 71 nor subcontract special conditions Overseas Page -71 to 80, and he only referred  to SOW specifications  in his analysis to Al Farez 31 claim .
it is a strong evidence which prove that KBR submit a false documents to the Tribunal and to Claimant.

- Any attachments in any change order should specify how many pages for each attachment in each change order and that's should be included in all KBR Change orders . Like all the attachments in the subcontracts agreement dated at March/22/2005 ( page -43), And change order 10 ,11 ,13 did not mentioned how many pages in each attachments even no Claimant sign or initial on any attachments pages.

2- Attachment 7 of change order 11 ( illegal drugs , Alcohol and firearms policy for Contractors WRC08122)

Under item 5.0 Terms And Conditions of change order 11 dated at Feb/13/2006 page -27 stated :
This change order number eleven to the above referenced subcontract replaces Exhibit C Attachment 7 Illegal Drugs, Alcohol and Firearms Policy for Contractors WRC08122 and - Attachment 9 – Contractor Safety Pre- Qualification Form ( SPQF)with Exhibit C Attachment 9...Subcontractor Requirements for Health safety and Environmental Performance .
KBR Mr. Mark Font alleged that Attachment 7 of change order 11 was produced by KBR on Nov/12/2014 as a part of KBR Final Hearing documents under Bates Nos: KBR –FH-000131 to KBR –FH-00133., while this Bates Nos: KBR-FH-000131 to KBR-FH-00133 referred to Attachment 6 Notice to Subcontractor Employees Illegal Drugs , Alcohol , and Firearms policy for contractors ( KBR-FH-000130 to KBR – FH-000133) signed with KBR on March/22/2005.
That is a strong evidence and prove that KBR disclose a false statement to Tribunal in their letter dated at July/28/2015 . focus this Tribunal attention away from Al Farez Claimant



letter to Tribunal dated at July/28 at 6:44 Am , and that's will prove the false statement of KBR that these documents never attached to Change order 11 as KBR alleged.
It is a strong evidence too that the Rev 003( 12/12/2005) never attached with Change order 11 and not omitted inadvertently as KBR alleged in their letter to Tribunal dated at July/21/2015.

3- Attacment 3 of change order 11 ( subcontract special Conditions overseas Rev 003( 12/12/05) attached with KBR letter dated at July / 21/2015 KBR-FH- 002669 to KBR -FH-002680

KBR alleged that this attachment omitted from change order 11 on previous submission inadvertently while the Respondent never attached to Change order 11.

Evidence

Attachment 3 of change order 11 submitted by respondent to Tribunal at July / 21/2015 ( KBR – FH- 002669 to KBR – FH- 002679) have no any black punch in any page .

It is a strong evidence which prove that KBR submit a false documents to the Tribunal in the final hearing .

## Change order 13 attachments

Evidence :

Per KBR email to Tribunal dated at July /28/2015 which stated the following :

Attachment 3 ( Subcontract or special overseas Conditions Rev.05 ( 07/27/06)referenced in change order no.13 was produced by KBR final hearing documents under Bates Nos.KBR-FH-000381 to KBR -FH-000398

Per KBR Attorneys documents submitted to Tribunal dated at Jan/7/2014 . under item 10 stated:

R.Ex. no .7 , Subcontract special conditions ( Rev 005 , 07/27/06)( incorporated into SJ000163 by Change order 13)

The documents Under R.Ex 7 are Rev 005 special Conditions – Overseas with 18 pages , all of these 18 pages have no black punch neither in the Top of each page nor in the left side .

It's a strong evidence which prove that these documents never documented and attached to Change order 13 .

It's a strong evidence which prove that Rev 005( 07/27/06)never attached in change order 13 signed bilateral .

KBR should produce the original copy of Change order no 10 and no 11 and no 13 with all the attachments (original copy) submitted to Tribunal ( Claimant letter requested to Tribunal dated at July/29/2015).



It is the strong evidence the Claimant rely on it to prove that all the attachments of change orders submitted to Tribunal in the final hearing which mentioned in KBR letter to Tribunal dated at July/28/2105  are a false attachments

## Change order 10

KBR should produce the original copy of Change order no 10 and no 11 and no 13 with all the attachments (original copy) submitted to Tribunal ( Claimant letter requested to Tribunal dated at July/29/2015).



It is the strong evidence the Claimant rely on it to prove that all the attachments of change orders submitted to Tribunal in the final hearing which mentioned in KBR letter to Tribunal dated at July/28/2105  are a false attachments

Any attachments in any change order should specify  how many pages for each attachment in each change order and that's should be included in all KBR  Change orders . Like all the attachments in the subcontracts agreement dated at March/22/2005        ( page -43), And change order 10 ,11 ,13 did not mentioned how many pages in each attachments even no Claimant sign or initial on any attachments pages.

## Claimant Requests from Tribunal

Based on forgoing proves and evidence

The Tribunal should not consider any attachments submitted by KBR to Tribunal in the final hearing . Also the Tribunal should not consider KBR attachment on July /21/2015   as a parts of the contract ,all of these attachment pertains Change order 10 , 11, 13
These documents are not omitted inadvertently as KBR alleged , these attachments never submitted to Claimant with the change orders as KBR alleged.
KBR deceived the Tribunal by attached these documents with the final hearing documents  to consider it as a part of the contract and they should be punished.

# Exhibit F1

SUBCONTRACT/LEASE AGREEMENT CHANGE ORDER

| | | | | |
|---|---|---|---|---|
| $1,022,847.60 | ORIGINAL AMOUNT AND PREVIOUS CHANGE ORDER(S) | GENERAL CONTRACTOR KELLOGG BROWN & ROOT SERVICES, INC. (KBRSI) | PAGE 1 OF 1 | DATE EFFECTIVE: 13-FEBRUARY-2006 |
| $0 | ADDITION BY THIS CHANGE ORDER | CPA CENTRAL – LOGCAP III BLDG | CHANGE ORDER ELEVEN (11) | REQ. NO. N/A |
| $0 | DEDUCTION BY THIS CHANGE ORDER | BAGHDAD, IRAQ | SUBCONTRACT NUMBER 02H8-US-SJ00163 | |
| $1,022,847.60 | AMENDED TOTAL | ORIGINAL _NOTIFICATION X CONFIRMATION | JOB NUMBER 02H8 | COST CODE A5A010X02-5-560605 |

| | |
|---|---|
| **SUBCONTRACTOR**<br>Al Fareez Wameed Company<br>Baghdad, Iraq | THE TERMS AND CONDITIONS FORMING THE ORIGINAL SUBCONTRACT ARE MADE A PART OF THIS CHANGE ORDER EXCEPT TO THE EXTENT MODIFIED ON THE FACE HEREOF. |
| VENDOR NO: N/A<br>SIZE OF BUSINESS: FOREIGN | THIS ACTION IS DPAS RATED: DO-C9<br>"This subcontract contains rated order quantities for national defense use, and you are required to follow all the provisions of the Defense Priorities and Allocations System regulation (15CFR Part 700) only as it pertains to the rated quantities." |

DESCRIPTION: Refer to Subcontract No. 02H8-US-SJ00163 FOR ANY AMENDMENTS

1.0 PURPOSE. The purpose of this Change Order No. Eleven (11) is as follows:
Revise the period of performance, payment terms, and terms and conditions as specified below..

2.0 SUBLET WORK CHANGES. N/A

3.0 PRICE. The fixed amount of the above referenced subcontract remains the same. The payment terms are revised from Net 30 to Net 15. The progress payment schedule is revised to fifteen percent milestone payments as reflected by the rolled up milestones within Vehicle Maintenance Facility Project Schedule dated 13 February 2006.

4.0 PERIOD OF PERFORMANCE. The contracted completion date is revised from 1 April 2005 through 28 February 2006 to 1 April 2005 through 31 July 2006.

5.0 TERMS AND CONDITIONS. Except as herein amended, all terms and conditions of the above referenced subcontract shall remain the same, and in full force and effect.

This change order number eleven to the above referenced subcontract replaces Exhibit C Attachment 2 – General Conditions, Order No. 36128A dated 03/92 with Exhibit C Attachment 2 - General Conditions, 6/15/05.

This change order number eleven to the above referenced subcontract replaces Exhibit C Attachment 3 – Subcontract Special Conditions Overseas, Rev. 002 (4/8/03) with Exhibit C Attachment 3 - Subcontract Special Conditions Overseas, Rev. 003 (12/12/05).

This change order number eleven to the above referenced subcontract replaces Exhibit C Attachment 7 — Illegal Drugs, Alcohol and Firearms Policy for Contractors WRC08122 and Attachment 9 – Contractor Safety/ Pre-Qualification Form (SPQF) with Exhibit C Attachment 9 – Subcontractor Requirements for Health Safety/ and Environmental Performance.

02H8-US-SJ00163 Change Order #11

6.0 **EXECUTION.** Subcontractor's authorized representative shall sign where indicated, retain one copy, and return one copy for counter signature to Procurement – Subcontracts department.

| SUBCONTRACTOR | | GENERAL CONTRACTOR | |
|---|---|---|---|
| SIGNATURE SIGNED | DATE 13-Feb-2006 | SIGNATURE SIGNED | DATE 2/13/06 |
| | | Julie McEachern #316884<br>Subcontract Administrator | |

| ID | Task Name | Notes |
|---|---|---|
| 1 | **Vehicle Maintenance Facility Milestones** | |
| 2 | Steal Structure installed | 15% |
| 3 | Office Building floor poured except for Bathroom area. | 15% |
| 4 | 1st floor office columns and ceiling complete | 15% |
| 5 | 2nd Floor office columes and ceiling concrete. | 15% |
| 6 | Steal Structure: 2nd Floor, Roll up doors, vehicle lifts, concrete slab, all complete. | 15% |
| 7 | Steel Structure: all sandwich panels, roof and walls, and crain complete. | 15% |
| 8 | Electrical, Water, Sewer, Plaster, Doors, Painting - All Complete | 10% |

4th Quarter: Sep, Oct, Nov, Dec | 1st Quarter: Jan, Feb, Mar | 2nd Quarter: Apr, May, Jun | 3rd Quarter: Jul, Aug

Project: Maintance Facility Enc
Date: Mon 2/13/06

Task | Split | Progress | Milestone | Summary | Project Summary | External Tasks | External Milestone | Deadline

KBR-FH-000328

  

Kellogg, Brown & Root Services, Inc. USMI Central Baghdad, Iraq AE APO 09316

**PROGRESS PAYMENT SCHEDULE AND PAYMENT TERM REVISIONS**

Date: 13 February 2006
Contract Number: 02H8-US-SJ00163 Change Order #11
Project: Vehicle Maintenance Facility

In light of delays to scheduled completion and the additional cost associated, and Al Farez Wameed Company's submittal of 1 February 2006 for revision to progress payment schedule and payment terms, KBR performed an analysis of the project schedule and related payment terms for review and approval by KBR management. The project schedule was revised to incorporate the milestone payments and determine whether the payment schedule was fair and work associated could be validated by KBR's QA Department prior to payment. KBR is recommending revision of the current twenty-five percent incremental progress payment schedule and Net 30 day payment terms to a fifteen percent incremental progress payment schedule and Net 15 day payment terms. The progress payment schedule and terms were reviewed and approved by Karl Schmidt, USMI – Central PSM manager for inclusion within the above referenced subcontract. Change Order number eleven will be issued accordingly.

KBRSI Subcontracts Administration Department:

Julia McEachern Badge No. 316884
Subcontract Administration Supervisor

Date: 13 February 2006

Kellogg, Brown & Root Services, Inc. Proprietary Data – Source Selection Data – See FAR 3.104
NOTE: In addition to protection under Federal Acquisition Regulation 3.104, this document contains information which may be withheld from the public because disclosure would cause foreseeable harm to an interest protected by one or more Exemptions of the Freedom of Information Act, 5 USC Section 552. Furthermore, it is requested that any government entity receiving this information act in accordance with DOD 5400.7-R, and consider this information as being for official use only, and mark, handle and store this information so as to prevent unauthorized access.

**Julie McEachern**

**From:** Julie McEachern
**Sent:** Monday, February 13, 2006 4:21 PM
**To:** FHOUKBR - KBR Sub Defense Base Act
**Subject:** 02H8-US-SJ00163 CO #11 Insurance Coverage

Angela

Please provide insurance coverage in accordance with the attached. Thanks

Julie McEachern
Subcontract Administrator
KBR
USMI Central, Iraq
Office Phone: (713) 445-5011





*Aon Risk Services*
1330 Post Oak Blvd, Suite 900
Houston, Texas 77057
Telephone: (832) 476 6000
US Fax: (800) 953-4542
International Fax: (847) 953 4178

*** APPLICATION ***
DEFENSE BASE ACT COVERAGE

KELLOGG BROWN & ROOT SERVICES, INC. (KBR)
SUBCONTRACTOR PROGRAM

SUBCONTRACTOR

| | | |
|---|---|---|
| INSURED/COMPANY NAME: (Exactly as indicated on contract) | Al Farez Wamed Company | |
| INSURED CONTACT PERSON: | Wamed Al Azzawi | |
| INSURED ADDRESS (Including City, State, Zip & Country: | Baghdad, Iraq | |
| EMAIL ADDRESS (list Subcontract Administrators if Subcontractor does not have one): | Wameed_jameel@yahoo.com | |
| PHONE (if available): | n/a | |
| ****************************************** | ****************************************************************************************** | |
| SUBCONTRACT NO: (Exactly as indicated on contract) | 02H8-US-SJ00163 | |
| SUBCONTRACT CHANGE ORDER NO: | 11 | |
| STATEMENT OF WORK: | Construction of the Vehicle Maintenance Facility | |
| FEDERAL SUPPLY CODE #: | | |
| COUNTRY OF PERFORMANCE: | Iraq | |
| CAMP SITE NAME/LOCATION: | Vehicle Maintenance Facility | |
| SUBCONTRACT TERM (Dates – Beginning and End): | Extended period of Performance<br>1 April 2005 – 31 July 2006 | |
| APPROXIMATE NUMBER OF HOURS TO BE WORKED MONTHLY: | | |
| CONTRACT VALUE: | Full Value: $1,022,848.00 | Change Order Value: 0 |
| ESTIMATED MONTHLY PAYROLL (if change order, please provide that amount only: | | |

PRIME CONTRACT

| | |
|---|---|
| PRIME CONTRACTOR: | Kellogg Brown & Root Services, Inc. |
| CONTRACT NUMBER/DESCRIPTION: | DAAA0902-D-0007 |
| TASK ORDER NO: | 100 |
| SAP JOB CHARGE NO: | GC02H8-A5A010X02-5 560605 |
| ADMINISTRATIVE CONTACT & EMAIL: (if applicable, only certain locations apply) | |
| SUBCONTRACT ADMINISTRATOR & EMAIL: | Julie McEachern |
| SUBCONTRACT MANAGER & EMAIL: | Karl Schmidt |

**EMPLOYEE CONCENTRATION**

| Nationality | Number of Employees | Estimated Payroll for Contract Term |
|---|---|---|
| United States (US) | | |
| Third Country Nationals (TCN) | 20 | $60,000 |
| Host Country Nationals (HCN) | | |
| TOTALS | 20 | $60,000 |

**EMPLOYEE WORK & HOUSING LOCATION**

| | | Number of Employees |
|---|---|---|
| Maximum # of employees at any one site | US | |
| *Only information for largest site* | TCN | 20 |
| | HCN | |

| Where are employees housed? – which camp, hotel, private residences, etc | Private Homes |
|---|---|

| Maximum # of employees housed together? | US | |
|---|---|---|
| *Only information for largest location* | TCN | |
| | HCN | |

**DAILY EMPLOYEE COMMUTE**

| Type of conveyance? Car, bus, etc | Walk |
|---|---|
| Is security provided? (Circle Answer) | YES or [NO] |

| Maximum # of employees in any one vehicle? | US | |
|---|---|---|
| | TCN | 55 |
| | HCN | |

**IN/OUT OF COUNTRY ROTATION**

| How do they travel? (Commercial, Charter Air, Ground, etc.) | N/A | |
|---|---|---|
| How often do they rotate? | N/A | |
| Maximum # of employees on any one flight? | US | |
| | TCN | |

**GENERAL INFORMATION**

| Will any of this work be subcontracted to others? (Circle Answer) | YES or [NO] |
|---|---|
| If yes, name of subcontractor | |

*If yes, prior permission must be approved by KBR and evidence of DBA coverage must be provided for Risk Management approval.*

**NOTES:**

1. All spaces should be filled in by either the Subcontractor or the Subcontract Administrator before sending application.
2. All applications must be returned to Subcontract Administrator to be verified and forwarded on to KBR's corporate office.
3. Subcontract Administrators - please send applications to functional mailbox address:

**FHOUKBR - KBR Sub Defense Base Act**

MK Data's Denial List Web - Browse the List

Page 1 of 1

MK Data's Denial List Web
Browse the List

Searched for name starts with Al Farez Wamed at 8:26 AM on 13-
matches 1 - 0 out of 0 matches

**Not Found**

[illegible]

[illegible]

[illegible]

https://www.mkdenial.com/denial.cfm

2/13/2006

KBR-FH-000333

# SUBCONTRACT GENERAL CONDITIONS

1. DEFINITIONS ........ - 1 -
2. DOCUMENT INTERPRETATION ........ - 4 -
3. GENERAL REQUIREMENTS ........ - 5 -
4. PAYMENT AND TAXES ........ - 8 -
5. TIME, SCHEDULE, DELAYS, EMERGENCIES ........ - 9 -
6. FORCE MAJEURE ........ - 10 -
7. INDEMNITY ........ - 10 -
8. INSURANCE ........ - 13 -
9. FINANCIAL GUARANTEES ........ - 13 -
10. WARRANTY ........ - 14 -
11. LIENS AND CLEAR TITLE ........ - 15 -
12. CONFIDENTIALITY ........ - 15 -
13. INTELLECTUAL PROPERTY RIGHTS ........ - 16 -
14. HEALTH, SAFETY, AND ENVIRONMENT (HS&E) ........ - 17 -
15. IMPORT AND EXPORT COMPLIANCE ........ - 19 -
16. PERSONNEL MATTERS ........ - 20 -
17. TITLE ........ - 21 -
18. EQUIPMENT ........ - 22 -
19. SUSPENSION AND TERMINATION ........ - 22 -
20. CHANGES ........ - 23 -
21. CLAIMS BY CONTRACTOR ........ - 24 -
22. LAWS ........ - 33-
23. DISPUTES AND DISPUTE RESOLUTION ........ - 25 -
24. NOTICES ........ - 28 -
25. CODE OF BUSINESS CONDUCT AND ETHICS ........ - 28 -
26. CONTRACTUAL RELATIONSHIP ........ - 29 -

## 1. DEFINITIONS

1.1 "Affiliate" of a Party shall mean any other entity controlling, controlled by or under common control with such Party, "control" for this purpose meaning at least 50% equity ownership, or the legal power to control the management policies of the controlled entity.

1.2 "Agreement" shall mean the entire integrated set of documents forming the written contractual relationship between the Parties as executed by both Parties, including all attachments, exhibits, and documents as specified and listed in the Agreement or referenced therein, and any subsequent Change Orders, work releases, work orders, renewals, extensions, notices, terminations, amendments, addenda, or other documents agreed upon by the Parties specifically issued under and referencing the Agreement.

1.3 "Backcharge(s)" shall mean a billing to or withholding of payment from Contractor for certain amounts as provided for in the Agreement.

1.4 "Change" shall mean any addition or modification to, deletion of, or alteration of, the Services.

1.5 "Change Order" shall mean the written document executed by both Parties referencing the Agreement which modifies, amends, or changes the schedule, compensation or Services of the Agreement.

1.6 "Claim" shall mean any request for or assertion of rights or other entitlement, or allegation of any Liability against a Party, by either the other Party or a third Party, which arises out of or relates to the Agreement, the Services, or based in Law.

1.7 "Client" shall mean that specific legal entity or entities expressly identified as the "Client" in the Agreement.

1.8 "Client Representative" shall mean the specific Employee of the Client identified in the Agreement as the person authorized to coordinate the Services with Company.

1.9 "Company" shall mean that specific legal entity expressly identified as the "Company" in the Agreement.

1.10 "Company Equipment" shall mean any equipment, tools, temporary facilities, structures, vessels, storage, and other items provided by Company Group to be used in the performance of Services that will not be permanently incorporated into the Services.

1.11 "Company Group" shall mean Company, Client, its and their Affiliates, and each of their respective directors, officers, Employees, contractors, suppliers, agents, carriers, brokers, freight forwarders, representatives, successors, assigns, and insurers of all tiers.





1.12 "Company Material" shall mean any goods, materials, or other items furnished by Company Group intended for permanent incorporation into the Services.

1.13 "Company Site" shall mean a Site owned, occupied or controlled by a member of Company Group.

1.14 "Confidential Information" shall mean any and all Company Group Intellectual Property and any and all data and information in any tangible or intangible form or media concerning or relating to the business of Company Group, including the Agreement, the Services, the Project, commercial strategies, processes, policies, procedures, designs, systems, projects, suppliers, proposals, negotiations, operations, organization, personnel, accounting, tax, financial, information technology, and litigation, and including that data and information which Company has received from a third party under a contractual obligation of confidentiality which may be revealed or disclosed to Contractor Group in any manner or form during the term of the Agreement and during performance of the Services.

1.15 "Contractor" shall mean that specific legal entity expressly identified as "Contractor" in the Agreement.

1.16 "Contractor Equipment" shall mean any equipment, tools, software, materials, supplies, consumables, temporary facilities, structures, vessels, storage and other items owned, leased, borrowed, utilized, chartered, hired, or provided by Contractor Group to perform the Services that will not be permanently incorporated into the Services.

1.17 "Contractor Group" shall mean Contractor and its and their Affiliates and each of their respective directors, officers, Employees, contractors, suppliers, agents, carriers, brokers, freight forwarders, representatives, successors, assigns, and insurers of all tiers.

1.18 "Contractor Material" shall mean any goods, materials or other items furnished by Contractor Group and intended for incorporation into the Services.

1.19 "Contractor Representative" shall mean the specific Employee of Contractor identified in the Agreement as the person authorized to coordinate the Services with Company.

1.20 "Contractor Site" shall mean a Site owned, occupied or controlled by a member of Contractor Group.

1.21 "Days" shall mean calendar days unless expressly specified otherwise.

1.22 "Deliverables" shall mean the tangible or intangible documents, products, goods, software, Contractor Materials, Intellectual Property or other items developed, performed, produced, created, procured, utilized or provided by Contractor under the Agreement comprising the Services.

1.23 "Dispute" shall mean any matter or issue arising out of this Agreemant or the Services between the Parties in which the Parties have not reached resolution (including unresolved Claims) after exhausting any procedures set forth in the applicable Article, and for which one Party desires to initiate the dispute resolution process or for which such dispute resolution process is required for final resolution hereunder.

1.24 "Employee" shall mean any individual who is employed on the direct payroll of a Party, and works under the direct supervision and control of such Party. It shall also include any temporary, contract or agency labor, crewmen, seconded, or other Personnel employed or obtained under contract by a Party who work under the direct supervision and control of the employing Party.

1.25 "Environmental Law(s)" shall mean any and all international, national, state and local Laws, regulations, statutes, treaties, conventions, codes, ordinances, orders, directives, actions, decisions, standards, rules, and all other governmental, legislative, executive, agency, judicial and organizational requirements of any nature, whether now existing or hereinafter enacted, in any jurisdiction, pertaining to the air, land and waters (including land and waters above the ground, underground, above the surface of the water, and below the surface of the water, coastal, port, offshore, outer continental shelf or international), and natural resources, and any other related or applicable Laws, which are applicable to the Services performed, to any Site at which the Services are performed (including any adjacent lands, underground areas, mineral resources or interests, natural wildlife or resources, waters, or airspace), or to any other persons or property affected by the Services. "Environmental Laws" shall include those pertaining to prevention, conservation, pollution, contamination, clean-up, remediation, restoration, indemnity, protection, preservation of endangered species, preservation of archeological, paleontological, antiquities, or historical finds, sustainable development requirements, as well as regulating the use, storage, handling, transportation, packaging, treatment, management, containment, clean-up, remediation, discharge, release, spillage, leakage, or disposal of pollutants, biohazards, chemicals, hazardous and non-hazardous wastes, substances or materials, and providing remedies for any environmental damages. Any reference in the Agreement to "Environmental Law" shall also include any other Laws which are applicable to the context or the situation.

1.26 "Force Majeure" shall mean an event or condition preventing performance caused by (A) an "act of God" (catastrophic storms and floods, earthquakes, volcanic action, lightning, or natural fires), (B) formally declared war, state of hostilities, or emergency (C) governmental action in response to a declared state of war, hostilities, emergency, or "act of God", (D) acts of terrorism officially confirmed as such by the government of the location in which such act occurred, or (E) civil disturbances or riots requiring the use of military force to control, and such event or condition listed in (A) through (E) also being (i) beyond the control of the affected Party and not due to its fault or negligence; and (ii) unforeseeable, not preventable or avoidable by the affected Party with the exercise of reasonable diligence; and (iii) of such impact which materially and adversely delays, disrupts, or renders impossible the affected Party's performance of its obligations under the Agreement. For the avoidance of ambiguity, events or conditions (A) through (E) above are intended to be an exclusive list,



and any resulting or consequential changes in the market or the economy, financial hardship, insolvency, changes in applicable Law, transportation delays, supply chain delays, manpower shortages, labor relations disputes or problems, visa or immigration delays, or acts of any third party other than those expressly set forth in this paragraph, shall not, however caused, constitute nor be excused by one of the above-listed events or conditions of Force Majeure.

1.27 "Group" or "Groups" shall mean either Contractor Group or Company Group individually or collectively in accordance with the context of use.

1.28 "Intellectual Property" shall mean any and all proprietary information of a Party in any form, whether tangible or intangible, deemed to be unique and original and to have marketplace commercial value by such Party and thus to warrant protection under the Law as a transferable property right of such Party under patent, copyright, trademark, or trade secret laws of the applicable jurisdiction. Examples of proprietary information include; ideas; inventions, developments and improvements (whether patentable or not); designs; chemical, business, or computer processes and methods; know-how; plans; drawings; prints; transparencies; photographs; negatives; samples; specifications; databases; reports; manuscripts; working notes; documentation; manuals; materials; copyrightable works; data; works made for hire; as well as the physical embodiments of intellectual effort such as, for example, models, machines, devices, designs, apparatus, instrumentation, circuits, computer programs and visualizations, biological materials, chemicals, and other products of research and development.

1.29 "Intellectual Property Rights" shall mean all copyrights, design rights, patents and patent applications, trademarks, trade secrets, and all other intellectual property rights as defined under any applicable Law, whether in the United States and any other jurisdiction, and regardless of whether claimed, established, filed, applied for, or pending.

1.30 "Law" or "Laws" shall mean all international, national, state and local laws, regulations, statutes, treaties, conventions, codes, ordinances, orders, directives, court actions, case precedents, common law principles, agency actions, standards, rules, and all other governmental, legislative, judicial, and executive orders of any nature, whether now existing or hereinafter enacted (including any decision, order or action construing, interpreting, enforcing, clarifying, or implementing any such Law), of any duly-authorized and constituted governmental or international body, organization, agency or authority.

1.31 "Liability" shall mean the effects, applications, or consequences, under any theory of applicable Law, including statutory, contractual, negligence (whether active, passive, sole, concurrent, or gross), willful misconduct or other fault, or strict liability, of a Party's acts or omissions or the acts or omissions of any person for which a Party (including any member of that Party's Group under the Agreement) is responsible under such Law, and whose Liability is alleged, claimed, asserted, determined, adjudicated, arbitrated, settled, or decided. Liability shall include any alleged or actual Claims, assessment, confiscation, expropriation, grievances, disputes, governmental actions, judgments, losses, costs (including attorney's fees, court and arbitrator costs, and costs of litigation and/or dispute resolution), expenses, fees, fines, penalties, interest, liens, disbursements, encumbrances, damages, lawsuits, cause of action, payments, and any similar consequence under a Law whatsoever.

1.32 "Lien" shall mean any and all Claims of any kind provided for under Law against any real or personal property interest related to the Services as security for payment of a debt or a duty under a Law, with the right by a lien holder to take, hold or sell the subject property should such payment or duty not be satisfied.

1.33 "Notice" shall mean a written communication from one Party to the other Party required under the Agreement and as provided for in accordance with Article 24 for the purpose of formally informing a Party of some matter arising or specified under the Agreement.

1.34 "Party" shall mean, individually, the contracting entities executing the Agreement as identified in the Agreement, and shall not include any person who is not a signatory to the Agreement. All contracting entities may be referred to, collectively, as the "Parties".

1.35 "Personnel" shall mean all persons for whom any Party is legally responsible under the terms of the specific provision.

1.36 "Project" shall have the same meaning as that specifically identified in the Agreement.

1.37 "Services" shall mean all obligations, duties and responsibilities required of Contractor pursuant to the Agreement, including all Personnel to be provided, labor and work to be performed, Contractor Equipment or Contractor Material to be provided, incorporation of Company Materials, use of Company Equipment, Deliverables to be created, supplied, fabricated, procured, designed, or engineered, any corrective Services and other requirements in the Agreement which are performed by or required of Contractor in executing or preparing to execute its duties and obligations under the Agreement.

1.38 "Site" shall mean the physical location or facility in, through, on which, or for which the Services are performed, or the physical location or facility into which the Services are incorporated. The Site shall include any physical work area (including adjacent areas), whether land, air, water, above-ground or underground, utilized by any member of the Contractor Group in preparing, fabricating, or performing any Services under the Agreement, including any additional areas as may be allocated in writing by Company for temporary use by Contractor during the performance of Services. Any reference to "Site" in the Agreement shall mean both Company Site and Contractor Site as may be applicable.



1.39 "Taxes" shall mean any taxes, fees, charges, levies, assessments, charges, imposts, import or export duties, or other amounts assessed or levied directly or indirectly by any authority claiming jurisdiction over the Agreement, Personnel provided, the Services, Contractor Equipment, or Contractor Material. Taxes shall include (A) all Taxes on Contractor's earnings, including income or excess profit, (B) all Taxes on salaries, wages, bonuses, perquisites, benefits, or other compensation paid by Contractor to its Personnel; (C) all Taxes on any property owned, leased, used, or under the care, custody and control of Contractor; (D) all Taxes on any rates of compensation received by Contractor; (E) any Taxes assessed by any non-U.S. jurisdiction or authority; (F) all applicable excise, sales or use Taxes based upon the compensation rates received by Contractor, and (G) Taxes assessed upon the Deliverables, the Services, or any component thereof.

## 2. DOCUMENT INTERPRETATION

**2.1 INTEGRATION**

2.1.1 The Agreement constitutes the sole agreement between Company and Contractor concerning the subject matter, superseding all negotiations, proposals, quotations, communications, documents and representations unless expressly incorporated herein. The Agreement may be amended only by a document in writing executed with equal authority and formality.

2.1.2 Anything mentioned in the specifications and not shown in the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown and mentioned in both.

2.1.3 In the event of any error, omission, conflict, inconsistency or other discrepancy within the various provisions of the Agreement, including the attachments, schedules, drawings, specifications, applicable codes and standards, or any documents expressly incorporated into the Agreement, Contractor shall immediately provide Notice to Company of such discrepancy and Company shall provide Notice to Contractor of appropriate precedence or other resolution. If such discrepancy materially affects Contractor's performance of the Services, Contractor shall not work on the affected Services until the discrepancy has been resolved and Company has released Contractor to proceed. If Contractor does not bring a discrepancy to Company's attention, then the term or condition of the document which requires the highest or most stringent applicable standard of performance shall control, and any additional costs incurred by Contractor because of Contractor's failure to timely provide Notice to Company or failure to have any discrepancy resolved by Company before continuing with the affected portion of the Services shall be for Contractor's account.

**2.2 NONWAIVER**

Unless otherwise specified herein, no waiver under the Agreement shall be effective unless it is an express waiver granted by Company in writing. Company's not exercising any right to which it is entitled hereunder shall not constitute a waiver of that right. Waiver by Company of any provision of the Agreement, including Company's rights in the event of Contractor default, shall not constitute a waiver concerning any other provision, a waiver of any subsequent default, nor a waiver of the same provision in the future, and shall not affect the right of Company to thereafter exercise any right or remedy concerning any other provision or default, whether similar or not. Furthermore, a Company right granted under the Agreement shall not bind Company to any duty or obligation to perform or invoke the right it reserves hereunder.

**2.3 SEVERABILITY**

If any one or more of the provisions of the Agreement shall for any reason be held invalid, illegal or unenforceable in any respect by any court of competent jurisdiction or any arbitration proceeding hereunder, such invalidity, illegality or unenforceability shall not affect any other provision.

**2.4 HEADINGS**

Titles and captions of Articles in the Agreement are for convenience and reference only, and are not to be used in the interpretation of any provisions, nor do they define, describe, extend, or limit the scope or intent of the Agreement or the intent of any provision contained herein.

**2.5 JOINT EFFORTS**

Notwithstanding the original drafting of documents, preparation of the Agreement has been a joint effort of the Parties and the resulting Agreement and provisions herein shall not be construed more favorably towards one Party than the other for reason of original drafting. Contractor acknowledges that it was given the opportunity to seek the advice of legal counsel concerning all provisions of the Agreement, including the indemnity obligations of Article 7.



**2.6 CONSTRUCTION**

In the Agreement: (A) the singular includes the plural and vice versa (except for "Party" or "Parties" and "Group" or "Groups", or otherwise in accordance with the intent, context, and meaning of the provision); (B) the word "including" or "include" means including or include without limitation; (C) references to Articles, Sections and Exhibits are, unless the context otherwise requires, references to Articles and, Sections of and Exhibits to the Agreement; and (D) any reference to any Law shall be construed to refer to such Law as the same may have been, or may from time to time be, amended or re-enacted.

**2.7 SURVIVAL**

Notwithstanding any termination or expiration of the Agreement, the following Articles shall survive for the purposes and to the extent set forth therein: Articles 1 (Definitions), 2 (Document Interpretation), 3 (General Requirements), 4.6 (Taxes), 7 (Indemnity), 8 (Insurance), 10 (Warranty), 11 (Liens and Clear Title), 12 (Confidentiality), 13 (Intellectual Property Rights), 15 (Import and Export Compliance), 17 (Title to and Responsibility for Goods and Services), 18 (Equipment), 19 (Suspension and Termination), 20 (Changes), 21 (Claims by Contractor), 22 (Laws), 23 (Disputes and Dispute Resolution), 24 (Notices) and 26 (Contractual Relationship).

## 3. GENERAL REQUIREMENTS

**3.1 INVESTIGATION OF PROJECT AND SITE CONDITIONS**

Contractor represents that it has examined the Agreement including the requirements to perform the Services, and has familiarized itself with the Project, the Laws relating to the Services; the considerations affecting the Project and the Services, and all other conditions affecting the Services, in order to achieve successful completion of the Services within the agreed upon compensation and schedule. If applicable, Contractor further represents that it has investigated the Site, and has requested and obtained any and all necessary information, and therefore is thoroughly familiar with the Site, its physical conditions, climate, terrain and surroundings as a whole, the availability and quality of labor, materials, transportation, facilities, storage and work areas, water, power, topography and ground and water surface and subsurface conditions (including access, road conditions, utilities, infrastructure, and other potential interferences) and all other applicable matters at the Site or in the vicinity of the Site which may affect the performance of Services, the compensation, the schedule, and the duties and obligations of Contractor in relation to the Services. In the event that any member of Company Group, or any person by or on a Company Group member's behalf, furnishes any member of Contractor Group with any data, drawings, information in any form, including any other parts of the Agreement, in connection with the Services, Contractor is responsible for confirming the accuracy, timeliness; completeness and sufficiency of such data, drawings or information for purposes of performing the Services, and therefore acknowledges that reliance on such data, drawings or information will be to its own account. Contractor shall immediately provide Notice to Company if Contractor encounters or discovers any erroneous, missing, conflicting, inconsistent, or differing conditions or requirements. Contractor is responsible and assumes all Liability for making such examination and review of data, drawings, information, conditions or requirements prior to commencement of performance of the Services, and waives any right to request a Change or submit a Claim for an adjustment in compensation or schedule.

**3.2 PERFORMANCE**

3.2.1 Contractor shall perform and provide all labor, Contractor Material, Contractor Equipment, and other items and requirements necessary to execute and complete the Services under the Agreement. Contractor shall use the latest revision or version of any documentation, software, drawings and specifications pertaining to the Services which have been issued to Contractor or which is customarily applied or used in performing the specific type of Services in order to achieve the required standards set forth in the Agreement.

3.2.2 Contractor agrees to furnish all supervision, know-how, labor, supplies, tools, Contractor Equipment, Contractor Materials, facilities, storage, and all other things, tangible and intangible, necessary or desirable to execute, perform and complete the Services.

3.2.3 Contractor shall be responsible for the correctness of the Services and the Deliverables, notwithstanding any assistance, information or acceptance by any member of Company Group. If at any time during the performance of the Services, a conflict, inconsistency, error or omission is discovered, Contractor shall immediately give Notice to Company's Representative and await instructions before proceeding with any correction, re-performance or resumption of the Services.

3.2.4 Contractor shall comply with any reporting requirements of Company, at the time intervals specified by Company, pertaining to the performance of Services and progress made therewith, including provision of any data, information and documents concerning costs, activities, schedule, Contractor and Company Material management, Contractor and Company Equipment, labor force, Site data, injuries, safety, local content, forecasts, and deliveries.

3.2.5 Contractor shall proceed with the Services in accordance with the written decisions, instructions and orders given by the Company, subject to and in accordance with the Agreement, including provisions for Change Orders as set out in Article 20.

3.2.6 No decision, instruction or order given by, or on behalf of, the Company shall be effective until written confirmation thereof has been received by the Contractor. If Contractor proceeds with any decision, instruction, or order given by, or on behalf of, Company which has not been placed in writing, any time, cost, or other consequences shall be to Contractor's account, provided that, in any emergency involving the risk of injury to persons or damage to property, Company may issue oral instructions with which Contractor shall immediately comply. Company shall confirm in writing any such oral instruction given in an emergency as soon as practical after its issue.

3.2.7 Within ten (10) days after receiving any written decision, instruction or order of the Company, Contractor shall provide Notice to Company if it questions or disputes the same, providing specific and detailed reasons. Company shall confirm, reverse or vary such decision, instruction or order within a further period of ten (10) days by Notice to Contractor, which decision shall be final and binding on the Contractor. If Contractor disagrees with such Company response, it may submit a Contractor Claim pursuant to Article 21. In the absence of Contractor notifying Company of its intention to seek resolution pursuant to Article 21 within such period, the decision, instruction or order of Company shall be final and binding, and Contractor waives any right to submit a Change, Claim or Dispute.

**3.3 PERMITS AND LICENSES**

Prior to commencement of performance of the Services, Contractor shall obtain at its expense all licenses, permits and governmental approvals that are necessary and required by Law to be issued in the name of Contractor to perform the Services in any location, including professional and contractor's licenses, specialty and task-specific permits, and transportation permits, which Contractor shall maintain for the duration of the Agreement. Contractor shall not commence any Services unless all required licenses, permits and governmental approvals are in full force and effect. Contractor shall furnish any bonds, security or deposits required in connection therewith. If requested by Company, Contractor shall furnish Company with a copy of any such licenses, permits and approvals obtained by Contractor. Contractor shall provide Company with any assistance as Company may reasonably require in obtaining and maintaining any licenses, permits and approvals pertaining to the Services or any Site required to be in the name of any member of Company Group. Contractor shall ensure that all members of Contractor Group strictly comply with the requirements of this Article.

**3.4 COMMUNICATION**

3.4.1 Contractor shall provide a competent and qualified Contractor Representative, and any necessary assistants, whose appointment shall be approved by Company, at all times during the performance of the Services. The Contractor Representative shall be responsible for communicating and coordinating matters under the Agreement with Company, and shall also be responsible for communicating such, including terms of the Agreement, to all Contractor Group Personnel. The Contractor Representative shall be located at the place designated by Company.

3.4.2 Company has the right to review the qualifications of the proposed Contractor Representative, including any necessary assistants, and to approve or disapprove the assignment. The Contractor Representative shall not be replaced without the prior consent of Company, unless such person ceases to be employed by Contractor. Contractor's Representative shall represent Contractor, and Contractor acknowledges that Company will rely that (A) all directions given to the Contractor Representative shall be as binding as if given to Contractor, and (B) all decisions made by the Contractor Representative shall be as binding as if made by Contractor.

3.4.3 Contractor Representative shall be able to fluently read, write, speak and fully comprehend the English language. The Agreement and all matters under the Agreement, including all Changes, Claims, Disputes, dispute resolution proceedings, meetings, communications and correspondence between Company and Contractor, policies, instructions, directions, rules, procedures, documentation and other requirements, shall be solely conducted in the English language. If any of Contractor's Personnel assigned to perform the Services are not fluent in English, Contractor Representative shall be both fluent in English and in the language spoken by such non-English speaking Personnel, unless otherwise approved by Company.

**3.5 COORDINATION AND PLANNING**

3.5.1 Contractor acknowledges that Company is committed to executing Project objectives in accordance with proper standards of performance, and if the Services are performed pursuant to a prime contract between Company and a Client, Contractor understands that Company will be contractually obligated to its Client and liable for proper performance of the Services to such Client. Accordingly, Company may also be charged with the responsibility of coordinating the efforts of all, or a significant portion of, the participants in the Project, including various subcontractors, specialty service contractors, suppliers, and other workers, the Employees and other Personnel of Company, other members of Company Group, and possibly other third parties. Contractor agrees to perform the Services as part of the team of participants in the Project in cooperation with all other participants, and subject to all rules, regulations, and directives of Company (A) for the



coordination and integration of the work of all participants, (B) for the maintenance of safety, efficiency, security and good order on the Project as a whole, (C) for compliance with all applicable Laws and the terms hereof, and (D) for the protection of the environment and the rights and well-baing of the public.

3.5.2 Contractor recognizes any joint occupancy conditions and acknowledges that Company will schedule and coordinate the use of jointly used facilities, equipment, and space, and Contractor shall accommodate its schedule to such conditions. Notwithstanding Company's coordination, Contractor shall perform all Services at any Company Site with minimum interference to others.

3.5.3 Throughout its performance, Contractor shall plan the Services thoroughly, effectively, diligently and accurately. Contractor shall specifically identify Contractor Equipment and Contractor Material requirements (including need dates and realistic procurement lead times) far enough in advance, and provide timely Notice of such to Company, to enable Company or other members of Company Group to order the Company Material and Company Equipment for delivery to occur prior to the requirement date.

**3.6 INTEGRATION WITH WORK OF OTHERS**

Contractor shall be responsible to obtain all relevant information regarding the nature, condition and state of progress of work of all other persons and entities which affects or integrates with the Services. Before integrating or connecting Services with the work of others, Contractor shall ascertain that such work of others is in all respects fully ready, prepared and in suitable condition for such integration or connection with the Services. Contractor shall Notify Company of any possible non-conformances, problems or delays in any work of others and await directions prior to proceeding.

**3.7 ALLOCATION OF FACILITIES**

Company may designate for use by Contractor certain entrances, parking areas, storage areas, office and work areas, facilities and Company Equipment, if and to the extent such are to be provided by Company Group under the Agreement. Company may allocate, and schedule the use of, such common facilities, Company Equipment, and utilities as are provided by Company Group for use of Contractor Group and other participants in the Project. The temporary interruption of Services, utilities, facilities, use of or access to the Site, and use of Company Equipment are anticipated and shall not be used by Contractor as the basis for a Change Order or a Claim for an adjustment in compensation or time for performance. No signs shall be erected on any Site without the express prior written consent (including approval of the content, size and location) of Company.

**3.8 SITE ACCESS**

Company will provide access, easements, land, port, or water rights to any Company Site, and Contractor shall comply with all restrictions, limitations, terms and conditions relative thereto. If required by Law, necessitated by a third party, or if such pertains to Services performed on Contractor Site, Contractor shall obtain any easements, land, port, or water rights it may require to perform the Services. At Company Site, Contractor shall comply with all applicable safety and security procedures and shall only perform the Services only during such hours as may be directed or approved in writing by Company. Company reserves the right to access and use any areas in Company Site as reasonably necessary for Company purposes. Company and Client shall be granted access to any Contractor Site at all times for purposes pursuant to the Agreement.

**3.9 INSPECTION, EXPEDITING, AND QUALITY CONTROL**

3.9.1 Company or Client (or their designee) shall have the right to inspect the Services, Contractor Material, Contractor Equipment, and any Contractor Site, at all times. As may be applicable, no Services shall be covered, embedded, installed, attached or commingled until inspected and released or otherwise approved to proceed by Company in writing, and any Services so without Company authorization shall be uncovered, uninstalled, or separated out by Contractor at its expense for inspection upon Company request. Any defective, non-confirming, or unsatisfactory Services shall be discontinued, removed and replaced or corrected at Contractor's expense in accordance with specifications and directions of Company.

3.9.2 Any review, inspection, release, direction, or approval of the Services by Company Group, or any failure to do so, shall not relieve Contractor of its obligation to comply with all requirements of the Agreement.

3.9.3 Company shall have the right at all times to conduct any expediting activities on Deliverables or Services furnished by any member of Contractor Group. Company shall be allowed reasonable access to any Contractor Site for expediting purposes.

3.9.4 Contractor shall furnish a quality assurance and quality control plan acceptable to Company prior to commencement of the Services or thereafter upon request.

3.9.5 Contractor shall maintain and furnish all quality assurance and quality control documentation for the Services and Deliverables, including that required in its plan, or as may be reasonably requested by Company.



3.9.6 Company's rights under this Article may be exercised by an agent, representative or other designee of Company.

### 3.10 RECORDS AND ACCOUNTS; AUDIT

Contractor shall maintain detailed books and records concerning performance of the Services and compliance with the Agreement, documenting all costs and amounts charged to Company, and shall preserve such books and records for a period of seven (7) years after termination or expiration of the Agreement. Upon reasonable Notice to Contractor, Company or Client shall have the right to inspect and audit such books and records for purposes of confirming performance of the Services and compliance with all terms of the Agreement, including those records which relate to cost reimbursement or performance of labor provisions. Copies of such documents and records shall be furnished to Company or Client upon request. Any overpayments, cost discrepancies or overcharges which are verified through such audit will be paid to the other Party within 30 (thirty) days. Company's rights under this Article may be exercised by an agent, representative or other designee of Company or Client.

### 3.11 PARTIAL OCCUPANCY OR USE

Company may occupy or use any portion of the Services which is sufficiently completed to permit such occupancy or use. Such partial occupancy or use shall not constitute an acceptance of the Services, and shall not relieve Contractor of the obligation to complete all of the Services strictly in accordance with the requirements of the Agreement, nor shall it relieve Contractor of any of its warranty or other obligations hereunder.

## 4. PAYMENT AND TAXES

4.1 Invoice. Within ten (10) days after the end of each month, Contractor shall submit an invoice to Company for all Services completed up to the end of such month. All payments are to be applied by Contractor as trust funds to pay for all components of the Services, including making of payments on time to all members of Contractor Group and their Personnel providing any labor, Services, goods, Contractor Equipment, or Contractor Materials. Each invoice shall be in the form or format specified or approved by Company, and shall be fully supported by proper evidence, including schedules, manpower reports, time sheets, justification for all costs and expenses, and any affidavit or certificate as may be requested by Company, showing: (A) the portion of the Services completed, (B) compliance with all requirements of the Agreement, (C) payment of all bills and (D) through attachment, in a form specified by Company, compliance with the requirement for delivery of final (and interim, if requested by Company) lien and claim waivers from Contractor, and each applicable member of Contractor Group, attesting that no Lien or Claim exists or could be claimed arising from the Services. Any invoice which is deficient may be rejected by Company, in whole or in part, and Company will have no obligation to pay such invoice until Contractor has remedied the deficiency to Company's satisfaction.

4.2 Payment. Once Contractor has submitted a properly completed and documented invoice, Company shall review such invoice, including obtaining any field or Project-level review and approvals, and if the invoice is deemed complete and has been approved at all required levels, Company will pay such invoice on a net thirty (30) days basis, or as otherwise set forth in the Agreement. If the invoice is rejected for payment in whole or in part, Company will provide Notice to Contractor of the reasons for such rejection. Company shall pay Contractor for the approved amounts as soon as possible after the invoice is approved, but not less than thirty (30) days after receipt of a proper invoice. If requested by Company, as a condition of payment, each invoice received by Company prior to final completion of the Services shall be accompanied by a fully executed interim Lien and Claim waiver from Contractor (and each applicable member of Contractor Group) attesting that no Lien or Claim exists or could be claimed arising from all Services performed through the date for which payment is invoiced.

4.3 Company may withhold from each interim payment ten percent (10%), or to the maximum percentage allowed by Law, of the amount earned, as retainage, until final completion and acceptance. In addition, upon Notice to Contractor, Company may withhold such amount as may be reasonably required to assure compliance by Contractor with the terms of the Agreement, to the maximum extent permitted by Law. Company may pay directly any obligation of Contractor arising under the Agreement and withhold such payment from amounts otherwise due Contractor. Company shall be entitled at all times to set off any amount owed by Contractor to any member of Company Group, including the assessment of Backcharges, in connection with the Agreement, or under any other contract or action, against any amount due or owing to Contractor.

4.4 In addition to the requirements in 4.1 above, Contractor shall submit with its invoice for final payment a total release of any Liens and Claims against Company Group in the form required and approved by Company.

4.5 Notwithstanding any other provision in this Article, should Company be paid by Client in accordance with a schedule of progress payments or invoiced payments based upon the amount of Services satisfactorily performed, to the extent allowed by Law Company at its option may make payment to Contractor for all undisputed amounts properly invoiced



in accordance with, and within 30 (thirty) days of, payments received by Company from Client which include the specific Services performed by Contractor.

4.6 Taxes. Contractor (A) accepts that its compensation includes; and (B) accepts exclusive Liability for payment of; and (C) shall pay, all Taxes assessed upon all components of the Services, or otherwise arising from its performance under the Agreement. Excise, sales and use Taxes on Contractor's Services will not be passed through to Company unless Company has so expressly agreed in the Agreement. Contractor agrees to pay any Taxes promptly and in a timely manner to the proper taxing authority in accordance with Law. If compensation to Contractor is other than lump sum, Contractor's invoices shall display the total amount of applicable Excise, sales, and use Taxes paid or billed by Contractor. Contractor shall comply with applicable Law in identifying and describing with specificity, to the satisfaction of Company, any such Taxes to be included in any invoice sent to Company. In the event Company is required by Law or as it may deem appropriate, Company is entitled to withhold and pay any Taxes assessed on the Services performed hereunder, which shall be paid to the proper tax authorities. With supporting documentation, Company may charge to Contractor the costs of any such Taxes it has withheld and paid.

## 5. TIME, SCHEDULE, DELAYS, EMERGENCIES

5.1 Upon request by Company, Contractor shall provide a detailed schedule for performance of the Services, in accordance with the Agreement, and in compliance with any Company format, planning software, and substance requirements. All original schedules and subsequent revisions must be approved by Company in writing. Contractor shall revise and update such schedule from time to time as required by Company or the terms of the Agreement. Contractor shall establish and maintain a separate electronic file of the schedule, including each updates to the schedule, in the approved format, planning software, and substance requirements, for a period of four (4) years after the later of completion of the Services or termination of the Agreement. The schedule for the Services shall be subject to revision by Company to coordinate the Services with the overall rate of progress of Company and other participants in the Project as a whole, and to expedite performance of critical items of Services under the schedule.

5.2 Contractor agrees to commence the Services promptly when directed by Company and to prosecute the Services diligently to completion. Contractor agrees to provide all Contractor Equipment, Contractor Materials, items or Personnel necessary to perform, execute, and complete the Services in accordance with the schedule. Contractor acknowledges that time is of the essence in completing the Services. In addition to providing progress reports and the other reports specified in the Agreement, Contractor shall provide any further information to Company as it may reasonably request to verify actual progress and to forecast future progress. If Contractor has reason to believe that the Services will not be performed in accordance with the schedule, Contractor shall so provide Notice to Company within forty-eight (48) hours of discovery of the facts upon which the delay may be based, specifying in its Notice the corrective action planned by Contractor to regain progress to the schedule.

5.3 If (A) Contractor fails to diligently prosecute the Services or is otherwise in breach of the Agreement, and (B) fails within five (5) days after receipt of written Notice from Company to make any corrections or recover the schedule to Company's satisfaction, Company may, without prejudice to any other remedy it may have, take any reasonable action necessary to correct any deficiency or breach and recover schedule, and assess Backcharges against Contractor for any amounts incurred by such actions. If the payments then or thereafter due Contractor are not sufficient to cover such amount, Contractor shall promptly pay the difference to Company. Neither Company nor Client shall in any way be liable or accountable to Contractor or its surety for the method by which the Services are supplemented by Company, or at Company's direction, or the price paid thereof.

5.4 Company will designate the daily working hours for any Company Site and such hours will apply to Contractor's performance of the Services thereon. Any special working hours outside of or exceeding the designated working hours will require prior written approval of Company.

5.5 If, for reasons beyond Contractor's control (including Force Majeure), Contractor is materially delayed in the performance of the Services, Contractor shall comply with the provisions of Article 20 for any potential Changes it may request caused by the delay.

5.6 In the event of any emergency endangering life or property (including any response to Force Majeure), Contractor is responsible to take such action on behalf of all members of Contractor Group as may be reasonable and necessary to prevent, avoid or mitigate injury, damage or loss, as well as comply with applicable Law, and shall, as soon as possible, report any such incidents, including Contractor's response thereto, to Company, except that Company or Client has the right to direct Contractor's Personnel and resources on Company Site. Company may immediately suspend or terminate the performance of the Services by Contractor in an emergency situation, including if, in Company's judgment, Contractor has not taken reasonable precautions to handle such emergency, or has caused or exacerbated an emergency. Upon receipt of any such direction from Company, Contractor shall immediately suspend or terminate its performance of the Services and take such other action as directed by Company at no additional cost to Company or extension of time. In the event the emergency was caused or exacerbated by Contractor, or if Contractor failed to take necessary and reasonable action to protect lives and property, Contractor shall not be entitled to a Change Order or any other cost or schedule relief,





and Contractor shall reimburse Company for the reasonable direct costs incurred by Company in taking any action to handle or mitigate any effects of the emergency. In such case, the issuance of a suspension, a termination, or the taking of any action by Company, or Company's failure to issue a suspension or taking an action, shall not relieve Contractor of any of its obligations under the Agreement. Contractor shall be responsible to provide all first aid, ambulance, and emergency medical services for all Contractor Group Personnel on Company Site, even if such may be available on such Site.

## 6. FORCE MAJEURE

6.1 In the event Contractor's (or any member of Contractor Group's) performance of any obligation under the Agreement is materially and adversely affected by an event of Force Majeure, Contractor shall immediately upon discovery give Notice to Company. Such Notice shall specify (A) the nature of the event or condition of Force Majeure, (B) a description of how performance is affected, (C) the estimated period of delay and the commercial impact, and (D) the measures undertaken to mitigate the adverse effects. If Contractor claims an adjustment in the time or cost of performance, Contractor shall Notify Company in writing within forty-eight (48) hours after the commencement of a delay, interruption, or interference in its performance caused by Force Majeure or the right to such adjustment shall be waived. No delay or failure in performance by Contractor caused by an event or condition of Force Majeure shall constitute a default under the Agreement provided the terms and conditions in this Article are satisfied. Unless the event or condition of Force Majeure materially and permanently prevents the resumption of performance by Contractor, Force Majeure shall not operate to excuse, but only to delay, performance, for a period specified below.

6.2 Upon satisfactory evidence that Contractor's performance has been materially and adversely affected by an event or condition of Force Majeure, Contractor may be granted additional time for performance equal to the number of days performance is delayed by the effects of Force Majeure in accordance with Article 20.

6.3 If Services are performed for Company on behalf of a Client, Contractor shall not be entitled to any increase or adjustment in its compensation for additional damages, costs, stand-by time, losses or other expenses incurred as a result of Force Majeure, except to the extent approved by the Client; and then Contractor shall recover only to the extent of any amounts that Company, on behalf of Contractor, actually recovers from the Client for such Force Majeure delay. If compensation is paid by Company, Contractor shall only be paid the direct costs incurred in any delay, and shall not be paid any profit, loss, revenue, overhead, or other indirect amounts.

6.4 Contractor shall exercise due diligence to ensure that all members of Contractor Group do all things reasonably possible to mitigate or remove any effects of Force Majeure, and resume performance at the earliest possible time. Contractor's failure to mitigate or remove the effects of Force Majeure and resume performance, if such mitigation, removal, and resumption of performance is reasonably possible, constitutes a material default under the Agreement, and Company shall have the right to immediately terminate the Agreement for default under Article 19.2.

## 7. INDEMNITY

**7.1 <u>COMPANY INDEMNITIES</u>. COMPANY SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS CONTRACTOR FROM AND AGAINST ANY AND ALL LIABILITY FOR INJURY TO OR ILLNESS OR DEATH OF EMPLOYEES, OFFICERS OR DIRECTORS OF COMPANY IN ANY WAY DIRECTLY OR INDIRECTLY ARISING OUT OF, RESULTING FROM, RELATED TO, OR OCCURRING IN CONNECTION WITH THE PERFORMANCE OF THE SERVICES, THE AGREEMENT, OR FROM ANY ACT OR OMISSION OF ANY MEMBER OF COMPANY GROUP (OR ANY PERSON DIRECTLY OR INDIRECTLY EMPLOYED BY ANY MEMBER OF COMPANY GROUP, OR ANYONE FOR WHOSE ACTS A MEMBER OF COMPANY GROUP MAY BE LIABLE) REGARDLESS OF THE CAUSE OF SUCH INJURY, ILLNESS OR DEATH, INCLUDING THE NEGLIGENCE (WHETHER SOLE, CONCURRENT, ACTIVE, PASSIVE OR GROSS), STRICT LIABILITY OR FAULT OF CONTRACTOR.**

**7.2 <u>CONTRACTOR INDEMNITIES</u>. CONTRACTOR SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS COMPANY GROUP FROM AND AGAINST ANY AND ALL LIABILITY IN ANY WAY DIRECTLY OR INDIRECTLY ARISING OUT OF, RESULTING FROM, RELATED TO, OR OCCURRING IN CONNECTION WITH, THE PERFORMANCE OF THE SERVICES, THE AGREEMENT, OR FROM ANY ACT OR OMISSION OF ANY MEMBER OF CONTRACTOR GROUP (OR ANY PERSON DIRECTLY OR INDIRECTLY EMPLOYED BY ANY SUCH MEMBER OF CONTRACTOR GROUP, OR ANYONE FOR WHOSE ACTS SUCH MEMBER OF CONTRACTOR GROUP MAY BE LIABLE) INCLUDING FOR ANY OF THE FOLLOWING:**

**7.2.1 INJURY TO OR ILLNESS OR DEATH OF EMPLOYEES, OFFICERS, AND DIRECTORS OF ANY MEMBER OF CONTRACTOR GROUP (INCLUDING ANY LIABILITY ARISING FROM OR RELATED TO THE PROVISION OF ANY MEDICAL, SECURITY, TRANSPORTATION, EVACUATION, OR OTHER FACILITIES, SERVICES OR EQUIPMENT TO CONTRACTOR GROUP PERSONNEL), OR ANY LOSS OF, DAMAGE TO, OR**



DESTRUCTION OF, ANY PROPERTY OF ANY MEMBER OF CONTRACTOR GROUP, REGARDLESS OF THE CAUSE OF SUCH INJURY, ILLNESS OR DEATH OR PROPERTY LOSS OR DAMAGE, INCLUDING THE NEGLIGENCE (WHETHER SOLE, CONCURRENT, ACTIVE, PASSIVE OR GROSS), STRICT LIABILITY OR FAULT OF ANY MEMBER OF COMPANY GROUP;

7.2.2 LOSS OF, DAMAGE TO, OR DESTRUCTION OF PROPERTY (INCLUDING THE EXISTING FACILITIES) OWNED BY COMPANY GROUP (EXCEPT AS PROVIDED BELOW FOR COMPANY EQUIPMENT), HOWEVER CONTRACTOR WILL NOT BE LIABLE HEREUNDER TO THE EXTENT OF ANY NEGLIGENCE (WHETHER SOLE, CONCURRENT, ACTIVE, PASSIVE OR GROSS), STRICT LIABILITY OR FAULT OF COMPANY AS MAY BE FINALLY DETERMINED. NOTWITHSTANDING THE FOREGOING, SHOULD ANY MEMBER OF CONTRACTOR GROUP USE ANY COMPANY EQUIPMENT, CONTRACTOR SHALL RELEASE, DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS COMPANY GROUP AGAINST ANY LIABILITY WHATSOEVER RESULTING OR ARISING FROM SUCH POSSESSION, OPERATION, TRANSPORTATION, STORAGE, OR USE, REGARDLESS OF WHETHER SUCH LIABILITY HAS OCCURRED AS THE RESULT OF THE NEGLIGENCE (WHETHER ACTIVE, PASSIVE, SOLE, CONCURRENT OR GROSS), FAULT OR STRICT LIABILITY OF COMPANY GROUP;

7.2.3 LOSS OF, DAMAGE TO, OR DESTRUCTION OF THE SERVICES, CONTRACTOR MATERIALS OR COMPANY MATERIALS, REGARDLESS OF TITLE AND REGARDLESS OF WHETHER SUCH LOSS, DAMAGE OR DESTRUCTION HAS OCCURRED AS THE RESULT OF THE NEGLIGENCE (WHETHER ACTIVE, PASSIVE, SOLE, CONCURRENT OR GROSS), FAULT OR STRICT LIABILITY OF ANY MEMBER OF COMPANY GROUP;

7.2.4 EXCEPT AS PROVIDED IN ARTICLE 7.1, AND IN ADDITION TO ITS INDEMNITY IN ARTICLE 7.2.1, ANY PERSONAL INJURY TO OR ILLNESS OR DEATH OF ANY PERSON AND LOSS OF, DAMAGE TO, OR DESTRUCTION OF PROPERTY OF ANY PERSON;

7.2.5 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ANY APPLICABLE LAW BY ANY MEMBER OF CONTRACTOR GROUP, INCLUDING (A) ANY HEALTH AND SAFETY LAW; (B) ANY PERMITTING AND LICENSING OBLIGATION UNDER ARTICLE 3.3; (C) ANY EMPLOYMENT OR LABOR LAW OR PROVISION OF ARTICLE 16; (D) ANY VIOLATION OF ARTICLES 15 OR 22 INCLUDING ANY OBLIGATION RELATING TO THE EXPORT AND IMPORT OF ITS PERSONNEL, EQUIPMENT, DELIVERABLES, GOODS, MATERIALS, DATA, INFORMATION, AND ANY PORTION OF THE SERVICES, AND THIS INDEMNITY SHALL BE IN ADDITION TO, AND NOT INSTEAD OF, ANY OTHER INDEMNITIES OR ANY OTHER OBLIGATIONS HEREUNDER PERTAINING TO COMPLIANCE WITH LAWS, AND SHALL NOT BE INTERPRETED TO LIMITED IN ANY WAY CONTRACTOR'S RESPONSIBILITY;

7.2.6 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ANY ARTICLE 14.3 OF THE AGREEMENT OR ANY ENVIRONMENTAL LAW BY ANY MEMBER OF CONTRACTOR GROUP, INCLUDING ANY ACTUAL OR ALLEGED POLLUTION, CONTAMINATION, DAMAGE OR ADVERSE EFFECT TO THE ENVIRONMENT, TO PROPERTY, OR TO NATURAL RESOURCES, ALLEGED TO BE CAUSED BY ANY ACTS OR OMISSIONS OF ANY MEMBER OF CONTRACTOR GROUP, INCLUDING ANY LIABILITY ARISING FROM POSSESSION AND CONTROL BY ANY MEMBER OF CONTRACTOR GROUP OF HAZARDOUS SUBSTANCES, MATERIALS AND WASTES (INCLUDING ANY FUELS, LUBRICANTS, MOTOR OILS, PIPE DOPE, PAINTS, OR SOLVENTS), WHETHER OR NOT BROUGHT ONTO THE SITE BY CONTRACTOR, AND;

7.2.7 ANY MISAPPROPRIATION, UNAUTHORIZED DISCLOSURE, IMPROPER USE OF, ACTUAL OR ALLEGED INFRINGEMENT, MISAPPROPRIATION OR VIOLATION OF ANY DOMESTIC OR FOREIGN PATENTS, COPYRIGHTS OR TRADEMARKS OR OTHER INTELLECTUAL PROPERTY, OR TRADE SECRET(S) OR CONFIDENTIAL INFORMATION OR OTHER PROPRIETARY RIGHTS, OR ANY OTHER VIOLATION OF OR FAILURE TO COMPLY WITH ARTICLES 12 (CONFIDENTIALITY) OR 13 (INTELLECTUAL PROPERTY RIGHTS), BY ANY MEMBER OF CONTRACTOR GROUP;

7.2.8 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ARTICLE 8 (INSURANCE) BY ANY MEMBER OF CONTRACTOR GROUP;



7.2.9 ANY VIOLATION OF OR FAILURE TO COMPLY WITH (A) ARTICLE 25 (CODE OF BUSINESS CONDUCT) BY ANY MEMBER OF CONTRACTOR GROUP; (B) ANY SIMILAR CODE OF CONDUCT OR ETHICAL REQUIREMENTS OF CLIENT; (C) ANY SIMILAR CODE OF CONDUCT OR ETHICAL REQUIREMENTS OF CONTRACTOR; (D) ANY PROFESSIONAL OR INDUSTRY-STANDARD CODES OF CONDUCT AND ETHICS APPLICABLE TO THE PERFORMANCE OF THE SERVICES, OR (E) ANY LAW APPLICABLE TO (A) THROUGH (D), INCLUDING THE U.S. FOREIGN CORRUPT PRACTICES ACT;

7.2.10 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ARTICLE 4.7 (TAXES) BY ANY MEMBER OF CONTRACTOR GROUP, INCLUDING ANY FAILURE BY ANY MEMBER OF CONTRACTOR GROUP TO (A) FILE TAXES; (B) MAKE TIMELY REPORTING OR REMITTANCE OF ANY TAXES; (C) COMPLY WITH ANY APPLICABLE LAW RELATED TO TAXES;

7.2.11 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ARTICLES 9 (FINANCIAL GUARANTEES) OR 11 (LIENS) BY ANY MEMBER OF CONTRACTOR GROUP, INCLUDING (A) FAILURE OF CONTRACTOR GROUP TO MAKE PAYMENTS RELATING TO THE SERVICES AS REQUIRED BY THE AGREEMENT, OR (B) ANY LIABILITY FROM CLAIMS RESULTING FROM THE FILING OR IMPOSITION OF ANY LIEN BY ANY MEMBER OF CONTRACTOR GROUP OR ANY OTHER PERSON; AND

7.2.12 ANY VIOLATION OF OR FAILURE TO COMPLY WITH ANY OTHER PROVISION OF THE AGREEMENT BY ANY MEMBER OF CONTRACTOR GROUP.

**7.3 INDEMNIFICATION PROCEDURE**

7.3.1 Contractor shall promptly give Company written Notice of any alleged, actual, or potential Liability against Contractor or any member of Contractor Group arising from the Services or the Agreement.

7.3.2 Company shall promptly give Contractor written Notice of any alleged, actual or potential Liability against Company or any member of Company Group arising from the Services or the Agreement.

7.3.3 Upon receipt of Notice, Contractor agrees to immediately assume the defense of any matter for which Contractor is obligated hereunder to indemnify Company Group or for which Company claims an indemnity obligation. Company shall have the right at its discretion to be represented by its own legal counsel and to participate in any defense, as well as the right to consent to resolution or disposition in any action, in which Company is named as defendant in any matter for which Contractor owes Company indemnification hereunder.

7.3.4 Notwithstanding the provisions of Article 23, should Contractor fail to assume defense upon Notice, for any reason, Contractor agrees that any issue or dispute concerning its obligation to assume defense under this Article 7 shall be immediately submitted to binding arbitration to the American Arbitration Association office in Houston, Texas, to be heard on an expedited basis in accordance with its rules, in the English language, and by an arbitrator agreed upon by both parties. Notwithstanding such arbitration, Company has the right to take any action necessary to defend itself or any member of Company Group during the period such arbitration is pending, including incurring any reasonable costs of defense, attorney and consulting fees, and other expenses, conduct any discovery, join any person, and file any motion or other document to preserve Company Group rights in the matter. The prevailing Party in such arbitration shall be reimbursed by the non-prevailing Party for any reasonable costs and expenses of defense incurred as may be awarded by the arbitrator. Company shall be relieved of its obligation to make payment for the portion of the Services affected by any alleged Liability for which indemnification is claimed, pending final resolution.

**7.4 INTENT AND APPLICATION OF INDEMNIFICATION PROVISIONS**

The indemnification herein shall only be effective to the maximum extent permitted by applicable Law. Notwithstanding anything herein, if it is judicially determined that any indemnity obligation in this Article 7 is unenforceable under applicable Law, or if such Law limits in any way the extent of the indemnification which may be provided, then the parties agree that the indemnity obligation shall be automatically amended to conform to the maximum limit of recovery for the indemnitee permitted under such Law.

**7.5 CONTRACTOR'S RESPONSIBILITY FOR ITS GROUP**

Contractor acknowledges that it is solely responsible to Company under the Agreement for any Liability, acts (whether negligent, intentional or otherwise) and omissions of all members of Contractor Group, including their Personnel, and accordingly to ensure the compliance of Contractor Group, including, if applicable, to flow down the appropriate requirements of the Agreement into any contracts or other commercial documents entered into for performance of the Services. The fact that any Liability was alleged to have been caused by or arisen from a member of Contractor Group and not Contractor itself shall not constitute a defense for Contractor concerning responsibility or Liability for its obligations to Company under the Agreement, specifically, this Article 7.



## 8. INSURANCE

8.1 Contractor shall provide insurance required by Law and to the extent necessary and normal in the industry to provide coverage for the Services performed under the Agreement. Without in any way limiting Contractor's liability hereunder, Contractor shall maintain at a minimum the following insurance in form and with underwriters satisfactory to Company:

8.1.1 Worker's Compensation as prescribed by applicable Law. Contractor shall ensure in its contracts that all of its contractors of all tiers have worker's compensation in place, to the extent required by applicable Law, for all Employees performing any portion of the Services.

8.1.2 Employer's Liability Insurance (including if applicable insurance covering liability under the Longshoremen's and Harbor Worker's Act, the Jones Act, and the Outer Continental Shelf Land Act). The limits of liability of such insurance shall be not less than $5,000,000 per occurrence.

8.1.3 Comprehensive or Commercial General Liability (Bodily Injury and Property Damage) Insurance including the following supplementary coverages: (A) Contractual Liability to cover liability assumed under the Agreement, (B) Product and Completed Operations Liability Insurance, (C) Broad Form Property Damage Liability Insurance, (D) explosions, collapse and underground hazards and (E) sudden and accidental pollution, including if applicable Oil Pollution Act coverage. The limit of the liability for such insurance shall not be less than $5,000,000 per occurrence, Combined Single Limit. Additionally, the policy shall include endorsement CG 25 03, Amendment–Aggregate Limits of Insurance (Per Project).

8.1.4 Automobile Bodily Injury and Property Damage Liability Insurance. Such insurance shall extend to owned, non-owned and hired vehicles used in the performance of the Services. The limits of liability of such insurance shall be not less than $5,000,000 per occurrence, Combined Single Limit.

8.1.5 Without in any way affecting Contractor's obligations herein, if marine or offshore Services are to be performed hereunder, Protection and Indemnity Insurance or equivalent insurance coverage, including coverage for injuries to or death of masters, mates and crews of vessels used in the performance of such Services. The limits of liability of such insurance shall be not less than $5,000,000 per occurrence.

8.1.6 Professional Liability (if applicable to or available for the Services, or required by Company) insurance with an amount not less than $5,000,000 in the aggregate on a claims made basis.

8.2 The above insurances 8.1.2 through 8.1.5 shall be on an occurrence basis. All insurances 8.1.2 through 8.1.6 shall be endorsed to: (A) name Company Group as additional insured; and (B) be primary coverage for all insureds, including any deductibles or self-insured retentions, which coverage shall not be considered contributory insurance with any insurance policies of any other insured); and (C) include a requirement that the insurer provide Company with thirty (30) days' written Notice prior to the effective date of any cancellation or material change of the insurance; and (D) contain waivers of subrogation in favor of Company Group; and (E) contain an assignment of statutory lien to Company Group, if applicable.

8.3 Contractor shall, before commencing the Services, provide Company with a certificate of insurance evidencing all required coverage, and such certificate shall contain the express endorsements contained on the policies for the benefit of Company Group as required in 8.2 above.

## 9. FINANCIAL GUARANTEES

Contractor will provide Notice to Company of any changes in Contractor's internal management organization of the unit, department, or division performing the Services, material adverse changes in its financial condition (including ratings), and any changes in the Contractor Party's legal structure or composition (including any changes in incorporation, restructuring, or ownership). At any time, whether prior to or during the performance of the Services, Company reserves the right to request that Contractor provide adequate financial assurance or a guarantee, in a form reasonably satisfactory to Company, that Contractor will be able to continue and complete performance of the Services, and pay all amounts due to any members of its Group pertaining to the Services. Such financial guarantee shall be in a form and be issued according to terms which shall allow Company to draw upon the guarantee in the event Contractor fails to meet its obligations under the Agreement. If requested by Company in writing, whether before commencement of the Services or at any time prior to completion and acceptance of the Services, Contractor shall provide a performance bond and/or a payment bond in form and with corporate surety satisfactory to Company. Company may terminate the Agreement for default or exercise the rights provided in Article 19 herein if Contractor should fail to provide such financial guarantee or bond when requested or if any guarantee or bond provided shall expire, be terminated, released, or revoked without the written consent of Company in accordance with the terms set forth within such guarantee or bond. The cost of the financial guarantee or bond will be for Company's account. Contractor agrees to ensure that any guarantor of Contractor's obligations under the Agreement shall be bound as a party to any arbitration involving Contractor in accordance with Article 23.



## 10. WARRANTY

### 10.1 GENERAL WARRANTY

10.1.1 Contractor expressly warrants that it will execute its duties and obligations under the Agreement in strict accordance with, and that all Services will meet, the requirements and specifications of the Agreement. All the Services shall be performed with quality and workmanship consistent with the highest applicable industry standards for the type of Services involved. In the event of any inconsistency of applicable industry standards, the highest performance standard contemplated shall govern Contractor's performance under the Agreement.

10.1.2 Contractor expressly warrants that all Deliverables and Contractor Materials furnished under the Agreement will be new, free from defects and conform to specifications, drawings, samples, or other description or requirements contained in the Agreement, and to acceptable industry standards. Contractor further warrants that any Contractor Equipment will be in good and proper operating condition and fit for Contractor's intended purpose of use in the Services. If required by Company, Contractor shall supply satisfactory evidence of the kind and quality of the Deliverables and Contractor Materials.

10.1.3 Contractor shall create, fabricate, procure, produce, service, install or apply all Contractor Materials, Company Materials, and Deliverables in strict accordance with the Agreement and any installation or application instructions and procedures set forth by the manufacturer. No other method shall be permitted or accepted unless specifically authorized in writing in advance by Company.

### 10.2 WARRANTY REMEDY

10.2.1 Should there be defects, errors, or omissions in, or breach of, any warranty of Contractor concerning the Services, the Deliverables, Contractor Materials, Contractor Equipment, incorporation of Company Materials, or workmanship contained therein, Contractor, without cost to Company or Client, shall promptly at Company's option correct, re-perform, repair, or replace the Services or Deliverables as may be applicable (including any defective or non-conforming Contractor Materials or workmanship) in whatever manner necessary, so that all the requirements of the Agreement are satisfactorily fulfilled. If Contractor fails after reasonable Notice to proceed promptly with the re-performance, correction, repair, or replacement of any defective Services or Deliverables, Company may correct, re-perform, replace or repair such Services or Deliverables to the extent required to correct any defect or deficiency, and charge all the costs thereof to Contractor, and/or Company may terminate the Agreement for default pursuant to Article 19. Company has no obligation to allow Contractor to cure any breach of warranty.

10.2.2 Contractor shall be responsible for any costs incurred for: (A) gaining access to effect any correction, re-performance, repair, or replacement, (B) any reinstallation required, and (C) any other associated costs required to ensure that all areas, work, or other facilities impacted and affected are returned to the condition existing prior to the commencement of the correction, re-performance, repair, or replacement of defects or deficiencies in the Services or the Deliverables.

10.2.3 Contractor's Liability under this Article 10 shall continue from the date of the Agreement through twelve (12) calendar months following the date the Services (including all Deliverables) have been accepted in their entirety by Company.

10.2.4 Any Services or Deliverables (including incorporated Contractor Materials or Company Materials or workmanship) which Contractor may have corrected, re-performed, repaired, or replaced under this Article 10 shall be re-warranted for an additional period of twelve calendar months following the date of acceptance by Company of such corrected, re-performed, repaired, or replaced Contractor Materials, Company Materials, workmanship, Services or Deliverables.

### 10.3 WARRANTY BENEFICIARIES

All of Contractor's warranties and warranty remedies hereunder shall be for the benefit of, extend to, and be enforceable by, either Company or Client. Contractor shall also ensure that any warranties and remedies obtained by Contractor from Contractor's subcontractors and suppliers shall also be made for the benefit of, extend to, and be enforceable by Company and its Client.

### 10.4 SUBSTITUTION

Contractor shall not substitute Services, Contractor Materials, Personnel or Deliverables for those specified nor otherwise deviate from the requirements of the Agreement without Company's prior written consent. If the words "or equal" are used, the proposed substitute must be approved in advance by Company in writing. Contractor shall submit to Company satisfactory evidence that proposed equals or substitutes fulfill the desired fundamental requirements and identical purposes of those specified and have no effect on any other part of the Services. Company's consent or rejection of such proposal shall be at Company's sole discretion. Company's consent to any substitution is based upon Contractor's expertise and



representations concerning the suitability of the proposed substitute. Company's consent does not relieve Contractor of any responsibility if the substitute proves not to be equal to that specified. Any increased costs or schedule changes resulting from the substitution shall be for Contractor's account unless otherwise agreed by Company in writing.

## 11. LIENS AND CLEAR TITLE

11.1 Contractor agrees to pay when due all money owed for labor, Contractor Materials, Contractor Equipment, storage, and Services incurred in the performance of the Agreement, the Services or connected with the Services. To the extent permitted by Law, Contractor hereby waives its rights and agrees not to claim or allow any Lien to be placed or filed against the Deliverables, Services, Contractor Materials, Contractor Equipment, or on any property of Company Group or any property of any third party on which any portion of the Services are performed. If Contractor's ability to waive its rights to file a Lien is limited by applicable Law, Contractor agrees that it shall not file or allow to be filed any Lien unless reasonable prior Notice, which Notice shall not be less than five (5) business days, has been provided to Company, and Company has been provided a reasonable time to investigate and cure any valid basis for such Lien. Contractor agrees to contractually bind all members of its Group to substantially similar provisions as set forth in this Article 11.1 for the benefit of Company Group.

11.2 Contractor warrants that the title to all Services, Deliverables, and Contractor Materials installed or delivered by Contractor, together with all improvements and appurtenances constructed or placed by Contractor, will be transferred with good title, free and clear of and from any Liens.

11.3 If a Party discovers the existence of a Lien in connection with the Services, it shall promptly provide Notice to the other Party of such Lien.

11.4 If any Lien is asserted or maintained by any member of Contractor Group or arising from the Services in violation of this Article, Contractor shall promptly proceed to have it removed. If Contractor fails to remove any such Lien, then Company may, but without obligation to do so, do everything necessary to have the Lien removed, and Contractor shall pay any and all costs, including attorneys' fees, incurred by Company in connection therewith.

## 12. CONFIDENTIALITY

12.1. During the term of the Agreement and performance of the Services, Contractor may be provided access to Company's Confidential Information.

12.2 Contractor shall not disclose Confidential Information to any third party without the prior written consent of Company. Contractor agrees to protect the disclosed Confidential Information by using the highest degree of care that is commercially reasonable to prevent the unauthorized disclosure, use, dissemination or publication of the Confidential Information.

12.3 Confidential Information shall be used by Contractor solely for the purpose of performing the Services under the Agreement and for no other purpose, and only by Contractor's Employees and other Personnel with a "need to know" for purposes of fulfilling the obligations and performing Services under the Agreement and who have undertaken obligations of confidentiality and limited use consistent with those set forth herein. Contractor will ensure that those of its Employees and other Personnel provided access to Confidential Information will be made aware of the Agreement and of the obligations hereunder. Contractor shall be fully responsible for the compliance of its Employees with the provisions of this Article 12, and shall be liable for any breach. Confidential Information may be disclosed to a member of Contractor Group only if such entity is under an obligation of confidentiality to Contractor protecting the receipt thereof. Company reserves the right to request, and Contractor agrees to ensure, that each Employee of Contractor and each member of Contractor Group, and all their Personnel, provided access to Confidential Information for purposes of fulfilling Contractor's obligations or performing Services under the Agreement shall execute an individual confidentiality agreement (with terms acceptable to Company) to the benefit of Company at any time.

12.4 Contractor understands and agrees that Confidential Information will be disclosed to Contractor "as is" and Company makes no warranties or representations concerning the accuracy, timeliness or sufficiency of Confidential Information. Unless otherwise expressly stated by Company, Contractor will rely upon such Confidential Information at its own risk.

12.5 Unless otherwise set forth in the Agreement, Company has no obligation to protect any information of Contractor as confidential.

12.6 The obligation of confidentiality set forth in this Article 12 shall not apply to any Confidential Information which Contractor can demonstrate through reasonable tangible evidence: (A) to have been in the possession of Contractor before disclosure by or receipt from Company; (B) to have been in or to have become publicly known without breach of the Agreement by Contractor or any of its employees; (C) has been rightfully received by the Contractor from a third party without any obligation of confidentiality; (D) is independently developed for Contractor prior to and without access or recourse to Confidential Information. Any document or item which contains any Confidential Information but which otherwise falls under one of the above exceptions shall be protected in its entirety as Confidential Information. Should Contractor








consider any Confidential Information to fall within any of the exceptions, if possible Contractor shall confirm such with Company prior to disclosure.

12.7 In the event Contractor becomes legally compelled (by deposition, interrogatory, official request for documents, subpoena, agency, civil investigative demand or similar process) to disclose any of the Confidential Information, Contractor shall provide Company with prompt prior written Notice of such requirement so that Company may seek a protective order or other appropriate remedy and/or waive compliance with the terms of the Agreement. In the event that such protective order or other remedy is not obtained, or that Company waives compliance with the terms hereof, Contractor agrees to furnish only that portion of the Confidential Information which Contractor is advised by its legal counsel (as approved by legal counsel for Company) is legally required. Contractor will exercise reasonable efforts to obtain assurance that confidential treatment will be afforded such Confidential Information.

12.8 Contractor shall not use the name, publications, marks, or logo of any member of Company Group, link to any Company Group website, or make any reference to any member of Company Group, the Project, the Services, or the Agreement, in any media or marketing materials or publications, use any Company Group name as a reference or in a list of customers, or publicize, publish, or photograph any property or Personnel of Company Group, except with the prior written consent of Company.

12.9 Upon request of Company at any time, all Confidential Information in the possession of Contractor Group or any of Contractor Group Personnel shall be promptly returned to Company or otherwise handled in accordance with Company instructions. Contractor may retain one copy of any Confidential Information for its records subject to a continuing obligation of confidentiality. Contractor understands and agrees that in the event of any threatened, alleged or actual breach of this Article 12 by any member of Contractor Group, Company may pursue any and all remedies available to it under the Agreement, in Law or in equity, including injunctive relief, in any forum or venue, such remedies under this Article 12 being exempt from the dispute resolution process under Article 23.

## 13. INTELLECTUAL PROPERTY RIGHTS

### 13.1 CONTRACTOR'S INTELLECTUAL PROPERTY AND INTELLECTUAL PROPERTY RIGHTS

Contractor warrants and represents that it owns, has duly licensed, or has been expressly granted the right to use, all Intellectual Property and Intellectual Property Rights therein that it uses to perform the Services or contained in the Deliverables, and that such usage will not violate the Intellectual Property Rights of any third parties. Any pre-existing documents, know-how, templates, programs, software, tools, processes, or systems owned or duly licensed by Contractor and used in the performance of the Services and/or embedded in the Deliverables, and any improvements or modifications thereto which may be developed or created by Contractor in the course of or as a consequence of performing the Services, shall remain the property of Contractor ("Contractor Technology") notwithstanding Article 13.4. Contractor grants Company (and any member of Company Group if applicable) a non-exclusive, worldwide, transferable, fully-paid and perpetual license to use the Contractor Technology solely for the purposes of Company Group's use of the Services and Deliverables. Contractor shall pay all royalties and obtain all licenses required for items specified to be furnished by Contractor, and for all items and methods selected by Contractor for the Services. Contractor understands and agrees that in the event of any threatened, alleged or actual breach of this Article 13 by any member of Contractor Group, Company may pursue any and all remedies available to it under the Agreement, in Law or in equity, including injunctive relief, in any forum or venue, such remedies under this Article 13 being exempt from the dispute resolution process under Article 23.

### 13.2 COMPANY'S INTELLECTUAL PROPERTY AND INTELLECTUAL PROPERTY RIGHTS

The Confidential Information and Intellectual Property of any member of Company Group disclosed to Contractor Group in any form and the Intellectual Property Rights therein (collectively "Company Proprietary Information) are and remains the property of the disclosing Company Group member, including ownership of all United States and foreign Intellectual Property Rights. Upon Company's request, termination or expiration of the Agreement for any reason, or with respect to any particular data on such earlier date that the same shall no longer be required by the recipient member of Contractor Group in order to render the Services hereunder, such Company Proprietary Information shall be promptly returned to Company by Contractor Group in a form and format acceptable to Company or, if Company so elects, shall be destroyed. Contractor shall not use the Company Proprietary Information for any purpose other than that of performing the Services under the Agreement or fulfilling its obligations under the Agreement, and Contractor shall not disclose, lend, sell, assign, lease, disseminate, or otherwise dispose of Company Proprietary Information or any part thereof to any other person, nor shall Contractor commercially exploit any part of Company Proprietary Information. Contractor shall not possess, or assert any property interest in, or assert any Lien, Claim, or other right against Company Proprietary Information.



**13.3 RIGHTS IN THE DELIVERABLES**

As between Company and Contractor, all Intellectual Property Rights, titles and interests to any Deliverables produced for Company under the Agreement are vested in Company, except to the extent of any Contractor Technology contained therein (the rights to which shall be retained by Contractor). Contractor shall not retain any rights to use the Deliverables.

**13.4 WORKS MADE FOR HIRE**

13.4.1 Any original works fixed in any tangible medium of expression (hereinafter referred to collectively as "Created Works") which a member of Contractor Group develops or creates as part of or in performing the Services for Company, including written reports, software, videos, manuals, charts, photographs, and designs which are covered by the definition of "work for hire" under 17 U.S.C. 101 of the U.S. Copyright Act of 1976, shall be considered a "work for hire" and Company shall be the owner of all such copyrights in and to any such Created Works (except to the extent provided for in Article 13.1).

13.4.2 To the extent that any such Created Works developed for Company may not be covered under the aforementioned "work for hire" definition of the Copyright Act such that Contractor or a member of its Group is regarded as the copyright author or owner, Contractor agrees to assign, and hereby assigns at the time of creation of the Created Works, without any requirement of further consideration, all right, title, and interest Contractor may have in such Creative Materials to Company or its designee. Upon request of Company, Contractor shall execute and deliver to Company all declarations and instruments of conveyance, and other documents for any applications or registrations Company may, at its expense, apply for and as may be appropriate to give full and proper effect to such assignments.

## 14. HEALTH, SAFETY, AND ENVIRONMENT (HS&E)

Contractor agrees to comply in all respects with Company's and its Client's' commitment to protecting the health, safety, and security of its Personnel and all other persons who are affected by its business activities, and protecting the environment. Contractor agrees it will exert its best efforts in the performance of the Services to (A) take all actions necessary to minimize the environmental impact of operations under its control, (B) not take any action which might compromise the health, safety, and security of any person or the environmental condition of any Site (or any property adjacent to such Site), (C) give the highest priority to achieving the goal of an incident-free work environment, (D) comply with all applicable Laws; and (E) ensure that its Employees, its Personnel, other contractors, and all other members of Contractor Group adhere to these goals. To this end, in its performance of the Services, Contractor will also (F) foster a positive HS&E culture; (G) implement an effective HS&E management system; (H) proactively manage HS&E performance; (I) integrate HS&E principles, objectives, and policies into its execution plan; and (J) provide effective enforcement of HS&E matters and the requirements under the Agreement.

**14.1 HEALTH, CLEANLINESS AND SANITATION**

14.1.1 Contractor shall promptly submit to Company's safety coordinator at the Site a written report covering all injuries to Personnel of Contractor Group occurring on Site. This report must include the following information: (A) name and address of the injured Personnel; (B) name and address of Contractor's liability insurance carrier; (C) a detailed description of the incident and whether any of Company Equipment, Company Material or Personnel were involved; (D) dated copy of Contractor's report of injury to Contractor's insurance carrier; and (E) any other information reasonably requested by Company.

14.1.2 At all times during the progress of the Services and upon completion of the Services, Contractor shall keep any Company Site clear of, and appropriately clean up, all trash, debris, and excess Contractor Materials and Contractor Equipment. Upon completion of the Services, Contractor shall promptly remove, relocate, or dispose of all excess Contractor Material, Contractor Equipment, Company Material, and Company Equipment from Company Site in accordance with Company directions, including returning Company Equipment and excess Company Materials to Company, and clean-up Company Site to Company's reasonable satisfaction. If Contractor fails to comply with the requirements of this Article 14, Company has the right to perform the clean-up, or cause it to be performed, at Contractor's expense, and the cost of the clean-up will be Backcharged to Contractor.

**14.2 SAFETY AND SECURITY**

14.2.1 Contractor shall perform the Services with the highest priority given to achieving a safe, incident-free workplace, and protecting the health, safety, and security of all persons impacted by the performance of Services. In accordance with, but without limiting, this overall obligation, Contractor shall strictly comply with all applicable Laws, industry standards and Company Site rules and regulations relating to safety and security.





14.2.2 Unauthorized items, including prohibited drugs, drug paraphernalia, alcoholic beverages, firearms, explosives, and weapons, shall not be allowed in or on any Company Site. As a safety precaution, entry into or upon any Company Site is conditioned upon Company and the Site owner's right to search the person and personal effects of any entrant for unauthorized items. Searches may be made by authorized Company and Site owner Personnel from time to time without prior announcement.

14.2.3 Contractor shall be responsible for the safety and security of Contractor Group Personnel throughout the performance of the Services and shall take effective measures to avoid the creation or existence hazards on Site. Without affecting Contractor's overall responsibility hereunder, upon encountering any unsafe condition or practice, Contractor shall immediately cease the performance of Services, provide Notice to Company, and immediately take action appropriate to remedy the situation if such is appropriate or prudent to prevent imminent injury or harm, or otherwise take such action as directed by Company. Contractor shall be responsible for establishing a safety program acceptable to Company containing an "incident-free workplace" objective, including holding frequent safety meetings, monitoring and correcting safety practices, and conducting routine safety inspections of operations, procedures, facilities and equipment used in the performance of the Services. If applicable to the type of Services to be performed and the Site, Contractor shall train or cause to be trained all applicable Contractor Group Personnel involved with the Services in the Company-approved safety and security program prior to commencement of Services.

14.2.4 In the event of an incident or near-incident either directly or indirectly involving the Services, Contractor shall promptly furnish Company with full written reports, including all documents filed with or received by any Contractor Group insurer and any government agency. Contractor will cooperate and assist Company Group in any investigation, provide any supporting documentation reasonably requested, and arrange for Contractor Group Personnel to provide interviews and information to Company or its designee.

14.2.5 Without limiting any of Contractor's other obligations under the Agreement, Contractor shall be responsible for the personal safety and security of any Contractor Group Personnel outside Company Site and in transit to any Company Site. Should Company Group provide any transportation service to Contractor Group Personnel, Contractor assumes the risk of such transportation in accordance with Article 7.2 herein.

**14.3 ENVIRONMENTAL OBLIGATIONS**

14.3.1 Throughout performance of its Services, Contractor shall conduct its operations in a manner which minimizes any adverse environmental impact of activities and operations under its control, preserves and conserves natural resources, and minimizes the risk of pollution or contamination.

14.3.2 Contractor shall conduct, and cause all members of Contractor Group to conduct, all activities and operations under the Agreement, in strict compliance with applicable Environmental Laws, including regulations applicable to air, port, inland, navigable, coastal, offshore, outer continental shelf and international waters, including Laws applicable to the handling, manegement, storage, transportation, and disposition of any solid, liquid, or gaseous wastes and hazardous wastes, substances and materials introduced or generated by Contractor or any member of its Group (including any paints, solvents, cleaners, fuels, lubricants, waste oil, construction/demolition wastes, process by-products, and other substances).

14.3.3 If requirements within applicable Law apply to the same obligation, Contractor shall comply with the most stringent requirement. Contractor is responsible for ensuring that all of its Personnel and all members of Contractor Group strictly comply with the provisions of this Article 14.

14.3.4 Except as specifically authorized by Company in the Agreement, Contractor shall not store, accumulate, dispose of, or treat any waste of any kind on any Company Site and shall not dispose or permit disposal of waste, trash, garbage, and sewage in any form on any Company Site or into any air, land, waters or system adjacent thereto.

14.3.5 Contractor shall be responsible for implementing, maintaining and supervising any and all environmental training necessary and desirable for members of Contractor Group in connection with the Services, including that specifically provided for in the Agreement. Contractor shall comply with, and shall ensure that all members of Contractor Group comply with, any written environmental policies, rules, and procedures provided to Contractor by Company or its Client, as well as all applicable Environmental Laws, and in the event of a conflict, provide Company with Notice so Company may evaluate and provide instructions to Contractor. If any separate requirements apply to the same obligation, Contractor shall comply with the most stringent requirement. Contractor will provide acceptable evidence of training to Company upon request.

14.3.6 To the extent applicable to its Services and its obligations under the Agreement, Contractor shall plan and perform the Services so as not to (unless authorized in advance by Company and covered by any applicable permit): (A) damage, close or obstruct any utility installation, highway, road, ditch, railroad bed or similar structure; (B) damage, disrupt, obstruct or otherwise interfere with the operation of any pipeline, telephone, cable, electric transmission line or similar structure; or (C) enter upon land in its natural state (including any wetland), disturb any wildlife, or damage or destroy cultivated and planted areas and vegetation such as trees, plants, shrubs, and grass on or adjacent to the Site. Contractor shall not be entitled to a Change Order or Claim for any consequences resulting from Contractor's failure to comply with the



provisions of this Article 14. All costs in connection with any damages, repairs or restoration necessary or required thereby shall be borne by Contractor to the extent of Contractor's responsibility under Article 7.

14.3.7 Contractor is responsible for the proper management of materials and wastes according to all applicable Environmental Laws and the Agreement. In handling materials and wastes, Contractor shall take measures to minimize production of new waste in the performance of Contractor's Services. Contractor shall not commingle the waste it handles with any waste generated by Company or others, and shall segregate hazardous waste from non-hazardous waste at all times. If Contractor is providing transportation of non-hazardous solid waste, trash or debris from any Company Site, no commingling of waste shall take place during transport without the prior written consent of Company. Under no circumstances shall hazardous wastes be commingled with non-hazardous wastes. Contractor shall not accumulate, store, transport, treat, recycle, reuse or dispose of any waste of any kind on any Company Site without the prior written consent of Company and in strict accordance with procedures provided or approved by Company and all applicable Environmental Laws.

14.3.8 Contractor shall immediately provide Notice to Company upon discovery of any environmental incident on any Site on which it or any member of its Group is performing Services, including sudden and accidental spills, exposures, leakages or releases, discharges, emissions, mishandling, commingling, explosions, fires, or any similar incident involving any biohazardous element, chemicals, radiation, or regulated or hazardous substances or wastes, whether on, over or under land, water (including into waste water collection systems and storm water collection systems), air or through any other media. Contractor shall submit a written report to Company within forty-eight (48) hours of the incident in the format and with information required by Company, including details concerning the date, time, location, amount and type of spillage, leak, or release, the type and extent of pollution and contamination, any injuries and property damage, any actions taken, and Contractor's recommendations for handling the incident. Any such spill, leak, or release shall be handled and cleaned up at Contractor's expense to Company's and the Site owner's satisfaction and in conformance with requirements of Environmental Law applicable to the type of spill, leak or release. In the event and to the extent an emergency situation arises as a result of an act or omission of a member of Contractor Group or relates to the Contractor's provision of Services hereunder, Contractor shall immediately provide Notice to Company and take all actions necessary to protect life and property and as required by applicable Law to respond to such situation.

14.3.9 If the environmental incident involves the release or potential release of a reportable quantity of any petroleum product, chemical, gas, or other hazardous substance in the performance of its Services, as those terms are defined by applicable Environmental Law, in addition to the Notice to Company as specified by 14.3.8, Contractor shall fully comply with any applicable Environmental Law pertaining to such release, and if such release occurred on any Company Site, Contractor shall coordinate notification to the appropriate agency with Company.

14.3.10 Contractor shall provide access to its internal non-privileged records and documents, Contractor Group Personnel, and otherwise fully cooperate with any investigation which Company or any governmental agency may elect to undertake in regard to any matter covered under this Article 14. Nothing herein shall be construed or is intended to require investigation or supervision, or any action on the part of Company.

14.3.11 Contractor will strictly comply with the OSHA Hazard Communication Standard (29 CFR 1910.1200) and all other applicable safety and handling Laws, standards or regulations of any jurisdiction regarding the container labeling, warning notices, supply of Material Safety Data Sheets ("MSDS"), training, and other requirements, including the following specific requirements: (A) Any member of Contractor Group bringing, or causing any hazardous chemical or substances to be introduced, on any Company Site shall be responsible for affixing proper tagging and warning labels to the containers and shall have on record all required MSDS documents, with copies being readily available to Contractor Site Personnel and submitted to Company upon request; (B) Contractor shall provide Notice to Company of any precautionary measures for any such items brought on Site in (A) that need to be taken to protect Company Group during normal operating conditions and in foreseeable emergencies at any Company Site; (C) Contractor shall supply with Contractor Material and Contactor Equipment all MSDS and associated information required by Law; (D) Contractor understands that it is its sole responsibility to ensure the compliance by all members of Contractor Group with this Article 14.3.11, including the complete, accurate, and timely submittal of documents.

14.4 In addition to and notwithstanding any other rights of suspension or termination under the Agreement, Company may immediately suspend or terminate, at any time, all or any part of the Agreement upon any violation or failure to comply by any member of Contractor Group with (A) any Law pertaining to health, safety, security or environmental matters; or (B) any Company Group rules, policies or procedures provided to any member of Contractor Group concerning any health, safety, security or environmental matter; or (C) any violation of this Article 14.

## 15. IMPORT AND EXPORT COMPLIANCE

15.1 To the extent applicable to the Services under the Agreement, Contractor agrees that it is solely responsible for each member of Contractor Group's strict compliance with the import and export Laws of the United States of America, and the import and export Laws of any other applicable jurisdiction or country (only to the extent such do not conflict with



the Laws of the United States of America). Nothing herein shall require, compel or obligate Contractor to violate any U.S. Law.

15.2 Contractor understands and acknowledges that the technology, know-how, Intellectual Property, designs, data, information, software, Deliverables, Contractor Equipment, Contractor Materials or other Services provided under the Agreement by any member of its Group, or the direct or indirect product or derivative of such Services (or any component thereof), or any technology based thereupon, may be subject to Laws restricting their export, re-export, transfer or release to certain governments, legal entities, or individuals and/or to certain destinations, including those Laws administered by the U.S. Department of Commerce (Bureau of Industry and Security) and the U.S. Department of the Treasury (Office of Foreign Assets Control).

15.3 Contractor expressly understands that any transmission of any technical data, designs, drawings, or information of any nature under the Agreement to any point outside the United States may constitute and be deemed an "export" as defined under United States Laws, and therefore it is Contractor's duty to verify in advance if such transmission is permitted under U.S. Laws.

15.4 To the extent applicable to its Services, Contractor agrees to comply with all applicable U.S. Laws including export and re-export controls set forth in the U.S. Export Administration Regulations, prohibitions on transactions with or transfers to the governments of, parties located in or operating from, or nationals of countries subject to U.S. economic sanctions which is revised from time to time (as of this revision date Cuba, Iran, North Korea, Syria, Myanmar, and the Sudan), and prohibitions on transactions with or transfers to entities or individuals identified on the U.S. Government's List of Specially Designated Nationals and Blocked Persons (U.S. Treasury Department) and the Denied Persons List and Entity List (U.S. Department of Commerce). Contractor is responsible for obtaining and complying with the most recent information and Laws.

15.5 If any import or export control or compliance form is attached to the Agreement or otherwise requested by Company to be completed by Contractor or any member of Contractor Group relating to the Services, including Company's "Request for Export Control Information", Contractor will fully and accurately complete such form and return it within ten (10) days to Company.

15.6 Contractor understands and acknowledges that (A) all members of Company Group will rely upon the information provided by Contractor, including determining whether any U.S. or foreign export or import license is required for the export of the supplied items or data to the country of destination; (B) Contractor is responsible for compliance with local import (including port and customs) and export control Laws of any jurisdiction, (C) Contractor is responsible for compliance with applicable U.S. re-export Laws; and (D) Contractor is fully responsible for the accuracy and completeness of import and export documentation prepared or executed by all members of Contractor Group, including any documentation required for the import, export or re-export of any part of the Services, Deliverables, Contractor or Company Equipment and Material, items or data used in production or manufacture, and any documents prepared or used by any member of Contractor Group.

15.7 Acknowledgements and requirements substantially the same as contained herein shall be included in any applicable contract involving import or export activities which Contractor executes with any other member of its Group in conjunction with the Services. Contractor will immediately provide Notice to Company of any alleged, prospective, possible or actual breach of this Article 15 or any violations of any import or export Law arising from its performance of Services or related to the Agreement.

## 16. PERSONNEL MATTERS

### 16.1 EMPLOYMENT PRACTICES

16.1.1 Contractor shall provide competent and adequately trained Personnel, and upon Notice from Company, shall remove from the Site or from the Services any Personnel deemed by Company in its sole judgment to be unsatisfactory due to incompetence, lack of cooperation, unwillingness to comply with established policies and procedures, improper conduct or other behavior deemed detrimental to the workplace. Contractor shall provide badges, color codes, or other symbols of identification for Contractor Personnel and Contractor Equipment in accordance with the system specified or approved by Company, and Contractor will ensure that all members of its Group will abide by and enforce security measures, including those pertaining to the prevention of theft, pilferage, vandalism, and waste.

16.1.2 Contractor shall comply with all applicable U.S. state and federal labor and employment Laws, including (A) Title VII of the Civil Rights Act, (B) the Age Discrimination in Employment Act, (C) the Americans with Disabilities Act, (D) the Family Medical Leave Act, (E) non-discrimination in any respect against any Employee or applicant for employment because of race, color, national origin, religion, sex, age, or for any reason prohibited by Law, and (F) the Fair Labor Standards Act (including the requirement to pay a statutory minimum wage to Employees).

16.1.3 Pursuant to the 1986 Immigration Reform and Control Act, Contractor shall verify that all Contractor Group Personnel performing any Services in the United States are authorized to work in the United States, and shall require signed original I-9 (Employment Eligibility Verification) forms or other acceptable proof of identity and authorization to work documents from each individual. Such original I-9 forms and copies of the other documents will be maintained by Contractor



to provide evidence as required by Law and will be available for inspection by the Company or its designee upon the Company's written request.

16.1.4 Contractor agrees to participete and cooperate in the implementation of any Affirmative Action Plan for equal employment opportunity adopted for the Project as a whole. To the extent applicable to the Services, Contractor shall comply with Executive Order 11246, or any amendment, replacement or counterpart thereof.

16.1.5 If the Services are performed outside the United States of America, Contractor shall ensure that it also complies with all applicable labor and employment Laws for such Site. Contractor shall be responsible for compliance by all members of Contractor Group with all foreign visa and immigration requirements of any jurisdiction if a Site is outside the United States.

16.1.6 Contractor shall contractually bind all members of Contractor Group to the express requirements of this Article.

**16.2 DRUG- AND ALCOHOL-FREE WORKFORCE**

16.2.1 Contractor warrants and agrees that Contractor Group Personnel shall not perform Services hereunder or be allowed access to any Company Group Site while under the influence of alcohol or any controlled substance, or while a measurable presence of alcohol or such substances has been or can be shown by a breathalyzer, urine, or blood test. Controlled substances include: marijuana, hashish, cocaine, hallucinogens, depressants, and stimulants. (unless in accordance with the proper prescribed dosage for current personal treatment by a licensed physician as documented by a valid written prescription). If a member of Contractor Group is removed from or denied access to any Company Site due to actual or under a reasonable suspicion of alcohol and/or controlled substance use, Contractor is responsible and assumes all Liability for immediately and safely removing the impaired person and the person's vehicle from such Site.

16.2.2 Contractor's compensation for the Services includes the cost of drug testing of its Personnel and the Personnel of its lower-tier subcontractors before assignment to the Project. Contractor's price also includes the cost of periodic random drug testing of same after assignment to the Project, if such testing(s) is directed by Company.

16.2.3 Contractor shall ensure that all Personnel of Contractor Group will be drug- and alcohol-free on their first assignment to perform any of the Services, as evidenced by a testing within one (1) month prior to their initial assignment. Additionally, Contractor agrees, and will cause all members of Contractor Group to agree to, periodic random alcohol and drug testing of all Personnel of Contractor Group performing the Services to ensure compliance with this Article 16. Contractor agrees that all members shall be subject to reasonable cause testing. Failure of Contractor to comply with any provision of this Article 16 shall constitute material breach.

16.2.4 Contractor shall comply with all applicable Laws in the adoption, implementation and enforcement of its own substance abuse policy. Contractor agrees to have its substance testing program subject to audit upon request by the Company.

**16.3 LABOR RELATIONS**

16.3.1 Contractor shall comply with the National Labor Relations Act, any applicable "Right to Work" Law, and any other applicable Law related to labor relations.

16.3.2 Contractor shall give Company Notice and full information regarding any threatened or existing labor relations problem or dispute affecting the Services. Contractor shall cooperate in any effort by Company to mediate or otherwise attempt to resolve labor relations problems and disputes, including threatened or existing work stoppages, slowdowns, boycotts, disturbances, strikes, or picketing, affecting any Site or any part of the Project. Contractor is solely responsible for any labor relations issues involving any member of its Group and to take reasonable measures to ensure that such do not affect performance of the Services, the Project, any Site, or this Agreement.

16.3.3 Contractor's obligation to diligently perform the Services will not be excused due to any labor relations problems, dispute or activity related thereto, including refusal to cross picket lines, unless, in the opinion of Company there is a clear and substantial danger of substantial bodily harm or property damage to Contractor Group Personnel by entering the Site or performing the Services.

16.3.4 If Contractor has pre-hiring collective bargaining agreements, Contractor represents that these agreements contain provisions prohibiting any strike, slow down, picketing, secondary boycotts or work stoppage during performance of the Services, and that Contractor's entering into the Agreement does not violate such agreement.

## 17. TITLE

17.1 Title to the Services and all Contractor Material intended for incorporation into the Services shall pass to Company from the earliest moment of identification to the Services, subject to Company's obligation to compensate Contractor therefore in accordance with the terms of the Agreement.

17.2 Notwithstanding Company's title thereto, Contractor shall be responsible for the care, custody, control and safekeeping and preservation of the Services, including all Company Material, Company Equipment, Contractor Equipment,



and Contractor Material, and Contractor bears full risk of loss or damage. Contractor shall promptly repair or replace at its expense any component of the Services, including Company Material or Contractor Material, which is damaged or lost. Company may Backcharge Contractor for any such components which Contractor fails to so repair or replace.

17.3 Overages on Company Material shall be returned to Company upon completion of the Services. Overages on Contractor Material may be retained by Contractor, provided that if surplus Contractor Material has been billed to Company, Contractor shall, prior to removal from Company Site, give Company a credit memo for these Contractor Materials at the same price as originally billed to Company. Contractor shall not remove either Company Materials or Contractor Materials from Company Site without first obtaining a written release from Company authorizing such removal.

17.4 Contractor shall be liable without reimbursement for all demurrage or other charges in connection with any delay in unloading, hauling, lifting or handling of Company Material, Contractor Material, Company Equipment, and Contractor Equipment.

## 18. EQUIPMENT

18.1 Contractor Equipment shall be verified by Contractor to be in at least good and proper operating condition, complies with applicable Laws, and fit for the intended purpose as suitable for proper, safe and efficient performance of the Services. Company shall have the right to inspect Contractor Equipment. Any Contractor Equipment which does not meet the foregoing standard shall be removed and replaced with acceptable equipment without cost to Company or delays to the schedule.

18.2 Contractor assumes the full risk of loss (including loss of use) or damage to ell Contractor Equipment, including loss or damage arising as a result of the fault or negligence (whether active, passive, sole, concurrent, or gross), willful misconduct, fault or strict liability of Company Group.

18.3 Contractor shall provide insurance, in accordance with Article 8, for the benefit of Company Group covering all risk of loss (including loss of use) or damage to Contractor Equipment used in the performance of the Services, with limits equal to or greater than the fair market value of Contractor Equipment.

18.4 If any Company Equipment is furnished to or used by any member of Contractor Group, whether on an exclusive or joint use basis, prior to any use Contractor shall inspect and satisfy itself as to its quality and safe condition and it is in at least good and proper operating condition, Contractor shall return any Company Equipment after such use in proper order and in at least the same condition as that in which received (normal wear and tear excepted). If any services are furnished to any member of Contractor Group by any member of Company Group for incorporation into the Services, Contractor shall be responsible to ensure that such services are in compliance with the terms of the Agreement. Contractor assumes the risk of loss, cost, delay, reperformance, and any other Liability for any Company Equipment or services of Company Group which are furnished to or used by any member of Contractor Group. Contractor shall at its own cost and without right of reimbursement, insure or self-insure all risks associated with such possession and usage.

## 19. SUSPENSION AND TERMINATION

### 19.1 SUSPENSION

19.1.1 Company shall have the right, at any time, to suspend all or any portion of the Services. Upon Notice of suspension from Company, Contractor agrees to permit Company to direct any continuance of the Services, and Contractor will discontinue the Services to the extent specified in Company's Notice. Unless Company directs, Contractor will not enter into any further contractual commitments, place no further orders or subcontracts, and promptly make reasonable efforts to obtain suspension terms satisfactory to Company on all orders, subcontracts, rental agreements and other outstanding commitments relating to the Services. In addition, Contractor, unless otherwise specified in the Notice, shall continue to preserve, protect, and maintain the Services, including those portions which have been suspended. Should the Services suffer any damage, loss or deterioration during the period of suspension arising from Contractor's failure to protect the Services, Contractor will perform and pay for any required restoration, replacement or repair. During the period of suspension, Contractor shall use its Personnel and Contractor Equipment in such a manner as to minimize costs associated with suspension. As full compensation for the period of suspension, Contractor will be reimbursed for actual costs reasonably incurred to the extent such costs directly result from such suspension of the Services.

19.1.2 Contractor shall not resume the Services without prior Notice from Company, and upon receipt of such Notice, Contractor shall promptly resume performance. Upon resumption of performance of the Services after suspension, Contractor may request a Change Order for an extension of time for performance of the Services in accordance with Article 20.

### 19.2 TERMINATION FOR DEFAULT

KBR-FII-000355




19.2.1 If Contractor is in default under any provisions of the Agreement, including failure, refusal, or neglect to supply proper Contractor Materials, skilled Personnel, labor, or Contractor Equipment to complete the Services within the agreed-upon time of performance set forth herein, or to promptly correct, replace or repair defective or deficient Services in accordance with Article 10, or for any other breach or failure to comply with the terms of the Agreement, Company may give Contractor Notice describing the default. If Contractor does not remedy or begin to remedy the default within five (5) business days after receipt of the Notice, Company may terminate all or any part of the Services under the Agreement and may then complete itself or have others complete all such terminated Services. In case of such termination, Contractor shall not be entitled to receive further payment until the Services are completed and accepted by Company. At Company's direction, Contractor shall cease all Services, not enter into any further contractual commitments, and at Company's option, either terminate or assign any purchase orders, subcontracts, and other outstanding contracts for any part of the Services to Company or its designee, and shall promptly obtain termination or cancellation upon terms satisfactory to Company of all purchase orders, subcontracts, rentals, or any other agreements existing for the performance of the terminated Services or assign all or part of the agreements to Company as directed. Contractor shall assist Company as directed in the maintenance, protection, and disposition of the Services in progress and any remaining Company Material and Contractor Material, and diligently and properly complete performance of any Services which are not terminated. If the costs incurred by Company, including costs incurred in performing correction, re-performance, replacement, repair or completion of the Services, exceed the unpaid balance of compensation due to Contractor, Contractor shall reimburse Company the excess within ten (10) days after receipt of an invoice therefore. If the unpaid and undisputed amount due Contractor for the Services completed prior to termination exceeds the costs and charges to correct, re-perform, repair, replace, and complete the Services, Company will pay such excess to Contractor. The rights and remedies provided in this Article 19.2.1 are in addition to any rights and remedies provided Company by law, equity, or under any other Article of the Agreement.

19.2.2 In the event of termination pursuant to this Article 19.2, Company may use all or part of Contractor Equipment and Contractor Material, without payment to Contractor, except to the extent any Company use of Contractor Equipment or Contractor Material reduces the cost of completing the Services. If Contractor's compensation is on a cost reimbursable basis, use of Contractor Equipment will be reimbursed at the lowest applicable rate provided for herein or at prevailing rental rates if no other rate is specified in the Agreement.

19.2.3 If, after termination pursuant to this Article 19.2, it is determined for any reason that Contractor was not in default, the rights and obligations of the Parties shall be the same as if the Notice of termination had been issued pursuant to Article 19.3

19.2.4 Company shall have the right to assess Backcharges against Contractor should any additional costs be incurred by Company as the result of any failure of performance or breach by any member of Contractor Group under the Agreement.

19.2.5 Notwithstanding the foregoing, termination under this Article 19 which is based upon a health, safety or environment matter may be invoked by Company without Notice and may be made effective immediately.

**19.3 TERMINATION FOR CONVENIENCE**

19.3.1 Company may, at its option, terminate the Services for its convenience in whole or, from time to time, in part, at any time by providing Notice to Contractor. Such Notice shall specify the extent to which the performance of Services is terminated and the effective date of such termination. Upon receipt of such Notice, Contractor shall (A) immediately discontinue the Services on the date and to the extent specified in the Notice; (B) enter into no further contractual commitments and place no further orders or subcontracts for Contractor Materials, Services, or Contractor Equipment, other than as may be required for completion of such portion of the Services that is not terminated; (C) promptly obtain termination or cancellation upon terms satisfactory to Company of all purchase orders, subcontracts, rentals, or any other agreements existing for the performance of the terminated Services or assign those agreements to Company as directed; (D) assist Company as directed in the maintenance, protection, and disposition of the Services in progress and any remaining Company Material and Contractor Material; and (E) diligently and properly complete performance of the Services which are not terminated.

19.3.2 Upon any such termination, Company shall have no Liability to any member of Contractor Group for any damages, including loss of anticipated profits. As its sole right and remedy, Contractor shall be paid the following: (A) all amounts due and not previously paid to Contractor for Services completed in accordance with the Agreement prior to such Notice of termination, and for Services thereafter completed as specified in such Notice; (B) reasonable administrative costs of settling and paying claims arising out of the termination of Services for subcontracts or purchase orders; and (C) reasonable, direct and necessary costs incurred in demobilization and the disposition of Contractor Material.

19.3.3 Contractor shall submit a proposal for an adjustment in compensation, including all incurred costs described herein, no later than thirty (30) days after receipt of Notice of termination.

## 20. CHANGES



20.1 Company reserves the right to make Changes in the Services through Notice to Contractor. Upon Notice of such Change, Contractor will identify, collect, and provide all information, including direct cost information, necessary for Company to determine whether there is to be an adjustment in the compensation or schedule. If no cost method is identified in the Agreement, Contractor shall use a time and materials basis when providing Change cost information.

20.2 No Change shall be made without written authorization from Company. Any Change to the Services directed and performed under this Article 20 will be integrated into the Agreement by a Change Order executed by the Parties.

20.3 Contractor shall provide Company with Notice of a potential Change within seven (7) days of discovery of the earliest factual circumstance or condition upon which the Change is based. Company and Contractor shall use their good faith efforts to agree on all terms for any Changes prior to the issuance of a Change Order. However, if the Parties cannot agree on the adjustment to be made in the compensation, schedule, completion date, or other applicable provisions of the Agreement as a result of the Change(s), Contractor shall promptly proceed to perform the Services described in the Notice of Change upon authorization from Company pending any agreed-upon adjustment in accordance with this Article or other resolution under this Agreement.

20.4 Contractor will treat all Services performed under this Article 20 as if such performance was for its own account, and will take all necessary steps to mitigate the costs and any schedule impacts thereof. Contractor shall identify, collect and provide to Company all direct cost information pertaining to the Change as if the Services were performed on a time and materials basis, and such information will be the basis for the determination of price for the Change Order.

20.5 No adjustment in the compensation or time of performance shall be made for Changes in arrangement, aesthetics, substitution of equivalent Services or any other Change unless such Change materially increases Contractor's cost of performing the Services or necessitates a material extension of the schedule. An equitable adjustment will be made in the compensation or time of performance or both, if the Change ordered by Company or requested by Contractor is both permitted under the Agreement and materially increases or decreases the cost to Contractor of the Services or necessitates adjustment in schedule. If possible, the method of determining the equitable adjustment shall be specified, and the compensation fixed at the time of the issuance of written direction for the Change. Unless a lump sum is established by agreement or another method of pricing is established by agreement, Company may direct determination of the equitable adjustment in price, whether an increase or decrease, by any of the following methods: (A) agreed or established fixed unit prices, (B) time and materials , or (C) cost plus fee.

20.6 If the time and materials method is directed by Company, the rates for equipment use, man-hour labor rate (including payroll burden and markup for overhead and profit), and reimbursement of actual cost of materials, as established in the Agreement, shall be used to determine the adjustment.

20.7 If the cost plus fee method is directed by Company, the adjustment will be based on the direct cost of the Change using the formula established in the Agreement.

20.8 In the absence of a formula in the Agreement to calculate the adjustment, Contractor shall be paid all reasonable, substantiated actual, additional direct cost incurred, without allocation of home office general and administrative expense, plus 10% of such costs as compensation for all indirect, administrative, overhead and profit; and Contractor shall maintain and furnish Company accurate and detailed records daily segregating the cost of the Change in the Services.

20.9 In case of deletion or reduction of the Services by such Change, Contractor shall not be entitled to anticipated contribution to home office overhead or profit from any portion of the Services not performed.

20.10 The equitable compensation and time adjustment due Contractor pursuant to this Article 20 shall be Contractor's sole entitlement for performing a Change in the Services.

20.11 In the event Contractor contends that (A) any member of Company Group or any third party has taken action which has caused an effect constituting a Change, or (B) there is a change in conditions, including, late or incomplete drawings, change in schedule requirements or working conditions, or interference or some other action or non-action by a member of Company Group, for which Contractor is entitled to an adjustment in compensation or in the time of performance, and such action is not incorporated in a written Change Order, Contractor must submit a Claim in accordance with the provisions of Article 21.

20.12 Contractor's failure to comply with the procedural requirements of this Article 20 shall constitute a waiver of any Change as well as any Claim by Contractor or any member of its Group for an adjustment in compensation or in the time of performance.

## 21. CLAIMS BY CONTRACTOR

21.1 No Claim by Contractor arising out of the Agreement (including any unresolved Change Orders) shall be deemed valid unless Notice is presented to Company (A) within ten (10) days after Notice of denial after Company rejection of Contractor's proposed pricing or schedule adjustment for a Company-issued Change, Contractor-recommended Change or other circumstance that the Parties agree merits a Change Order; and, (B) in all other cases, within ten (10) days after Contractor obtains knowledge of the facts giving rise to Contractor's Claim, and in any event, not to exceed thirty (30) days



after the date final payment in settlement of Contractor's final invoice is sent by Company.

21.2 All Notices of any Contractor Claim shall describe in reasonable detail the basis for Contractor's Claim, including reasonable documentary evidence of the factual basis for Contractor's Claim, circumstances of discovery, and the efforts by Contractor to manage and mitigate such Claim prior to submission to Company. To the extent possible at the time, Contractor shall submit with its Notice of Claim all complete documentary evidence it wishes to rely upon to substantiate its position. Each item of the Claim shall be itemized and detailed, the documentary evidence collated, and unless for good cause such evidence shall not be later added to or detracted from the initial Claim.

21.3 Contractor shall make all reasonable commercial efforts to mitigate any adverse effects of such Claim. If the Services are still on-going, it is Contractor's responsibility to make all reasonable commercial efforts to continue to perform its obligations under the Agreement and mitigate any adverse effects of the Claim, and if Contractor fails to take reasonable and timely measures to mitigate, such Claim may be denied by Company.

21.4 Contractor and Company will negotiate in good faith to resolve Contractor's Claim. To the extent practicable, the Parties will exert reasonable commercial efforts to resolve all Contractor Claims before completion of the Services. Contractor shall continue to diligently perform the Services and otherwise meet all contractual obligations pending resolution of Contractor's Claim. In the event the Parties cannot reach a resolution to Contractor's Claim under the procedures of this Article 21, Contractor agrees that the Claim will be exclusively resolved in accordance with the provisions of Article 23 hereunder.

21.5 For any Claim, Contractor agrees to fully comply with this Article 21 before invoking any provision of Article 23.

21.6 Contractor understands and agrees that its failure to comply with the procedures of this Article 21 shall constitute a waiver and release of any of Contractor's contractual, legal or equitable rights with respect to the subject matter of Contractor's Claim.

21.7 In the event Contractor's Claim is not resolved under the procedures in this Article 21 within sixty (60) days of the date of the Notice of Contractor Claim, the negotiations under this Article 21 will terminate, unless the Parties agree in writing to extend negotiations to a fixed date. Upon termination of the negotiations under this Article 21, the Parties must then proceed to resolve the matter as a Dispute in accordance with the procedures in Article 23. If Contractor fails to properly initiate the procedures of Article 23 within 10 (ten) days of the termination of the negotiations under this Article 21, unless this deadline is extended in writing to a fixed date by agreement of the Parties, then such failure shall constitute a waiver and release of any of Contractor's contractual, legal or equitable rights with respect to the subject matter of Contractor's Claim.

## 22. LAWS

22.1 The Agreement and any issues, Claims, Disputes, or any other matter, issue, or question of interpretation arising hereunder between Company and Contractor will be governed by the substantive Laws of the State of Texas, and the United States of America, notwithstanding any conflicts of Laws principles which may be applied or invoked directing the application of the Laws of another jurisdiction.

22.2 Except for any equitable relief sought or enforcement action of any court or arbitral award, the Parties agree that the exclusive venue for any court or dispute resolution proceeding arising hereunder for any Claim or Dispute shall be Houston, Harris County, Texas, notwithstanding any conflicts of Laws principles which may direct the jurisdiction of any other court, venue or forum, including the jurisdiction of Contractor's home country.

22.3 The United States Arbitration Act shall govern the interpretation, enforcement, and proceedings for all Disputes. In the absence of any express provision in such Act, the governing Law of the Agreement as set forth above shall apply.

22.4 Contractor shall be aware of and comply with all applicable Laws of any professional or governmental entity or international organization having jurisdiction or authority over any aspect of the Agreement, Contractor's performance, or the location of performance of any of the Services.

22.5 Nothing in any other applicable Law or in the Agreement shall require any member of Contractor group to violate, or excuse any member of Contractor Group's compliance with, any Law of the United States of America.

22.6 Contractor shall ensure that all members of Contractor Group comply with the provisions of this Article 22.

## 23. DISPUTES AND DISPUTE RESOLUTION

23.1 Company and Contractor expressly agree to resolve any Dispute arising out of or relating to the Agreement, the Services, or the relationship between the Parties, amicably, promptly, and without resorting to litigation. Therefore, the Parties agree that compliance with the terms, conditions, and procedures outlined in this Article 23 within the prescribed time limits shall be an exclusive substitute for filing any litigation against the other Party, except for interim measures identified in this Article, and any action to enforce a court or arbitral award. .

23.2 If any Dispute arises between the Parties, and if a Party desires that such Dispute be subject to the provisions



of this Article 23, it shall provide a Notice of Dispute Resolution to the other Party. Such Notice shall describe in reasonable detail the basis for such alleged Dispute, including reasonable documentary evidence of the factual basis for the Dispute, and include all relevant supporting documentation as required by Article 23.6. Any agreement or settlement of a Dispute shall be placed in writing and executed by both Parties.

23.3 All negotiations and proceedings under this Article 23 are confidential and shall be treated as compromise and settlement negotiations under the United States Federal Rules of Evidence.

23.4 Unless extended in writing by agreement of the Parties, the Notice of Dispute by Contractor shall be presented to Company's Representative within the time frames set out in Article 21.6 (if Article 21 applies), or if Article 21 does not apply, within ten (10) days after Contractor obtains knowledge of the facts upon which the Dispute is based. In any event, Notice of Dispute by Contractor shall be provided no later than thirty (30) days after final payment for all unpaid amounts (other than those which may be in Dispute) has been sent by Company. Failure to provide Notice within the time provided for herein shall be deemed a waiver by Contractor of any rights giving rise to such Dispute. Contractor shall continue to diligently perform the Services and otherwise meet all contractual obligations pending resolution of the Dispute.

23.5 Notices of Dispute shall be submitted to Company's Representative, with all details concerning the basis for the Dispute, including reasonable documentary evidence of the facts, circumstances of discovery, and all efforts by Contractor to manage, mitigate and resolve the situation giving rise to the Dispute prior to submission to Company. If possible or applicable to the nature of the Dispute, if the Services are still on-going, it is Contractor's responsibility to continue to perform its obligations under the Agreement and make all reasonable commercial efforts to mitigate any adverse effects of the Dispute.

23.6 To the extent possible at the time, Contractor shall submit with its Notice of Dispute all complete documentary evidence it wishes to rely on to substantiate its position on each issue in Dispute. Each issue in Dispute shall be itemized and detailed, the documentary evidence put forward collated, and unless for good cause such evidence shall not be later added to or detracted from at any later stage of proceedings.

23.7 Any Claim that remains unresolved after exhausting the provisions of Article 21 may, after the requirements of 23.2, 23.4, 23.5, and 23.6 are met, is deemed to have met the negotiation requirement of 23.7 herein, and such unresolved Claim (now a Dispute) may proceed directly to resolution under the mediation and arbitration sections of Article 23.8 et seq.

23.8 The Parties agree that they shall first exert all reasonable and necessary efforts, amicably, promptly, diligently, and in good faith, to resolve any Dispute by direct negotiation between Contractor and Company's Project Subcontracts Department. If a resolution is not reached within sixty (60) calendar days of their first meeting on the matter, the Dispute shall be resolved in the second instance by Contractor and Company's project management. If Company requires further information from Contractor, the 60-day time limit for resolution will be extended by the time Company has given Contractor to provide such information. If a resolution is not reached within sixty (60) calendar days of the first meeting by project management on the matter, the Dispute shall be resolved in the third instance by Contractor and Company's designated home office representative.

23.9 Mediation.

23.9.1 If the Dispute has not been resolved by negotiations within 120 (one hundred and twenty) days after the date of the Notice of Dispute as required by Article 23.7, or if a Party fails or refuses to meet within such time period, the Parties agree to submit the Dispute to non-binding mediation, or the Parties may mutually agree to proceed directly to binding arbitration under this Article 23. Either Party may initiate mediation by sending a Notice of Demand to Mediate to the other Party and to the American Arbitration Association. Such Notice shall comply with the Notice requirements of the Agreement and the requirements under the American Arbitration Association's Commercial Mediation Rules.

23.9.2 The situs of the mediation will be Houston, Harris County, Texas, and the mediation will be conducted pursuant to the Commercial Mediation Rules of the American Arbitration Association.

23.9.3 Company and Contractor will mutually agree upon an independent mediator who has professional expertise in the subject matter of the Dispute, and experience in mediating such subject matter. The mediator will not have the authority to impose a settlement upon the Parties, but will attempt to facilitate the Parties reaching a satisfactory resolution of their Dispute. Failing agreement between the Parties, upon selection, the mediator shall promptly schedule the date, time and place of the first mediation session which shall be conducted in the manner prescribed by the applicable rules. The mediation shall be terminated: (A) by the execution of a settlement agreement by the Parties; or (B) by a written declaration of the mediator to the effect that the Parties are hopelessly deadlocked and further efforts of mediation are no longer viable; and (C) by a written declaration signed by both Parties that the mediation proceedings are terminated by mutual agreement; or (D) 60 (sixty) days after Notice of Demand to Mediate, unless extended in writing by the Parties to a fixed date. The fees and expenses of the mediation process, including the mediator and the organization, shall be borne equally by the Parties.

23.10 Arbitration.

23.10.1 Should mediation efforts not resolve the Dispute by the date the mediation terminates, the Parties agree to then submit the Dispute to final and binding arbitration. It is the intent of the Parties that this is a broad form



arbitration agreement designed to encompass all possible Disputes among the Parties relating to the Agreement. This right to arbitrate any Disputes, Claims, or controversies under the Agreement shall survive the termination of the Agreement.

23.10.2 Either Party may initiate arbitration by a sending a Notice of demand to arbitrate to the other Party and to the appropriate administering organization specified below. Such Notice shall comply with the Notice requirements of the Agreement and the requirements under the applicable arbitration rules and procedures.

23.10.3 The situs of the arbitration will be Houston, Harris County, Texas. The arbitration shall be conducted in accordance with the applicable Arbitration Rules and Procedures of the American Arbitration Association, the United States Arbitration Act, and the governing Law of the Agreement. For domestic arbitrations under the Agreement, the arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date of commencement of the arbitration proceeding. For international arbitrations under the Agreement, the arbitration shall be conducted in accordance with the International Arbitration Rules of the American Arbitration Association (also known as the International Centre for Dispute Resolution) in effect on the date of commencement of the arbitration proceeding. An international arbitration is one that is not entirely between citizens of the United States, involves property located outside the United States, or involves performance or enforcement outside the United States, or has some other reasonable relation with one or more foreign states. All other arbitrations under the Agreement shall be considered domestic.

23.10.4 Method of Selecting Arbitrators and Multi-Party Arbitration

23.10.4.1 If the amount in Dispute involves less than US $5 million, exclusive of interest and costs, then the arbitration shall be conducted and finally settled by a sole arbitrator. If the amount in Dispute, exclusive of interest and costs, is US $5 million or more, if the amount in dispute is unknown, or if relief other than damages is sought, then the arbitration shall be conducted and finally settled by a tribunal of three (3) arbitrators.

23.10.4.2 If the arbitration is to be conducted by a sole arbitrator, then the arbitrator will be jointly selected by the Parties. If the Parties fail to agree on the arbitrator within 30 days after the initiation of the arbitration, then the American Arbitration Association shall appoint the arbitrator.

23.10.4.3 If the arbitration is to be conducted by a tribunal of three (3) arbitrators and there are only two Parties to a Dispute (or if the parties can be conveniently grouped together into two groups based upon a common interest and common position in the Dispute), then each party or group shall appoint one (1) arbitrator, within 30 days of receipt of notice of the commencement of the arbitration, or within 30 days of the receipt of the notice from the AAA of its grouping of the parties, and the two arbitrators so appointed shall select the presiding arbitrator within 30 days after the later of the two arbitrators is appointed by the parties. If the two party-appointed arbitrators fail to agree on the third arbitrator within 30 days after the appointment of the later of the two, then the third arbitrator shall be appointed by the AAA. If there are three or more parties who cannot be grouped together based on a common interest and common position in the Dispute, or if there are three or more groups of parties, then the AAA shall appoint all three (3) arbitrators.

23.10.4.4 Each arbitrator shall be and remain at all times wholly impartial and shall provide the Parties with a statement that he or she can and shall decide the case impartially. No arbitrator shall have any financial interest (directly or indirectly) in the Dispute or any financial dependence (directly or indirectly) upon any of the parties. All arbitrators shall be knowledgeable of the subject matter of the Agreement and the Dispute, and the Law applicable thereto. The American Bar Association/American Arbitration Association Code of Ethics for Arbitrators in Commercial Disputes, in effect on the date of commencement of the arbitration proceedings, shall be applicable in domestic arbitrations, and the International Bar Association's Rules of Ethics for International Arbitrators shall be applicable to international arbitrations.

23.10.4.5 Each of the Parties shall (a) bear all of its own legal and other costs and expenses in the dispute resolution process, including attorney fees, and (b) pay its proportionately equal share of the costs and expenses of the administration of any Dispute hereunder, unless otherwise awarded by an arbitrator or court, or otherwise agreed upon in writing by the Parties in any settlement. The prevailing Party in such arbitration shall be reimbursed by the non-prevailing Party for any reasonable costs and expenses incurred as may be awarded by a sole arbitrator or tribunal.

23.10.4.6 Interim Measures. The sole arbitrator or the tribunal of three arbitrators, or in an emergency the presiding arbitrator of a three-person tribunal acting alone in the event one or more of the other arbitrators are unable to be involved in a timely fashion, may grant interim measures including injunctions, attachments and conservation orders in appropriate circumstances, which measures the Parties agree may be immediately enforced by the sole arbitrator, the tribunal or by court order. Hearings on request for interim measures may be held in person, by telephone or by video conference, and requests for relief, responses, briefs or memorials may be sent to, and orders or awards received from, the tribunal by facsimile or other similar means which include a confirmation of delivery. Notwithstanding any other provision in Article 23, any Party may apply to a court for interim measures, and the Parties agree that seeking and obtaining such measures shall not waive the right to arbitration nor waive any Party's obligation to otherwise comply with this Article 23.

23.10.4.7 The arbitrator or tribunal may grant any remedy or relief that it deems just and equitable, except that the Parties expressly stipulate that any award of damages shall be limited to actual and direct damages and that the award shall not include any special, indirect, exemplary, incidental, punitive, and other consequential



damages. The Parties agree to promptly implement the arbitrator's or tribunal's decision, pay any amounts which may be owed thereby, and agree that judgment upon any award which may be rendered by the arbitrator or tribunal may be entered into and enforced by any court of competent jurisdiction. The Parties further agree the decision of the arbitrator or the tribunal shall be final and binding, and that there shall be no appeal of the decision or initiation of any further action on the arbitrated issues of the Dispute in any court, proceeding or jurisdiction. Except as expressly provided for above for interim measures, no Party shall be entitled to commence or maintain any action in any court of law concerning any matter under the Agreement except only for the enforcement of the amount found due on such arbitration determined by the arbitrator or tribunal or to enforce an order of the court in equity. Any award in arbitration shall bear interest at the prime rate as set forth by the Chase Manhattan Bank, New York City, New York from the date of the Notice of Demand for Arbitration to the time of receipt of payment of the award.

23.11 If the Parties to the Agreement or others who are bound to this or another similar arbitration agreement initiate multiple arbitration proceedings, the subject matter of which are related by common questions of Law or fact and which could result in conflicting awards or obligations, then the Parties hereby agree that all such proceedings may be consolidated into a single arbitral proceeding if the consolidated proceeding can be conducted in a manner consistent with the terms of the Agreement. The Parties do not intend or agree by this provision to authorize a class action or a mass action.

23.12 Unless otherwise directed by the Company, Contractor shall continue to perform its Services pending resolution of any Dispute under this Article 23. Contractor agrees to place the text of this Article 23 in any contract it executes with any contractor or supplier of any tier for any Services to be performed under the Agreement.

23.13 Except as may be required by Law or with the prior written consent of both Parties, this dispute resolution process is deemed to be "Confidential Information" under the Agreement, and Contractor may not disclose the existence, content, or results of any dispute resolution proceeding hereunder to any third party (except to its legal and financial advisors provided such are under a confidentiality obligation to Contractor covering such disclosures), except with the prior written permission of Company.

23.14 All Notices, Change Order, Claims, and dispute resolution proceedings, as well as documents submitted and communications under the Agreement, shall be exclusively prepared, submitted, and conducted in the English language.

23.15 Pending the resolution of any Dispute under this dispute resolution process, each Party shall, except in the event of termination or expiration of the Agreement, continue to fully perform all its obligations under the Agreement and such performance does not constitute a waiver of any other rights or obligations hereunder.

23.16 If any provision of this Article is deemed void or unenforceable for any reason, it shall be severed from the rest of the Article, and the remainder of the Article shall be enforced.

23.17 Should any matter in Dispute under this Agreement be included within, or the subject of, any litigation, claim, dispute, arbitration, or settlement between Company and any other member of Company Group, Company's rights under this Article may be exercised by an agent, representative or other designee of Company, Contractor agrees to be bound by the terms of the outcome of such proceeding, including any award or settlement, to the extent that such pertains to the matter in Dispute hereunder.

## 24. NOTICES

24.1 Notices shall be in writing signed by the Party giving such Notice and shall be hand delivered or sent by overnight courier, messenger, facsimile or certified mail, return receipt requested, to the other Party at the address set forth in the Agreement. Notices shall comply with the specific requirements of the Article. Any Notice concerning a Change, Claim, or Dispute shall describe in reasonable detail the basis for the Change, Claim or Dispute, including reasonable documentary evidence of the factual basis, circumstances of discovery, and mitigation efforts. Notices, demands, offers or other written instruments shall be deemed to have been duly given on the date actually received by the intended recipient.

24.2 If either Party changes the address, individual or contact information specified in tha Agreement at any time during the term of the Agreement, such Party shall immediately provide Notice to the other Party of such change.

## 25. CODE OF BUSINESS CONDUCT AND ETHICS

25.1 Contractor shall strictly comply with this Article and any specific codes of conduct and ethical requirements contained in the Agreement, including if applicable Company's Code of Business Conduct (including the provisions pertaining to International Business Relationships) and with any code or ethical requirements of Client. Contractor shall also comply with any professional or industry-standard codes of conduct and ethics applicable to the performance of the Services, and any applicable Law (including the U.S. Foreign Corrupt Practices Act). Contractor warrants that it will establish and maintain appropriate internal business standards, policies, procedures and controls to ensure its compliance with this Article, including those necessary to avoid any real or apparent impropriety or adverse impact on the interests of

Company Group. Company and Client shall have the right, but not the obligation, to periodically review at reasonable frequency during performance of the Services and for a period of three (3) years after completion of the Services, such business standards, policies, procedures and controls including those related to the activities of all Personnel of Contractor Group in their relations with Company or Client employees, agents and representatives, vendors, subcontractors and other third Parties, and those relating to the placement and administration of purchase orders, subcontracts, or any commercial agreements. Such review(s) or participation by Company or Client shall not relieve Contractor of its obligations under the Agreement, nor shall it constitute a waiver by Company of any rights under the Agreement or an agreement by Company to undertake any obligation pursuant to such review or participation.

25.2 Contractor shall not make, either directly or indirectly, any improper payments of money or give anything of value to any member of Company Group, nor to any government official, political Party or official thereof, or any candidate for political office, or to any officer, director, employee or any agent or representative of any instrumentality of any government in connection with the Agreement.

25.3 All payments by Company to Contractor will be received by Contractor for its own account and Contractor is not authorized to offer, give, or promise any part of such payments, directly or indirectly, to any government official, political Party or official thereof, or any candidate for political office, or to any officer, director, employee, agent or representative of any instrumentality of any government.

25.4 Contractor shall exercise all reasonable care and diligence to prevent any actions or conditions to avoid any real or apparent impropriety or which could result in a conflict with or adverse impact on Company's or Client's best interests. This obligation shall apply to the activities of all Personnel of Contractor Group in their relations with the employees and families of Company Group (including Client, vendors, agents, and subcontractors) and third Parties. Contractor's compliance with this requirement shall include establishing precautions to prevent its Personnal, or those of its vendors or subcontractors, from making, receiving, providing, or offering any substantial gifts, extravagant entertainment, payments, loans or other considerations. Contractor warrants that it has not and will not pay any fee, commission, or compensation and that it will not grant any gift, gratuity or rebate of any kind to any officer, agent, servant, Employee, or other Personnel of any member of Company Group, including either as an inducement to obtain the Agreement or as acknowledgment of any other agreement.

25.5 Contractor shall ensure that all documents, including invoices, vouchers, financial settlements, billings and reports, submitted by Contractor to Company shall accurately and with specificity reflect the facts about the activities and transactions to which they pertain, and Contractor represents that in any further recording or reporting made to Company for whatever purpose, Company may rely upon all such documents and the data therein as being complete and accurate. If Contractor discovers or is advised of any errors or exceptions related to its invoicing of the Services, Contractor and Company will together review the nature of the errors or exceptions, and Contractor will, if appropriate, promptly take corrective action as directed by Company, to adjust the relevant invoice, apply any credits due, refund overpayments, or otherwise.

25.6 Contractor shall place similar requirements in its contracts with any member of Contractor Group (specifically, contractors and vendors) involved in furnishing Deliverables or performing any Services, including the obligation to notify Company upon discovery of any instance of non-compliance as stipulated below.

25.7 Contractor agrees to provide Notice to Company promptly upon discovery of any instance in which the Contractor or any member of Contractor Group has violated or fails to comply with this Article 25 or any relevant Law.

## 26. CONTRACTUAL RELATIONSHIP

### 26.1 INDEPENDENT CONTRACTOR

Contractor shall perform the Services as an independent contractor with exclusive control of the manner and means of performing the Services in accordance with the requirements of the Agreement. Contractor has no authority to act or make any agreements or representation on behalf of Company or Client, and no agency, partnership, or other contractual relationship exists between Contractor and any member of Company Group, nor between Company and any member of Contractor Group. No Employee or agent engaged by Contractor shall be, or shall be deemed to be, an employee or agent of any member of Company Group. In the event Company should, at the request of Contractor, furnish Employees to Contractor for any purpose to perform Services as borrowed servants under the direction and supervision of Contractor, such Employees of Company shall be deemed to be the Employees of Contractor, and Contractor shall be responsible for their actions for all purposes under the Agreement while so engaged. Except as expressly provided herein, there are no third party beneficiaries of the Agreement, and the Agreement does not create or confer any legal right, claim or cause of action in favor of any person who is not a signatory to this Agreement. The obligations and legal duties imposed on any Party by this Agreement are owed exclusively to the other Party and are not owed to any person not a signatory hereunder.

### 26.2 SUBCONTRACTING AND ASSIGNMENT

Contractor shall not subcontract any portion of the Services without the prior written approval of Company. Company shall approve the specific subcontractor and the form and terms and conditions of the lower-tier subcontract. Contractor shall not assign the Agreement or any funds due hereunder, in whole or in part, without the prior written consent of Company, and any attempted assignment in violation hereof shall be of no effect and shall constitute a default hereunder. No assignment or subcontracting, even with Company's approval, shall relieve Contractor of any obligation hereunder, or create any contractual relationship between such lower-tier subcontractor and Company or Client. Company reserves the right to assign the Agreement without Contractor's consent, in whole or in part, to any person, and will give Notice to Contractor if such occurs. At Company's request at any time, Contractor agrees to assign to Company or its designee any of its contracts for any part of the Services.

**26.3 ELECTRONIC ACCESS, TRANSFERS AND TRANSACTIONS**

26.3.1 With respect to any business conducted by the Parties through electronic means, including by e-mail, Internet-based systems, or facsimile transmission, or otherwise, each Party acknowledges and agrees that: (A) Company and Contractor may correspond or convey documentation via electronic means unless Company expressly requests otherwise, (B) Contractor will comply with any written instructions by Company concerning electronic communications; (C) Contractor will not electronically forward or use for any other purpose any matters pertaining to the Agreement, the Services, and the Project, including any transmissions received from Company or Client, without the prior written permission of Company, except to members of Contractor Group for the purpose of performing the Services, and subject to their express contractual agreement as to the protection of the confidentiality of such information; (D) neither Party has complete control over the performance, reliability, availability, or security of Internet transmissions, however, each Party agrees to use commercially reasonable and up-to-date security measures to optimize the effectiveness, security and privacy of transmission; and (E) neither Party shall be liable to the other Party for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet transmissions by an unauthorized third party due to any reason beyond the Party's reasonable control.

26.3.2 Payments from one Party to the other Party may be transmitted by wire transfer in accordance with the wiring instructions provided by the receiving Party. It is the receiving Party's responsibility to verify proper receipt of funds, and to immediately notify the sending Party in writing should such funds not be properly received.

26.3.3 Neither Party is responsible for, and shall have any Liability hereunder arising out of or relating to, the performance, reliability, availability, or security of the Internet, except if such Liability arises out of any negligence or fault of any member of Contractor Group in providing appropriately secure and properly operating software and hardware, or from Services performed, Deliverables produced, or Equipment provided, under the scope of the Contractor's Services.

26.3.4 Electronic commerce transactions between Company and Contractor will be solely governed by the terms and conditions contained in the Agreement. Company will not be bound by any legal terms and conditions contained on Contractor's website, including on any of Contractor's other electronically transmitted forms and documents. Specifically, any terms and conditions on Contractor's Internet site to which agreement by Company is required in any manner during performance of the Agreement, whether through an electronic agreement mechanism on any website, deemed implied by site access or use, or otherwise, will be null and void and have no legal effect on Company.

26.3.5 If any member of Contractor Group performs any Services electronically and is granted access to any Company Group network, system, or computer equipment, project or collaborative portal, or password-protected Internet or intranet site, Contractor agrees to comply with all applicable Company Group policies regarding access, security and use, will not use such systems for any purpose other than for the performance of the Services, and agrees to exercise reasonable care to take appropriate security measures to protect Confidential Information from unauthorized disclosure to a third party. Contractor agrees not to access, download, forward, print, or otherwise use any Company Group Proprietary Information under Article 13.2 in any manner other than to the extent which is necessary and required to perform the Services.

26.3.6 Contractor is responsible for ensuring that all members of Contractor Group comply with the requirements of this Article 26.

# Exhibit G1

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
Arbitration No. 50-467-T-000707-12

In the Matter of

AL FAREZ-WAMED CO.,

Claimant

vs.

KELLOGG BROWN & ROOT SERVICES, INC.,

Respondent.

---

**RESPONDENT KBR'S MOTION TO SUPPLEMENT THE DOCUMENTARY EVIDENCE**

---

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510

***Attorneys for Respondent***
***Kellogg Brown & Root Services, Inc.***

July 21, 2014

Pursuant to Procedural Order No. 9, Respondent Kellogg Brown & Root Services, Inc. ("KBR") respectfully files this motion to supplement the documentary evidence it intends to rely upon at the hearing in this case and in support thereof would show this Tribunal as follows:

1. Pursuant to Procedural Order No. 9, on November 12, 2014, Respondent KBR submitted the documents that it intends to rely upon at hearing in this case.

2. As set forth in the Supplemental Statement of Gregory Jacobs, during the course of preparing for the hearing in this matter, Respondent became aware that several accounting entries (line items related to KBR's requests for payments for Al Farez's work on Subcontract No. 02H8-US-SJ00163 ("SJ00163")) on a voucher (Voucher No. 52) submitted by KBR as part of its documentary evidence were redacted.

3. That discovery lead to a second search and review of KBR's accounting and finance system for entries related to KBR's requests for payments for Al Farez's work on Subcontract No. SJ00163. That search revealed that accounting entries (line items) related to KBR's requests for payments for Al Farez's work on Subcontract No. SJ00163 were also contained in 3 vouchers (Voucher Nos. 30, 44, and 48) that were not produced by Respondent on November 12, 2014. None of the additional accounting entries (line items) identified result in any change to the total amount paid to KBR by the U. S. Government.

4. Because of the potential confusion created by the number of invoices submitted by Al Farez for work on SJ00163 and the resulting KBR accounting entries, including the additional entries related to correcting Work Breakdown Structure ("WBS")

codes and a credit back to the U.S. Government followed by additional funding of the Task Order and subsequent requests for payment of the credited line items, Mr. Jacobs created a chart which tracks the accounting entries related to KBR's requests for payments for Al Farez's work on Subcontract No. SJ00163. Respondent believes the chart will be beneficial to the Tribunal and Claimant in understanding Mr. Jacobs' testimony at the hearing in this matter.

5. In addition to the foregoing, Respondent has also discovered that the Subcontractor Special Overseas Conditions - Rev. 003 (12/12/05) which became effective upon the execution of Change Order No. 11 to Subcontract No. SJ00163 on February 13, 2006, were omitted from the Change Order No. 11 file submitted by Respondent on November 12, 2014.

6. Allowing the supplemental documentary evidence will not prejudice the Claimant in any way.

7. The interests of justice are best served by the parties and this Tribunal having access to as complete and as accurate a set of documents related to Subcontract No. SJ00163 as possible and that this is more than sufficient good cause, as required by Procedural Order No. 9, for allowing Respondent to supplement the documentary evidence in this case.

8. Accordingly, Respondent requests that this Tribunal allow KBR to supplement the documentary evidence in this matter by adding the following documents to the documentary evidence that may be used at hearing:

a. Chart – Analysis of Al Farez Billings (KBR-FH-002441 – KBR-FH-002443)

b. Voucher 30 (KBR-FH-002444 – KBR-FH-002544)

c. Voucher 44 (KBR-FH-002445 – KBR-FH-002570)

d. Voucher 48 (KBR-FH-002571 – KBR-FH-002589)

e. Voucher 52 (KBR-FH-002590 – KBR-FH-002668)

f. Subcontractor Special Overseas Conditions - Rev. 003 (12/12/05) (KBR-FH-002669 – KBR-FH-002680)

Respectfully Submitted,

**SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP**

Margaret T. Brenner
William W. Russell
Mark A. Font
Briana J. Bassler
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510
*pbrenner@sdablaw.com*
*wrussell@sdablaw.com*
*mfont@sdablaw.com*
*bbassler@sdablaw.com*

***Attorneys for Respondent***
***Kellogg Brown & Root Services, Inc.***

KELLOGG BROWN & ROOT SERVICES, INC.

LOGCAP III

SUBCONTRACT SPECIAL CONDITIONS

FOR OVERSEAS SUBCONTRACTS

In support of

CONTRACT NO. DAAA09-02-D-0007

These Subcontract/Purchase Order Special Conditions are to be read in conjunction with the Subcontract GENERAL CONDITIONS (03-92) and/or PURCHASE ORDER TERMS AND CONDITIONS (05-01) as appropriate; these Special Conditions are to be considered supplementary to the Subcontract GENERAL CONDITIONS (03-92) and/or PURCHASE ORDER TERMS AND CONDITIONS (05-01) except in those cases where there is conflict, in which case these Special Conditions take precedence. CONTRACT refers to KBRS' prime contract DAAA09-02-D-0007 with the U. S. Government (U.S. ARMY); Subcontract refers to this Subcontract between KBRS and SUBCONTRACTOR.

## 1.0 INCORPORATION OF FEDERAL ACQUISITION REGULATIONS

52.215-2 AUDIT AND RECORDS - NEGOTIATION (JUN 1999) (IN PARA'S (a) THRU (e) CHANGE "CONTRACTOR" TO READ "SUBCONTRACTOR"

1.1 The Following Federal Acquisition Regulations (FAR) clauses are hereby incorporated by reference as if set out fully herein, except the word "KBRS" shall be substituted for the words "Contracting Officer" wherever they appear, and the term "SUBCONTRACTOR" shall be substituted for the term "Contractor" wherever it appears for all clauses incorporated within paragraph 1.0.

| PARAGRAPH | TITLE |
|---|---|
| 52.202-1 | DEFINITIONS (OCT 1995)--ALTERNATE I (APR 1984) |
| 52.203-3 | GRATUITIES (APR 1984) |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES (APR 1984) |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995) |
| 52.203-7 | ANTI-KICKBACK PROCEDURES (JUL 1995) |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 1997) |
| 52.204-2 | SECURITY REQUIREMENTS (AUG 1996) |
| 52.204-2 | SECURITY REQUIREMENTS, ALTERNATE II (APR 1984) |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUL 1995) |

LOGCAP III
SUBCONTRACT SPECIAL CONDITIONS - OVERSEAS

| PARAGRAPH | TITLE |
|---|---|
| 52.211-5 | MATERIAL REQUIREMENTS (AUG 2000) |
| 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENT (SEP 1990) |
| 52.215-10 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (OCT 1997) |
| 52.215-11 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA - MODIFICATIONS (OCT 1997) |
| 52.215-12 | SUBCONTRACTOR COST OR PRICING DATA (OCT 1997) |
| 52.215-13 | SUBCONTRACTOR COST OR PRICING DATA MODIFICATIONS (OCT 1997) |
| 52.215-14 | INTEGRITY OF UNIT PRICES (OCT 1997) ALTERNATE I (OCT 1997) |
| 52.215-19 | NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997) |
| 52.223-6 | DRUG-FREE WORKPLACE (JAN 1997) |
| 52.225-3 | BUY AMERICAN ACT - NORTH AMERICAN FREE TRADE AGREEMENT - ISRAELI TRADE ACT - BALANCE OF PAYMENTS PROGRAM (FEB 2000) |
| 52.225-5 | TRADE AGREEMENTS (APR 2000) |
| 52.225-10 | NOTICE OF BUY AMERICAN ACT - BALANCE OF PAYMENTS PROGRAM - CONSTRUCTION MATERIALS UNDER TRADE AGREEMENTS (FEB 2000) |
| 52.225-15 | SANCTIONED EUROPEAN UNION COUNTRY END PRODUCTS (FEB 2000) |
| 52.227-1 | AUTHORIZATION AND CONSENT (JULY 1995) |
| 52.228-3 | WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT) (APR 1984) |
| 52.228-4 | WORKER'S COMPENSATION AND WAR-HAZARD INSURANCE OVERSEAS (APR 1984) |
| 52.229-6 | TAXES -FOREIGN FIXED PRICE CONTRACTS (JAN 1991) |
| 52.232-17 | INTEREST (JUNE 1996) |
| 52.236-5 | MATERIAL AND WORKMANSHIP ( APR 1984) |
| 52.236-7 | PERMITS AND RESPONSIBILITIES (NOV 1991) |
| 52.236-19 | ORGANIZATION AND DIRECTION OF THE WORK (APR 1984) |
| 52.239-1 | PRIVACY OR SECURITY SAFEGUARDS (AUG 1996) |
| 52.244-5 | COMPETITION IN SUBCONTRACTING (DEC 1996) |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED PRICE CONTRACTS) (DEC 1989) |
| 52.246-2 | INSPECTION OF SUPPLIES - FIXED PRICE (AUG 1996) |
| 52.246-4 | INSPECTION OF SERVICES - FIXED PRICE (AUG 1996) |
| 52.246-12 | INSPECTION OF CONSTRUCTION (AUG 1996) |
| 52.246-21 | WARRANTY OF CONSTRUCTION (MAR 1994) |
| 52.246-29 | F.O.B. ORIGIN (NOV 1991) |
| 52.246-34 | F.O.B. DESTINATION (NOV 1991) |
| 52.247-14 | KBRS RESPONSIBILITY FOR RECEIPT OF SHIPMENT (APR 1984) |
| 52.247-15 | KBRS RESPONSIBILITY FOR LOADING AND UNLOADING (APR 1984) |
| 52.247-63 | PREFERENCE FOR U.S. FLAG AIR CARRIERS (JAN 1997) |

1.2 INCORPORATION OF DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT CLAUSES

| PARAGRAPH | TITLE |
|---|---|
| 252.203-7001 | PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER DEFENSE-CONTRACT RELATED FELONIES (MAR 1999) |
| 252.204-7000 | DISCLOSURE OF INFORMATION (DEC 1991) |
| 252.209-7000 | ACQUISITION FROM SUBCONTRATORS SUBJECT TO ON-SITE |

**LOGCAP III**
**SUBCONTRACT SPECIAL CONDITIONS - OVERSEAS**

| PARAGRAPH | TITLE |
|---|---|
| | INSPECTION UNDER THE INTERMEDIATE RANGE NUCLEAR FORCES (INF) TREATY (NOV 1995) |
| 252.222-7002 | COMPLIANCE WITH LOCAL LABOR LAWS (OVERSEAS) (JUN 1997) |
| 252.222-7003 | PERMIT FROM ITALIAN INSPECTORATE OF LABOR (JUN 1997) |
| 252.222-7004 | COMPLIANCE WITH SPANISH SOCIAL SECURITY LAWS AND REGULATIONS (JUN 1997) |
| 252.223-7002 | SAFETY PRECAUTIONS FOR AMMUNITION AND EXPLOSIVES (MAY 1994) |
| 252.223-7003 | CHANGE IN PLACE OF PERFORMANCE - AMMUNITION AND EXPLOSIVES (DEC 1991) |
| 252.223-7004 | DRUG-FREE WORK FORCE (SEP 1988) |
| 252.223-7001 | HAZARD WARNING LABELS (DEC 1991) |
| 252.223-7006 | PROHIBITION ON STORAGE AND DISPOSAL OF TOXIC AND HAZARDOUS MATERIALS (APR 1993) |
| 252.225-7005 | IDENTIFICATION OF EXPENDITURES IN THE UNITED STATES (DEC 1991) |
| 252.225-7007 | BUY AMERICAN ACT - TRADE AGREEMENTS - BALANCE OF PAYMENTS PROGRAM (APR 2000) |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES (AUG 2000) |
| 252.225-7026 | REPORTING OF CONTRACT PERFORMANCE OUTSIDE THE UNITED STATES (JUN 2000) |
| 252.225-7030 | RESTRICTION ON ACQUISITION OF CARBON, ALLOY, AND ARMOR STEEL PLATE (OCT 1992) |
| 252.225-7032 | WAIVER OF UNITED KINGDOM LEVIES (OCT 1992) |
| 252.225-7043 | ANTITERRORISM/FORCE PROTECTION POLICY FOR DEFENSE CONTRACTORS OUTSIDE (JUN 1998) |
| 252.236-7005 | AIRFIELD SAFETY PRECAUTIONS (DEC 1991) |
| 252.247-4521 | UNITIZATION/PALLETIZATION (MAR 1988) |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA (MAR 2000) ALTERNATE I (MAR 2000) |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA—NONCOMMERCIAL ITEMS (NOV 1995) |
| 252.227-7014 | RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER (JUN 1995) |
| 252.227-7015 | TECHNICAL DATA--COMMERCIAL ITEMS (NOV 1995) |
| 252.227-7020 | RIGHTS IN SPECIAL WORKS (JUN 1995) |
| 252.228-7003 | CAPTURE AND DETENTION (DEC 1991) |
| 252.228-7006 | COMPLIANCE WITH SPANISH LAWS AND INSURANCE (JUN 1997) |
| 252.229-7002 | CUSTOMS EXEMPTIONS (GERMANY) (JUN 1997) |
| 252.229-7003 | TAX EXEMPTIONS (ITALY) (JUN 1997) DFARS |
| 252.229-7004 | STATUS OF KBRS AS A DIRECT KBRS (SPAIN) (MAR 1998) |
| 252.229-7005 | TAX EXEMPTIONS (SPAIN) (JUN 1997) |
| 252.229-7006 | VALUE ADDED TAX EXCLUSION (UNITED KINGDOM) (JUN 1997) |
| 252.229-7007 | VERIFICATION OF UNITED STATES RECEIPT OF GOODS (JUN 1997) |
| 252.229-7008 | RELIEF FROM IMPORT DUTY (UNITED KINGDOM) (JUN 1997) |
| 52.229-7009 | RELIEF FROM CUSTOMS DUTY AND VALUE ADDED TAX ON FUEL (PASSENGER VEHICLES)(UNITED KINGDOM) (JUN 1997) |

LOGCAP III
SUBCONTRACT SPECIAL CONDITIONS - OVERSEAS

| PARAGRAPH | TITLE |
|---|---|
| 252.229-7010 | RELIEF FROM CUSTOMS DUTY ON FUEL (UNITED KINGDOM) (JUN 1997) |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES (DEC 1991) DFARS |
| 252.232-7008 | ASSIGNMENT OF CLAIMS (OVERSEAS) (JUN 1997) DFARS |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS (DEC 1991) |
| 252.233-7001 | CHOICE OF LAW (OVERSEAS) (JUN 1997) DFARS |
| 252.245-7001 | REPORTS OF GOVERNMENT PROPERTY (MAY 1994) DFARS |
| 252.246-7002 | WARRANTY OF CONSTRUCTION (JUN 1997) DFARS |

**1.2 FAR CLAUSES INCORPORATED IN FULL TEXT**

**52.225-13 –Restrictions on Certain Foreign Purchases. (MAR 2005)**

(a) Except as authorized by the Office of Foreign Assets Control (OFAC) in the Department of the Treasury, the Contractor shall not acquire, for use in the performance of this contract, any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States.

(b) Except as authorized by OFAC, most transactions involving Cuba, Iran, Libya, and Sudan are prohibited, as are most imports from North Korea, into the United States or its outlying areas. Lists of entities and individuals subject to economic sanctions are included in OFAC's List of Specially Designated Nationals and Blocked Persons at http://www.epls.arnet.gov/News.html. More information about these restrictions, as well as updates, is available in the OFAC's regulations at 31 CFR chapter V and/or on OFAC's website at http://www.treas.gov/ofac.

(c) The Contractor shall insert this clause, including this paragraph (c), in all subcontracts.

(End of clause)

**52.244-6 SUBCONTRACTS FOR COMMERCIAL ITEMS (JUL 2004)**

(a) *Definitions*. As used in this clause-

"Commercial item" has the meaning contained in Federal Acquisition Regulation 2.101, Definitions.

"Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or non-developmental items as components of items to be supplied under this contract.

(c) (1) The Contractor shall insert the following clauses in subcontracts for commercial items

(i) 52.219-8 Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting

opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $500,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(ii) 52.222-26, Equal Opportunity (Apr 2002) (E.O. 11246).

(iii) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (Dec 2001) (38 U.S.C. 4212(a));

(iv) 52.222-36, Affirmative Action for Workers with Disabilities (June 1998) (29 U.S.C. 793).

(v) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Apr 2003) (46 U.S.C. Appendix 1241 and 10 U.S.C. 2631) (flow down required in accordance with paragraph (d) of FAR clause 52.247-64).

(2) While not required, the Contractor may flow down to subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

(End of clause)

## 2.0 ANTI-KICKBACK NOTICE

Your attention is directed to the prohibitions contained within the Anti-Kickback Act of 1986 (FAR Clause 52.203-7), highlights of which are: Subcontractors and suppliers are prohibited from offering any money, fee, commission, credit, gift, gratuity, thing of value or compensation of any kind directly or indirectly to Brown & Root Services employees for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

## 3.0 STOP-WORK ORDER

3.1 KBRS may, at any time, by written order to the SUBCONTRACTOR, require the SUBCONTRACTOR to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the SUBCONTRACTOR, and for any further period to which the parties may agree. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of 90 days after a stop-work order is delivered to the SUBCONTRACTOR, or within any extension of that period to which the parties shall have agreed, KBRS shall either-

(1) Cancel the stop-work; or

(2) Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

3.2 If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the SUBCONTRACTOR shall resume work. KBRS shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing accordingly, if-

> (1) The stop-work order results in an increase in the time required for, or in the SUBCONTRACTOR'S cost properly allocable to, the performance of any part of this contract, and
>
> (2) The SUBCONTRACTOR asserts a claim for the adjustment within 15 days after the end of the period of work stoppage, provided, that, if KBRS decides the facts justify the action, KBRS may receive and act upon the claim asserted at any time before final payment under this contract.

3.3 If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, KBRS shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

3.4 If a stop-work order is not canceled and the work covered by the order is terminated for default, KBRS shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

3.5 Notwithstanding the above, where the stop-work order is occasioned by the imposition of such stop-work order by the GOVERNMENT on KBRS, SUBCONTRACTOR will be entitled to only such adjustment that is awarded to KBRS to the extent such adjustment relates to this Subcontract.

**4.0 DISPUTES**

4.1 Notwithstanding any other provision in this Subcontract, any decision of the Government's Contracting Officer pursuant to the contract between KBRS and the Department of the Army (Prime Contract) which binds KBRS shall bind both KBRS and SUBCONTRACTOR to the extent that it relates to the Subcontract, provided (1) KBRS promptly notifies SUBCONTRACTOR of the decision, and (2) if requested by the SUBCONTRACTOR, KBRS appeals the decision in accordance with the Disputes clause of the Prime Contract and takes whatever further action is required under this clause.

4.2 Any decision on the appeal, or any other decision of the Government under the Prime Contract that is binding on KBRS and cannot be appealed under the Disputes clause of the Prime Contract, shall also bind KBRS and the SUBCONTRACTOR to the extent that it relates to the Subcontract, provided KBRS promptly notifies SUBCONTRACTOR of the decision and, if requested by the SUBCONTRACTOR, brings suit or files a claim, as appropriate, against the Government. A final judgment in the suit shall be conclusive upon KBRS and SUBCONTRACTOR.

4.3 If requested by KBRS, SUBCONTRACTOR shall assume the burden of prosecuting for KBRS any appeal, suit, or claim initiated by KBRS at SUBCONTRACTOR'S request. Each party shall cooperate fully in assisting the other party in the proceedings. If any appeal, suit, or claim is prosecuted by KBRS under this clause, SUBCONTRACTOR shall be permitted to participate fully in the prosecution for the purpose of protecting its interests.

4.4 Pending any decision, appeal, suit or claim pursuant to this clause, SUBCONTRACTOR shall proceed diligently with performance of this Subcontract. All costs and expenses incurred by

SUBCONTRACTOR and KBRS in prosecuting any appeal, suit or claim initiated by KBRS at SUBCONTRACTOR'S request shall be paid by SUBCONTRACTOR. The rights and obligations of KBRS and SUBCONTRACTOR under this Subcontract shall survive completion of, and final payment under, this Subcontract.

## 5.0 ALTERNATIVE DISPUTE RESOLUTION

The following provision for Alternative Dispute Resolution shall be incorporated into the SUBCONTRACT AGREEMENT as follows:

In the event of any claim or dispute between the parties arising under or relating to this AGREEMENT or any WORK RELEASE hereunder, AS AN EXCLUSIVE SUBSTITUTE FOR INITIATING ANY ACTION IN LAW OR EQUITY IN ANY COURT OR OTHER JUDICIAL PROCESS, THE PARTIES AGREE THAT THE FOLLOWING DISPUTE RESOLUTION PROCEDURE SHALL BE COMPLIED WITH:

1. If any claim or dispute of any nature arises between the parties, both parties first shall exert all reasonable and necessary efforts, amicable and in good faith, to resolve such dispute promptly and with finality, by direct negotiation between each party. Any settlement agreement shall be placed in writing.

2. Should such efforts described in 1 above fail to settle such dispute, then the aggrieved party shall send to the other a notice in writing, and the receiving party shall have ten (10) working days to submit a written response. The notice and response shall include: (i) a statement of each party's position and a summary of facts supporting that position, with all pertinent supporting documentation, and (ii) the name and title of who will represent that party in negotiations.

3. Within thirty (30) working days after delivery of the written response, the representatives from each side shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to exert their best efforts to resolve the dispute with finality. All reasonable requests for information made by either party to the other shall be honored. Any settlement agreement shall be placed in writing.

4. Should negotiations between the representatives not be successful after thirty (30) days, the dispute shall then be submitted to binding arbitration administered by the American Arbitration Association in Arlington, Virginia, USA in accordance with the applicable rules, regulations, and procedures of the American Arbitration Association.

5. The governing law of this contract shall be the law of Texas, USA excluding any conflict of law provisions which would lead to the application of a different body of law.

6. The arbitration panel shall be composed of three arbitrators; one arbitrator shall be appointed by each of the parties to the claim or dispute, and another independent arbitrator appointed by the two arbitrators chosen by the parties.

7. Each of the parties shall pay one-half of the costs and expenses of the American Arbitration Association in the administration of any dispute resolution proceeding, including but not limited to any mediation and arbitration. Each party shall bear all of its own expenses in the dispute resolution process.

8. The decision of a majority of the arbitrators shall be reduced to writing, final and binding without the right of appeal. Judgment upon the award may be entered in any court having

jurisdiction over the person or the assets of the Party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be.

9. Unless otherwise directed by KBRS, SUBCONTRACTOR shall continue to perform the WORK pending resolution of any claim or dispute under this Article.

10. Consequential, punitive or other similar damages shall not be allowed; provided, however, the award may include appropriate punitive damages where a Party has engaged in delaying and dilatory actions

**6.0 CHANGES**

6.1 KBRS may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the Subcontract, including changes:

(1) in the specifications (including drawings and designs);

(2) in the method or manner of performance of the work;

(3) in the Government-furnished facilities, equipment, materials, services, or site; or,

(4) directing acceleration in the performance of the work.

6.2 Any other written or oral order (which, as used in this paragraph 5.2 includes direction, instruction, interpretation, or determination) from KBRS that causes a change shall be treated as a change order under this clause; provided, that the SUBCONTRACTOR gives KBRS written notices stating (1) the date, circumstances, and source of the order and (2) that the SUBCONTRACTOR regards the order as a change order.

6.3 Except as provided in this clause, no order, statement, or conduct of KBRS shall be treated as change order under this clause or entitle the SUBCONTRACTOR to an equitable adjustment.

6.4 If any change under this clause causes an increase or decrease in the SUBCONTRACTOR'S cost of, or time required for, the performance of any part of the work under this Subcontract, whether or not changed by any such order, KBRS shall make an equitable adjustment and modify the Subcontract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph 5.2 of this clause shall be made for any costs incurred more than twenty (20) days before KBRS gives written notice as required under the Prime Contract to the Government. In the case of defective specifications for which KBRS is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the SUBCONTRACTOR in attempting to comply with the defective specifications

6.5 The SUBCONTRACTOR must assert its right to an equitable adjustment under this clause within fifteen (15) days after (1) receipt of a written change order under paragraph 5.1 of this clause, or (2) the furnishing of a written notice under paragraph 5.2 of this clause, by submitting to KBRS a written statement describing the general nature and amount of the proposal including a detailed cost breakdown Included costs must conform to FAR Part 31 (including the DOD FAR Supplement). As required by FAR supplement, no profit on General & Administrative Overhead may be included. The statement of proposal of adjustment may be included in the notice under paragraph 5.2 above.

6.6 SUBCONTRACTOR shall not submit nor shall KBRS accept a proposal for an equitable adjustment if asserted after the fifteen (15) day period set forth in paragraph 5.5 above.

**7.0 VALUE ENGINEERING**

7.1 SUBCONTRACTOR is encouraged to develop, prepare and submit value engineering change proposals (VECP'S) voluntarily. The SUBCONTRACTOR shall share in any award on an equal basis with KBRS (to the extent that it involves this Subcontract) that KBRS receives from the Government for any instant contract savings under the prime contract.

7.2 All definitions associated with the VECP'S shall be as stated in FAR 52.248-1.

7.3 SUBCONTRACTOR shall provide KBRS with any and all information required from SUBCONTRACTOR to enable KBRS to submit VECP'S to the Government pursuant to the requirements of FAR 52.248-1.

7.4 If a VECP is accepted by the Government, the SUBCONTRACTOR hereby grants the Government unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, the Government shall have the rights specified in the prime contract modification implementing the VECP and shall appropriately mark the data. (The terms "unlimited rights" and "limited rights" are defined in Part 27 of the FAR).

**8.0 COMMENCEMENT, PROSECUTION AND COMPLETION OF WORK**

8.1 The SUBCONTRACTOR will be required to (a) commence work under this Subcontract on the required Start Date as stated in the Subcontract Terms, (b) prosecute the work diligently, and (c) complete the entire work ready for use (including completion of all punchlist items and clean-up) not later than the Completion Date as stated in the Subcontract Terms. However, any delays in giving notice to proceed, attributable to SUBCONTRACTOR'S failure to execute the subcontract and give the required performance and payment bonds (if any) will be deducted from the number of days allowed for completion in the Subcontract Terms.

**9.0 PERFORMANCE EVALUATION OF SUBCONTRACTOR**

9.1 SUBCONTRACTOR'S performance will be evaluated upon final acceptance of the work. However, interim evaluation may be prepared at any time during the subcontract performance when determined to be in either the best interest of KBRS or the Government.

9.2 KBRS will use whatever format for evaluation it chooses, including the SF1420. KBRS reserves the right to forward its evaluation to the Government if so requested by the Government's Contracting Officer.

**10.0 CONTRACTUAL RELATIONSHIP**

10.1 There is no privity of contract between the SUBCONTRACTOR and the Government. All communication on this project (oral or written) shall be addressed to KBRS.

**11.0 LOWER-TIER Subcontract CONDITIONS**

11.1 SUBCONTRACTOR shall include in its lower-tier subcontracts (including purchase orders) all Government Contracting clauses as detailed in Paragraph 1.0.

**12.0 CONFLICTING REQUIREMENTS**

12.1 Any conflict between the specifications, data sheets, drawings, referenced national standards, and codes shall be brought to KBRS' attention, and approved written clarification shall be obtained before proceeding.

**13.0 EXPEDITING AND INSPECTION**

13.1 KBRS reserves the right to expedite and/or inspect equipment, materials and services covered by any resultant Subcontract at any location, including lower-tier subcontracts. Access shall be given to representatives of KBRS and its client at all reasonable times under adequate notice to SUBCONTRACTOR, so that SUBCONTRACTOR may advise any involved lower-tier subcontractor. The SUBCONTRACTOR shall ensure that all of the expediting and inspection clauses included in this Subcontract are made part of any lower-tier subcontract.

**14.0 INVOICING**

14.1 Invoices received that do not agree with the provisions of this Subcontract will be returned for correction. Invoices shall reference this Subcontract number and shall show shipping point, quantities shipped and description, as well as price. SUBCONTRACTOR'S failure to provide specified vendor data requirements will result in payment of invoices being delayed.

**15.0 INSURANCE (NOTE: FOR WORK TO BE PERFORMED ON ANY GOVERNMENT OR KBRS OWNED FACILITIES)**

15.1. Insurance

Supplementing General Condition 5.2, Insurance, Subcontractor shall provide to Brown & Root Services Corporation and Owner, its insurance certificate stating the names and addresses of its insurance carriers and certifying that its insurance coverage meets the requirements of General Condition 5.2, Insurance, with respect to type and form and that its limits meet the following minimum requirements:

15.1.1 Comprehensive general liability insurance: $500,000 per occurrence.

15.1.2 Comprehensive automobile liability insurance: $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage.

15.1.3 Workmen's Compensation and Employer's Liability Insurance: Comply with Federal and State Worker's Comp and Occupational Disease Statutes. If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability section of the insurance policy, except when Contract operations are so commingled with a Contractor's commercial operation that it would not be practical to require this coverage. Employer's liability coverage of at least $100,000 shall be required, except in states with exclusive or monopolistic funds that do not permit workers' compensation to be written by private carriers. (NOTE: The States of California, New Jersey, New York and Rhode Island have imposed upon employers the obligation to afford benefits for arising out of employment. Employers may, under state law, be given the option of insuring with companies or underwriters or of self-insuring this obligation.)

15.1.4 Bailed Property: $100,000 per occurrence.

15.1.5 Other as required by State Law.

15.1.6 Above insurance coverage's are to extend to Subcontractor personnel operating Government and General Contractor owned equipment and vehicles.

Insurance shall be certified using the attached Certificate of Insurance, Exhibit A, form. This form must be received prior to start of work at the jobsite. The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective (1) for such period as the laws of the State in which this subcontract is to be performed prescribe, or (2) until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer, whichever period is longer. The insurance specified above shall contain waivers of subrogation in favor of Kellogg Brown & Root Services and the U.S. Government and an assignment of statutory lien to Kellogg Brown & Root Services, if applicable. The insurance shall also name Kellogg Brown & Root Services, the U.S. Government and Kellogg Brown & Root Services other subcontractors and all of their affiliates as Additional Insureds.

**The Subcontractor shall submit Insurance Certificates to the Contractor as soon as possible after award of a work release/subcontract but in any event prior to commencing work.** The Subcontractor shall insert the substance of this clause, including this paragraph, in all lower-tier subcontracts under this subcontract that require work on a Government installation and shall require subcontractors to provide and maintain the insurance required above. **The Subcontractor shall maintain a copy of all lower-tier subcontractor's proofs of required insurance, and shall provide copies to the Contractor as soon as possible after award but in any event prior to the lower tier subcontractor commencing work.**

## 16.0 RELEASE OF INFORMATION

Subcontractor shall not draft, issue, release or participate in, directly or indirectly, any news release, interview with any form of media, public announcement, advertisement or public statement, either written or oral, concerning any aspect of this Subcontract Agreement or any attachment thereunder; KBRS' Prime Contract with the U.S. Government; or any work being performed under the Prime Contract or this Subcontract without first obtaining prior **written** approval of KBRS. Furthermore, Subcontractor is required to direct all media inquiries or requests for information to KBRS.

Subcontractor may submit written requests for approval to release information to KBRS. Such requests shall identify the specific information to be released, the medium to be used, and the purpose for the release. The Subcontractor shall submit its request to KBRS at least 45 days before the proposed date for release.

Any violation of this provision is considered a material breach of the subcontract.

## 17.0 ORDER OF PRECEDENCE

17.1 In case of conflicts between various Subcontract documents, the following order of precedence shall be used to settle said conflicts:

Change Order (s) (latest one issued)
Subcontract Terms
Subcontract Special Conditions

LOGCAP III
SUBCONTRACT SPECIAL CONDITIONS - OVERSEAS

Special Subcontract Requirements
Subcontract General Conditions/Purchase Order Terms and Conditions
Specifications (unless specifically stated otherwise elsewhere within the Subcontract documents)
Drawings:
- Schedules shown on drawings
- Details shown on drawings
- Individual drawing sheets

Page 12 of 12

Sp Conditions -- Overseas Rev. 005 (12/12/05)

KBR-FH-002680

# Exhibit H1

- ORDER BY TOMORROW MORNING

# International Center for Dispute Resolution

Case No. 50-110-T-00698 12

**AL FAREZ-WAMED CO.**
Claimant

vs.

**KELLOGG BROWN & ROOT SERVICES.**
Respondent

## Claimant Requests Postponement due to Incomplete discovery of the government documents requested and witnesses

1. Pursuant to the Claimant complaint in the eastern district of California Case no. ***2:15-CV-01138-GEB-CKD*** against the government for not release the information requested by the Claimant under FOIA and case no.***2:15-CV-1468GEB –AC- PS*** against KBR for not comply with Tribunal ruling for the product of the government documents requested by Claimant.

2. Pursuant to American Arbitration rules paragraph 7 provides:

- ***The arbitrators shall have the authority to order such discovery ,by way of deposition , interrogatory , documents production ,or otherwise , as the arbitrator considers necessary to a full and fair exploration of the issues in dispute.***

EX.

3. Pursuant to Respondent for not comply to product of the government documents In Tribunal ruling dated at Aug/06/2014 which is the strong evidence the Claimant relay on it to prove his claim

-Email dated at Aug/02/2014 ( Appendix A )
-Email dated at Sep/04/ 2014 (Appendix B)
-Email dated at Aug/25/2014 ( Appendix C)
-Email dated at Jan/05/2015 ( Appendix D)

4. Pursuant for multi requests to Tribunal pertains compel the Respondent to product the government document requested by Claimant.

-Email dated at Sep/ 05/2014 (Appendix E )
-Email dated at Sep /12/2014 (Appendix F)
-Email dated at July /24/2014 ( Appendix G)
-Email dated at Aug /25/2014 ( Appendix H)
-Email dated at July /21/2015 ( Appendix I)

5. Pursuant to Claimant requests from Tribunal to recall the government documents from the government .

-Email dated at Sep /05/2014 ( Appendix J)
-Email dated at Aug/25/2014 ( Appendix K)
- See Stanton v.Paine Webber Jackson & Curtis
(*157 F.R.D. 42,43( M.D.tenn.1994)* ( Appendix O )

6. Pursuant to Claimant requests from Tribunal to order KBR to bring the original copy of the government ( DFAS) document and the original documents of the change orders requested

-Email dated at July/21/2015 (Appendix L)
-Email dated at July /29/2015 (Appendix M)

7. Pursuant to Tribunal deny the Claimant witness stated in his letter

-Email dated at Dec/15/2014 ( Appendix N)

-Email dated at Jan/05/2014   ( Appendix O)

8. Pursuant to ICDR case manager Mrs Chaza  for prejudice towards the Respondent and her vague role when she chose the court reporter without  serve the claimant  and for not comply with the procedures of ICDR rules and parties requests.

9. Pursuant to KBR for  not comply with the witnesses  list submitted to Tribunal in the pre hearing which caused a confusion to the claimant.

   -Email dated at Dec/15/2014  (Appendix P)

10. Pursuant to KBR new evidence submitted to Tribunal
    Which need a preparation and times required for the Claimant to prove it is a false government documents in relative to the Claimant complaint to the Federal court stated forgoing on item 1.

   -Email dated at July/21/2015 ( Appendix Q )

Based on forgoing:
The Claimant requests a postponement in the hearing scheduled at Aug/03 caused by incomplete pre hearing discovery ( government documents production) which are the strong evidence the Claimant rely on it to prove his claim.
If the Tribunal have no jurisdiction and a power given by law of Texas  for the discovery of these documents, then this matter should be postponement till the Federal court decision in that case.

Appendix A

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Arbitration No. 50-467-T-000707-12**

In the Matter of

AL FAREZ-WAMED CO.,

Claimant

vs.

KELLOGG BROWN & ROOT SERVICES, INC.,

Respondent.

RESPONDENT ICBR's OBJECTIONS TO
CLAIMANT AL FAREZ' REQUESTS FOR PRODUCTION

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510

*Attorneys for Respondent*
*Kellogg Brown & Root Services, Inc.*

Appendix A

August 2, 2014

Appendix A

Pursuant to the Tribunal's Procedural Orders No. 7 and 8 Respondent Kellogg Brown & Root Services, Inc. ("KBR") respectfully objects to the requests for production from Claimant Al Farez-Wamed Co. (Al-Farez) as follows:

1. On July 24, 2014, Al Farez sent KBR and this Tribunal an email with several documents attached. One of the documents was Al Farez' requests for production, a true and correct copy of which is attached hereto as Exhibit A.

2. KBR objects to request number 1 because it is not reasonably specific as required by the Procedural Orders. Request number 1 is not limited in time or scope; it literally seeks all government invoices ever paid to KBR. Such a request clearly goes beyond the scope of this dispute. In addition, the request contains a substantial amount of language which is incomprehensible and/or not properly part of a request for production. KBR believes Al Farez is seeking documents reflecting amounts paid by the U.S. Government to KBR on vouchers submitted (KBR does not submit invoices) on subcontract number 02H8-US-SJ00163. Although the payments by the U.S. Government to KBR on subcontract number 02H8-US-SJ00163 are not relevant to Al Farez' claims before this Tribunal, KBR is in the process of locating such documents and will produce those documents related to the vouchers submitted and payments received on subcontract number 02H8-US-SJ00163. The Tribunal should reform and limit request number 1 to those documents.

3. KBR objects to request for production number 2 because it contains misstatement of fact. Al Farez references a statement made by KBR legal counsel in a letter dated May 1, 2008. A copy of the document referred to and sent by Al Farez with

the request is attached hereto as Exhibit B. It is an email from Tom Hudson, who is not counsel for KBR, to Warned Jameel. KBR believes that Al Farez is seeking documents reflecting that KBR purchased 2 evaporative coolers which is part of KBR's counterclaim. The Tribunal should refonn and limit request number 2 to those documents.

4. KBR objects to request for production number 3 because it contains misstatements of fact. Attached hereto as Exhibit C is a true and correct copy of Change Order 14, without exhibits. The document is signed by Mr. Al-Azzawi and does not mention any back charges as alleged in the request. Consequently, the request does not make sense and KBR has no idea what Al Farez is seeking. The Tribunal should strike this request.

WHEREFORE, KBR requests that this Tribunal reform and limit Al Farez' requests for production number 1 and 2 as set forth herein and that it strike request no. 3.

Appendix A

Respectfully Submitted,

SCHIRRMEISTER pIAZ -ARRASTIA BREM LLP

Margaret TLBrenner
William W. Russell
Mark A. Font
Briana J. Bassler
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile (713) 228-3510
pbrenner@sdablaw.com
wrussell@sdablaw.COM
infont@sdablaw.c0771
bbassler@sdablaw.coin

***Attorneys for Respondent***
***Kellogg Brown & Root Services, Inc.***

00168121.DOCX; 3

Appendix A

# Exhibit A

Appendix A

# International Center for Dispute Resolution
**Case No. 50-110-T-00698 12**

**AL FAREZ-WAMED CO.**
Claimant

vs.

**KELLOGG BROWN & ROOT SERVICES.**
Respondent

**Al Farez requested of Production of Relevant Documents ( evidence)**

Pursuant to tribunal procedural order number 8 pertaining production evidence and documents of the case .

The Claimant requested from Respondent the production of the relevant documents of the case as following:

1. All the government invoices paid to KBR as a cost plus in date .these invoices should showing the approval of the contractor officer on these invoices and the amount and the date of payment for each invoices.

   This matter affirmed by the letter from the member of the house / Senator Jerry Mc.Nemey to the Defense Finance and Accounting service ( DFAS) on Dec/21/2009 attached ( Doc# 0) , Which the DFAS affirmed to AL Farez on

Appendix A

a conference call that all the invoices of claim forwarded by the Senator were paid by the DFAS to KBR .

t

Appendix A

And this matters was affinned too by the detailed Inspector General of the U.S Army contracting command / Mr. Mark Smith in his correspondence on Sep/28/2011 to Al Farez attached ( Doc # 38 )stated :

The contract that existed was between US Government (Army) and KBR to provide the services as indicated in the specific Task/Delivery Orders. Since the work that was done by KBR (and its subcontractors, including your company) was accepted by the contracting official, payments were made in relation to each applicable contract therefore, KBR received payment for the work which was deemed acceptable. It is now incumbent upon KBR to pay all of its subcontractors. KBRs failure to accomplish this task is not the responsibility of this office to ensure happens.

Purpose:

a) The Claimant need the accurate date of the government invoices paid to KBR for Al Farez claim of invoices submitted to KBR mentioned in KBR VRT analysis on May/02/2008 as stated for)going ( Doc# 38 , # 40) So the Claimant can add the accurate interest rate to the invoices in relative to the date of payments by the government to KBR.

b) The Claimant need to know any approval from the government pertaining KBR back charge of invoices( ITF1 &ITF2 ) mentioned in change order 14.

c) Did the government paid for all my invoices of claim as stated in (document #38, #40)?

d) Did the government paid for additional concrete in the new footings approved by KBR engineering and not in scope of work?

e) Did the government paid to KBR for the power supply for the works activity?

f) Did the government paid to KBR for the covering of the factory with sandwich panel or steel corrugated plate?

g) Did the government paid for kick plate.?

h) Did the government paid for thermo stone .?

i) Did the government paid for HVAC in office building and annex buildngs.?

j) Did the government paid for fire suppression?

k) Did the government paid for rolling up doors.

l) Did the government paid for a concrete slab for factory and offices.

m) Did the government paid for removal of asbestos.? When?

Appendix A

n) Did the government paid for jag hammering and removal of old pavement? What the parts approval? When

Appendix A

o) Did the government paid for the 3 vehicle lifts? Is it the one in the SOW , or is it the new approval?

p) Did the government paid for steel decking of the mezzanine?

q) Did the government paid for 2 compressors?

r) Did the government paid for 2 exhaust fan in factory?

s) Did the government paid for all Electrical and main board?

t) Did the government paid for adding additional columns in mezzanine with its footings.

u) Did the government paid for terrace in office building?

v) Did the government paid for additional windows?

w) Did the government paid for ramp of factory?

x) Did the government paid for covering the factory parapet (tie beam) with stone?

y) Did the government paid for covering the tie beam in front of the factory with ceramic tiles?

z) Did the government paid for ceramic tiles on all walls of rest rooms? Did the government paid for covering the entrance of the main building with ceramic tiles?

aa)Did the government paid for shelves in mezzanine ?

bb) Did the government paid for delay invoices?

cc) Did the government paid for foundations of vehicle lifting?

dd) Did the government paid for the steel structure over the rolling up doors in the factory?

ee)Did the government paid for the new design of the main building office adding additional columns and footings?

2. The invoice of the evaporative coolers ( number , amount , date) as stated by KBR legal counsel Mr. David Brenner allegation that KBR paid it to AL Farez-Wamed Co. In KBR letter dated on May/01/2008. ( attached).

3. Is there any notification of mutual agreement (document) of KBR back charge invoices ( ITF1,ITF2 ) mentioned in change order 14? If so need to forward it .

Appendix A

5

Appendix A

Respectively submitted

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell: | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed(@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix A

---- Forwarded Message-------
From: Tom Hudson2 <Tom.Hudson2@kbr.com>
To: warned jameel <wamedjameel@yahoo.com>
Cc: Mark Day <Mark.Day@kbr.com>; Ronald Gandy <Ronald.Gandygkbr.com>; David Brenner <David.Brenner2Okbr.com>
Sent: Thursday, May 1, 2008 8:12 PM
Subject: 02H8-US-SJ00163 (Construction of Maintenance Facility in the IZ) - VRT Claim Analysis

Sir:

Attached is VRT's analysis of your 31 claims for Subcontract 02H8-US-SJ00163 (Construction of the IZ Maintenance Building). This analYsis is based on a review of the subcontract documents, interviewsyith Kpi3 employees, and, consultation with KBR. Legal. Also attached is the spreadsheet showing the back charge for electrical work in the amount of $60.734.20 which KBR self performed after giving your firm written notice in Dec 2006.

1) In the attached spreadsheet entitled "KBR Claim Analysis for Sub SJ00163", VRT's analysis s is stated under the column heading "KBR VRT analysis". This spreadsheet is based on the 31 line item claim "Proforma Invoice" which your firm submitted.
2) In order for a claim to be valid, VRT needed to determine if it was outside the scope of work, and directed by KBR personnel. For only two of the 31 claims was VRT able to verify that KBR employees directed work outside the scope of work.
3) If you have any additional documentation in writing showing that these changes were directed by KBR, please provide it. Please note that "Approved" written on a drawing does not constitute a constructive change, but rather an approval that the work is within the existing scope of work.
4) Also attached is a spreadsheet showing the back charge for electrical work which KBR self performed. This is based on a review of daily headcount records, consultation with KBR employees, and KBR Quality Assurance Reports.
5) KBR and your firm need to determine a fair price for the fire suppression/alarm system and PA system which was in the scope of work and part of the contract price, but was not provided. KBR Estimating has calculated a detailed estimate as to the cost, but KBR would prefer to agree on a price to back charge for these items. It should be noted that the fire suppression system was ultimately determined to not be needed by the fire chief as the offices were not put on the second floor of the maintenance building due to structural and workmanship issues. A deduction is still required to the subcontract value as these items were part of the original contract price.
6) Other back charges exist which were agreed to in writing by your firm and KBR, but based on VRT's calculations in the attached spreadsheet, it appears that any amounts owed to your firm are already negated by the existing back charges for electrical and work not performed.
7) VRT is back charging for the two evaporative coolers ("swamp coolers") which were purchased by your firm and for which KBR assisted in the expediting from Kuwait Free Trade Zone to Baghdad — International Zone. As you know, when these coolers arrived in the International Zone they were missing their motors and internal components, essentially empty shells. KBR Legal has determined that the risk of loss remains upon the subcontractor for this item. Accordingly, the attached analysis deducts $25,304.56 based on invoices supplied showing the purchase price and shipping costs incurred by your firm. KBR is deducting this amount as it had to supply split HVAC units at its own cost. There is documentation in the file indicating that KBR has already paid you for these evaporative coolers.
8) KBR realizes that there is a significant variance between your claim of $985,000 USD and VRT's calculation that nothing further is owed. Please note that this is a cost plus subcontract and KBR has no reason to be other than completely fair as to determining the validity of any claim. KBR is a fiduciary entrusted with US government funds and must determine that all claims are allowable and valid under the contract, as well as applicable regulations and laws.

Appendix A

9)   Your firm has rights under this subcontract, including but not limited to its rights under the Alternative Disputes Resolution clause of the Special Conditions incorporated by Change Order 13. This provides for arbitration by a 3 arbitrator panel with one arbitrator selected by your firm, one by KBR, and the third mutually selected by both sides. Should you desire to pursue this right, please contact

David Brenner
Senior Counsel / KBR Gov't and Infrastructure
4100 Clinton Drive / Building One, #590
Houston, TX 77020 USA
713.753.2320

Please provide me with what you believe a fair deduction amount is for the fire suppression/alarm system, and PA system. Also please provide a detailed description of this system which you based your contract bid upon.

Please provide any additional written documentation which shows KBR directed work outside the scope of work. VRT wants to be fair and review any documents which your firm may have evidencing this.

Respectfully,

Tom Hudson
Business Segment Manager -Procurement - Vendor Resolution Team (VRT)
KBR Inc.
APO AE09366
Egalia Complex, Building 1, Room 10
Office: 281 669 2490 ( Houston number rings in Kuwait )

Appendix A

# Exhibit C

19

Appendix A

| | | SUBCONTRACT CHANGE ORDER GENERAL CONTRACTOR | | |
|---|---|---|---|---|
| $1,022,847.60 | ORIGINAL AMOUNT AND PREVIOUS CHANGE ORDER(S) | KELLOGG BROWN & ROOT SERVICES | PAGE 1 of 1 | DATE 01 Dec 06 |
| $0.00 | ADDITION BY THIS CHANGE ORDER | KELLOGG BROWN & ROOT USMI Central KBR HQ Bldg. (RSO) Baghdad, International Zone, Iraq | CHANGE ORDER Fourteen (14) | REQ. NO N/A |
| $0.00 | DEDUCTION BY THIS CHANGE ORDER | | SUBCONTRACT NUMBER 02H8-US-SJ00163 | |
| $1,022,847.60 | AMENDED FIRM FIXED PRICE | ORIGINAL NOTIFICATION F CONFIRMATION | JOB NUMBER GCO2H8 | Accounting Code A5A01OX02-5 560605 |

SUBCONTRACTOR

Al Fareez Wameed Company
Baghdad, Iraq
POC: Wamed Jameel
Email wamedjameel@yahoo.com

VENDOR NO: NA

SIZE OF BUSINESS: FOREIGN

THE TERMS AND CONDITIONS FORMING THE ORIGINAL SUBCONTRACT ARE MADE A PART OF THIS CHANGE ORDER EXCEPT TO THE EXTENT MODIFIED ON THE FACE HEREOF.

THIS ACTION IS DPAS RATED DO-C9

This Subcontract Agreement contains rated order quantities for national defense use, and you are required to follow all the provisions of the Defense Priorities and Allocations System regulation (15CFR part 700) only as it pertains to the rated quantities

DESCRIPTION: New Vehicle Maintenance Facility SUBCONTRACT NO. 02H8-US-SJ00163, AMMEND AS FOLLOWS

1.0. PURPOSE The purpose of Change Order No. Fourteen (14) is to:
- 1.1 Restart the project due to renegotiation.
- 1.2 The SOW in effect for this contract will be Revision Four (4) (attached) dated August 15, 2005 with the Descoped addendum to the SOW Exhibit B (attached). All other versions of the SOW are hereby rescinded.
- 1.3 Revise the Period of Performance to allow time for submitting plans, schedules in order to correct all deficiencies noted by the General Contractor's QA department.
- 1.4 Extend the DBA Insurance to reflect the extended period.
- 1.5 Adjust the payment terms to net three (03) days based upon Exhibit A

ke

2.0. SUBLET WORK Remains unchanged.

3.0. PRICING See Exhibit A for pricing/payment schedule and note the 20% Retention on each milestone is to be paid upon final Project QA/IR. Milestone Payments will be made upon each itemized completed task. The task is considered complete when QA/QC reports that each milestone has been approved with a QA/I R.

4.0. PERIOD OF PERFORMANCE The period of performance is hereby changed
FROM: 01 April 2005 to 23 September 2006
TO: 01 April 2005 to 01 April 2007

5.0 TERMS AND CONDITIONS
Payment shall be net three (03) days instead of net thirty (30) days. The Payments will consist of US currency paid by the KBR A&F Department at USMI Central.

6.0. EXECUTION

| SUBCONTRACTOR Al Farzeez Wameed Company | Subcontractor's authorized | GENERAL CONTRACTOR KELLOGG BROWN & ROOT SERVICES |
|---|---|---|

## Appendix A

representative is required to sign this bilateral change order, supplemental agreement to reflect and acknowledge the revisions made to the subject Subcontract.

| SIGNATURE | DATE SIGNED | SIGNATURE | DATE SIGNED |
|---|---|---|---|
| [signature] | 02-12 | [signature] | 02 [illegible] |
| Owner Representative AUTHORIZED REPRESENTATIVE | | Contract Administrator | |

Appendix B

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** DK Hodges <dkhodges@sdablaw.com>; "Markham Ball (markhamball@gmail.com)"
<markhamball@gmail.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>
**Cc:** "simotasat@adr.org" <simotasat@adr.org>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font
<mfont@sdablaw.com>
**Sent:** Friday, September 5, 2014 6:21 AM
**Subject:** Re: Case Number: 50-20-1200-0698 Al Farez v. KBR

Dear ,members of Tribunal

Once again, KBR did not comply with the Tribunal ruling on Aug/06/2014
nor with Tribunal procedural on Aug/25/2014 . KBR letter submitted to tribunal
on Sept/04/2014 is full with lying and deceiving to Tribunal as they always use
that tactic with the government before (All KBR VRT on May/02/2014).and in
Tribunal phase 1 .

KBR declined to comply to the production of the government invoices, which
confirm KBR stole the government money as well as AL Farez invoices of claim
( Exhibit A , Exhibit B) accepted and paid by the government to KBR          (
doc#38) stated :

*Since the work that was done by KBR (and its subcontractors, including your
company) was accepted by the contracting official, payments were made in
relation to each applicable contract therefore, KBR received payment for the
work which was deemed acceptable. It is now incumbent upon KBR to pay all
of its subcontractors. KBRs failure to accomplish this task is not the
responsibility of this office to ensure happens.)*

Mr , Chairman . The main reason KBR did not ,and will not reveal the production
of government invoices ,as Al Farez stated to Tribunal before, cause it will
uncover on all KBR breaching , stole , fraud and deceiving the government .

Al Farez predicted ,that KBR will not reveal the production of the government
invoices , and that's why AL Farez requested from the Tribunal before to recall it.

 KBR incredibility and lying clearly noticed in that matter ( blank all the
government invoices paid to KBR for AL Farez works . and in KBR allegation that
they do not possess the government ( DCMA)approval on each invoice KBR
submitted to the government  ( they possess all Al Farez invoices , and they do not
possess the government approval of payments to KBR in millions)

Appendix B

KBR incredibility and lying clearly noticed also in the outline briefing of invoices submitted ,as KBR did not gave any indication or prove to their counterclaim invoice( fire suppression ), and no indication or prove of back charging invoice 1&2 in the government invoices ,which affirm a fraud)

Mr. Chairman , KBR used on lying since we start the subcontract on March /2005 and till now , (runaround ,breaching ,deceiving ,fraud , stole ,and stalling) . and Al Farez will submit with evidence all of these actions , some of them submitted to Tribunal ( KBR VRT on May/02/2014 ) and the others after Al Farez get all the government invoices in details paid to KBR for Al Farez accepted work.

The production of the government invoices will prove , the lying and deceiving actions by the Respondent (Mrs Brenner) in her letter to Tribunal on Aug/09/2014 .

The respondent did not gave any explanation for the reason of Back charging ? Any agreement of the back charging ? Any change order refer to it? , any agreement for the partial amount paid by KBR to Al farez for reaching ( 30%)milestone ( invoice #3)? as alleged by KBR before. KBR stated in invoice #3 details under description its payment for reaching 30% milestone? So which mile stone KBR was referred to? Is it the mile stone of change order 11? or a partial payment as KBR alleged? Did KBR submitted invoice # 3 to the government in reaching 30 % of Al Farez work for only $57,537 ?

Wasn't that , A breaching by KBR in change order 11 for partial payment in invoice # 3 ? (11 month of Al Farez working since March /2005 with 2 additional change orders and reaching 30% of work ,is it worth $ 57,537? ( that's will not cover a part of the indirect cost of Al Farez company for 11 month ) .? how many millions KBR submitted as invoices to the government for the approval of Al Farez 30% of accepted work.? As stated in task order 100 (SJ00163) for KBR voucher Num 20,21,25,35 the government paid to KBR more than 65 millions ( KBR 000002 ) till the date 28/Feb/2006 ? Did the government subtract invoice 1, 2 from KBR ? In which voucher or invoice ,the government subtract invoice 1,2 from KBR submitted vouchers ? if not, why KBR back charge it from Al Farez ,as Mrs .Brenner like to call the back charging in invoice #3 a subtract process .

Based on forgoing and on KBR incredibility , Al Farez request from Tribunal to :

Appendix B

1- Recall all the invoices of VMF (SJ00163) approved and accepted by government DCMA contractor officer ( doc# 38) as KBR stated in their letter on Sep/04/2014 it is not under KBR possession.

2- Recall all the invoices of VMF( SJ00163) paid by the government ( DFAS) to KBR in details , the amount of each invoice and the date .As KBR blank all the details of invoices paid by the government to KBR for Al Farez accepted works.

3- Recall all the investigation done by the US army contracting command in this matter in referring to doc# 38 and doc# 39,and In relative to AL Farez reply letter in doc#39.

Best Regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix C

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>; DK Hodges <dkhodges@sdablaw.com>; William Russell <wrussell@sdablaw.com>; "David Brenner (David.Brenner2@kbr.com)" <David.Brenner2@kbr com>; Briana Bassler <bbassler@sdablaw com>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>
**Cc:** Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>; "cc: Shingirirai Chaza, LL.M." <ChazaS@adr.org>
**Sent:** Monday, August 25, 2014 6.11 AM
**Subject:** Re: Al Farez v. KBR--Ruling on KBR's objections to discovery requests

Dear members of Tribunal

Pursuant to the Tribunals order procedural # 8 and to Tribunal ruling on Aug 6 2014 .
The Respondent did not comply with tribunal ruling in the production of the relevant document mentioned in Claimant letter to KBR dated on July 24 /20149 (attached) In relative to Al Farez requested production of relative document from KBR item 1 stated:

((*All the government invoices paid to KBR as a cost plus in date .these invoices should showing the approval of the contractor officer on these invoices and the amount and the date of payment for each inv*oices)).

- The Respondent decline in his letter dated on Aug 22/2014 ( attached) the production of the relative documents in details as ruling by tribunal on Aug 6 /2014, in showing the approval of the government on each vouchers of task order( all items of Al Farez sublet work ) submitted by KBR to the government for the approval including items of claim invoices( Exhibit A , Exhibit B) .

- The Respondent blanked all the details of vouchers submitted to Al Farez from KBR000008 through KBR 00000211 ( 203 pages blank documents)(attached) random document of KBR blanked voucher.

- In change order 14 the retention money for each invoice is 20% ( invoice 7 to 41 ) and KBR mentioned in their letter it is 10% and they are lying.

- KBR submitted to Al Farez as their deceiving tactic, the outline of the vouchers , procedures on how KBR submitted vouchers to the government rather than to give evidence and details of the vouchers submitted .

Appendix C

- The government affirmed paid all these invoices ( Exhibit A , Exhibit B) to KBR as stated in the government letter dated on Sep 28 / 2011 ( doc# 38)and they accept all Al Farez works items.

- KBR in their letter on Aug 22 2014 to Al Farez deny that the government paid for invoices of claim ( Exhibit A , Exhibit B ) and they are lying ( doc#38)

- KBR also deny and lying in their letter, stating that KBR did not back charge from invoice # 3 the amount of the agreement in invoice 1 , 2 (attached Al Farez documents for invoice # 3) and they are lying too when they stated in their letter too that they paid to Al Farez a partial amount on invoice # 3 , the only invoices KBR paid a partial amount is in invoice number ( 1 , 2 ) for the material and equipment imported .

- KBR lying and deceiving the Tribunal when they deliberate to concealment of Al Farez bidding attached with the subcontracts agreement signed with KBR on 22 March / 2005.( doc 39 and doc 40) attached.

- There is no indication of fire suppression in the vouchers outline submitted showing approval of the government as KBR alleged in their counter claim. That's prove and evidence that KBR are lying in their counter claim.

- KBR affirmed in their letter too, that they did not paid to Al Farez the invoice of agreement for the evaporative cooler , and that's another lying of KBR in VRT on May 2 / 2008, as well as all oher 31 items.

Based on forgoing items, and based upon KBR incredibility due to their all breaching actions and lying and deceiving the Tribunal and due to KBR blanked vouchers submitted, The Claimant request from Tribunal to recall all the vouchers in details paid to KBR by the government (DFAS) for the task order SJ00163 ( vehicle maintenance facility), and all Al Farez sublet works submitted by KBR to DCMA (the owner of the contract) for approval as a cost plus contract.

Referring to procedural #8 , the claimant need to know from tribunal , The final date for submitting the requested production of documents for this order?

Best Regard

Appendix C

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

**From:** Markham Ball <markhamball@gmail.com>
**To:** wamed jameel <wamed_jameel@yahoo.com>; DK Hodges <dkhodges@sdablaw.com>; William Russell <wrussell@sdablaw.com>; "David Brenner (David.Brenner2@kbr.com)" <David.Brenner2@kbr.com>; Briana Bassler <bbassler@sdablaw.com>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>
**Cc:** Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>; "cc: Shingirirai Chaza, LL.M." <ChazaS@adr.org>
**Sent:** Wednesday, August 6, 2014 7:08 AM
**Subject:** Al Farez v. KBR--Ruling on KBR's objections to discovery requests

Dear Counsel:

The tribunal has considered KBR's Objections to Claimant's Requests for Production and Claimant's response thereto. We issue the following order:

Objection to request number 1. Respondent shall furnish all vouchers that it submitted for payment under subcontract 02H8-US-SJ00163 and that were paid by the Government, together with evidence of payments received on such vouchers.

Objection to request number 2. Respondent shall furnish a copy of Claimant's invoice for "two evaporative coolers (swamp coolers)" referred to in an email from Tom Hudson dated May 1, 2008, together with documents showing Respondent's response to the invoice, including any documents indicating whole or partial payment of the invoice.

Objection to request number 3. Respondent shall furnish copies of any documents in its possession showing Claimant's agreement or disagreement with KBR back charge invoices ITF1 or ITF2.

Appendix C

Except as provided herein, KBR's Objections to Claimant's Requests for Production are denied.

For the Tribunal,

Markham Ball
Chair

Appendix D

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>; Tom Welby <twelby@wbgllp com>, Robert Rubin <rrubin@mccarter.com>; Esq. Thomas M. Ventrone <ventronet@adr.org>; David Brenner <david.brenner2@kbr.com>; Peggy Brenner <pbrenner@sdablaw.com>
**Cc:** Mark CIV USA Smith <mark.smith16@us.army.mil>; Kristan A. CIV USA AMC Mendoza <kristan.mendoza@us army.mil>; Terese CIV USA AMC Harrison <terese.harrison@us.army.mil>; MARY CIV DFAS DEWITT <mary.dewitt@dfas.mil>; MARK CIV DFAS BARTA <mark.barta@dfas.mil>
**Sent:** Monday, January 5, 2015 5:30 AM
**Subject:** mian contract DAAA-09-02-D-0007 /Subcontract : 02H8- US-SJ-00163 / Task order : 100 / New Vehicle Maintenance Facility

Dear Tribunal Chairman, Mr.Ball

Referring to tribunal procedural #9

3. On or before January 26, 2015 either party may, in a writing to the tribunal with a copy to the other party, briefly outline the legal and factual contentions on which it intends to rely, and may also propose an agenda for the hearing, stating the order in which issues should be presented and witnesses heard. The tribunal may wish to schedule an additional prehearing conference after receiving proposals from either party.

<u>The Claimant legal contensions rely on the following ( strong evidence)</u>

1- All the government letters ( owner of the contract) in relative to the government correspondences which affirmed to Al farez ,that the Government approved and accept all Al Farez works for the subcontract mentioned as an invoices mile stone items in the Hearing documents.

2- All the government correspondences and conversation call which affirmed to Al Farez that the Government paid to KBR all Al Farez invoices of claim submitted to Tribunal in the Hearing documents .

3- All the correspondences to the Government and from the government in regarding the verification from the government to AL Farez in referring to the Senator letters Mrs Dianna Feinstein to the US Army assistance secretary of Defense for legislative affair dated on 03/Oct/2014 and 31/Oct/2014 ( attached).

4- All letters and correspondences in relative to the government release of information mentioned in Al Farez letters to the Government ( owner of the contract) in relative for the production of the government details on all invoices paid to KBR by DFAS and in relative to DCMA approval and accepted Al Farez items of works.

Appendix D

5- All KBR engineering ,supervisor ,and construction testify mentioned in KBR VRT1 dated on May/02/2008 and VRT 2 dated on Oct/21/2010 and ALL KBR contentions and verification in that Report.

6- All KBR Change orders ( including KBR breaching and Fraud Change orders)

7- The Original Agreement signed with KBR submitted with the hearing Documents.

8- KBR approval report on all items of work did by Al Farez ( QAQC)

9- KBR schedule time for items of works (directed and prepared by KBR construction)

10- Terms of contract attached with the agreement .

11- All the invoices paid by KBR to Al Farez for items of works.

12- Scope of works and drawings.

13- Other document ( letters and correspondences between KBR and Al Farez).

<u>The Claimant legal contension will not rely on KBR witness for the following reasons:</u>

1- KBR gave their witnesses testify before on KBR VRT May/02/2008 , ( Engineering , construction , QAQC, procurement , supervisors )as directed by KBR Legal Councel , Mr . David brenner in

2- The role of the witnesses party testify in comparing with Al Farez strong evidence submitted (government documents ) ,is insignificant role, taking in consideration , the list of witness party submitted by KBR ( non of KBR witnesses in that list are in relative to the issue and to KBR VRT report )

3- As KBR lack of incredibility through their lying and deceiving and Fraud actions , therefore the tribunal should not consider their witness testify under consideration .

4- KBR witness list, should be in relative to activity of the subcontract stated forgoing on item 5 , not as the KBR list of witnesses submitted to Tribunal , as none of them in relative to the claim.

<u>The Claimant, requests Mr. David Brenner( KBR legal counsel) to be a witness</u> for all his knowledge and his supervision and directed ( KBR VRT1 &VRT 2) ,also Mr. David Brenner copied for all Al Farez correspondences to the

government since 2007 till present. He is the legal counsel of KBR whose testify will be of importance to clarify his statements in correspondences and verification and actions to Al Farez and the government regarding Al farez Claim issue.

The Claimant request Mrs Julie.McEachern & Mr. Tyson Kisser ( KBR procurement)to be a witness

She was KBR procurement responsible and supervise of the subcontract. Her testify will high lighted on their responsibility on all the breaching of change orders and terms of contract.

The claimant requests Mr. Jack (KBR construction manager)

Mr. Jack is the manager of KBR whos directed and prepared and organized and discussed KBR schedule with Al farez in a weekly meeting attended by Al Farez with KBR staff of engineer , QAQC, procurement .

The claimant requests Mr. David Fullerton ( KBR engineer)

Mr. David Fullerton , directed and approved all Al farez drawings not in SOW And he can highlighted on KBR responsibility for the breaching of terms of contract ( change order).

Best regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix D

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Kristan A. CIV USA AMC Mendoza <kristan mendoza@us army.mil>; Mark CIV USA Smith <mark smith16@us.army mil>; Terese CIV USA AMC Harrison <terese.harrison@us.army.mil>; MARY CIV DFAS DEWITT <mary.dewitt@dfas.mil>; MARK CIV DFAS BARTA <mark.barta@dfas.mil>; Thomas L. CIV USA KING <tom.king@us.army.mil>
**Cc:** Markham Ball <markhamball@gmail.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>; Esq. Thomas M. Ventrone <ventronet@adr.org>; David Brenner <david.brenner2@kbr.com>; Peggy Brenner <pbrenner@sdablaw.com>
**Sent:** Friday, January 2, 2015 6:25 AM
**Subject:** Fw: Fwd: Fw: mian contract DAAA-09-02-D-0007 /Subcontract : 02H8- US-SJ-00163 / Task order : 100 / New Vehicle Maintenance Facility

Dear Mrs / Christian Mendoza
US army contracting command / Contractor officer

/ Mary Dewitt
US Defense and Accounting Service

- Referring to the Senator Mrs. Dianna Feinstein letter to the US Army of Defense /assistance Secretary of Defense for legislative affair dated on Oct/03/2014 ( attached) .
- Referring to Army Regulation 20-1 chapter 3-7

3-7. Requests for inspector general records under the Freedom of Information Act
a. The FOIA is a statutory right of access to Federal Government information. The Government's policy is to
disclose requested records unless exempt or excluded from disclosure under the FOIA and PA (5 USC 552 and 552(a)).
b. Examples of FOIA requests include the following:
(1) Requests for records by a Member of Congress. The IG will treat requests for copies of IG records by an MC, on the MC's own behalf or on the behalf of a constituent, as a request for records under the FOIA.

- Referring to the request of the contractor ( KBR) from Al Farez Co( subcontractor). to recall these documents from the Government ( owner) as the contractor contends thats these documents ( government approval on all Al Farez accepted works ) are not in KBR possession.

Appendix D

Will you please response to the Senator requests and provide AL Farez the verification in details, of the government invoices paid to KBR and for the Government accepted and approved on each items of work did by Al Farez for the contract as affirmed by US army contracting command letter dated on Sep/28/2011 ( attached) and as affirmed too by DFAS Mrs Dewitt in a conversation call.

Main Contract: DAAA-09-02-D-0007
Subcontract : 02H8- US-SJ-00163
Task order : 100
Name of subcontract : New Vehicle Maintenance Facility
The owner : DCMA
Main Contractor : KBR
Subcontractor : Al Farez-Wamed Co.

Best regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA
Cell : 001 5104370708 USA
Cell : 00962 795358717 JORDAN
Cell : 00964 7714277666 IRAQ

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Kristan A. CIV USA AMC Mendoza <kristan.mendoza@us.army.mil>; Mark CIV

Appendix D

USA Smith <mark.smith16@us.army.mil>; Terese CIV USA AMC Harrison <terese.harrison@us.army.mil>
**Cc:** Markham Ball <markhamball@gmail.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>; David Brenner <david.brenner2@kbr.com>
**Sent:** Tuesday, December 23, 2014 8:00 AM
**Subject:** mian contract DAAA-09-02-D-0007 /Subcontract : 02H8- US-SJ-00163 / Task order : 100 / New Vehicle Maintenance Facility

**From :** Al Farez-Wamed Co.
General Manager / Eng. Wameedh Al azzawi

**TO :** US Army Contracting Command
Mrs . Christan Mendoza / Contractor officer

**Subject :** Main Contract : DAAA-09-02-D-0007
Sub contract : 02H8- US-SJ-00163
Task order : 100

Dear Mrs. Mendoza

Referring to the Senator Mrs. Dianna Feinstein letter to the US Army of Defense /assistance Secretary of Defense for legislative affair dated on Oct/03/2014 ( attached) regarding a verification of the government approval on all the items of works ( mile stones) of Al Farez-Wamed Co ( Subcontractor) as accepted by the government and affirmed by the Detailed inspector General of the US army contracting command Mr. Mark smith in his correspondence dated Sep/28/2011 ( attached) .
Also AlFarez need a verification on all the details of invoices submitted by KBR for approval to the government

Main Contract: DAAA-09-02-D-0007
Subcontract : 02H8- US-SJ-00163
Task order : 100
Name of subcontract : New Vehicle Maintenance Facility
The owner : DCMA
Main Contractor : KBR
Subcontractor : Al Farez-Wamed Co.

Reasons

1- KBR contends to Al Farez-Wamed and to the Tribunal , that they do not have any possession of these documents .As the Tribunal ruling KBR for the production of these documents. and they request from Al Farez to recall it from the Government.

2- KBR deny that the government paid to KBR on all Al Farez accepted works mentioned in the Detailed inspector General of the US army contracting command Mr. Mark smith in his correspondence dated Sep/28/2011 ( attached) .

3- KBR did not comply with Tribunal ruling for the production of the detailed invoices approved by government . instead of that ,KBR blank on all the details of invoices submitted to Al Farez with no details . ( attached)

4- The US army contracting command still did not reply on the Senator letters forward to US Army of Defense /assistance Secretary of Defense for legislative affair dated on Oct/03/2014.

Attached

1- All items of Al Farez works( invoices of claim) which accepted by the government and paid by the government, which KBR still holding up the government invoices.

2- KBR engineers mile stone schedule for all items of works of the subcontract.

3- vouchers with no details as submitted by KBR to Tribunal.

Will you please copy in your reply to the members of Tribunal indicated in CC of this letter.

Best regard

Appendix D

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix E

---- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** DK Hodges <dkhodges@sdablaw.com>; "Markham Ball (markhamball@gmail.com)" <markhamball@gmail.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>
**Cc:** "simotasat@adr.org" <simotasat@adr.org>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>
**Sent:** Friday, September 5, 2014 6:21 AM
**Subject:** Re: Case Number: 50-20-1200-0698 Al Farez v. KBR

Dear ,members of Tribunal

Once again, KBR did not comply with the Tribunal ruling on Aug/06/2014 nor with Tribunal procedural on Aug/25/2014 . KBR letter submitted to tribunal on Sept/04/2014 is full with lying and deceiving to Tribunal as they always use that tactic with the government before (All KBR VRT on May/02/2014).and in Tribunal phase 1 .

KBR declined to comply to the production of the government invoices, which confirm KBR stole the government money as well as AL Farez invoices of claim ( Exhibit A , Exhibit B) accepted and paid by the government to KBR ( doc#38) stated :

*Since the work that was done by KBR (and its subcontractors, including your company) was accepted by the contracting official, payments were made in relation to each applicable contract therefore. KBR received payment for the work which was deemed acceptable. It is now incumbent upon KBR to pay all of its subcontractors. KBRs failure to accomplish this task is not the responsibility of this office to ensure happens.*)

Mr , Chairman . The main reason KBR did not ,and will not reveal the production of government invoices ,as Al Farez stated to Tribunal before, cause it will uncover on all KBR breaching , stole , fraud and deceiving the government .

Al Farez predicted ,that KBR will not reveal the production of the government invoices , and that's why AL Farez requested from the Tribunal before to recall it.

KBR incredibility and lying clearly noticed in that matter ( blank all the government invoices paid to KBR for AL Farez works . and in KBR allegation that they do not possess the government ( DCMA)approval on each invoice KBR submitted to the government ( they possess all Al Farez invoices , and they do not possess the government approval of payments to KBR in millions)

Appendix E

KBR incredibility and lying clearly noticed also in the outline briefing of invoices submitted ,as KBR did not gave any indication or prove to their counterclaim invoice( fire suppression ), and no indication or prove of back charging invoice 1&2 in the government invoices ,which affirm a fraud)

Mr, Chairman , KBR used on lying since we start the subcontract on March /2005 and till now , (runaround ,breaching ,deceiving ,fraud , stole ,and stalling) . and Al Farez will submit with evidence all of these actions , some of them submitted to Tribunal ( KBR VRT on May/02/2014 ) and the others after Al Farez get all the government invoices in details paid to KBR for Al Farez accepted work.

The production of the government invoices will prove , the lying and deceiving actions by the Respondent (Mrs Brenner) in her letter to Tribunal on Aug/09/2014 .

The respondent did not gave any explanation for the reason of Back charging ? Any agreement of the back charging ? Any change order refer to it? , any agreement for the partial amount paid by KBR to Al farez for reaching ( 30%)milestone ( invoice #3)? as alleged by KBR before. KBR stated in invoice #3 details under description its payment for reaching 30% milestone? So which mile stone KBR was referred to? Is it the mile stone of change order 11? or a partial payment as KBR alleged? Did KBR submitted invoice # 3 to the government in reaching 30 % of Al Farez work for only $57,537 ?

Wasn't that , A breaching by KBR in change order 11 for partial payment in invoice # 3 ? (11 month of Al Farez working since March /2005 with 2 additional change orders and reaching 30% of work ,is it worth $ 57,537? ( that's will not cover a part of the indirect cost of Al Farez company for 11 month ) .? how many millions KBR submitted as invoices to the government for the approval of Al Farez 30% of accepted work.? As stated in task order 100 (SJ00163) for KBR voucher Num 20,21,25,35 the government paid to KBR more than 65 millions ( KBR 000002 ) till the date 28/Feb/2006 ? Did the government subtract invoice 1, 2 from KBR ? In which voucher or invoice ,the government subtract invoice 1,2 from KBR submitted vouchers ? if not, why KBR back charge it from Al Farez ,as Mrs .Brenner like to call the back charging in invoice #3 a subtract process .

Based on forgoing and on KBR incredibility , Al Farez request from Tribunal to :

Appendix E

1- Recall all the invoices of VMF (SJ00163) approved and accepted by government DCMA contractor officer ( doc# 38) as KBR stated in their letter on Sep/04/2014 it is not under KBR possession.

2- Recall all the invoices of VMF( SJ00163) paid by the government ( DFAS) to KBR in details , the amount of each invoice and the date .As KBR blank all the details of invoices paid by the government to KBR for Al Farez accepted works.

3- Recall all the investigation done by the US army contracting command in this matter in referring to doc# 38 and doc# 39,and In relative to AL Farez reply letter in doc#39.

Best Regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| Cell : | 001 5104370708 | USA |
|---|---|---|
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix F

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>
**Cc:** DK Hodges <dkhodges@sdablaw.com>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>; David Brenner <david brenner2@kbr.com>; Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>; "simotasat@adr.org" <simotasat@adr.org>; Esq. Thomas M. Ventrone <ventronet@adr.org>
**Sent:** Friday, September 12, 2014 7:19 AM
**Subject:** Re: Case Number: 50-20-1200-0698 Al Farez v. KBR

Dear,Members of Tribunal

Referring to Tribunal letter dated on Sep/11/2014

AL Farez reserve all his right under the law in referring to the Fraud indication committed by KBR as the Claimant **raised** the claim of the Fraud to the Tribunal . It is in the Claimant response to Tribunal procedural # 6 of Al Farez Memorandum for pre-conference call submitted to the tribunal (dated on June/27/2014) under 1 procedure , a) documents discovery ( vii) and( viii) and under 2. Other issues either party wishes to raise.

The Claimant requests from the Tribunal the following:

**As KBR did not comply with Tribunal ruling** dated on (Aug/06/2014 and on Aug/25/2014 ) in the production of the relative government documents stated :

Objection to request number 1. Respondent shall furnish all vouchers that it submitted for payment under subcontract 02H8-US-SJ00163 and that were paid by the Government, together with evidence of payments received on such vouchers.

Therefore Al Farez request to apply the jurisdiction or any law enforcement given to Tribunal on KBR for the production of :

**1. All documents submitted by KBR to Al Farez dated on Aug/22/2014 without any blank to any details or any briefing or outline to any invoices**

Appendix F

**2. All the invoices of Al Farez work submitted by KBR to the government for approval , showing the government approval on each invoice with all the details ( quantity , date , cost , others) with no blank to any details of any invoices submitted.**

**All of these production of documents affirmed and in relative of the government paid of all Al Farez accepted work to KBR ( doc#38) , and in relative to Al Farez invoices to be adjusted later (exihibitA ,B) in relative to the dates and the details of all the government invoices submitted to KBR.**

Sincerely

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA
Cell : 001 5104370708 USA
Cell : 00962 795358717 JORDAN
Cell : 00964 7714277666 IRAQ

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

**From:** Markham Ball <markhamball@gmail com>
**To:** wamed jameel <wamed_jameel@yahoo.com>
**Cc:** DK Hodges <dkhodges@sdablaw com>, Peggy Brenner <pbrenner@sdablaw com>, Mark Font <mfont@sdablaw.com>; David Brenner <david brenner2@kbr.com>; Tom Welby <twelby@wbgllp com>; Robert Rubin <rrubin@mccarter.com>; "simotasat@adr.org" <simotasat@adr.org>; Esq. Thomas M. Ventrone <ventronet@adr org>
**Sent:** Thursday. September 11, 2014 1:04 PM
**Subject:** Re: Case Number: 50-20-1200-0698 Al Farez v. KBR

Dear counsel and parties:

The tribunal has considered Claimant's email of September 11.

Appendix F

To the extent Claimant objects to KBR's response to discovery requests, the tribunal has already ruled on these objections in its email of September 8; no other ruling is necessary. The deadline for additional discovery requests has passed.

Claimant's question and arguments address the merits of the case, not the present stage of the case. If timely and coherently presented, they will be addressed by the tribunal in due course.

Markham Ball
Tribunal chair

On Thu, Sep 11, 2014 at 1:21 PM, wamed jameel <wamed_jameel@yahoo.com> wrote:

Dear members of Tribunal

Al Farez need to clarify from the Tribunal the following items of concern :

1- Does the Tribunal have the jurisdiction giving by the law , to investigate and ruling in the government fraud ? As Al Farez evidence of the fraud committed by KBR in stole millions of government money (American tax payers ) clearly indicated in KBR blanked invoices on the government invoices submitted to Al farez ( attached) and in KBR declined for the production of the government approval on each items of Al Farez works ( KBR letter to Tribunal on Sep/04/20)

2- The Tribunal in their letter on ( Aug/06/2014 and on Aug/25/2014) ruling for the production of the documents pertaining All government invoices paid to KBR and all government approval on invoices of Al Farez works.
KBR did not comply with the Tribunal ruling . in the production of the relative documents.
Al Farez need these strong evidence to prove to the Tribunal that KBR contends of counterclaim is either lying or fraud , and to prove to the tribunal that the government paid to KBR all the invoices of claim ( Exhibit A , Exhibit B).As KBR deny that the government paid these invoices .
All KBR actions in denying and blanked government invoices and their contends they do no had the possession of the government approval on invoices is an evidence and affirming that AL Farez invoices ( Exihibit A , B) were paid by the government to KBR and its an indication of Fraud towards the government and towards Al Farez .

Appendix F

Best regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA
Cell : 001 5104370708 USA
Cell : 00962 795358717 JORDAN
Cell : 00964 7714277666 IRAQ

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

**From:** Markham Ball <markhamball@gmail.com>
**To:** wamed jameel <wamed_jameel@yahoo.com>; DK Hodges <dkhodges@sdablaw.com>; Peggy Brenner <pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>
**Cc:** Tom Welby <twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>; "simotasat@adr.org" <simotasat@adr.org>
**Sent:** Monday, September 8, 2014 11:40 AM
**Subject:** Re: Case Number: 50-20-1200-0698 Al Farez v. KBR

Dear counsel and parties:

The tribunal has reviewed Claimant's objections to KBR's responses to Claimant's First Requests for Production, dated August 25, together with KBR's response thereto of September 4 and a further email from Claimant dated September 5.

Claimant's objections are overruled. Any requests for further action by the tribunal that are included in Claimant's filings are denied.

For the tribunal
Markham Ball, chair

Appendix F

On Fri, Sep 5, 2014 at 9:21 AM, wamed jameel <wamed_jameel@yahoo.com> wrote:

Dear ,members of Tribunal

Once again, KBR did not comply with the Tribunal ruling on Aug/06/2014 nor with Tribunal procedural on Aug/25/2014 . KBR letter submitted to tribunal on Sept/04/2014 is full with lying and deceiving to Tribunal as they always use that tactic with the government before (All KBR VRT on May/02/2014).and in Tribunal phase 1 .

KBR declined to comply to the production of the government invoices, which confirm KBR stole the government money as well as AL Farez invoices of claim ( Exhibit A , Exhibit B) accepted and paid by the government to KBR      ( doc#38) stated :

*Since the work that was done by KBR (and its subcontractors, including your company) was accepted by the contracting official, payments were made in relation to each applicable contract therefore, KBR received payment for the work which was deemed acceptable. It is now incumbent upon KBR to pay all of its subcontractors. KBRs failure to accomplish this task is not the responsibility of this office to ensure happens.)*

Mr , Chairman . The main reason KBR did not ,and will not reveal the production of government invoices ,as Al Farez stated to Tribunal before, cause it will uncover on all KBR breaching , stole , fraud and deceiving the government .

Al Farez predicted ,that KBR will not reveal the production of the government invoices , and that's why AL Farez requested from the Tribunal before to recall it.

KBR incredibility and lying clearly noticed in that matter ( blank all the government invoices paid to KBR for AL Farez works . and in KBR allegation that they do not possess the government ( DCMA)approval on each invoice KBR submitted to the government ( they possess all Al Farez invoices , and they do not possess the government approval of payments to KBR in millions)

KBR incredibility and lying clearly noticed also in the outline briefing of invoices submitted ,as KBR did not gave any indication or prove to their counterclaim

5

Appendix F

invoice( fire suppression ), and no indication or prove of back charging invoice 1&2 in the government invoices ,which affirm a fraud)

Mr, Chairman , KBR used on lying since we start the subcontract on March /2005 and till now , (runaround ,breaching ,deceiving ,fraud , stole ,and stalling) . and Al Farez will submit with evidence all of these actions , some of them submitted to Tribunal ( KBR VRT on May/02/2014 ) and the others after Al Farez get all the government invoices in details paid to KBR for Al Farez accepted work.

The production of the government invoices will prove , the lying and deceiving actions by the Respondent (Mrs Brenner) in her letter to Tribunal on Aug/09/2014 .

The respondent did not gave any explanation for the reason of Back charging ? Any agreement of the back charging ? Any change order refer to it? , any agreement for the partial amount paid by KBR to Al farez for reaching ( 30%)milestone ( invoice #3)? as alleged by KBR before. KBR stated in invoice #3 details under description its payment for reaching 30% milestone? So which mile stone KBR was referred to? Is it the mile stone of change order 11? or a partial payment as KBR alleged? Did KBR submitted invoice # 3 to the government in reaching 30 % of Al Farez work for only $57,537 ?

Wasn't that , A breaching by KBR in change order 11 for partial payment in invoice # 3 ? (11 month of Al Farez working since March /2005 with 2 additional change orders and reaching 30% of work ,is it worth $ 57,537? ( that's will not cover a part of the indirect cost of Al Farez company for 11 month ) .? how many millions KBR submitted as invoices to the government for the approval of Al Farez 30% of accepted work.? As stated in task order 100 (SJ00163) for KBR voucher Num 20,21,25,35 the government paid to KBR more than 65 millions ( KBR 000002 ) till the date 28/Feb/2006 ? Did the government subtract invoice 1, 2 from KBR ? In which voucher or invoice ,the government subtract invoice 1,2 from KBR submitted vouchers ? if not, why KBR back charge it from Al Farez ,as Mrs .Brenner like to call the back charging in invoice #3 a subtract process .

Based on forgoing and on KBR incredibility , Al Farez request from Tribunal to :

1- Recall all the invoices of VMF (SJ00163) approved and accepted by government DCMA contractor officer ( doc# 38) as KBR stated in their letter on Sep/04/2014 it is not under KBR possession.

Appendix F

2- Recall all the invoices of VMF( SJ00163) paid by the government ( DFAS) to KBR in details , the amount of each invoice and the date .As KBR blank all the details of invoices paid by the government to KBR for Al Farez accepted works.

3- Recall all the investigation done by the US army contracting command in this matter in referring to doc# 38 and doc# 39,and In relative to AL Farez reply letter in doc#39.

Best Regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix G

July/24/2014

# International Center for Dispute Resolution
**Case No. 50-110-T-00698 12**

**AL FAREZ-WAMED CO.**
Claimant

**VS.**

**KELLOGG BROWN & ROOT SERVICES.**
Respondent

## Al Farez requested of Production of Relevant Documents ( evidence)

Pursuant to tribunal procedural order number 8 pertaining production evidence and documents of the case .
The Claimant requested from Respondent the production of the relevant documents of the case as following:

1. All the government invoices paid to KBR as a cost plus in date .these invoices should showing the approval of the contractor officer on these invoices and the amount and the date of payment for each invoices.
   This matter affirmed by the letter from the member of the house / Senator Jerry Mc.Nerney to the Defense Finance and Accounting service ( DFAS) on Dec/21/2009 attached ( Doc#40) , Which the DFAS affirmed to AL Farez on a conference call that all the invoices of claim forwarded by the Senator were paid by the DFAS to KBR .

Appendix G

And this matters was affirmed too by the detailed Inspector General of the U.S Army contracting command / Mr. Mark Smith in his correspondence on Sep/28/2011 to Al Farez attached ( Doc # 38 )stated :

The contract that existed was between US Government (Army) and KBR to provide the services as indicated in the specific Task/Delivery Orders. Since the work that was done by KBR (and its subcontractors, including your company) was accepted by the contracting official, payments were made in relation to each applicable contract therefore, KBR received payment for the work which was deemed acceptable. It is now incumbent upon KBR to pay all of its subcontractors. KBRs failure to accomplish this task is not the responsibility of this office to ensure happens.

Purpose:

a) The Claimant need the accurate date of the government invoices paid to KBR for Al Farez claim of invoices submitted to KBR mentioned in KBR VRT analysis on May/02/2008 as stated for)going ( Doc# 38 , # 40 ) So the Claimant can add the accurate interest rate to the invoices in relative to the date of payments by the government to KBR.

b) The Claimant need to know any approval from the government pertaining KBR back charge of invoices( ITF1 &ITF2 ) mentioned in change order 14.

c) Did the government paid for all my invoices of claim as stated in (document #38, #40)?

d) Did the government paid for additional concrete in the new footings approved by KBR engineering and not in scope of work?

e) Did the government paid to KBR for the power supply for the works activity?

f) Did the government paid to KBR for the covering of the factory with sandwich panel or steel corrugated plate?

g) Did the government paid for kick plate.?

h) Did the government paid for thermo stone .?

i) Did the government paid for HVAC in office building and annex buildngs.?

j) Did the government paid for fire suppression?

k) Did the government paid for rolling up doors.

l) Did the government paid for a concrete slab for factory and offices.

m) Did the government paid for removal of asbestos.? When?

n) Did the government paid for jag hammering and removal of old pavement? What the parts approval? When

o) Did the government paid for the 3 vehicle lifts? Is it the one in the SOW , or is it the new approval?

p) Did the government paid for steel decking of the mezzanine?

q) Did the government paid for 2 compressors?

r) Did the government paid for 2 exhaust fan in factory?

s) Did the government paid for all Electrical and main board?

t) Did the government paid for adding additional columns in mezzanine with its footings.

u) Did the government paid for terrace in office building?

v) Did the government paid for additional windows?

w) Did the government paid for ramp of factory?

x) Did the government paid for covering the factory parapet (tie beam) with stone?

y) Did the government paid for covering the tie beam in front of the factory with ceramic tiles?

z) Did the government paid for ceramic tiles on all walls of rest rooms? Did the government paid for covering the entrance of the main building with ceramic tiles?

aa) Did the government paid for shelves in mezzanine ?

bb) Did the government paid for delay invoices?

cc) Did the government paid for foundations of vehicle lifting?

dd) Did the government paid for the steel structure over the rolling up doors in the factory?

ee) Did the government paid for the new design of the main building office adding additional columns and footings?

2. The invoice of the evaporative coolers ( number , amount , date) as stated by KBR legal counsel Mr. David Brenner allegation that KBR paid it to AL Farez-Wamed Co. In KBR letter dated on May/01/2008. ( attached).

3. Is there any notification of mutual agreement (document) of KBR back charge invoices ( ITF1,ITF2 ) mentioned in change order 14? If so need to forward it .

Appendix G

Respectively submitted

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix I

**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>
**Cc:** Peggy Brenner <pbrenner@sdablaw.com>; Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>; "Tom Simotas (simotasat@adr.org)" <simotasat@adr.org>; DK Hodges <dkhodges@sdablaw.com>; Mark Font <mfont@sdablaw.com>; Marc Folsom <Marc.Folsom@kbr.com>
**Sent:** Tuesday, July 21, 2015 6:40 AM
**Subject:** Tribunal governed law

Dear Members of Tribunal

Referring to items **9.2 Laws** of the subcontract General conditions(volume1–page 69) which stated the following :

***" Unless otherwise provided in the subcontract Terms , this Agreement shall be construed and governed by the laws of the state of Texas"***

Referring to the subcontract agreement, the Tribunal giving the power of Texas laws
Referring to law of Texas given to Tribunal , the Claimant requests from the Tribunal the following before the hearing :

1- Apply the Texas law, to recall the Claimant witnesses mentioned in Claimant letter to Tribunal dated at Dec/15/2014 ( Attachment F)and the Respondent witnesses ( Tyson kisser /KBR procurement , David Fullerton /KBR Civil Eng , Jimmy hyde ( KBR / Mechanical Eng ) and Jack ( KBR /Construction)

2- Apply the Texas law to impose KBR to comply with the Tribunal ruling dated at Aug/06/2014 ( Attachment Q)for the product of the government documents (contractor officer approval on all Al Farez works ) stated in Claimant letter to Tribunal dated at July/24/2014 (Attachment N ) and attached ( ( A ,B ,C D, E, I, J, K, L, M, , O, P, Q )

3- Apply the Texas law to impose KBR to comply with the product of all the details of the DFAS invoice ( original copy) Attached ( A ,B ,C D, E, I, J, K, L, M, N, O, P, Q )

Appendix 1

All these three requests items are the Claimant strong evidence rely on it as stated in Claimant Claim submitted to Tribunal at Jan/22/2015

Best regard

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| Cell : | 001 5104370708 | USA |
|---|---|---|
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix L

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>
**Cc:** Peggy Brenner <pbrenner@sdablaw.com>; Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>; "Tom Simotas (simotasat@adr.org)" <simotasat@adr.org>; DK Hodges <dkhodges@sdablaw.com>; Mark Font <mfont@sdablaw.com>; Marc Folsom <Marc.Folsom@kbr.com>
**Sent:** Tuesday, July 21, 2015 6:40 AM
**Subject:** Tribunal governed law

Dear Members of Tribunal

Referring to items **9.2 Laws** of the subcontract General conditions(volume1-page 69) which stated the following :

***" Unless otherwise provided in the subcontract Terms , this Agreement shall be construed and governed by the laws of the state of Texas"***

Referring to the subcontract agreement, the Tribunal giving the power of Texas laws
Referring to law of Texas given to Tribunal , the Claimant requests from the Tribunal the following before the hearing :

1- Apply the Texas law, to recall the Claimant witnesses mentioned in Claimant letter to Tribunal dated at Dec/15/2014 ( Attachment F)and the Respondent witnesses ( Tyson kisser /KBR procurement , David Fullerton /KBR Civil Eng , Jimmy hyde ( KBR / Mechanical Eng ) and Jack ( KBR /Construction)

2- Apply the Texas law to impose KBR to comply with the Tribunal ruling dated at Aug/06/2014 ( Attachment Q)for the product of the government documents (contractor officer approval on all Al Farez works ) stated in Claimant letter to Tribunal dated at July/24/2014 (Attachment N ) and attached ( ( A ,B ,C D, E, I, J, K, L, M, , O, P, Q )

3- Apply the Texas law to impose KBR to comply with the product of all the details of the DFAS invoice ( original copy) Attached ( A ,B ,C D, E, I, J, K, L, M, N, O, P, Q )

Appendix L

All these three requests items are the Claimant strong evidence rely on it as stated in Claimant Claim submitted to Tribunal at Jan/22/2015

Best regard

Wameedh Al Azzawi   / Civil Eng
  GENERAL MANAGER
  Al FAREZ-WAMED CO
  888 WILLIAMS ST.
  TRACY / CA 95376 USA
  Cell :     001 5104370708     USA
  Cell :     00962 795358717    JORDAN
  Cell :     00964 7714277666   IRAQ

  E-mail : wamed@alfarez-wamed.com
  URL : www.alfarez-wamed.com

Appendix M

----- Forwarded Message -----
**From:** wamed jameel <wamed_jameel@yahoo.com>
**To:** Markham Ball <markhamball@gmail.com>; Mark Font <mfont@sdablaw.com>; DK Hodges <dkhodges@sdablaw com>; Peggy Brenner <pbrenner@sdablaw.com>; Marc Folsom <Marc.Folsom@kbr.com>
**Cc:** Tom Simotas <SimotasAt@adr.org>; Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp.com>
**Sent:** Wednesday, July 29, 2015 10.09 AM
**Subject:** Re: hearing documents

Dear Mr .Ball

The Claimant requests the the following (original copy) from the Respondent to bring it in the Hearing :

1- Change order 10 ( original copy) with all the attachments ( original attachments )

2- Change order 11 (original copy) with all the attachments ( original attachments)

3- Change order 13 ( original copy) with all the attachments ( original attachments)

The Reason:

It is a strong evidence the Claimant will rely on it to prove to Tribunal that the attachments submitted by Respondent to Tribunal are false attachments.

Best Regard

Wameedh Al azzawi

**From:** Markham Ball <markhamball@gmail com>
**To:** Mark Font <mfont@sdablaw com>; DK Hodges <dkhodges@sdablaw com>; wamed jameel <wamed_jameel@yahoo com>; Peggy Brenner <pbrenner@sdablaw com>, Marc Folsom <Marc.Folsom@kbr com>
**Cc:** Tom Simotas <SimotasAt@adr org>; Robert Rubin <rrubin@mccarter.com>; Tom Welby <twelby@wbgllp com>
**Sent:** Wednesday, July 29, 2015 7:26 AM
**Subject:** hearing documents

Dear parties:

Appendix M

It would expedite the hearing, and be a convenience to all concerned, if each party
would bring to the hearing four copies of any document that the party intends to refer
to in the presentation of its case, and would give copies of each document to the
arbitrators and the opposing party when or before referring to the document.

Markham Ball
Tribunal chair

Appendix N

Dec/15/2014

**International Center for Dispute Resolution**
**Case No. 50-110-T-00698 12**

**AL FAREZ-WAMED CO.**
Claimant

**VS.**

**KELLOGG BROWN & ROOT SERVICES.**
Respondent

**Claimant Tentative List of Witnesses**

Pursuant to procedural order No.9 , The claimant Al Farez Wamed Co. respectfully submits this tentative list of government witnesses who may testify at the hearing in this matter:

1- Mark Smith

The detailed inspector general of the US army command.
He may testify in referring to his letter to Al Farez-Wamed Co. dated on Sep/28/2011 ( doc#38) that All Farez company works was accepted by the contracting official, payments were made in relation to each applicable contract therefore, KBR received payment for the work which was deemed acceptable.

Appendix N

2- <u>Mary Dewitt</u>

Manager in DFAS department
She may testify that the government paid all the invoices of Al Farez Claim to KBR as she mentions it to the Claimant on the conference call. She may testify also that KBR did a fraud and over invoice the government.

3- <u>Mark Barta</u>

Government DFAS Attorney
He may testify and affirm that all the conversation call between DFAS Mary Dewitt and the Claimant regarding what Ms. Mary dewitt mentioned to Al Farez that the government paid all the invoices of Al farez accepted work invoices to KBR.

4- <u>Kris Mendoza</u>

The contractor officer of US army command , who is in charge of this contract in monitoring and approval of all works activities . she may testify that All Al Farez Works was approved and accepted by the government .and they paid all these invoices to KBR

Respectively submitted

Wameedh Al Azzawi / Civil Eng
GENERAL MANAGER
Al FAREZ-WAMED CO
888 WILLIAMS ST.
TRACY / CA 95376 USA

| | | |
|---|---|---|
| Cell : | 001 5104370708 | USA |
| Cell : | 00962 795358717 | JORDAN |
| Cell : | 00964 7714277666 | IRAQ |

E-mail : wamed@alfarez-wamed.com
URL : www.alfarez-wamed.com

Appendix N

Appendix O

In stanton v. Paine Webber Jackson & Curtis *157 F.R.D. 42,43 (M.D.Tenn.1994)*

The Arbitrator at the request of the defendants , issued subpoenas to nonparties requiring pre-hearing production of documents.

The plaintiff objected , contending issuance of the subpoenas was improper because it constituted impermissible pre-hearing discovery . The court , observing that prohibiting the subpoenas would be improper judicial intrusion into an arbitration proceeding , held that pursuant to:

….. the arbitration Act , the arbitrators may order and conduct such discovery as they find necessary .( citation omitted) . plaintiff's contention that paragraph 7 of the Arbitration Act only permits the arbitrators to compel witnesses at the hearing , and prohibits pre-hearing appearances , is unfounded.

( ***see Id. See also Amgen ,Inc.,879 F.Supp.at 879 ( recognizing an arbitrators authority to compel testimony and documents prior to hearing);Hines Parts Service, Inc. v . NCR corp.,859 F.supp.349,353( N.D. Ind.1994)( acknowledging an arbitrators authority to order pre-hearing discovery pursuant to section 7 of the FAA***)

Appendix P

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
Arbitration No. 50-110-T-00698-12

In the Matter of

AL FAREZ-WAMED CO.,

Claimant

*v.*

KELLOGG BROWN & ROOT SERVICES, INC.,

Respondent.

---

## RESPONDENT KBR'S TENTATIVE LIST OF WITNESSES

---

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510

*Attorneys for Respondent*
*Kellogg Brown & Root Services, Inc.*

December 15, 2014

Appendix  P

Pursuant to Procedural Order No. 9, Respondent Kellogg Brown & Root Services, Inc. ("KBR") respectfully submits this tentative list of witnesses who may testify at the hearing in this matter:

1.      Robert Hill: Mr. Hill is a current KBR Project General Manager with more than 38 years of experience working on projects in the construction, security, and energy fields. Mr. Hill has extensive experience managing construction and other projects in Iraq, Kuwait, Afghanistan, UAE, Djibouti, Honduras, and Turkmenistan. Mr. Hill is a retired U.S. Army Lt. Colonel. He is familiar with KBR and U.S. Government subcontracting policies and procedures. Mr. Hill may offer factual and opinion testimony related to construction in a contingent environment, subcontract administration, subcontract interpretation, KBR policies and procedures, U.S. Government, U.S. Army, and U.S. Department of State policies and procedures, the effects on subcontractors of the U.S. armed forces' withdrawal from Iraq, the difficulties of locating former KBR personnel and evaluating subcontractor claims years after a construction project is completed, certain claims of the Al Farez-Wamed Co. ("Al Farez"), KBR's counterclaim, events during the construction of the VMF, project construction and documentation, responsibility for delays and costs, and alleged damages.

2.      Gregory Jacobs: Mr. Jacobs is a current KBR Senior Government Compliance Manager. Mr. Jacobs is a Certified Public Accountant who has been employed by KBR for the past 19 years. During that time, Mr. Jacobs has held positions in the Internal Audit, Sarbanes-Oxley Compliance, and Government Compliance programs at KBR. Mr. Jacobs will offer factual and opinion testimony regarding the processing of invoices, payment of subcontractors, payment of KBR by the U.S. Government, contract close out procedures, Task Order close out procedures, KBR's counterclaim, certain claims of Al Farez, Al Farez's invoices, payments to Al Farez, and payments to KBR by the U.S. Government for work on Subcontract SJ00163.

3.      Christopher Sullivan: Mr. Sullivan is a Senior Consultant in the Construction Solutions practice group of FTI Consulting, Inc. Mr. Sullivan has provided project support, analysis, and dispute resolution services in the areas of project controls, claims, program management, contract administration, owner representation, and construction cost controls to a number of clients in a variety of industries. Mr. Sullivan has reviewed documents related to the VMF, Al Farez's claims and KBR's counterclaim. Mr. Sullivan will offer factual and opinion testimony regarding the VMF subcontract, certain claims of Al Farez, KBR's counterclaim, project construction and claim

documentation, contract administration, responsibility for delays and costs, and potential damages.

4. **Matt Bayne:** Mr. Bayne is a former KBR subcontract administrator who was assigned to the Vehicle Maintenance Facility ("VMF") subcontract for a portion of the construction period. He oversaw subcontract SJ00163 and had personal dealings with Wameedh al Azzawi, the general manager of Al Farez, during the construction of the VMF and after Al Farez left the project. Mr. Bayne may offer factual and opinion testimony related to construction in a contingent environment, subcontract administration, subcontract interpretation, KBR policies and procedures, U.S. Government and U.S. Department of State policies and procedures, certain claims of Al Farez, KBR's counterclaim, events during the construction of the VMF, project construction and claim documentation, interaction with Mr. al Azzawi and Al Farez personnel, responsibility for delays and costs, and potential damages. Mr. Bayne is no longer employed by KBR and does not live in the United States. Mr. Bayne possesses unique and important information related to KBR's defense of Al Farez's claims and prosecution of KBR's counterclaim in this matter. Mr. Bayne has informed KBR that he is unsure of his availability to appear at the final hearing in this matter.

5. **Tyson Kiser:** Mr. Kiser is a former KBR subcontract administrator who was in Iraq working on the requisition, request for proposal, response to request for proposal, and the beginning portion of the construction of the VMF. He oversaw subcontract SJ00163 and had personal dealings with Wameedh al Azzawi, the general manager of Al Farez, during the construction of the VW. Mr. Kiser may offer factual and opinion testimony related to construction in a contingent environment, subcontract administration, subcontract interpretation, KBR policies and procedures, U.S. Government, U.S. Army, and U.S. Department of State policies and procedures, certain claims of Al Farez, events during the construction of the VMF, project construction and claim documentation, and interaction with Mr. al Azzawi and Al Farez personnel, responsibility for delays and costs, and potential damages. Mr. Kiser also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. Mr. Kiser has informed KBR that he now fears for the safety of himself and his family and is currently unwilling to appear at the hearing or otherwise testify; he believes that Mr. al Azzawi and/or unknown militant terrorists may harm him or members of his family as a result of his relationship to and involvement in Subcontract SJ00163.

Appendix P

6. **Karl Demming:** Mr. Demming is a current KBR employee who was a KBR Engineering Supervisor at USMI Baghdad during a portion of the construction of the VMF. Mr. Demming is an electrician and construction manager and may offer factual and opinion testimony regarding construction in a contingent environment. KBR policies and procedures. U.S. Government. U.S. Army. and U.S. Department of State policies and procedures. engineering issues. electrical issues. construction issues. certain claims of Al Farez. KBR's counterclaim. events during the construction of the VMF. and interactions with Mr. al Azzawi and Al Farez personnel. subcontract administration. project construction documentation. responsibility for delays and costs. and potential damages. Mr. Demming is currently working for KBR on a Department of State project in Romania. Mr. Demming also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter and prosecution of KBR's counterclaim in this matter. He is willing to testify. but is currently unsure of his availability to leave Romania in March to appear live at the hearing.

7. **David Fullerton:** Mr. Fullerton is a former KBR employee who was a civil engineer in the KBR Engineering Department assigned to the Green Zone in Iraq during a portion of the construction of the VMF. Mr. Fullerton may offer factual and opinion testimony regarding construction in a contingent environment, KBR policies and procedures, U.S. Government, U.S. Army, and U.S. Department of State policies and procedures. engineering issues. certain claims of Al Farez, events during the construction of the VMF. project construction documentation, interactions with Mr. al Azzawi and Al Farez personnel. subcontract administration. responsibility for delays and costs. and potential damages. Mr. Fullerton also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He is willing to testify but is currently unsure of his availability to appear live at the hearing.

8. **Eric Stump:** Mr. Stump is a former KBR employee who was an electrical superintendent in the Green Zone in Iraq during a portion of the construction of the VMF and also served as a construction manager over that project. Mr. Stump may offer factual and opinion testimony regarding construction in a contingent environment. KBR policies and procedures. engineering and electrical issues. certain claims of Al Farez. events during the construction of the VMF. and interactions with Mr. al Azzawi and Al Farez personnel. subcontract administration. project construction documentation. responsibility for delays and costs. and potential damages. Mr. Stump also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He is willing to testify but does not live in the United States and he is currently unsure of his availability to appear live at the hearing.

9. Carl Brown: Mr. Brown is a former KBR employee who was a Quality Manager who oversaw quality control over the VMF during a portion of the project. Mr. Brown may offer factual and opinion testimony regarding construction in a contingent environment, KBR policies and procedures, U.S. Government, U.S. Army, and U.S. Department of State policies and procedures, certain claims of Al Farez, project construction documentation, events during the construction of the VMF, interactions with Mr. al Azzawi and Al Farez personnel, subcontract administration, responsibility for delays and costs, and potential damages. Mr. Brown also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He does not live in the United States and, because of a pending employment opportunity, is currently unable to commit to appearing live at the hearing.

10. Jim Parris: Mr. Parris is a former KBR employee who served as Director of Engineering in the Green Zone in Iraq during a portion of the construction of the VMF. Mr. Parris may offer factual and opinion testimony regarding construction in a contingent environment, KBR policies and procedures, engineering issues, certain Al Farez claims, events during the construction of the VMF, interactions with Mr. al Azzawi and Al Farez personnel, subcontract administration, responsibility for delays and costs, and potential damages. Mr. Parris also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He does not live in the United States and has not yet committed to appearing live at the hearing.

11. Tom Berger: Mr. Berger is a former KBR employee who served as a construction manager on the VMF project. He may offer factual and opinion testimony regarding construction in a contingent environment, KBR policies and procedures, engineering issues, certain claims of Al Farez, events during the construction of the VMF, interactions with Mr. al Azzawi and Al Farez personnel, subcontract administration, responsibility for delays and costs, and potential damages. Mr. Berger also possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He does not live in the United States and has not yet committed to appearing live at the hearing.

12. Jimmie Hyde: Mr. Hyde is a former KBR employee who served as a mechanical engineer on the VMF project. Mr. Hyde may offer factual and opinion testimony regarding construction in a contingent environment, KBR policies and procedures, engineering issues, certain claims of Al Farez, events during the construction of the VMF, interactions with Mr. al Azzawi and Al Farez personnel, subcontract administration, responsibility for delays and costs, and potential damages. Mr. Hyde also

possesses unique and important information related to KBR's defense of Al Farez's claims in this matter. He does not live in the United States and has not yet committed to appearing live at the hearing.

Respectfully Submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

Margaret T. Br
er William W.
Russell Mark
A. Font Briana
J. Bassler
Pennzoil Place - North Tower 700
Milam Street, 10th Floor Houston,
Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510
*pbrenner@sdablaw.corn*
*wrussell@sdablaw. corn*
*mfont@sdablaw. corn*
*bbassler@sdablaw.com*

*Attorneys for Respondent*
*Kellogg Brown & Root Services, Inc.*

6

Appendix Q

----- Forwarded Message -----
**From:** DK Hodges <dkhodges@sdablaw.com>
**To:** "Markham Ball (markhamball@gmail.com)" <markhamball@gmail.com>; Tom Welby
<twelby@wbgllp.com>; Robert Rubin <rrubin@mccarter.com>; "wamed_jameel@yahoo.com"
<wamed_jameel@yahoo.com>
**Cc:** "Tom Simotas (simotasat@adr.org)" <simotasat@adr.org>; Peggy Brenner
<pbrenner@sdablaw.com>; Mark Font <mfont@sdablaw.com>; "Marc Folsom (Marc.Folsom@kbr.com)"
<Marc Folsom@kbr.com>
**Sent:** Tuesday, July 21, 2015 3:29 PM
**Subject:** ICDR No. 50 110 T 00698-12

Dear Members of the Tribunal and Mr. al Azzawi,

Please see attached correspondence, Supplemental Statement of Gregory Jacobs,
Respondent KBR's Motion to Supplement the Documentary Evidence, and KBR's
supplemental document evidence. We are sending a duplicate paper copy by Federal
Express.

Please contact me if you have difficulty opening any of the attachments.

Sincerely,

Dana

# Exhibit J1

# PROFORMA INVOICE

CONSTRUCTION OF MAINTENANCE FACILITY IN THE IZ

02H8-US-SJ00163
VRT CLAIM ANALYSIS

| Item | items no. in the scope of work | Description of item in the SOW | Description of additional work not in the SOW | price of the item in SOW bidding | Price of the additional work not in the SOW | Details | KBR VRT ANALYSIS DENY/ACCEPT |
|---|---|---|---|---|---|---|---|
| 1 | | Not in the SOW | Generator 100 KV fuel & Maintenance one year | | $15,000.00<br>$21,000.00 | imposed by construction manger / Tom burger | Per SOW section 16.3 the sub shall "provide, deliver, install, and test electric power for the new Vehicle Maintenance Facility, and associated equipment including lighting, outlets, HVAC, and equipment". DENY |
| | | | | | | | Also SOW section 1.1.2 states this is a "turnkey project" and all material, labor and design is to be provided<br>DENY - The generator is required to be provided based upon the above SOW sections. DENY |
| | | | | | | | The sub is responsible for the generator and other electrical equipment until project turnover.<br>DENY |
| 2 | 2 3 1 | continuous foundation 50 cm x 80 cm | separate footings & tie-beam | | $150,000.00 | approved by David Fullerton / 20 Oct 2005 | Per conversation with KBR Construction - on 18 Nov 2007, the change from continuous concrete footing to separate footings is less expensive for the sub. This should be a deductive change in KBR's favor. DENY |
| 3 | | | Demolish 8 failure footings/ and re do it again | | $15,000.00 | TOM burger impose the batch plant Iraqi conc. | Substandard concrete was used. Vendor was directed by KBR to seek refund from his batch concrete supplier. |

# PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 | | Not in the SOW | Demolish the main office concrete slab 20 cm thick | | $25,000.00 | approved by engineer | The SOW (rev 4) which was made part of the subcontract by Mod 5 states in 2.13 that "Subcontractor to demo existing slab, remove debris, add sub base, grade and compact. Jackhammer old pavement, remove the 40cm thickness of debris, add 15cm of sub base providing a level site grade. The total subcontract value was increased by $28,932 for this extra work. DENY | |
| 5 | | Not in the SOW | Adding sub-base over the main office area (40 cm) and compact | | $6,000.00 | approve by David Fullerton on 22/Oct/2005 | The SOW (rev 4) which was made part of the subcontract by Mod 5 states in 2.13 that "Subcontractor to demo existing slab, remove debris, add sub base, grade and compact. Jackhammer old pavement, remove the 40cm thickness of debris, add 15cm of sub base providing a level site grade. The total subcontract value was increased by $28,932 for this extra work. DENY | |
| 6 | | Not on the KBR drawings submitted | adding 7 concrete columns in the office area, with its footing and the beams | | $35,000.00 | approved by David Fullerton on 22/Oct/2005 | Per conversation with KBR Construction Karl ("Joe") Demming - on 18 Nov 2007, the addition of these columns was due to substandard steel support columns provided by the sub. This claim is DENY | where is the report |
| 7 | | Not on the KBR drawings submitted | adding 7 Steel columns with its footing in the Mezzanine | | $28,000.00 | approved by David Fullerton on 22/Oct/2005 | SOW SECTION 5.2 STATES THE SUB SHALL DESIGN, FURNISH, AND INSTALL ALL STRUCTURAL ELEMENTS OF THE BUILDING:STEEL COLUMNS, BEAMS, AND TRUSSES. ALL DESIGNS SHALL BE APPROVED BY KBR ENGINEERING. CHECKED WITH KBR CONSTRUCTION TO SEE IF THIS IS ADDITIONAL WORK. DENY | |
| 8 | | Not on the KBR drawings submitted | increasing the side-entrance corridor width from 1.5 m to 2m | | $9,000.00 | approved by David Fullerton on 22/Oct/2005 | CHECKED WITH KBR PERSONNEL TO SEE IF THIS IS ADDITIONAL WORK. NO CORROBORATION THAT KBR DIRECTED THIS WORK. WIDTH OF SIDE ENTRANCE CORRIDOR NOT REFERENCED IN SOW. DENY | |

# PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 9 | | Not on the KBR drawings submitted | Adding terrace in the main office | | $18,000.00 | approved by David Fullerton on 22/Oct/2005 | CHECKED WITH KBR PERSONNEL TO SEE IF THIS IS ADDITIONAL WORK. THIS "TERRACE" WAS ORIGINALLY INTENDED TO BE SECOND FLOOR OFFICE SPACE IN THE VEHICLE MAINTENANCE FACILITY. DUE TO POOR CONSTRUCTION WORK (CONCRETE), THIS AREA IS NOT HABITABLE.<br><br>AS A LESS EXPENSIVE ALTERNATIVE TO FIXING THESE DEFECTS, KBR PERMITTED THE SUB TO CONSTRUCT A SMALLER OFFICE BUILDING ADJACENT TO THE MAINTENANCE FACILITY.<br><br>IT SHOULD BE NOTED THAT THIS "TERRACE" IS STILL ROPED OFF, AS IT IS NOT FIT/HABITABLE. THE SECOND FLOOR AREA USED BY THE "PARTS ROOM" IS HABITABLE/FIT FOR USE.<br><br>THE CLAIM FOR THE "TERRACE" IS DENIED. | |
| 10 | 26.1 | concrete blocks 20/20/40 | building with thermo-stone (25cm width x 20cm height x 45cm long) | | $20,000.00 | approved by Tom burger/construction manger | CHECKED WITH KBR CONSTRUCTION TO SEE IF THIS IS ADDITIONAL WORK. The sub wanted thermo stone because it was cheaper for him. KBR did not direct nor require. DENY | |
| 11 | | Not in the SOW | Adding side-kick tile | | $10,000.00 | approved (change order 14) | CHECKED WITH KBR CONSTRUCTION TO SEE IF THIS IS ADDITIONAL WORK. DENY | |
| 12 | 2.11 | 4 rolling side doors | 4 rolling up doors | | $80,000.00 | approved by Tom burger/and David Fullerton | Required by SOW v.4 Division 8.1 DENY | |
| 13 | | Not in the SOW | adding additional steel structure over the doors and cladding | | $25,000.00 | approved by engineer | CHECK ED WITH KBR CONSTRUCTION TO SEE IF THIS IS ADDITIONAL WORK. DENY | |

PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | 2.5 8 | Cover the roof structure of the factory with corrugated steel sheets | Change it to Sandwich Panel/7.5 cm thick | | $50,000.00 | approved by Tom burger/and David Fullerton | CHECKED WITH KBR CONSTRUCTION<br>TO SEE IF THIS IS ADDITIONAL WORK.<br>SOW 2.7.3 STATES SUB IS TO "PROVIDE AND INSTALL INSULATION PANELS FOR ALL OUTSIDE WALLS AND THE ROOF CONSTRUCTION". SUB'S INTENT TO PUT CORRUGATED STEEL SHEETS IS NOT PER SOW. EVEN IF KBR "APPROVED" THE DESIGN AS THE SUB CLAIMS, IT DOES NOT RELIEVE SUB OF PERFORMING TO SOW. DENY | |
| 15 | | Not in the SOW | Covering the front of the building with ceramic tiles | | $5,000.00 | approved by engineer | CHECK WITH KBR CONSTRUCTION<br>TO SEE IF THIS IS ADDITIONAL WORK. SOW SECTION 3.3 REQUIRES OUTSIDE CONCRETE WALLS TO BE PLASTERED NOT TILED.<br>DENY AS THIS WAS DONE AT SUB'S OWN INITIATIVE AND NOT DIRECTED BY KBR. | |
| 16 | | Not in the SOW | Covering the tie-beam parapet with stone | | $8,000.00 | approved by engineer | CHECK WITH KBR CONSTRUCTION<br>TO SEE IF THIS IS ADDITIONAL WORK. NO MENTION OF STONE IN SOW DIVISION 9 - FINISHES.<br>THERE IS NO CONFIRMATION THAT THIS WAS DIRECTED BY KBR. ALSO, APPROVAL OF A DRAWING/DESIGN DOES NOT CONSTITUTE A CONSTRUCTIVE CHANGE.<br>DENY | |
| 17 | 2.8.2 | | Adding additional windows/additional flashing&purlines | | $23,000.00 | approved by engineer | CHECK WITH KBR CONSTRUCTION<br>TO SEE IF THIS IS ADDITIONAL WORK.<br>DENY AS THIS WAS DONE AT SUB'S OWN INITIATIVE AND NOT DIRECTED BY KBR. | |
| 18 | 6.2 | Mezzanine 2nd floor metal-wood | Mezzanine in 2nd floor all made by steel structure | | $40,000.00 | approved by engineer | Divison 6.2 of the SOW states the contractor will design, furnish, and install the mezzanine (second floor) of the facility with prefab metal-wood construction material appropriate for the admin building and parts room.<br><br>Divisions 6.4 and 6.6 also state that sub shall construct the structural elements of the mezzanine along with a drop ceiling for the mezzanine.<br><br>Need to check with KBR Construction<br><br>DENY AS THERE IS NO CONFIRMATION THAT THIS WAS DONE AT KBR'S DIRECTION. | |

## PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 19 | | | Adding additional support for duct work/change it to the outdoor | | $8,000.00 | approved by Jimmy Hyde | CHECK WITH KBR CONSTRUCTION IF THIS IS OUTSIDE THE SCOPE<br>DENY AS THERE IS NO CORROBORATION THAT THIS WAS DONE AT KBR'S DIRECTION | |
| 20 | | Not in the SOW | adding 6 footings for vehicle lifting 8 ton | | $15,000.00 | approved by Wayne paris | CHECK WITH KBR CONSTRUCTION IF THIS IS OUTSIDE THE SCOPE. SOW 14.2 DISCUSSES THE LIFTS, REQ TO HAVE "4 POSTS".<br>ACCEPT, AS THE NEED FOR FOOTINGS TOR A VEHICLE LIFT WAS NOT STATED IN THE SOW. THESE FOOTINGS ARE NECESSARY IN ORDER TO PREVENT THE CONCRETE PAD FROM CRACKING. KBR Construction verified Sub was directed to perform this work. | |
| 21 | | | Adding additional angles 3 inch to the spare parts steel structure | | $8,000.00 | approved by engineer | CHECK WITH KBR CONSTRUCTION IF THIS IS OUTSIDE THE SCOPE.<br>DENY AS THERE IS NO CORROBORATION KBR DIRECTED THIS OR THAT THIS OUTSIDE THE SOW.<br>DENY | |
| | | | 20% retention of change order 14 | $ 50,000.00 | | | Subcontract Period of Performance expired on 1 April 2007. No final QAIR ever issued. DCMA will not sign off.<br>Need final Change Order to descope certain items in order for QA<br>The total retention amount held by KBR is $75,752.1 as of Nov 30 2007. Most of this will be applied to back charges for electrical, not supplying a fire suppression/alarm system, and no PA system. | |
| 22 | 2.15 | In the SOW/ bidding | All the electrical material and work | $ 75,000.00 | | Not shown in any invoice | KBR self performed the electrical work from 14 Dec 2006 onward and will be back charging as per letter to sub on 14 Dec 2006.<br>DENIED | |
| 23 | | | 2 Evaporative Cooler/ 80,000 CFM | $ 50,000.00 | | Not shown in any invoice | VRT confirmed that coolers were ordered. KBR expedited their delivery from Kuwait Free Trade Zone to the IZ via BIAP. When the coolers arrived at the IZ, they were empty shells missing engines and fans. Per KBR Legal, risk of loss, remains upon the seller.<br>DENIED | |
| 24 | | Item 6 / change order 11 | concrete Slab for steel structure | $ 100,000.00 | | Not shown in any invoice | Division 3 of the SOW requires the sub to construct two concrete slabs. Thus, this is not additional work. Also, this contract is Firm Fixed Price and the sub's invoices did not always correspond to the actual work performed.<br>DENIED | |

# PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 25 | 2.13 | Vehicle lifting 14,000 lb | Changed to 18,000 lb | | $12,000.00 | approved by Tom burger/and David Fullerton | CHECK WITH KBR CONSTRUCTION TO SEE IF WE TOLD SUB TO CHANGE 14,000 LIFT TO 18000 LB.<br>DENY, THIS WAS DONE BY THE SUB BECAUSE HE COULD NOT FIND A 14,000 POUND LIFT AS SPECIFIED IN THE SOW. | |
| 26 | | not in the S.O.W. | pour drive way pad(ramp) | | $5,000.00 | Not in the original S.O.W | CHECKED WITH KBR CONSTRUCTION. KBR DIRECTED SUB TO BUILD RAMP AS IT WAS NEEDED DUE TO HEIGHTH DIFFERENCE BETWEEN INTERIOR OF BUILDING AND STREET LEVEL.<br>THIS CONCRETE WORK WAS NOT IN THE SOW. THE SOW SPECIFICALLY STATES IN SECTION 3.2THAT THE SUB WAS TO DESIGN AND CONSTRUCT 2 NEW CONCRETE SLABS ON TOP OF THE EXISTING PAVING.." ACCEPT | |
| 27 | | | provide 3 vehicle lifting(18,000 lb) | | $15,000.00 | KBR pay 75%of the price in invoice 2 then back charged the price on invoice 3 ( KBR pay only for installation CO.14) | SOW 14.2 REQUIRES TWO 18,000LB LIFTS AND ONE 14,000 LB LIFT.<br>KBR'S MILESTONE SCHEDULE IS A PAYMENT SCHEDULE. THE SUB'S PURCHASE PRICE FOR GOODS IS FACTORED INTO THE MILESTONE AS THIS IS A FIRM FIXED PRICE TURNKEY SUBCONTRACT. NOT SPECIFICALLY SPECIFYING "PURCHASE" AND INSTALL IN A MILESTONE PAYMENT SCHEDULE DOES NOT MEAN THE SUB IS ENTITLED TO ADDITIONAL FUNDS.<br>ADDITIONALLY, KBR PAID $16,000.00 FOR THE 3 LIFTS IN ITF 10. THIS REPRESENTS $20,000.00 LESS 20% RETENTION.<br>MILESTONES DO NOT REPRESENT AN EXACT ACCOUNTING OF THE SUB'S COST, BUT RATHER REPRESENT AN AGREED SYSTEM OF PAYING THE SUBCONTRACT'S FIRM FIXED PRICE AS CERTAIN MILESTONE'S ARE REACHED.<br>CLAIM DENIED | |
| 28 | | | Demobilization | | $10,000.00 | Not in the original S.O.W & approved on CO.14 | NOT IN SOW<br>AND NOT IN CO14<br>DENIED | |

# PROFORMA INVOICE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 29 | | not in the S.O.W. | concrete slab finishing using a power floating machine& adding special cement for toughen the surface | | 18,000,00 | approved by engineer | SOW 3.3 requires special cement (sulfate resisting Portland cement) Also requires use of appropriate vibratory compaction tool. | |
| 30 | | | provide shelves for parts room | | $21,000.00 | KBR pay 75%of the price in invoice 2 then back charged the price on invoice 3 ( KBR pay only for installation CO.14) | SOW 15.7 requires adjustable shelves in parts rooms and SOW 1.1.2 states this is a "turnkey" operation and Sub is required to provide all materials. DENIED | |
| 31 | | not in the S.O.W. | provide 2 (5000 cfm) exhust fan | | $7,000.00 | approved by engineer | SOW 15.2.6 requires exhaust fans in bathrooms. DENIED | |
| | | | | [illegible] | [illegible] | Value of Subcontract: | $1,022,847.60 | |
| | | | | Total Invoices | [illegible] | Amount Retained by KBR | $76,752.21 | |
| | | | | | | Valid Claim 20 (footings for vehicle lifts) | $15,000.00 | |
| | | | | | | Valid Claim 26 (ramp) | $5,000.00 | |
| | | | | | | Amount owed to Sub after addition of claim values | $96,752.21 | |
| | | | | | | Back charge Amount for KBR Electric Work | ($60 734 20) | |
| | | | | | | Revised total owed to sub before other back charges | $36,018.01 | |
| | | | | | | Back charge amount for HVAC.. Estimate for split units supplied by KBR is based on invoice prices sub supplied for the Evaporative Coolers which arrived as empty shells. | ($25 304.56) | $3100 shipping + $22,204.56 based on invoices for empty shells. 5 Dec 2007-. |

## PROFORMA INVOICE

| | | | | |
|---|---|---|---|---|
| | | Revised total owed before back charge for fire alarm/suppression system and PA system | $10,713.45 | |
| | | Back charge Amount for Fire Suppression/Alarm System | To be determined. | KBR Estimate greatly exceed the revised total owed on the line above. |
| | | Total owed to sub on Subcontract | $0.00 | |

# Exhibit L1



4100 Clinton Drive
Houston, TX 77020
Phone: (713) 753-4012

October 21, 2010

Wamed E. J. Al-Azzawi
Al Farez-Wamed Company
General Manager
888 Williams St.
Tracy, CA-95376

Reference:

1. Subcontract 02H8-US-SJ00163 between Kellogg Brown and Root Services, Inc. and Al-Farez Wamed Company dated 01 April 2005 for Construction of Maintenance Facility in the IZ (the "Subcontract")

2. Letter from Erica Johnson to Wamedh Al-Azzawi dated 24 March 2010 – VRT Claim Analysis

3. E-mail from Tom Hudson to Wamedh Al Azzawi sent by email dated 02 May 2008, Subject: 02H8-US-SJ00163 (Construction of Maintenance Facility in the IZ) – VRT Analysis

Subject: Subcontract 02H8-US-SJ00163 (Construction of Maintenance Facility in the IZ) – VRT Claim Analysis

Dear Mr. Al-Azzawi:

Kellogg Brown & Root Services, Inc. (KBR) have at your request again carefully evaluated the claims for $985,000.00 submitted by Al-Farez-Wamed Company ("Al-Farez") for work which Al-Farez considers to be outside the Scope of Work of the above referenced Subcontract. KBR's first response to your 31 claims was issued to you on 2 May 2008, referenced above as item 3; KBR determined two of the 31 claims were valid, but were negated by credits due KBR, and 29 claims were denied because they were not outside the Scope of Work and/or were not adequately documented by Al-Farez. This position was re-stated in KBR's letter of 24 March 2010, referenced above as item 2. At this time, the KBR Vendor Resolutions Team along with Engineering, Legal, Management, and other staff have concluded the final review of all available documentation related to your 31 claims. Although it's been very challenging, we have diligently tried to work with Al-Farez, as we always have, throughout the history of this Subcontract. However, this final review uncovered no documentation or evidence which causes us to revise our position concerning your claims.

As the Subcontract is the driving force that manages the Subcontractor/General Contractor relationship held between Al-Farez Wamed Company and KBR, our current and prior evaluations were based on a review of the Subcontract, including its Scope of Work, General Conditions, Special Conditions, Attachments and change orders as well as correspondence, interviews with KBR employees, the limited documentation provided by Al-Farez and any other relevant facts made available. The Subcontract was awarded on 22 March 2005 in the Firm



Fixed Price amount of $988,500.00 for "complete, satisfactory and timely performance of the Sublet Work in strict accordance with the requirements set forth in this Subcontract" (Subcontract Terms, Article 3.0, Pricing). Through the last change order, Change Order No. 14 executed 2 December 2006, the Subcontract price increased to $1,022,848.00. This price does not reflect credits in the amount of $293,876.76 due KBR for work Al-Farez either did not perform at all or performed unsatisfactorily, which amount we have asked to negotiate with you on several occasions. Al-Farez 31 claims total $ 985,000.00.

Subcontractor's Thirty-One Claims

KBR understands and recognizes that your and our signatures on the Subcontract and all bilateral change orders represent an agreement between KBR and Al–Farez that both parties will comply with the Subcontract, and any change orders, such as changes to the periods of performance and price adjustments. Pursuant to Subcontract Special Conditions Clause 4.0, in part, "Contractor may, at any time... by written order designated or indicated to be a change order, make changes in the work within the general scope of the Subcontract... Any other written or oral order... from the Contractor that causes a change shall be treated as a change order under this clause; provided the Subcontractor gives the Contractor written notices stating the date, circumstances and source of the order and that Subcontractor regards the order as a change order. Except as provided in this clause, no order, statement, or conduct of the Contractor shall be treated as a change order under this clause or entitle the Subcontractor to an equitable adjustment." Also refer to General Conditions Article 8, including 8.1.7 "The equitable compensation and time adjustment pursuant to this Article shall be Subcontractor's sole entitlement for the performance of a change in the Sublet Work. "

Understanding this, we re-evaluated your claims and compared each claim to the original Scope of Work, as well as each revision to the Scope of Work. The revisions to the Scope of Work were incorporated by Change Order No. 3 (Revision 3), Change Order No. 5 (Revision 4), and Change Order No. 14 (Amended Revision 4). Al-Farez agreed to all of these change orders, including compensation, as evidenced by its signature.

**THE FOLLOWING CLAIMS WERE FOUND TO BE WITHIN THE SCOPE OF WORK AND THE SUBCONTRACT FIRM FIXED PRICE. EVEN IF THESE CLAIMS WERE DETERMINED TO BE WITHIN THE SCOPE OF WORK, AL-FAREZ HAS PROVIDED NO WRITTEN DOCUMENTATION TO SUPPORT THE CLAIMS.**

**Claim No. 1 – Provide 100KV Generator fuel and one year maintenance**

KBR previously determined that the work described in Claim No. 1 was within the Scope of Work. After additional review, KBR has confirmed the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Scope of Work Revisions 3 and 4 for the following:

1.1.8: Provide one year warrantee on all labor, material, and equipment

16.3: Provide, deliver, install and test electric power and equipment for the new Vehicle Maintenance Facility and associated equipment including lighting, outlets, HVAC, and equipment.

**Claim No. 4 – Demolish the main office concrete slab 20 cm thick**

KBR previously determined this work was within the Scope of Work. After additional review, KBR has confirmed the work is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

2.13: Subcontractor to demo existing slab, remove debris, add sub-base, grade and compact. Jackhammer old pavement, remove the 40cm thickness of debris, add 15cmf sub-base

providing a level site grade.

Change Order No. 5 revised the Scope of Work and added additional work, as well as added funds to the Award to cover the additional work. (*Please see Attachment A*).

**Claim No. 5 – Add sub-base over the main office area (40 cm) and compact**

KBR previously determined that this work was within the Scope of Work. After additional review, KBR has confirmed the work is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

2.13: Subcontractor to demo existing slab, remove debris, add sub-base, grade and compact. Jackhammer old pavement, remove the 40cm thickness of debris, add 15cmf sub-base providing a level site grade.

Change Order No. 5 revised the Scope of Work and added the additional work, as well as added funds to the Award to cover the additional work. (*Please see Attachment A*).

**Claim No. 7 – Add 7 steel columns with footing in the Mezzanine**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

5.2: The contractor will design, furnish, and install all structural elements of the building: steel columns, beams and trusses. All designs and materials (samples) shell be approved by KBR engineering.

**Claim No. 12 – Four rolling up doors**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

8.1: The contractor needs to provide four outside rolling doors at least 25' wide and 16' height for convenience of vehicle traffic. The contractor shall provide the designs for the motor and wiring for all the doors.

**Claim No. 13 – Add additional steel structure over the doors and cladding**

KBR Engineering previously determined that this work was necessary to prevent doors from being damaged. Therefore, it was determined that this is within the Scope of Work. After additional review, KBR has also determined that the work provided was standard practice and also within the Scope of Work and within the Subcontract Firm Fixed Price. Please see the original Scope of Work (2.1.6), which was changed to Revision 3 (1.1.6), and Revision 4 (1.1.6). Also, the same standard is required by the General Conditions to the Subcontract. Please consider for the following:

1.1.6: Work shall be done in a workmanlike manner using the best trade practice. All new work shall comply with the International Building Code (all trades).

Gen Cond. 1.2.1: Subcontractor shall perform all work which is manifestly necessary to carry out the intent of the latest revision of the drawings and specifications pertaining to the Sublet Work which have been issued for Subcontractor or which is customarily done in performing this type of work.

Gen Cond. 1.2.2 Subcontractor agrees to perform the Sublet Work in accordance with good construction practice...

**Claim No. 14 – Covered the roof structure of the factory with corrugated steel sheets. Change it to sandwich panel/7.5 cm thick**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see the original Scope Work (2.7.3), which was changed to Revision 3 (7.2), and Revision 4 (7.2) for the following:

7.2 Provide and install insulation panels for all outside walls and the roof construction. Provide sample to KBR Engineering for final approval.

**Claim No. 24 – Concrete slab for steel structure**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

3.2 Design and construct 2 new concrete slabs on top of the existing paving with the following dimensions 33 x 37 meters and 12 x 33 meters.

**Claim No. 29 – Concrete slab finishing using a power floating machine & adding special cement to toughen the surface**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

3.3 For the slab furnish and install including all forms and materials 8" (20cm) 4000 psi hard rock concrete in compliance with Section B8 for Standard Road Specifications for Roads and Bridges for the Republic of Iraq as directed by a KBR authorized representative, concrete Portland Cement Concrete shall be as specified in section R10 of the Iraq Standard Specification for Roads and Bridges. All aggregate shall be gravel for appropriate concrete.

All concrete for foundations (and in contact with earth) should use type V sulfate resisting Portland cement. All other concrete should consist of I-II class Portland cement.

All concrete shall be consolidated by vibratory compaction tool of appropriate size and shape.

Concrete will be poured out of a truck or filled mixed with at least 3 machines x1m3 in order to provide good quality without cold joints inside of the slabs and fast delivery.

Provide Reinforcing Steel (1/2" Grade 40 Rebar) in the top and bottom of the slab. Rebar shall be embedded a minimum of 1-1/2" (4cm) from surface.

All rebar shall be ASTM A615M, metric rebar specification. Grade 300 for bar 12 mm and grade 400 for all other sizes.

Provide reinforcing steel imbedded in concrete as necessary to guarantee a strong and sufficient installation, must meet KBR approval.

Cure the concrete.

**Claim No. 30 – Provide shelves for parts**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see the original Scope of Work (2.1.2), which changed to Revision 3 (1.1.2 and 15.7), and Revision 4 (1.1.2 and 15.7) for the following:

1.1.2 This is a turnkey project and all material, labor and design to make a complete functional system shall be provided.

15.7 Furnish and install adjustable shelves 20" single way (40" double row) in parts room

**Claim No. 31 – Provide 2 (5000 cfm) exhaust fan**

It was previously determined that this was within the Scope of Work. After an additional review, KBR has also determined that the work provided is required by the Scope of Work and within the Subcontract Firm Fixed Price. Please see Revisions 3 and 4 for the following:

15.2.5 Include exhaust fans in all restrooms…

**THE FOLLOWING CLAIMS INVOLVE SUBSTITUTIONS OR CHANGES BY AL-FAREZ (ON ITS OWN INITIATIVE AND WITHOUT A WRITTEN CHANGE ORDER) TO THE WORK, TIME, OR MANNER OF PERFORMANCE. ALSO, AL-FAREZ HAS PROVIDED NO WRITTEN DOCUMENTATION TO SUPPORT THESE CLAIMS.**

Please note that Sections 4.4 and 8.1 of the General Conditions of the Subcontract state the following:

4.4 Substitution Subcontractor shall not substitute materials or equipment for those specified nor otherwise deviate from the requirements of this Subcontract without General Contractor's written consent.

8.1.1 Changes No change shall be made by Subcontractor in the Sublet Work or the time or manner of its performance, without prior written instructions from General Contractor in a written Change Order specifying the change in plans, specifications, procedures, time, sequence, or other requirements of this Subcontract, and specifying whether there is to be an adjustment in the compensation or time for performance and how any such adjustment shall be determined.

**Claim No. 2 – SOW required continuous foundation 50 cm x 80 cm. Did separate footings and tie-beams**

It was previously determined that Al-Farez was never directed to add separate footings and tie-beams, which were a deviation and not included in the Scope of Work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the deviation was previously approved by KBR in writing.

**Claim No. 3 – Demolish 6 failure footings/and do it again**

This was not included in the Scope of Work. It was previously determined by KBR that Al-Farez used substandard concrete instead of what was directed in the Scope of Work. KBR suggested Al-Farez return to his supplier to get a refund. After an additional review, no evidence could be found that KBR was presented with a written request to substitute materials or for additional funds due to the work. Further, no evidence was found that a written request for additional work, which would result in increased costs, was approved by KBR. Because the work Al-Farez originally performed did not meet Subcontract specifications and was deficient, Al-Farez is obligated to perform corrective work at its own cost and expense.

**Claim No. 6 – Adding 7 concrete columns in the office area, with its footing and the beams**

It was previously determined by KBR that Al-Farez added these columns to remedy problems Al-Farez caused because he used substandard steel support columns that did not meet specifications. The columns were not included in the Scope of Work. After an additional review, no evidence could be found that Al-Farez was entitled to be paid increased costs for this work or that were previously approved for payment by KBR in writing. Not only was the work Al-Farez originally performed defective but the addition of concrete columns did not remedy or correct the serious problems created by Al-Farez' poor construction practices. Because the work Al-Farez originally performed did not meet Subcontract specifications and was deficient, Al-Farez is obligated to perform corrective work at its own cost and expense.

**Claim No. 8 – Increasing the side-entrance corridor width from 1.5m to 2m**

This was not included in the Scope of Work. It was previously determined that Al-Farez was never directed to do this work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the deviation in the specifications was previously approved by KBR in writing.

**Claim No. 9 – Adding terrace in the main office**

The Scope of Work included second floor office space in the vehicle maintenance facility. Due to poor construction work by Al-Farez, this area is not habitable and cannot be used for an office, a terrace or much of anything else. The terrace is still roped off as it is not safe and not usable for its intended purpose.

It is completely absurd that we are being asked to pay for a "terrace" that was intended for use as office space. KBR never received the benefit of having functional office space on the second floor of the vehicle maintenance facility due to the Subcontractor's poor construction practices, negligence and other fault. No evidence could be found that KBR was presented with a written request for additional funds due to the work your company was asked to perform that would result in increased costs. Further, no evidence was found that a written request for additional work, which would result in increased costs, was approved by KBR.



**Claim No. 10 – SOW required concrete blocks 20/20/40. Building with thermo-stone (25cm width x 20cm height x 45 cm long)**

It was previously determined by KBR Construction that Al-Farez wanted to use thermo-stone because it was cheaper for Al-Farez. It was also previously determined Al-Farez was never directed to deviate from the Scope of Work or substitute materials. After an additional review, no evidence could be found that Al-Farez was directed to deviate from the work, or that the substitution added increased costs that were previously approved by KBR in writing.

**Claim No. 11 – Add side-kick tile**

It was previously determined that Al-Farez was never directed to do this work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing or that the work was in the Scope of Work.

**Claim No. 15 – Cover front of building with ceramic tile**

It was previously determined that Al-Farez performed this work on his own initiative. Revisions 3 and 4 of the Scope of Work state the following:

4.2 Construct all outside walls of the new facility out of light concrete blocks and insulation panels. Submit plan details to KBR for approval.

After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing or that the work was included in the Scope of Work.

**Claim No. 17 – Adding additional windows/additional flashing & purlines**

This work was not included in the Scope of Work. It was previously determined that Al-Farez performed this work on his own initiative. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing.

**Claim No. 18 – Mezzanine 2nd floor was made with metal-wood. Mezzanine in 2nd floor all made by steel structure**

It was previously determined that Al-Farez was never directed to do this work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing.

**Claim No. 19 – Added additional support for duct work/change it to the outdoor**

It was previously determined that Al-Farez was never directed to do this work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing, or that the change was necessitated by changed conditions not caused by Subcontractor.

**Claim No. 21 – Added additional angles 3 inch to the spare parts steel structure**

It was previously determined that Al-Farez was never directed to do this work. After an additional review, no evidence could be found that Al-Farez was directed to do this work, or that the substitution added increased costs that were previously approved by KBR in writing.

**Claim No. 22 – All electrical work and material**

It was previously determined that all electrical work from 14 December 2006 will be backcharged. Al-Farez was notified by e-mail dated 14 December 2006 that KBR would self-perform the electrical portion.. Al-Farez was given multiple opportunities to correct its performance of the electrical work. As a result of Al-Farez' continued failure to meet the schedule and correct deficiencies, as well as failure to respond to countless requests for the electrical drawings, and placing the project in jeopardy of failure, KBR had no alternative but to take over this work in the interest of the project. It has been determined on second review to uphold the backcharge. (*See Attachment B*)

**Claim No. 23 – Evaporative Coolers**

It was previously determined that there would be a charge for the two evaporative coolers and related work. The coolers arrived as empty shells and were not even functional. Please consider Section 6.1.2 of the General Conditions, which places responsibility for materials and equipment on Al-Farez and makes Al-Farez liable for the full risk of loss.

As a result of the arrival of the defective coolers, KBR had to self-perform this work.

**Claim No. 27 – Provide 3 vehicle lifting (18,000lb)**

Section 14.2 called for the following:

14.2 The contractor shall install 2 x 18,000lbs (8200 kg) vehicle lifts and 1 x 14,000 lbs (6400 kg) lift. These lifts shall have 4 posts and should be able to run with 220v/50HZ current.

KBR Engineering and Construction stated that Al-Farez provided three 18,000lb lifts due to availability. After an additional review, no evidence could be found that Al-Farez was directed to install an 18,000 lbs lift instead of a 14,000 lbs lift, or that the substitution added increased costs that was previously approved by KBR in writing. Al-Farez made the decision to perform using the more expensive equipment.

**Claim No. 28 – Demobilization**

Demobilization was not in the Scope of Work and not in Change Order No. 14. After an additional review, no evidence could be found that Al-Farez was directed to charge demobilization costs in addition to the Firm Fixed Price, or that demobilization costs were previously approved by KBR in writing as an additional cost.

<u>Work Determined to be Outside the Scope of Work</u>

It was previously determined that the following work was outside the Scope of Work and in compliance with the Subcontract and General Conditions:

- KBR directed Subcontractor to build ramp as it was needed due to height difference between interior of building and street level. $5,000.00

- KBR directed Subcontractor to add 6 footings to an 8-ton vehicle lift — $15,000.00
- **TOTAL** — **$20,000.00**

After second review, KBR will uphold that decision.

<u>Subcontractor's Delay Invoice</u>

In your 7 April 2007 letter to the Client and original claim package to KBR, you did not include a claim for delay. However, in consideration of your email of 01 October 2010 to me, Harold Davis, regarding delay and the email you forwarded from Tyson Kiser dated 01 April 2005 which you described as evidence of delays directed by KBR, KBR has again reviewed a document entitled "Delay Invoice." In that document, we found the following information:

| Item | Company Position | No. | Payroll Per Day | Total Delay Time | Total Amount |
|---|---|---|---|---|---|
| 1 | Project Manager | 1 | $500.00 | 540 days | $270,000.00 |
| 2 | Engineers | 5 | $100.00 | 540 days | $270,000.00 |
| 3 | Foremen | 6 | $70.00 | 540 days | $226,800.00 |
| 4 | Laborers | 40 | $40.00 | 540 days | $864,000.00 |
| 5 | Expenditures | | $300.00 | 540 days | $162,000.00 |
| **TOTAL AMOUNT** | | | | | **$1,792,800.00** |

KBR finds your allegation of experiencing a financial hardship in the amount of $1,792,800.00 due to a 540-day delay period without merit due to the following:

- Al-Farez was issued a Limited Notice to Proceed on 5 July 2005 to begin demolition work
- Lack of supporting documentation of staff of 52 personnel holding the positions that are mentioned above
- Lack of supporting documentation for the expenditures by line item. (Your company was paid for the materials that were brought on site. Also, KBR documented your lack of resources and inability to provide sufficient equipment.)
- Multiple issues throughout the period of performance due to delays caused by Al-Farez and other performance issues, including lack of resources, failure to follow the Scope of Work, specifications, drawings and schedule, or otherwise comply with Subcontract requirements
- Failure of Al-Farez to respond to KBR notices of deficiencies that were seriously impacting the work, including but not limited to:
  - 28 December 2005 E-mail from Joseph Affatato notifying Al-Farez that its performance was putting its contract in jeopardy,
  - 05 August 2006 Notice of Deviation from Scope of Work and Schedule-Request for Corrective Action,
  - 13 September 2006 Stop Work Order
  - 17 September 2006 Letter of Concern,
  - Cure Notice,
  - 14 December 2006 e-mail notifying Al-Farez that KBR would self-perform the electrical portion of the work
  - 26 January 2007 letter regarding KBR self-performance of various items of work.

In response to your request, KBR is willing to consider the following:

- Evidence of incurred costs directly resulting from delay during the period from 1 April 2005 through 5 July 2005, which are not caused by or resulting from the actions or inactions of Al-Farez.

- In order to compensate you for costs incurred as a result of delay during the period from 1 April 2005 through 5 July 2005, we will need proof of those costs, including but not limited to the following:
  - Names of all employees employed from 1 April 2005 through 5 July 2005
  - Signed timesheets during the delay period for those named employees that were employed between 1 April 2005 through 5 July 2005
  - Badging information for those named employees that were employed from 1 April 2005 through 5 July 2005
  - Proof of amounts paid to these employees
  - Any information detailing an established man camp
  - A list of what work was performed from 1 April 2005 through 5 July 2005
  - Any other document that would provide proof of what was previously mentioned between 1 April 2005 through 5 July 2005

**NOTE:** Al-Farez was compensated for the materials brought on site. Al-Farez was also compensated for the demolition work that KBR asked you to perform on the Limited Notice to Proceed. You were also compensated for the asbestos work that we asked you to perform after the Limited Notice to Proceed. (*See Attachment C*). The asbestos work was added to the Scope of Work by Change Order No. 3 (*see Attachment D*) and demolition work was added to the Scope of Work by Change Order No. 5. (*See Attachment A*).

<u>KBR's Backcharges</u>

KBR has previously warned Al-Farez that lack of performance would result in backcharges. (*See Attachment E*) Al-Farez' refusal to perform work, performance outside the Scope of Work, mismanagement and other failures and deficiencies resulted in many problems for the project. Instead of terminating Al-Farez for default, KBR accommodated changes to the period of performance and renegotiation of the Subcontract with new pricing schedule in order to give Al-Farez yet another opportunity to comply with the Scope of Work, schedule and other Subcontract requirements.

KBR intends to assert the following backcharges or credits against Al-Farez:

| | |
|---|---|
| ▪ Fire suppression/alarm system | $207,838.00 |
| ▪ Split HVAC units | $25,304.56 |
| ▪ Electrical work | $60,734.20 |
| ▪ **TOTAL** | **$293,876.76** |

<u>Conclusion</u>

KBR believes that it has given every opportunity to reach a solution with Al-Farez on multiple issues during and after the period of performance. KBR has tried to work through your company's deficiencies, lack of resources, and noncompliance to KBR's administrative processes for quite some time. Because of your repeated appeals for further review, we have reconsidered your claims, explained KBR's position to you, and are still trying to reach a solution with you. We request that you consider the package that we've sent you and provide all the documentation that we've requested in this letter or in previous communications, or any form of relevant documentation that will support your claims in accordance with the Subcontract and KBR's requests. Please **only** provide those documents that relate to what was stated above. Al-Farez must support each claim for additional compensation with evidence of (1) your original direct estimate and (2) what you were paid so that a cost differential can be ascertained. You must also provide the requisite written proof to show that Al-Farez was directed to perform the specific work and that KBR approved the additional costs.

Al-Farez should respond in writing, with the requisite support, no later than November 15, 2010 to the following address:

**Erica D. Johnson**
**4100 Clinton Dr., Houston, Tx 77020**
**Bldg: 03/870G**

As KBR has previously informed Al-Farez, the documentation available to KBR does not support your request for payment. **Therefore, if Al-Farez fails to provide KBR with a written response along with the requisite support to this request by November 15, 2010, consider this letter as notice of KBR's final determination that 29 of the group of 31 claims and any delay claim are without merit and are denied.** KBR will then move forward and assert its backcharges against Al-Farez, after applying a credit of $20,000.00 for the two claims KBR has determined were outside of the Scope of Work and in compliance with the Subcontract and General Conditions.

If KBR receives a timely and appropriate written response with documentation as required, please allow ten business days for your submission to be reviewed. KBR will then contact you with a final determination. If we can not reach an agreement, you can pursue your rights under the "Disputes" provisions of the Subcontract.

Your response to these matters will be greatly appreciated.

Respectfully,

Harold Davis,
Manager, Vendor Resolutions Team

Enclosures